## IN THE  UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN  DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ELIJAH DEWAYNE JOUBERT, | § | |
| | § | |
| Petitioner | § | |
| | § | |
| v. | § | No. 4:13-CV-03002 |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice - | § | |
| Correctional Institutional Division | § | **DEATH PENALTY CASE** |
| | § | |
| Respondent | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY AN INMATE IN STATE CUSTODY

### I.   Preliminary Statement

Mr. Elijah Dewayne Joubert, TDCJ Inmate Number 999492 files this first federal petition for writ of habeas corpus challenging his conviction and death sentence.   Mr. Joubert's was convicted and sentenced to death for the shootings of Alfredia Jones and Houston Police Officer Charles Clark during a store robbery in Houston in April 2003.  He was convicted largely upon the testimony of his cooperating co-defendant, Deshon Glaspie, who avoided his own trial for capital murder and obtained a lenient sentence to a lesser-charge in exchange for his testimony.   Following Mr. Joubert's trial, evidence has come to light in the state post-conviction proceedings for Mr. Joubert's   death sentenced co-

1

defendant, Alfred Dwayne Brown, that Glaspie presented false testimony and the State withheld evidence which could have challenged Glaspie's recounting of events.   This information was material toward Mr. Joubert's case also and would have been critical in the jury's determination of whether Mr. Joubert was worthy of a death sentence based on the facts established by Mr. Glaspie's testimony.

In addition,   Mr. Joubert has raised evidence which reflects that trial counsel, while pursuing a strategy, undermined that strategy by failures to investigate potentially material evidence of neuropsychological impairment which was consistent with the defense strategy, as well as failed to prepare for the case, resulting in the exclusion from evidence of important parts of the defense's punishment case.

When these issues are viewed individually or in combination, it is clear that Mr. Joubert did not receive a fair trial. He is entitled to relief.

## II.  Jurisdiction

This Court has subject matter jurisdiction of this case under  28 U.S.C. § 2241(d). Mr. Joubert   was indicted for the offense of capital murder in the 351st District Court of Harris County, Texas, which is in the Houston division of the Southern District of Texas. Mr. Joubert  is in the custody of the Texas Department  of Criminal Justice in accordance with this judgment and death sentence.   Under 28 U.S.C. §  2244(d)(1), a petition filed on or before September 24, 2014, is timely.

2

### III.  Procedural History

A.     Trial

Mr. Joubert was represented by appointed counsel, Mr. Jerome Godinich, as lead counsel, and Mr. Alan Isbell, as second chair counsel.

I.     Guilt - Innocence phase of trial

The  trial record reflects that on April 3, 2003  three individuals committed an armed robbery of the ACE Cash Express check cashing store located at 5700, South Loop East in Houston.   During the robbery,   ACE employee Alfredia Jones was killed by a gun shot to the head caused.   [28 R.R.: 95].   A second victim,   Houston Police Department Officer Charles Clark was killed with a second weapon.[1]    [28 R.R.: 95].   Acting on information received during the investigation,    officers from the Houston Police Department arrested Petitioner, Mr. Joubert,  on April 4, 2003. [26 R.R.: 193; 27 R.R.: 193 - 195].   On that same day,  police arrested co-defendant Dashon Glaspie, and co-defendant Alfred Dwayne ("Dobi") Brown.   [27 R.R.: 105 - 106; 28 R.R.: 29 - 32].

There were no eye witnesses to the robbery itself and the incident was not captured on video camera.    There were, however, witnesses placing Mr. Joubert in the company of the two co-defendants on the morning of the robbery.    Alisha Hubbard, a resident of the Villa American Apartments, observed Dashon Glaspie,   Mr. Joubert, and Alfred Brown gathered together by Glaspie's  around 8:15 a.m. on April 3, 2004. [26 R.R.: 206 - 207].  As

---

[1]  A .380 caliber projectile was recovered during Clark's autopsy, but the bullet did not matched to any recovered weapon.   [28 R.R.: 76 - 77; 153 - 156].

3

she walked by, she overheard Glaspie asking the others whether they were "ready to go do it."   [26 R.R.: 207].   Hubbard also observed Glaspie  loading bullets into the clip of his pistol, insert the clip into the weapon, and then load another clip. [26 R.R.: 220  – 223].

Later that morning, around 8:45 a.m.,  Alisha's sister,  LaTonya Hubbard, stopped at a gas station on Telegraph and Alameda when she observed Mr. Joubert and Brown, standing next to a White Grand Am belonging to Glaspie's girlfriend, parked at as pump.  [26 R.R.: 182 - 183].   Glaspie exited the convenience store and approached the car.  [26 R.R.  177 - 187].

James Wheat, a wrecker driver and friend to the deceased officer had been speaking with Clark when he received a robbery call and  followed Clark to the scene of the robbery-in-progress. [26 R.R.: 44 - 46].   There was a white car parked in front of the check cashing store.  [26 R.R.: 49].   Clark went to investigate while Wheat remained behind calling for assistance. [26 R.R.: 50].  Within seconds, three black males exited the store, entered the white car, backed up, and drove off. [26 R.R.: 50 - 51, 56 - 57].  Approaching, Wheat observed Clark laying by the front door to the check cashing store, injured.   [26 R.R.: 52 - 53].  Wheat stared into the store and observed Jones on the floor, still alive. [26 R.R.: 54].   At trial, Wheat did not identify any of the individuals exiting the store.

Randy Love, a courier testified he was sitting in highway traffic passing by the strip center containing the check cashing store when he saw a police officer crouching by the door, and then heard two gunshots. [26 R.R.: 137].   As Love drove past, he observed a black male

emerging from the store and standing over the officer, with his hand extended. [26 R.R.: 138 - 140, 158 - 159].

Sheikah Mohammed Afzel, an employee at Affordable Furniture, a discount furniture store located in the same strip center as ACE Check Express testified that shortly after opening the store on April 3, two men entered separately and briefly looked around at furniture. [26 R.R.: 242, 245  – 246]. From a photograph, Afzel tentatively identified, Dashon Glaspie as one of the men in his store, and Doby Brown, as the other. [26 R.R.: 246 - 248 ]. The two men conferred in the store and then both exited, walking in the direction of the check cashing store. [26 R.R. 249 - 250, 255].

A second furniture store employee, Shoukat Hussein, testified that two black males came into the store in the morning of April 3, looked around briefly, and then left, heading toward the check cashing store. [26 R.R.: 277 - 283]. He heard two shots "a few seconds" later. [26 R.R.: 284]. Hussein went outside and saw a police officer on the sidewalk. [26 R.R.: 285]. Hussein identified Glaspie and, tentatively Brown from a photograph. [26 R.R.: 280].

Police recovered one of the firearms used in the robbery, a .45 caliber Heckler & Koch pistol equipped with a laser sight. [ 27 R.R.: 96 - 98; State's Exhibit 148]. George "Ju-Ju" Powell, who frequented the apartment complex where Mr. Joubert lived, the Villa American Apartments, testified that at some point in the morning on April 3, 2014, as was returning to his friend Noonie's apartment he came upon Dashon Glaspie, standing by a white vehicle

5

and  arguing with Mr. Joubert in the parking lot. [27 R.R.: 12 - 13, 19 - 20].   Mr. Joubert

walked off.   [27 R.R.: 13, 19].   Glaspie asked Powell to hold his gun and gave him  a .45

caliber H & K semi-automatic pistol with a laser sight. [ 27 R.R.: 15 - 17].   Powell took the

pistol to his friend's house and hid it.   [27 R.R.: 22].

Thomas "Muff" Jolivette testified that in the afternoon of April 3, he purchased a .45

caliber semi-automatic pistol with a laser sight from his friend, "Ju-Ju" at the Villa American

apartments, identifying State's Exhibit 48 as the weapon. [26 R.R.:  230 -233].   Jolivette

purchased the pistol to share it with his cousin, Rayfael Viverette. [26 R.R.: 234 - 236].

Rayfel  "Noonie" Viverette testified that on April 3, his cousin came to his apartment

and showed him a black gun that he had just purchased.   [26 R.R.: 260 - 261].   Viverette

took the gun and  carried it with him throughout the rest of the afternoon.   [26 R.R.: 262 -

263].   The next day, Viverette learned that the police were out in force throughout the VA

Apartments and searching for him,  so he placed the pistol in a diaper bag and dropped it

outside of his window. [26 R.R.265 - 266].   After meeting with the police and consenting

to a search of his apartment, Viverette was persuaded to reveal the location of the pistol, but

it was missing when the police searched.   [26 R.R.: 268 - 269].

Latruscheva "Monique" Jenkins, another VA Apartments resident, obtained the

diaper bag and pistol from a mutual friend of hers and Rayfel Viverette and ultimately turned

it over to the police. [27 R.R.:  79 - 82].

Police recovered several projectiles and shell casings from the interior of the ACE

6

Cash Express:  a .45 caliber projectile and shall casing,   two .380 caliber shell casings  and a 9 mm projectile,  the latter believed to have been fired from Officer Clark's weapon.  [28 R.R.: 124 - 125,  145 - 147, 152 - 154].    Ballistics testing on the recovered projectile believed to have killed Afreidia Jones matched to Glaspie's .45 caliber pistol.  [ 28 R.R.: 165 - 169].

The weapon believed to have killed Officer Clark  was never recovered.

Testing for gunshot residue  on Glaspie's hands  was inconclusive; the samples taken from Glaspie's hand the day after the shooting did not contain residue. [ 28 R.R.  112 - 113]. The State presented no testimony about residue testing on Mr. Joubert's hands.

The State did not present any DNA evidence relating to Glaspie's .45 caliber pistol.

Following his arrest,  Mr. Joubert was interrogated  by Homicide Detectives James Binford and W.O. Allen in the offices of the Houston Police Department Homicide Division. As  an  interrogation  ploy,  the  detectives  played  him  portions  of  the  tape  recorded interrogation of Glaspie.  After hearing portions of the recording, Mr. Joubert agreed to give an oral statement, a video recording of which was admitted into evidence as State's Exhibit 2 and published to the jury.   [27 R.R.: 221; 28 R.R.: 10].

Mr. Joubert told the police that the had been pressured by Glaspie into participating in the robbery.   He denied having a gun during the robbery or shooting anyone.   He explained that  Glaspie had loaned him money to post bond on a drug case.  Glaspie robbed people for a living and carried a gun, a black .45 caliber  semi-automatic pistol equipped with

a laser sight.   After helping him bond out of jail, Glaspie started to intimidate Joubert into participating in robberies.   Joubert had nowhere to flee because Glaspie knew all of his haunts, and he worried that Glaspie would harm him or his family if he refused to help.

On the morning of the robbery,  Glaspie located him at A.D. Brown – Doby Brown's brother's – house.    Glaspie was driving his girlfriend's 1995 white Grand Am..  Doby Brown was already inside the car.    They drove to a store on Telegraph Road.  Joubert, who was armed, and Doby, who had a gun, exited the car and approached the store.   They observed a man standing by the store who was armed, so Doby and Joubert returned to the car and they all drove back to the VA Apartments.    Back at the VA, Doby suggested robbing the ACE check cashing store so Glaspie drove them to the store and parked.  Glaspie and Doby got out the car.

A women parked in front of the store and started to open the door.   Joubert got out of the Glaspie's car, approached with his hand in his pocket to appear that he had a gun, and then followed her inside.    Doby entered the store after Mr. Joubert, and then let Glaspie inside.  Both Doby and Glaspie were armed; Doby with a small automatic, and Glaspie with his .45.

While inside the store, the woman made a phone call to another store to tell them that she had opened the store.   A short while later, a police officer appeared and Doby ran to the front door.   The officer backed out while firing a shot.  He then peeked back into the front door and Doby shot him.

8

Joubert and Glaspie then started to flee.  Glaspie hd the woman by her neck and shot her.   Both fled th store, got into the waiting car, Doby at the wheel, and drove back to the VA.  Once back at the VA Apartments, the three split up.   Joubert later burned the clothing he had worn during the robbery.   [27  R.R.: 215, 221; 41 R.R.: SX 2].

Dashon Glaspie testified the State's star witness.  Glaspie admitted that he had accepted a plea offer of 30 years on a reduced charge of Aggravated Robbery  to testify against Mr. Joubert, continent that he testify "truthfully."[2]   [29 R.R.: 9 -   11].  Glaspie understood his plea deal to have  also been contingent upon him being the non-shooter.  [29 R.R.: 9 - 10, 12].

Glaspie and Mr. Joubert were life-long friends, having grown up together in the VA Apartments.   Glaspie he had a conversation with Joubert on April 2 about  a robbery on a check cashing store on Telephone and Alameda-Genoa.  [29 R.R.: 13 - 14].  Joubert agreed

---

[2]  The prosecutor emphasized this point, that Glaspie testify completely truthfully:

| [Prosecutor]: | Okay.   What if you – what if you tell the truth about 99 percent of everything and you mislead u os on one tiny thing, what happens on the deal? |
| A: | Then it's off.  I don't' have – I don't have the deal.  I'll be prosecuted for capital murder. |
| . . . | |
| Q: | So if you lie about anything, even a small thing,   you are eligible for the death penalty? |
| A: | Yes. |

[29 R.R.: 12].

to do the robbery.  Later that evening, Glaspie called Doby Brown and recruited him on the robbery. [29 R.R.: 15 - 16].  The next morning,  Glaspie called Doby to check out the check cashing store, and then called Mr. Joubert shortly thereafter.   [29 R.R.: 18].

Glaspie acknowledged that the H & K .45 semi-automatic pistol used in the robbery, State's Exhibit 215, was his gun.   [29 R.R.: 19 - 20, 112].    He habitually carried the gun with him.   [29 R.R.: 128].

Glaspie borrowed his girlfriend, Tonikia Hutchins's white Grand Am to commit the robbery because it was a smaller car that he anticipated would not be associated with being involved in a robbery.   [29 R.R.: 21 - 22].  He picked up Doby Brown from his girlfriend's residence, and then drove to the VA Apartments to pick up Mr. Joubert. [29 R.R.: 23 - 24]. They eventually made it to the prospective robbery location,  but abandoned  the plan when the  man opening the check cashing store observed them and displayed a gun. [29 R.R.:  29 – 33].   They returned to the VA apartments where  – at Doby Brown's suggestion – they formed a new plan, to rob the ACE cashing store. [29 R.R.: 36 - 37].  He noted that Mr. Joubert readily agreed to the plan and did not need coercion. [37 R.R.: 38].

Doby Brown directed them to the ACE check cashing store where they parked and waited for it to open.   [29 R.R.: 38 - 41].  While waiting, Mr. Joubert inquired about Glaspie's gun and grabbed it from its hiding place in order to  commit the robbery.  [29 R.R.: 40 - 41]. Glaspie and Brown exited the car and went into a nearby furniture store to pass the time, leaving Joubert alone in the car to wait for an employee to arrive and open the store.

10

[29 R.R.: 42, 46].    The plan was for Joubert to hold the store employee  who arrived at gunpoint and get inside the store; Glaspie was only supposed to be the driver and had not planned to enter the store.  [29 R.R.: 43].

After a while, Brown left the furniture store, Glaspie following a few minutes later. [29 R.R.: 47].   Glaspie waited inside the empty car for a few more minutes, then walked to the ACE check cashing to see why the robbery was taking so long.  [29 R.R.: 47 - 48].  He entered the store and saw Joubert with a female clerk in the both. [29 R.R.: 49].  Doby was holding open  the door to permit entry into the booth.    [29 R.R.: 51 - 52].   Joubert was holding Glaspie's pistol to the clerk's head while she knelt at the store's safe. [29 R.R.: 55] The store phone rang and Joubert instructed the clerk to answer it.  She gave terse answers and then hung up.   [29 R.R.: 56].

Glaspie went into the bathroom area to search for surveillance camera; on returning, he heard the sound of a police radio and observed a police officer in the lobby.   [29 R.R.: 57 - 59].  Doby moved toward the door, and  Joubert, grabbing the clerk by her shirt, moved behind Doby.  [29 R.R.: 60 - 61].  Doby passed into the lobby and Glaspie heard "a few" shots.  [29 R.R.  62].  Joubert, grabbing the clerk, also moved into the lobby, followed by Glaspie. [29 R.R.: 63].    Joubert told Glaspie that "this bitch played us, man", raised his elbow and shot the clerk.   [29 R.R.: 64, 65].  Joubert and Glaspie ran out of the store to the waiting car.  Doby was in the driver's seat and they drove off. [29 R.R.: 66 - 67].  At some point during the drive,  Joubert moved from the back seat to the front passenger seat, leaving

Glaspie's pistol with him in the back seat.   [29 R.R.: 67, 68].   He noticed Doby's gun, a

chrome semi-automatic was also left in the back, on the floorboard. [29 R.R.: 68].

They returned to the VA apartments and went to a friend, Nikki Colar's apartment.

[29 R.R.: 69 - 70].   Before leaving the parking lot, Glaspie wrapped his .45 pistol in a t-shirt

he had in the car and gave it to "Ju-Ju," who happened to be ambling by, asking him to hold

the weapon because the  police were in the area.   [29 R.R. 71 - 72].   Glaspie went inside

Nikki Colar's apartment and, along with Joubert, changed into different clothes. [29 R.R.:

74].   Glaspie denied calling anyone on his phone in Nikki's house and specifically denied

he admitted to anyone that he shot the woman in the ACE check cashing store.[3] [29 R.R.: 74,

165 - 166].   The three of them, Glaspie, Joubert, and Brown walked to another friend's

apartment, remaining for a while, and then separated and left. [29 R.R.: 74 - 75].    Reports

of the robbery was breaking on the morning television news. [29 R.R.: 75].   Glaspie called

his girlfriend, Tanikia Hutchins,  to pick him up in his car and her sister came later to retrieve

her car from the VA parking lot. [29 R.R.: 75 - 77].   Glaspie and his girlfriend drove to sell

some marijuana, and then drove to a hotel off of the 59 Freeway, where he was later arrested

the Houston Police.   [29 R.R.: 79 - 80].

Glaspie was questioned by detectives at the Homicide offices.  He admitted that at first

he had been untruthful because he was attempting to cover for himself Doby and Joubert.  He

---

[3] Under cross-examination, Glaspie changed his testimony slightly, admitting that he had actually
called someone on his cell phone – something proven through his cell phone records – but denied stating
he shot the woman in the check cashing store. [29 R.R.: 166].

initially contended Mr. Joubert had accidentally shot Alfredia Jones, but after learning that Joubert had accused him of shooting Alfredia Jones.  [29 R.R.: 78 - 83, 90 - 91].  Based on this accusation, he changed his statement and accused Joubert of intentionally shooting Jones.

Glaspie had been scheduled to go to trial before Mr. Joubert.  [29 R.R.: 89].   Prior to his trial, the State made the 30 year plea offer to a lesser charge and so in July of 2004, Glaspie and his attorneys thereafter met with the police to prepare the statement that would be the basis for his testimony at Mr. Joubert's trial.  [29 R.R.: 84 - 88].

Glaspie admitted during cross-examination that he had lied to the police throughout his oral statement on April 4: he falsely stated that he only learned of the robbery through his sister, 29 R.R.: 98, that he had owned a pistol, 29 R.R.: 99,  that he had not seen the pistol on the day of the robbery, 29 R.R.: 100,  and that he had not seen Mr. Joubert on the day of the robbery, having last spoken to him the previous day,  29 R.R.: 102.    Glaspie admitted that after the police confronted him  he gave new false information.  [29 R.$.: 102, 107]. Glaspie admitted he initially lied about Mr. Joubert and Brown appearing in Joubert's girlfriend's car, 29 R.R.: 105, later admitting that they all drove in his car, but only because Mr. Joubert had misinformed him of the target of the robbery, a drug-dealer, 29 R.R.: 107 - 108, 110 - 111.  Glaspie admitted that he had mislead the police when he claimed that he had not entered the check cashing store and had only heard the gunshots while sitting in the car. [29 R.R.: 114].   Again confronted by the police, Glaspie admitted that he had lied about telling the police he had not seen Jones get shot.  [29 R.R.  115].  He admitted he had changed

his story again

When the police told Glaspie they had a witness who saw him leaving the check cashing store and he changed his story again. [29 R.R. 115].   He told police he did not see Jones get shot. [29 R.R.: 115].   He later changed his story and stated that he did see Jones get shot; she had been sitting on a bench when Mr. Joubert hit her in the head with the pistol and it accidentally went off. [29 R.R.: 115, 117].

Glaspie admitted during cross-examination that he had initiated the idea of robbing a check cashing store and selected and cased a store on Telegraph road. [29 R.R.: 123 - 124]. Less than a week before, Glaspie had posted a bond for Joubert to get out of jail and he wanted Joubert to assist him in the robbery.  [29 R.R.: 124, 126].  Glaspie had also recruited Alfred Brown.  [29 R.R.: 126].  He conceded that he had decided to use his girlfriend's car because he considered to be a less suspicious vehicle.  [29 R.R.: 128].  He also conceded that Mr. Joubert had not formulated the plan for either robberies; Glaspie had come up with the plan for the first store, and Brown had come up with the plan for the second. [29 R.R.: 139].

Lamarcus Colar testified during the defense's case-in-chief as the sole witness. Colar lived with his sister, Nichole Colar in the VA Apartments.  He came home early from school,  between 10 - 10:30 a.m.  on April 3.   [30 R.R.: 39].   Minutes after coming home,  Glaspie, Mr. Joubert, and Brown arrived, staying for around 10 to 15 minutes and then leaving.  [30 R.R.:  39 - 41].  While in the apartment,  Glaspie made a phone call to an unknown person explaining that he had killed Alfredia Jones: "Shit, bitch got out of line.  She

was taking too long, so I had to do what I had to do." [30 R.R.: 46 - 47].

ii.      Punishment phase of trial

The State introduced records relating to a juvenile adjudication and commitment to the Texas Youth Commission in 1994 for Aggravated Robbery, Possession of a Controlled Substance, and Possession of Marijuana (State's Exhibit 226),  and records of a probated juvenile adjudication for Aggravated Assault and Unlawfully Carrying a Weapon (State's Exhibit 227).  [33 R.R.: 23 - 26,  44 R.R.: SX 226 & 227].   The State also introduced a penitentiary packet from a  1998 conviction for Aggravated Assault (State's Exhibit 228). [33 R.R.: 25].

In addition to the records, the State presented witnesses to discuss the details of several of the convictions, as well as  several extraneous unadjudicated offenses.

1n July 1993, as a fourteen year old, Mr. Joubert was arrested following a complaint that he had threatened an older boy; a pat down resulted in the discovery of a small pistol.  [33 R.R.: 27 - 45].  The arrest resulted in his charge of Aggravated Assault and Unlawful Carrying of a Weapon.  [33 R.R.:  34].

In another incident as a young teenager, Mr. Joubert got into a dispute with a schoolmate, Monique Pichon.   During the argument, Pichon struck Mr. Joubert in the head with a partially full can of Coke and he punched her in her eye in retaliation. [33 R.R.: 210 - 222].

In May of 1994, Mr. Joubert participated in a armed robbery of a Foodarama grocery

store with three other individuals, during which one of the employees was shot.  [33 R.R.: 42 - 51, 51 - 68, 69 - 78].   Mr. Joubert subsequently received a juvenile adjudication for his role in the robbery.

In January 1997, Mr. Joubert got into a dispute with a neighbor, Albert Butler, after Butler warned him off from dealing drugs while sitting on  Butler's car.    The day after the argument, came out of hiding while Butler was putting out the trash and shot Butler in the leg. [33 R.R.:  79 - 102].  Mr. Joubert received a prison sentence based on the assault. [33 R.R.: 98].

As a juvenile, Mr. Joubert left the TYC halfway house   and had to be arrested and returned.  [33 R.R. 102 - 128].

Ricky Pendergrass testified that in December 2002 he loaned his work truck to Mr. Joubert in exchange for crack cocaine.   Mr. Joubert did not return the truck as promised and Pendergrass had to go out and locate his truck.  Upon recovering his truck, he learned Joubert had taken his tools and personal belongings from the vehicle.   Shortly after recovering his truck, Pendergrass encountered Joubert in a fast-food parking lot, where Joubert assaulted him.  [33 R.R.: 129 - 153].

Mr. Joubert had arrests in December 2002 for weapon possession and in March 2003 for drug possession. [33 R.R.:  154, 226].

Mr.  Joubert was identified as one of three individuals who committed an armed robbery of the OST Market on  March 31, 2003.   [33 R.R.: 241 - 274].   Store manager,

16

Michael Jabbour, recognized Joubert as one of the robbers from a photograph in a newspaper article   about the ACE check cashing robbery.   [33 R.R.: 269].   Jabbour also identified Glaspie as another one of the robbers, relating that Glaspie had struck Jabbour's brother in the head with at large pistol resembling the .45 caliber pistol admitted as State's Exhibit 215 . [33 R.R.:   251 - 253, 264 - 265].

The State presented evidence that Mr. Joubert was involved in the murder of Derrick Todd Prophet outside a Houston barbershop on November 1, 2002.   [34 R.R.: 4 - 23;   37 - 47; 85 - 128].   John Faniel, a passerby testified that as he was driving home from work, he observed two individuals wearing hooded sweatshirts shoot two other individuals in the parking lot outside the barbershop.   As the gunmen walked back to a waiting vehicle, he lowered his hood; Faniel subsequently identified him as the one who shot the decedent, Derrick Prophet at close range.   Faniel followed the gunmen as they drove off until he lost them in traffic.  [34 R.R.: 162 - 206].

Therail Williams, who had initially been a suspect in the Prophet  testified that after his interrogation by the police, me met with Mr. Joubert and surreptitiously recorded him. During their  conversation about the shooting,  Joubert admitted to having shot Prophet as a favor for Glaspie.   [34 R.R.: 207 - 253; 35 R.R.: 3 - 55].   The State published Joubert's recorded statements to Williams.  [35 R.R.: 6 - 20; State's Exhibits 231 - 233].

iii.      Defense's punishment case-in-chief

Mr. Joubert's maternal grandmother, Mary Carmouche testified briefly and generally

about her grandson's family background. [35 R.R.: 105 - 127].  Carmouche was first married at fourteen.  [35 R.R.: 116].  She left her first husband and had four children with her second husband, Elijah White, the oldest of whom was Joubert's mother, Leona.  [35 R.R.: 111].  Leona herself had her first child, Joubert's sister, at the age of 14 and was 18 when she gave birth to Joubert. [35 R.R.: 117].   At some point, Leona and her children moved away from Carmouche.  [35 R.R.: 121 - 122].  Leona started using drugs in 1974 and because addicted, a problem which continued to the present day. [35 R.R.: 122 - 123].   Carmouche admitted that she did not visit her daughter and children at their home, instead, they came to visit her. [35 R.R.: 123].  Carmouche also explained that she had not been affectionate toward her daughter because she was not raised to express affections. [35 R.R.: 124].

Immediately following Carmouche's testimony, the defense called Bettina Wright, a certified social worker to explain the events in the formative phases of Mr. Joubert's life upon his subsequent development.    [35 R.R.: 129 - 214].   The trial court excluded much of Wright's specific testimony as it applied, however, because her relation of specific examples of Joubert's upbringing were based on hearsay.  [35 R.R.: 137, 142, 143 - 145, 153, 155, 157, 158, 159, 160 - 164, 168 - 169].

Based on the records, Wright characterized Mr. Joubert's childhood as "very neglectful," marked by an absent parent and the absence of feelings of being loved.  [35 R.R. 153].    She explained that as a general matter, a drug addicted parent is not emotionally present for his or her child.  [35 R.R. 153 - 154].  Wright attributed Joubert's maternal

neglect was directly attributable to her drug use. [35 R.R. 169].   Joubert's mother appeared to have been absent and lacking any interest in his whereabouts.   As a result his upbringing had been unsupervised and undisciplined. [35 R.R. 169].   The records reflected that Mr. Joubert had missed out on completing all of the developmental stages of maturation.   She opined that given the neglect and abuse in his past, he was prevented from psychologically developing to the point he could function as a mature adult. [35 R.R. 164 - 165].

The records reflected Mr. Joubert's involvement with drugs commenced early: he started using drugs around 11, and selling them by the time he reached 12 or 13. [35 R.R.: 154].

Wright opined that the school system, or even the juvenile justice system could not provide compensatory structure to substitute for the absence of parental affection and structure. [35 R.R.: 154, 200 - 201].   She admitted on cross-examination that individuals growing up in Mr. Joubert's circumstances were more likely to commit crimes in future. [35 R.R.: 210].

Leona May Brown, Mr. Joubert's mother testified.   [36 R.R.: 4 - 31].   He was the middle of three children; he had an older sister  and a younger brother who did not grow up with his older siblings, after his father took him from Leona's home as an infant. [36 R.R.: 5, 8 - 9].   All her children had different fathers. [36 R.R.: 6 - 8].   Leona had progressed as far as the 9th grade in school.   [36 R.R.: 5, 8 - 9].   Leona had her first child, Nicole, at fourteen, and Joubert at eighteen.   [36 R.R.: 7].

19

Leona had a long history of drug use.  She started using marijuana at the age of 12 or 13.  [36 R.R.: 11].   She started using cocaine in 1983, switching to crack in 1984.  [36 R.R.: 12].   She admitted that since then, she used crack every day.  [36 R.R.: 13].   While pregnant with Joubert, Leona used marijuana to deal with her morning sickness.  [36 R.R.: 12].

Leona had left home at 18, briefly moved back, and then moved into her own apartment.  [36 R.R.: 13 - 14]. She moved, along with her children to the Villa Americana Apartments in 1983, living there until 1994.   [36 R.R.: 15 - 16, 17].   She tersely characterized the VA Apartments as  "not a good place to live, not to raise kids." [36 R.R.: 17].

She met and married Orlando Brown, a Jamaican drug dealer in 1984.  Brown sold marijuana and cocaine, storing the marijuana at Leona's apartment. [36 R.R.: 18, 21].   He dealt drugs from the apartment.  [36 R.R.: 21].   While together, Brown provided Leona cocaine daily. [36 R.R.: 19].   Brown also gave her money and  she  stopped working.  [36 R.R.: 19].   Brown lived with his mother for a long period of time during their relationship and so Leona went to stay with him and his mother.   During this time, she left her kids in the care of her sister-in-law.  [36 R.R.: 20].   After an absence of "several months," Leona returned.  [36 R.R.: 20].   Leona divorced Brown in 1996, after he was imprisoned for drugs.  [36 R.R.: 22 -23].   Leona herself received a felony conviction for cocaine conviction in 1995. [36 R.R.: 23].   After divorcing Brown, she took up with a new  Jamaican drug dealer.

20

[36 R.R.: 23 - 24].

Leona agreed with counsel's suggestion that she had not been present for her children when they were growing up, instead, spending time with her boyfriends. [36 R.R.: 24].   She admitted that at times she left them in the apartment unsupervised. [36 R.R.: 25].   She agreed with counsel's suggestion that her  children spent a lot of time on the streets. [36 R.R.: 31]. She had not been involved in her children's schooling or encourage them to stay in school. [36 R.R.: 24, 31].   Leona explained the way she tried to show affection for her children was by purchasing them things.   She had even given her son marijuana. [36 R.R.: 32].

Mr. Joubert's sister, Roberta Nicole Davis testified about the conditions in which she and her brother grew up in the Villa Americana Apartments.  [36 R.R. 32 - 89].   The family lived in the VA Apartments for ten years; the VA were a federal housing project. [36 R.R.: 36].   The apartments were "not a nice place to live." [36 R.R.: 39].   Illegal activities, such as gambling, and drug dealing occurred on a daily basis. [36 R.R.: 39].   Nicole personally observed drug dealing going on, as well as, on one occasion, as a murder take place.   [36 R.R.: 37].   On other occasions, Nichole  observed the  bodies of murder victims around  the complex.  [36 R.R.: 38].    Her brother  these same  activities. [36 R.R.: 39].

Nichole and Mr. Joubert's mother sporatically lived with them: "some times she was there . . . [s]ometimes she wasn't." [36 R.R.: 39].   When Nichol was 12 or 13, their mother went to go live with her husband Orlando Brown.  This lasted a year to a year and a half. [39 R.R.: 40].   Their mother left the children in charge of an "in law."  [39 R.R.: 40].  When their

mother returned, there was generally no male figure around except when their mother had her boyfriends staying in the apartment with them, but these were usually short-lasting arrangements. [39 R.R.: 41].   Even while living together,   Leona was frequently out all night, leaving the children home alone, locked inside the apartment. [39 R.R.: 60 - 61, 63].

Brown had lived in the apartment with the family for a while, keeping his marijuana and cocaine throughout the apartment.   [39 R.R.: 44].  Nichole recalled seeing "rolls of money" and "plates of powder [cocaine]" . . . on the table.  Weed everywhere."  [39 R.R.44]. She and her brother "saw everything." [39 R.R.: 44].   As a result of his drug dealing, federal agents raided the apartment on one occasion, confiscating a bag of marijuana. [39 R.R: 49 - 46].

Nichole and her brother  sold drugs; Nichole sold marijuana and Joubert sold cocaine, to earn money. [39 R.R.: 46 - 47].   Joubert was around 10 years old when he started selling drugs. [39 R.R.: 64].  Drugs were plentiful in their neighborhood, there was a demand among their peers, and it was common in the neighborhood for people to sell drugs. [36 R.R.: 47, 64].

Leona did not work. [39 R.R.: 64].   Brown had provided for her during their relationship but after their separation conditions got worse. [39 R.R.: 63].  The family lived on government assistance, and contributions from Joubert's drug dealing. [39 R.R.: 64, 65]. Leona recognized the money received from her son came from dealing, and encouraged him to continue selling drugs. [39 R.R.: 65].   On occasion, Leona would steal her son's drug proceeds from the places he had stashed it away. [39 R.R.: 68].

Leona had a drug problem which was obvious to her children.   Nichole observed her mother smoke marijuana and use crack; she estimated he brother  would have been around five or six when he first saw his mother using drugs. [39 R.R.: 42].   Other family members also had drug problems.   Their uncle Charles, with whom Mr. Joubert lived for a period of time, was addicted to crack cocaine. [39 R.R.: 48].   Another uncle, Troy, openly smoked "preemo" – cigarettes laced with crack – in the children's presence. [39 R.R.: 49].   A cousin, "Little Troy" also "experimented" with PCP and marijuana.   [39 R.R.: 50].

Several relatives, Uncle Troy, a cousin named Terrance, had been to prison.  [39 R.R.: 50].   Additionally, many of Mr. Joubert's childhood friends and associates had also served prison sentences for selling drugs, "or [were] dead."   [39 R.R.: 51].

Nichole related that her mother was not emotionally or physically affectionate with he children. [39 R.R.: 52 - 53].   She did not verbally express love for her children; she did not hug or kiss them.   She did not put them to bed at night.   [39 R.R.:  53].   The children went to sleep at whatever time she felt. [39 R.R.: 54].   The children fixed their own breakfast in the morning and prepared for school. [39 R.R.: 57].   The children cleaned the apartment. [39 R.R.: 57 - 58].   Nichole was the one who prepared the meals. [39 R.R.: 60].   They spent little time together as a family.  [39 R.R.: 53 - 54].

Their mother also took no interest in the children's schooling, neither helping with school work, checking their grades, or meeting with their teachers.   [39 R.R.: 54, 55].

Leona would, on occasion did discipline her children.  This could be triggered from

different tings "somebody else could [have] made her angry" or the children had not done something, such as "not clean[ing] up right." [39 R.R.: 57, 58]. Their mother used switches from a tree branch against the children's bare skin. The beatings left bruises, sometimes severe. The children covered the bruising so the authorities never caught on. [39 R.R.: 58 - 59]. Nichole related one instance in which she did not dress out for gym class in middle school in order to hide the cuts on her leg. [39 R.R.: 56].

The defense presented Dr. Mark Cunningham., a clinical and forensic psychologist, to testify about the   interplay between the conditions in which Mr. Joubert grew up and his subsequent development into an adult, as well as discuss his evaluation of Joubert on the probability that he would constituted a future danger while incarcerated.   As with Bettina Wright, however, the trial judge excluded significant portions of Dr. Cunningham's testimony, and demonstrative Power Point exhibits, because they were based on hearsay statements made to Cunningham by family members. [36 R.R.:  90 - 177;  37 R.R.  3 - 4, 31 - 33].  The trial court excluded in its entirety Dr. Cunningham's testimony on the probability that Mr. Joubert would be a future danger.  [37 R.R.: 3 - 4, 30 - 31; 38 R.R.: 9 1 - 169].

Subject to the trial court's restrictions on his testimony, Dr. Cunningham testified of the effects of Mr. Joubert's upbringing and family in its relation to his subsequent development. He explained that the U.S. Department of Justice had conducted several studies over the years, identifying both risk factors and protective factors correlative to juvenile delinquency and violence.   These factors included the conditions and values of a child's

24

family (including prenatal difficulties, family attitudes toward, or engagement in criminal behavior, family stability and nurturing), conditions of schools (Such as whether the child bonded with school, the truancy and drop out rates of the community schools), circumstances of the community (including poverty rates, the extent of community disorganization , such as prevalence of crime); peer influence (whether the child's peers were engaged in criminal activity); "constitutional factors" (such as the child's intelligence, and whether the child was hyperactive or had a diagnosis of ADHD);   and "Situational factors"  [37 R.R.: 62 - 76]. Mr. Joubert had scored highly across these indices, nearly meeting each criteria determined to be correlative of a high likelihood of delinquent behavior.  [37 R.R.:  66 - 69, 77].   By contrast, Mr. Joubert's personal history reflected none of the protective factors correlated to at-risk children withstanding the "toxic" effects of his environment and upbringing.   [37 R.R.: 176].

Dr. Cunningham discussed the interaction of the identified risk factors toward Mr. Joubert's maturation.  Mr. Joubert's family environment had a formative effect upon his development.   Mr. Joubert did not have a stable father-figure in the family home. [37 R.R.: 121 - 124].  To compound this absence, his  mother had been physically abusive in her disciplinary techniques,  and emotionally neglectful, both factors increasing  the likelihood of delinquency.  [37 R.R.:  129 - 130, 134 - 135].   The family structure was chaotic and disorganized, marked by significant parental neglect.  [37 R.R.: 139].  Joubert's mother did not express affection for her children, providing no emotional support.  [37 R.R.: 121, 125].

25

Moreover, she was frequently absent from her children's lives and  had provided no guidance or moral structure of behavior.  [37 R.R.: 139 - 140].   As a result, Joubert had received little parental supervision and support during his childhood and adolescence. [37 R.R.: 141].

The community in which Mr. Joubert grew up posed numerous risk factors to future delinquency.   The neighborhood had a significant rate of crime and violence and when criminal activity occurred on a routine basis, it became the norm for acceptable  behavior. [37 R.R.: 1567 - 158].   Similarly, growing up in an environment in which crimes, such as drug dealing were the norm, such activities would lose their moral stigma in spite of their illegality. [37 R.R.: 157].    Mr. Joubert's own start in drug trafficking was influenced by several factors: the family's poverty, his older sister engaging in drug trafficking, and his mother's frequent absence and failure to set rules of behavior. [37 R.R.: 157].   The pervasive conditions of crime and violence in the community would likely have a deleterious effect upon an individual's emotional development. [37 R.R.: 159 - 162].

Dr. Cunningham suspected, but it was unconfirmed that Mr. Joubert  had "wiring problems" which likely contributed to his delinquent behavior. [39 R.R.: 91, 98].  A possible cause for dysfunction was attributable to prenatal exposure to THC; his mother had smoked marijuana during her pregnancy.    [37 R.R.:  99].   Dr. Cunningham explained that juvenile delinquent behavior was a function of "wiring problems" coupled with abuse and neglect. [37 R.R.: 91 - 92].

Although undiagnosed, as reflected through his school and TYC records,  Mr. Joubert likely had ADHD, a condition marked by hyperactivity and racing thoughts. [37 R.R.: 100 - 102].   ADHD

26

was co-morbid with other psychological problems exhibited by Mr. Joubert, such as rebellious behavior. [37 R.R.: 102].   Dr. Cunningham again explained that ADHD was a correlative factor to an increased likelihood of alcoholism and drug abuse, antisocial personality disorder, and being incarcerated.   [37 R.R.: 103].

Addressing substance abuse, the widespread drug abuse in Mr. Joubert's family suggested Joubert himself genetic pre disposition to drug abuse, Dr. Cunningham noting that the TYC records indicated Joubert started smoking marijuana at the age of 10, used codeine daily from the age of 14, and was "dependant" on wide variety of drugs and alcohol. [37 R.R.: 126 - 127, 151, 168].

Although Mr. Joubert had been placed in TYC, removing him from the effects of his neighborhood and upbringing, Dr. Cunningham explained that at best it was a "mixed package." [38 R.R.: 83].   While he had received some counseling and psychological services while in TYC, these occurred "very late in the game" making it difficult to overcome the years leading up to that point. [37 R.R.: 164].   Morevoer, while he benefitted from the structure TYC provided, he had still mixed with delinquent peers.  [37 R.R.: 174 - 175;  38 R.R.: 83. Further, on release, he returned to the same problematic community.   [ 38 R.R.: 83].

Larry Fitzgerald, a former public information officer for TDCJ, advised the jury about the prison classification system, the daily prison regimen,  and the means by which the prison administration exercised control over inmates.    [39 R.R.: 4 - 76].   In addition, he related TDCJ's published statistical compilation of assaultive and violent behavior by incarcerated inmates, which reflected low overall rates of aggressive misconduct in prison.  [39 R.R.: 44 -

59].   Fitzgerald reviewed Mr. Joubert's TDCJ and TYC disciplinary records and opined that the prison system would be able to incarcerate him successfully.   [39 R.R.: 59].

As rebuttal to Fitzgerald, the State presented testimony by A.P. Merillat, an investigator for the Special Prosecution Unit, which prosecutes prison situated offenses in TDCJ.   [39 R.R.: 77 - 124].   Merillat disagreed with Fitzgerald's contention that prison structure imposed restrictions on inmate behavior - Merillat characterized inmate behavior as primarily based on his inmate peers. [39 R.R.:  87 - 90].   He contended TDCJ's statistical compilation were inaccurate and did not reflect the true quantity of violence and misconduct which occurred in the prison system. [39 R.R.: 97 - 100].   He punctuated his testimony with numerous anecdotes of incidents which the SPU had prosecuted over the years.   [39 R.R.: 91 - 95, 100, 104, 108].   In defining violent behavior, however,  Merillat utilized a broad personal definition of violence,  characterizing any act of disobedience to a guard to constitute an act of violence.   [39 R.R.: 101,  118 - 119].

B.     Direct Appeal

Mr. Joubert was appointed on direct appeal by appointed counsel, Mr. Kenneth Burkhalter. Mr. Burkhalter prepared and filed a brief on direct appeal raising seven grounds for relief.[4]     He subsequently withdrew and was replaced by Roland Moore.   The Texas

---

[4]  Appellate counsel raised the following issues on direct appeal:

First Point of Error:

The trial court committed reversible error in overruling the Appellant's motion to dismiss the indictment returned against him for capital murder, where the facts alleged in the indictment did not include the special punishment issues necessary for the jury to resolve in order for the

Court of Criminal Appeals denied relief in *State v. Joubert*, 235 S.W.3d 729 (Tex.Cr.App.

2007).

The United States Supreme Court denied Mr. Joubert's petition for certiorari.  *Joubert*

---

Appellant to be put to death, in violation of the Appellant's federal constitutional right to due process of law.

Second Point of Error:

The trial court committed reversible error in overuling the Appellant's motion to dismiss the indictment returned against him for capital murder, where the facts alleged in the indictment did not include the special punishment issues necessary for the jury to resolve in order for the appellant to be put to death, in violation of the Appellant's state constitutional right to indictment by a grand jury.

Third Point of Error:

The trial court committed reversible error in failing to strike venireman Patricia Bloom from the panel, where the record shows she could not consider mitigation punishment.

Fourth Point of Error:

The evidence was insufficient to support the Appellant's conviction for capital murder, as a matter of law, and as a principal, where the State failed to corroborate the testimony of Dashan Glaspie, an accomplice witness, in violation of the Appellant's federal constitutional right to due process of law.

Fifth Point of Error:

The evidence was insufficient to support the Appellant's conviction for capital murder, as a matter of law, and as a party, where the evidence was insufficient to establish that the Appellant had acted with the intent to cause the death of either complainant, and where the deaths could not have been anticipated by the Appellant, in violation of the Appellant's Federal constitutional right to due process of law.

Sixth Point of Error:

The trial court committed reversible error in granting the State's motion, during the punishment phase of trial, prohibiting the Appellant from arguing that Dashan Glaspie's thirty year plea bargained sentence was a mitigating factor in assessing the Appellant's punishment, in violation of the Appellant's Federal constitutional right against cruel and unusual punishment.

Seventh Point of Error:

The trial court committed reversible error in instructing the jury, during the punishment phase of trial, that it could answer special issue number two "yes" if they found the Appellant had merely anticipated that a death would occur during the alleged underlying robbery offense, in violation of the Appellant's  federal constitutional right against cruel and unusual punishment.

*v. State*, No.07-7830, 552 U.S. ___ (February 25, 2008).

C.       State Post-conviction Proceedings

Mr. Joubert was represented in state post-conviction proceedings by appointed counsel

Mr. Kurt Wentz.   Wentz filed the state writ petition on December 20, 2006.   He raised 17

claims.[5]    *Ex parte Eliljah Dewayne Joubert*, WR 78-119-01,  <u>State Habeas Clerk's Record</u>

---

[5]  Post-conviction counsel raised the following claims:

First claim for relief:

The applicant was denied his 6th Amendment right to the effective assistance of counsel for the reason that at punishment trial counsel failed to object to hearsay testimony relating to extraneous acts of misconduct.

Second claim for relief:

By allowing the State to provide a definition of "criminal acts of violence" through its expert that so diminished the meaning of the term as to ensure that special issue one would be answered affirmatively, trial counsel provided ineffective assistance of counsel.

Third claim for relief:

The trial court erred in denying the applicant's request for a jury instruction defining "criminal acts of violence" when the jury received an incorrect definition of that term from the State's expert witness at punishment.

Fourth claim for relief:

The applicant was denied his 6th Amendment right to the effective assistance of counsel on direct appeal when appellate counsel failed to raise the trial court's error in denying Mr. Joubert's request for an instruction on "criminal acts of violence."

Fifth claim for relief:

The State's reductive definition of "criminal acts of violence" unconstitutionally impaired special issue one's selective function thereby depriving the applicant of his rights under the 8th and 14th Amendments.

Sixth claim for relief:

The applicant was denied his 6th Amendment right to the effective assistance of counsel for the reason that trial counsel failed to investigate and develop available impeachment evidence for the State's accomplice witness.

Seventh claim for relief:

> The trial court violated Mr. Joubert's 6th Amendment right to confront the witnesses against him by admitting the applicant's T.D.C.J. disciplinary records which contain testimonial statements by unavailable witnesses containing references to numerous acts of extraneous misconduct.

Eighth claim for relief:

> The applicant was denied his 6th Amendment right to the effective assistance of counsel for the reason that trial counsel failed to object to the admission of his T.D.C.J. records which contained hearsay testimonial statements relating to numerous acts of extraneous misconduct that violated the Confrontation Clause.

Ninth claim for relief:

> The Texas mitigation issue violates the applicant's 8th Amendment right against cruel and unusual punishment for the reason that it gave mixed signals to the jury as to how the issue is to be applied.

Tenth claim for relief:

> The applicant's death by lethal injection is cruel and unusual punishment in violation of the 8[th] and 14th Amendments to the U.S. Constitution.

Eleventh claim for relief:

> The applicant is ineligible for the death penalty under the 8[th] and 14th Amendments to the U.S. Constitution.

Twelfth claim for relief:

> The application of Texas Penal Code Ann. § 7.02(b) to Mr. Joubert's case violates the 8[th] and 14[th] Amendments because it resulted in a sentence of death for one who is ineligible for that penalty.

Thirteenth claim for relief:

> The application of Texas Penal Code Ann. § 7.02(b) to Mr. Joubert's case violates the 8[th] and 14th Amendments to the United States Constitution.

Fourteenth claim for relief:

> The jury charge at the punishment phase of the applicant's case denied him his 6th Amendment right to trial by jury for the reason that it misled the jury as to the numerical requirements for answering the special issues in a manner leading to life imprisonment.

Fifteenth claim for relief:

> The jury charge at the punishment phase of the applicant's trial denied him his 8th Amendment right to be free from cruel and unusual punishment for the reason that it mislead the jury as to the numerical requirements for answering the special issues in a manner leading to life imprisonment.

(SHR): 2 - 64.

The state habeas court held an evidentiary hearing on November 19, 2012, in which counsel focused on issues 1 - 4 and 6.   [*Ex parte Eliljah Dewayne Joubert*, WR 78-119-01, State Writ Hearing (SWH):  7 - 8].  At the conclusion of the hearing, the court did not make a ruling but directed the parties to submit proposed findings of fact and conclusions of law. [SHR: 111 - 113]. The state habeas court subsequently adopted verbatim the State's Proposed Findings of Fact and Conclusions of Law recommending that relief be denied.   [SHR: 241 - 272].   The Texas Court of Criminal Appeals  denied relief.  *Ex parte Elijah Dewayne Joubert*,  WR 78-119-01, Order  (Tex.Cr.App., September 25, 2013).[6]

### IV.  Evidence in Support of Petition

This Petition for Writ of Habeas Corpus is augmented by an accompanying Appendix containing Exhibits offered in support of the claims plead below.    Mr. Joubert requests this Court consider the Exhibits as if  incorporated in into the body of the writ application.

---

Sixteenth claim for relief:

> The jury charge at the punishment phase of the applicant's case denied him his 14[th] Amendment right to due process of law for the reason that it mislead the jury as to the numerical requirements for answering the special issues in a manner leading to life imprisonment.

Seventeenth claim for relief:

> The applicant was denied his 6th Amendment right to the effective assistance of counsel on direct appeal when counsel failed to raise on direct appeal how Art. 37.071 failed to inform jurors of the result of a single "no" vote on any special issue violated Mr. Joubert's 6[th], 8[th], and 14[th] Amendment rights under the U.S. Constitution after these errors were raised at trial.

[6]   The Court concluded that 10 post-conviction claims, 3, 5, 7, 9, 11, 12, 13, 14, 15, 16 "should have been raised on direct appeal" and were not cognizable in a post-conviction writ.  *Joubert*, Order, at 2 (citing *Ex parte*, 769 S.W.2d 539 (Tex. Cr. App. 1998)).

Mr. Joubert further asks this Court to review and take judicial notice of the state appellate record and state habeas record in this case.

Mr. Joubert advises that he will move this Court to permit expansion of the record under Habeas Rules 6 through 7, and to grant him one or more evidentiary hearings, *see* Habeas Rule 8, in order to establish facts sufficient to establish cause and prejudice to excuse any unexhausted and / or procedurally defaulted claims consistent with the holdings in *Martinez v. Ryan*, 566 U.S. ___ (2012), *and*, *Trevino v. Thaler*, 569 U.S. ___ (2013). *See Canales v. Stephens*, ___ F.3d ___, 12-70034, Loislaw slip op. at 18 -23 & n.2 (5th Cir. August 29, 2014) (recognizing and applying *Martinez - Trevino* to remand case to district court to establish prejudice and granting court discretion to hold an evidentiary hearing).

Alternatively, Mr. Joubert request the opportunity to develop evidence to present to this Court for a stay of proceedings and abatement fo the writ in order to return to state court and exhaust any unexhausted claims. *Rhines v. Weber*, 544 U.S. 269 (2005).

### V. Restatement of the Claims for Relief

Claim for Relief Number One:

THE PROSECUTION PRESENTED A FALSE AND MISLEADING IMPRESSION OF ITS' KEY WITNESS DESHON GLASPIE'S TRUTHFULNESS BY WITHHOLDING EVIDENCE AND BY FAILING TO CORRECT TESTIMONY WHICH UNDERMINED THE BOLSTERING EFFECT OF THE STATE'S ZERO TOLERANCE PLEA AGREEMENT.

Claim for Relief Number Two:

THE PROSECUTION WITHHELD MATERIAL EVIDENCE WHICH IMPEACHED ITS KEY WITNESS, DESHON GLASPIE'S TESTIMONY AND WHICH WOULD HAVE UNDERMINED THE BOLSTERING FORCE OF THE STATE'S ZERO TOLERANCE PLEA

AGREEMENT.

Claim for Relief Number Three:

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF TRIAL BY COUNSEL'S FAILURE TO UNDERSTAND THE BASIS OF THE AVAILABLE MITIGATING EVIDENCE THEREBY UNDERMINING THE PRESENTATION OF EVIDENCE THROUGH THE DEFENSE'S EXPERT WITNESSES LICENSED SOCIAL WORKER BETTINA WRIGHT AND FORENSIC PSYCHOLOGIST MARK CUNNINGHAM.

Claim for Relief Number Four:

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF TRIAL  FAILING TO INVESTIGATE AND DIRECT THE DEFENSE NEURO-PSYCHOLOGIST, DR. LINDSAY ROSEN, TO CONDUCT SUFFICIENT TESTING TO DETERMINE THE EXISTENCE OF NEURO-PSYCHOLOGICAL IMPAIRMENT IN THE FACE OF POTENTIAL INDICATORS OF DAMAGE.

Claim for Relief Number Five:

MR. JOUBERT RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL BY APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL THE TRIAL COURT'S DENIAL OF MR. JOUBERT HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS BY EXCLUDING RELEVANT MITIGATION TESTIMONY BY DR. MARK CUNNINGHAM  RELATING TO MR. JOUBERT'S FUTURE DANGEROUSNESS.

Claim for Relief Number Six :

MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO  TRIAL COUNSEL'S FAILURE TO OBJECT TO SEVERAL INSTANCES OF HEARSAY EVIDENCE DURING THE PENALTY PHASE OF TRIAL.
                    (STATE WRIT APPLICATION ISSUE NUMBER ONE)

Claim for Relief Number Seven:

MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF TESTIFYING CO-DEFENDANT'S COMMUNITY REPUTATION FOR UNTRUTHFULNESS.
(STATE WRIT APPLICATION ISSUE NUMBER SIX)

Claim for Relief Number Eight:

MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO TRIAL COUNSEL'S FAILURE TO REASSERT HIS OBJECTION TO THE ADMISSION OF PRISON DISCIPLINARY RECORDS DURING THE PENALTY PHASE OF TRIAL.
(STATE WRIT APPLICATION ISSUE NUMBER EIGHT)

Claim for Relief Number Nine:

THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. JOUBERT AS A PRINCIPLE TO THE CAPITAL MURDER BASED ON CO-DEFENDANT DESHON GLASPIE'S TESTIMONY WHERE THE STATE FAILED TO ADEQUATELY CORROBORATE GLASPIE'S TESTIMONY UNDER THE STATE ACCOMPLICE-WITNESS RULE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
(STATE DIRECT APPEAL ISSUE NUMBER FOUR)

Claim for Relief Number 10:

THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. JOUBERT AS A PARTY TO THE CAPITAL MURDER BASED ON CO-DEFENDANT DESHON GLASPIE'S TESTIMONY WHERE THE STATE FAILED TO PRESENT EVIDENCE THAT MR. JOUBERT ACTED WITH INTENT TO CAUSE DEATH IN THE COMMISSION OF THE OFFENSE OR THAT HE COULD REASONABLY ANTICIPATE THE DEATHS, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
(STATE DIRECT APPEAL ISSUE NUMBER FIVE)

Ground for Relief Number 11:

THE TRIAL COURT DENIED MR. JOUBERT OF HIS RIGHT TO DUE PROCESS UNDER THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY PREVENTING TRIAL COUNSEL FROM ARGUING THE CO-

DEFENDANT'S 30-YEAR SENTENCE SHOULD BE CONSIDERED IN MITIGATION.
(STATE DIRECT APPEAL ISSUE NUMBER SIX)

## VI.  Anti Terrorism and Effective Death Penalty Act of 1996

Because this case is filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its provisions apply and govern this petition and the issues raised in it.  *See generally Lindh v. Murphy*, 521 U.S. 320, 326 (1997) ("The statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's  enactment (except where chapter 154 otherwise makes select provisions of chapter 153 applicable  to pending cases."). Generally speaking, under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). T his provision is a limitation on the relief a federal habeas court may grant.  The deferential requirement of § 2254(d) only applies to state claims that were adjudicated *on the merits*. "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim

without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007).

The Supreme Court has explained the independent meaning of the "contrary to" and "unreasonable application" clauses:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citations omitted). When a state court's factual determinations are challenged, an application for writ of habeas corpus may not be granted unless the adjudication of the claim by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State court factual determinations are presumed to be correct, and the applicant has the burden to rebut the presumption of correctness "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Although the rules of procedural default apply to post-conviction challenges under § 2254, the Supreme Court has crafted and exception to this rule in its recent decisions in *Martinez v. Ryan*, 566 U.S. ___ (2012), *and*, *Trevino v. Thaler*, 569 U.S. ___ (2013). Under *Martinez* and *Trevino*, deficient representation by state post-conviction counsel in state post-

37

conviction proceedings which results in the procedural default of an underlying meritorious claim relating to the adequacy of trial or appellate counsel may provide requisite cause and prejudice to excuse the default.   *Martinez* and *Trevino* permit excusal to a procedurally defaulted claim upon a showing that: (1) the underlying claim of ineffective counsel at the trial/appellate level is substantive; and (2) state post-conviction counsel's representation was itself deficient, as measured by the standards in *Strickland v. Washington*.   *Trevino*, 569 U.S. at ___, slip op. at 8, 14.

## VII.  Claims for Relief

Claim for Relief Number One:

THE PROSECUTION PRESENTED A FALSE AND MISLEADING IMPRESSION OF ITS' KEY WITNESS DESHON GLASPIE'S TRUTHFULNESS BY WITHHOLDING EVIDENCE AND BY FAILING TO CORRECT TESTIMONY WHICH UNDERMINED THE BOLSTERING EFFECT OF THE STATE'S ZERO TOLERANCE PLEA AGREEMENT.

A.      Facts in Support of Claim

1.      The robbery of the ACE Check Express store in this case  occurred shortly before 10:00 a.m. on April 3, 2003.   [28 R.R.: 56; 44 R.R.: 8 (State's Exhibit 1)].

2.      Within hours of the killings, Houston Police Department Sargent S.H.  Kennedy spoke with a resident of the Villa American Apartments, Alisha "Lisa" Hubbard.  Hubbard advised Kennedy that earlier that morning, around 8:00 a.m.,   she had observed three individuals,  "Shawn" (subsequently identified as Deshon Glaspie), "Ghetto" (subsequently identified as  Mr. Joubert), and "Deuce" (subsequently identified as a third individual named Ernest Matthews.) standing around in the parking lot while Glaspie loaded a .45 caliber semi-

38

automatic pistol. [28 R.R.: 56; 44 R.R.: 8 (State's Exhibit 1)].

3. During the morning of April 3rd, LaTonya Hubbard, Lisa Hubbard's sister, after learning of the ACE Check Cashing store robbery phoned Crime Stoppers to report her suspicions about the participants. She advised the police that she had seen Deshon Glaspie, Mr. Joubert and "Deuce" earlier that morning while at a gas station. [26 R.R.: 197-198]. *See* Pet. Ex. 94 (<u>Trial counsel's notes on statement of LaTonya Hubbard to Houston Police Department</u>).

4. Upon his arrest on April 4, 2003, Glaspie was interrogated by Houston Police Department detectives W.O. Allen and Brian Harris in the offices of the Homicide Division. Glaspie identified Alfred Dwayne "Doby" Brown as one of the participants in the robbery. He specifically charged that Brown had been the one to have shot and killed the police officer, Charles Clark. *See* Pet. Ex. 21 (<u>Statement of Deshon Glaspie,</u> pp. 30 - 33, April 4, 2003).

5. Houston Police Department Sergeants Kennedy and Ramsey interviewed Lamarcus Colar on April 4, 2003, the morning after the offense. They related that Colar told them that around 10:30 a.m. on April 3, Glaspie, Mr. Joubert and Brown came over to his apartment. During their stay, Colar overheard Glaspie speaking on his cell phone and admit that he shot Alfredia Jones, during the robbery. When shown photo arrays of the three individuals, Colar positively identified Glaspie and Mr. Joubert, but only "tentatively" identified Brown. [ 44 R.R.: 8 (State's Exhibit 1)].

6.      On or about April 5, 2003, Houston Police Department officers  interviewed, Sheikah Mohammed Afzel and Shoukat Hussein the owners of the furniture store.   They positively identified   Glaspie as one of the two individuals who had entered the store immediately prior to the robbery, but  gave only a  tentative identification that Brown "might be #3" in  the photo array.   See, Pet. Ex.  63 (*State v. Alfred Brown*,  No. 944,75,  Motion to Suppress Identification, 351st District Court of Harris County Texas).[7]

7.      In the days after the offense, HPD took statements from Alfred's girlfriend Ericka Dockery, her son Reginald Lewis Jones.  Ericka told police that she got up at 6:45 and Doby slept on her couch. She left for work at 8:30 and he was still sleeping.  She called home at 9:30 to check on her sons and was told Brown was sleeping upstairs.  When she arrived home from work that day around 1:30, Brown was upstairs ill. *See*,  Pet. Ex. 90 (Trial counsel notes on Ericka Dockery's statement to Houston Police Department)

8      Reginald Lewis Jones, Ericka's son  told police that he work up around 9:30 or 10:00 on the morning of the offense and sat in the living room near the door throughout the morning.   Alfred Brown  got up and came downstairs around 1:00 p.m.   He had not come down and exited the apartment prior to that.  Pet. Ex 91 (Trial Counsel's notes on Reginald Jones statement to Houston Police Department);   Pet. Ex. 16 (Reginald Jones Declaration).

9.      In  April,  nearly  two  weeks  after  the  offense,  Houston  Police  Officers

---

[7]  The documentary exhibit relating to the tentative identification of Mr. Brown  unavailable at the time of the filing of this writ application, and are believed to be in the case file, currently in the custody of the Harris County District Clerk's Office, and of  the Texas Court of Criminal Appeals.   They will be supplemented to this writ application as an exhibit as soon as is reasonably possible.

interviewed   Ericka Dockery's employer, Alma Berry.   Berry knew Brown and recognized his voice from Dockery having previously brought to Berry's house.   Berry related that she answered her phone around 10:00 a.m. on April 3 and spoke with Brown.   *See*  Pet.  Ex. 110 [Houston Police Report Offense Report # 045215203-Page 1.006].[8]   The police subsequently issued a subpoena duces tecum for Dockery's phone records, which reflect a call from her residence to Berry's residence at approximately 10:08 a.m.  *See* Pet. Ex. 64 (*Ex parte Alfred Dwayne Brown*   Cause 1035159-A, Court's Findings of Fact and Conclusions of Law); Pet Ex. 92 (Trial Counsel Notes to Berry Statement to Houston Police Department).

10     On April 21, 2003,    Ericka Dockery, Alfred Dewayne Brown's girlfriend testified before the Grand Jury.   Dockery testified that she had awoken at 6:45 and left her apartment to go to work as a home health care aide at 8:30 and observed Brown, her boyfriend, asleep on the couch  from the time she arose to the time she left.[9]  *See*  Pet. Ex.62 (Grand Jury Testimony of Ericka Dockery, April 21, 2003).   She subsequently received a phone call from Brown around 10:00 a.m.   *See* Pet. Ex. 62.   Throughout her testimony, Dockery maintained that the phone call from Brown occurred around 10:00 a.m.   *See* Pet. Ex.62, (Dockery,  95 – 120, 113 – 114).   Dockery also denied that Brown had ever admitted

---

[8]   This citation to the offense report relates to the undersigned counsel's review of the offense report contained within the files of the Harris County District Attorney's Office in June 2014.  While counsel designated the report for copying pursuant to an Texas Open Records Act request, as of the filing of this federal post-conviction writ application, the Harris County District Attorney has not provided the copies.  Mr. Joubert's counsel will supplement the writ application exhibit filings with the missing records within a reasonable time after they are obtained.

[9]   One of the same prosecutors who tried Mr. Joubert, examined Ms. Dockery in front of the grand jury. There can be no doubt that the prosecution had direct knowledge of her testimony. *See* Pet. Ex. 62 (Grand jury Testimony of Ericka Dockery)

to having participated in the robbery.    *See* Pet. Ex. 62, (Dockery, at 43, 73, 75, 137).

11.    On April 28, 2003,  the State called Glaspie's girlfriend,  Tonikia Hutchins, as a witness during Grand Jury proceedings.    Under questioning about any admissions Glaspie had made to her about participating in the robbery, Hutchins stated that Glaspie had related to her that Ju Ju, rather than "Doby" (Alfred Brown) had been present at the robbery.    *See* Pet. Ex. 61 (Grand Jury Testimony of Tonikia Hutchins, p. 23,  April 28, 2003).[10]    Glaspie told her that he was present at the scene of the robbery but had not gone inside the store;  Mr. Joubert and "Ju-Ju" were the ones who went into the check cashing store.    *See*  Pet. Ex.  61 (Hutchins, at 88 - 89).   She repeated that  Glaspie told her that "Ju Ju" had been present but not "Doby."  *See*  Pet. Ex.  61 (Hutchins, at 90).

12    Tonikia Hutchins also testified to the Grand Jury that she heard Glaspie call Mr. Brown around  6:00 a.m. on the morning of the offense. Glaspie asked for Mr. Brown but was told Brown was still asleep.  Glaspie ordered someone to wake him up and was refused.  *See* Pet. Ex. 61  (Hutchins, p. 29, 33, 48).

13.    The State did not provide the defense copies of  Dockery's or Hutchins Grand Jury testimonies. *See*, Pet. Ex. 93 (Email from Allen Isbell to Jerome Godinich August 12, 2004).

14.    Following Alfred Brown's conviction at least two  witnesses have  repudiated their statements linking Alfred Dwayne Brown to Glaspie and Mr. Joubert on the day of the

---

[10]  Ju-Ju has been identified as George Morgan Powell.

42

robbery:

    a.    LaTonya Hubbard executed a declaration in relation to the state post-conviction case of Ex parte Alfred Dwayne Brown, Cause 1035159-A that she was encouraged by the officers of the Houston Police Department to identify Brown as being present with Glaspie and Mr. Joubert though she was unsure whether she had seen him.    When shown a photograph of Mr. Brown by police detectives, she advised that she could not identify him. During a personal interview with prosecutor Dan Rizzo before trial, she was encouraged to identify Brown as the individual she had seen.    See Pet. Ex.  13 (<u>LaTonya Hubbard Declaration</u>).

    b.    Lamarcus Collar likewise executed a declaration in the *Ex parte Alfred Dwayne Brown* case in which he recanted his previous trial testimony identifying Brown as being present in his apartment in the time period after the robbery, and explaining his positive identification of Brown as a result of police coercion.  *See* Pet. Ex. 15 (<u>Lamarcus Collar Declaration</u>).

15.    At Mr. Joubert's trial, Glaspie testified as a key witness regarding Mr. Joubert's participation in the offense.    Glaspie asserted that  Mr. Joubert, not he, had been the one to have shot Alfredia Jones  – albeit with Glaspie's pistol -- during the robbery.  [29 R.R.: 64, 65].   He also testified unequivocally that Alfred Brown had been the third individual present at  the robbery and had accompanied him and Mr. Joubert back to Nichole Collar's residence.

16.    As part of this testimony, Glaspie testified that he was testifying in exchange for a  plea bargain agreement of a 30 year sentence to Aggravated Robbery.  [29 R.R.: 9 - 11].  Glaspie  also stated that his plea agreement was contingent upon his being completely truthful and that if he testified falsely to any matter, his plea agreement would be withdrawn and he could receive a death sentence.  [29 R.R.: 12]

17.    During closing argument, the prosecutor specifically urged the jury to regard Glaspie testified truthfully because of the stringency of the plea agreement that Glaspie testify entirely truthfully, to -wit:

> Glaspie is eligible for the death penalty in Texas.  Glaspie testified heat he knows that if he testifies falsely about one thing and it doesn't match the evidence and it doesn't match anything, if he testifies falsely about one thing, that all deals are off.

> Also, he testified that there's no substantial compliance.  In other words, he can testify about 99 percent of – and comply with 99 percent of everything, but if one thing he doesn't comply with, he testifies falsely, then he can be prosecuted, again, for capital murder.  That's a heavy hammer.  That's a bigger hammer than most witnesses have over their head.

[31 R.R.:  118]

18.    After Mr. Joubert's and Alfred Brown's trials,   Glaspie plead guilty and pursuant to his plea agreement,  received a 30-year sentence to Aggravated Robbery.  *See* Pet. Ex.  100 (TDCJ Offender Information Detail).

19.    Alfred Dwayne Brown has challenged his own capital conviction in state post-conviction proceedings.   Mr. Brown has alleged  that the State withheld favorable evidence consisting of Ericka Dockery's phone records from the date of the offense which would have corroborated Ericka Dockery's testimony in his trial supporting his alibi.   The state habeas court has entered fact-findings that the State had, in fact, obtained, and failed to disclose Dockery's phone records, and that the record were material toward impeaching Glaspie on his

testimony that Brown had participated in the robbery. *See* Pet. Ex. 64 (*Ex parte Alfred Dwayne Brown*, Cause 1035159-A, Court's Findings of Fact and Conclusions of Law). As of the filing of this state post-conviction writ application, Mr. Brown's state writ is still pending in the Texas Court of Criminal Appeals.

B.      Argument and Authorities

The State violated Mr. Joubert's right to Due Process of Law by presenting false and misleading testimony through co-defendant Deshon Glaspie relating to Alfred Brown's participation in the robbery and by falsely vouching for Glaspie's credibility based on the zero-tolerance plea agreement which was premised upon Glaspie's complete truthfulness. This false and misleading testimony was critical to the jury's assessment of Glaspie's credibility. Glaspie exclusively supported the prosecutor's theory that Mr. Joubert, and not Glaspie, shot Alfreda Jones. In absence of direct physical evidence, Glaspie's word is the only support that was the actual shooter during the robbery, and therefore possessed a greater moral culpability, rendering him death-worthy.

The Due Process Clause to the Fifth and Fourteenth Amendments to the United States Constitution precludes the use of false or misleading testimony in order to obtain a conviction. *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264 (1959)*; and*, *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). Knowledge of the falsity or misleading nature of testimony is imputed among all members of the prosecution team, which, at a minimum, includes law enforcement personnel participating in the investigation. *Giglio v. United States*, 405 U.S.

150, 154 (1972); *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998); *Wedra v. Thomas*, 671

F.2d 713, 717 n. 1 (2d Cir. 1982); *United States v. Antone*, 603 F.2d 566, 569 (5th Cir.

1979) *Curran v. Delaware*, 259 F.2d 707, 712 - 713 (3rd Cir. 1958); *and*, *Ex parte*

*Castellano*, 863 S.W.2d 476, 481 (Tex.Cr.App. 1993).

False or misleading testimony requires the conviction be reversed if it is material, that

is, if it creates "any reasonably likelihood [it might] have affected the judgment of the jury

..." *Napue v. Illinois*, 360 U.S. 264, 271 (1959). *See also, Kyles v. Whitley*, 514 U.S. 419,

433 n. 7 (1995); *and*, *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Mr. Joubert would seek the opportunity to demonstrate to this court that the State

presented false and misleading testimony through its star witness Deshon Glaspie as well as

through the prosecutor's vouchsafing of Glaspie's credibility and that the false testimony was

material, creating a reasonable likelihood that the jury was influenced by the falsity in

returning a death sentence against Mr. Joubert.

Mr. Joubert anticipates proving in an evidentiary hearing that the State, through law

enforcement and/or prosecutors coerced witnesses into positively and unequivocally

identifying Alfred Brown to have been in Glaspie's company on the morning of the robbery,

despite those witnesses having earlier identified a different individual named "Deuce." The

effect of this coercion was to support Glaspie's account of the offense and identification of

the participants. Further, Mr. Joubert would show that the State early in the investigation

obtained strongly probative evidence in the form of Ericka Dockery's phone records which

refuted Glaspie's account.   The effect of this evidence, either singularly, or in combination rendered at least a portion of Glaspie's testimony at trial false and misleading.

To compound the error, the prosecutor presented false and misleading information concerning the terms of Glaspie's plea agreement, indicating to the jury that the agreement would be rendered void by the slightest of misstatements, or testimony which did not comport with the evidence.   In fact, Ericka  Dockery's phone records, which had been obtained by the State,  directly indicate that Glaspie had almost certainly misstated an important fact of his story – that Alfred Brown in any way participated in the offense.   The prosecutor's assertions that the State was holding Glaspie to a standard of 100% truth was illusory in light of its possession of such evidence demonstrating Glaspie's mendacity.

Upon development of the evidence, Mr. Joubert would also show that the false testimony, as well as false assertions relating to the plea agreement were material in that there is a reasonable likelihood that the punishment verdict would have been different had the actual facts been disclosed.  Glaspie's plea status was premised upon the State's theory that he had not been the actual shooter – Mr. Joubert had.   Even if this is not the determinative factor to whether the State could obtain a conviction under the law of parties, Tex.Penal Code § 7.02,  or a death sentence under the parties special issue, Tex.Code Crim.Pro. Art. 37.071, § 2(b)(2),   the dichotomy between the actual shooter, and non-shooter bore unmistakable significance to the jury's decision of moral culpability.   A jury would more likely have regarded the actual shooter as death worthy than a non-shooter.  Glaspie's  contention that

he was not the individual who directly caused Alfredia Jones' death, coupled with the State's false vouchsafing that he was more likely to be truthful as a result of his plea agreement, had a likely effect of convincing the jury that Mr. Joubert had been the one to have actually shot Ms. Jones.   Had the evidence been presented to the jury that reliable phone records contradicted a part of his account, and that the grand jury testimony from his girlfriend (presented thru Ms. Hutchins) contradicted this account,   jurors would necessarily have questioned the other aspects of his testimony, as well as whether the State's professed incentive was a sufficient guaranty of truth.   Like a house of cards, had one portion of Glaspie's account been exposed as false, the remainder of his story would likewise have fallen apart.   In the absence of evidence pointing to Mr. Joubert as the shooter, jurors might well have concluded that Glaspie, who originated the idea of a robbery and provided the gun and getaway vehicle, had likely been the shooter, placing Mr. Joubert's own culpability in a more favorable light.

C.     The claim is unexhausted and Mr. Joubert requests a reasonable opportunity under *Rhines v. Weber*, 544 U.S. 269 (2005) to demonstrate the issue warrants a stay and abatement to exhaust the claim in state court.

Mr. Joubert concedes that the above claim is unexhausted and procedurally defaulted. Neither counsel on direct appeal, nor state habeas counsel raised the claim in the state courts. Direct appeal counsel could not have raised the claim however, because it is premised on facts which are not established in the trial record.  State habeas counsel did not discover the claim; in fact, Mr. Joubert's state writ petition was filed in December 2006.   Mr. Brown did not file

his post-conviction petition and exhibits, including the previously secret grand jury testimony relevant to both Mr. Brown and Mr. Joubert until October 27, 2007. And the state habeas court in the *Brown* case did not issue its findings of fact and conclusions of law in the *Ex parte Brown* case until May 22, 2013.

Accordingly, the present case presents the existence of an unexhausted claim arising out of a factual and legal basis which did not exist at the time Mr. Joubert's writ was filed. Under these circumstances, the claim may be subject to being accepted in a successive petition to the Texas Court of Criminal Appeals under Tex.Code Crim.Pro. Art. 11.071, § 5. Under *Rhines v. Weber*, 544 U.S. 269 (2005), this Court has the discretion to stay and abate the proceedings when there is "good cause" to do so and there is some showing that the claim is not merritless. *Id*., 544 U.S. at 277.

Mr. Joubert would request the opportunity to develop the facts of this claim to the extent necessary to make the required showing under *Rhines*, *supra*.

§§§

Claim for Relief Number Two (Unexhausted Claim):

> THE PROSECUTION WITHHELD MATERIAL EVIDENCE WHICH IMPEACHED ITS
> KEY WITNESS, DESHON GLASPIE'S TESTIMONY AND WHICH WOULD HAVE
> UNDERMINED THE BOLSTERING FORCE OF THE STATE'S ZERO TOLERANCE PLEA
> AGREEMENT.

A.      Facts in Support of Claim

1.      The robbery of the ACE Check Express store in this case  occurred shortly before 10:00 a.m. on April 3, 2003.   [28 R.R.: 56; 44 R.R.: 8 (State's Exhibit 1)].

2.      Within hours of the killings, Houston Police Department Sargent S.H.  Kennedy spoke with a resident of the Villa American Apartments, Alisha "Lisa" Hubbard.  Hubbard advised Kennedy that earlier that morning, around 8:00 a.m.,  she had observed three individuals,  "Shawn" (subsequently identified as Deshon Glaspie), "Ghetto" (subsequently identified as  Mr. Joubert), and "Deuce" (subsequently identified as a third individual named Ernest Matthews.) standing around in the parking lot while Glaspie loaded a .45 caliber semi-automatic pistol.  [28 R.R.: 56; 44 R.R.: 8 (State's Exhibit 1)].

3.      During the morning of April 3rd,   LaTonya Hubbard,  Lisa Hubbard's sister, after learning of the  ACE Check Cashing store robbery phoned Crime Stoppers to report her suspicions about the participants.   She advised the police that she had seen  Deshon Glaspie, Mr. Joubert and "Deuce" earlier that morning while at a gas station. *See*   Pet. Ex.94 (Trial Counsel notes on statement of LaTonya Hubbard to Houston Police Department).

4.       Upon  his arrest on April 4, 2003,  Glaspie was interrogated by Houston Police Department detectives W.O. Allen and Brian Harris in the offices of the Homicide Division.

Glaspie identified Alfred Dwayne "Doby" Brown as one of the participants in the robbery. He specifically charged that Brown had been the one to have shot and killed the police officer, Charles Clark. *See* Pet. Ex. 21, (Transcript of Dashon Glaspie Statement to Houston Police Department April 4, 2003, pp. 30 - 33).

5.     Houston Police Department Sergeants Kennedy and Ramsey interviewed Lamarcus Colar on April 4, 2003, the morning after the offense.   They related that Colar told them that around 10:30 a.m. on April 3, Glaspie, Mr. Joubert and Brown came over to his apartment.   During their stay, Colar overheard Glaspie speaking on his cell phone and admit that he shot Alfredia Jones, during the robbery. When shown photo arrays of the three individuals, Colar positively identified Glaspie and Mr. Joubert, but only "tentatively" identified Brown. [41 R.R.: 8 (State Exhibit 1 – Affidavit for Arrest)].

6.     In April, nearly two weeks after the offense, Houston Police Officers interviewed Ericka Dockery's employer, Alma Berry.   Berry knew Brown and recognized his voice from Dockery having previously brought to Berry's house.   Berry related that she answered her phone around 10:00 a.m. on April 3 and spoke with Brown. *See* Pet. Ex. 110 [HPD OR# 045215203-Page 1.006]; Pet. Ex. 92 (Trial Counsel notes of Berry statement to HPD).   The police subsequently issued a subpoena duces tecum for Dockery's phone records, which reflect a call from her residence to Berry's residence at approximately 10:08 a.m. *See* Pet. Ex. 64 (*Ex parte Alfred Dwayne Brown* Cause 1035159-A, Court's Findings of Fact and Conclusions of Law, Fact Finding # 28, p.7).

7.     On April 21, 2003,   Ericka Dockery, Alfred Dewayne Brown's girlfriend testified before the Grand Jury.   Dockery testified that she had awoken at 6:45 and left her apartment to go to work as a home health care aide at 8:30 and observed Brown, her boyfriend, asleep on the couch  from the time she arose to the time she left.   *See*  Pet. Ex.62 (Grand Jury Testimony of Ericka Dockery, April 21, 2003).   She subsequently received a phone call from Brown around 10:00 a.m.   *See* Pet. Ex. 62.   Throughout her grand jury testimony, Dockery maintained that the phone call from Brown occurred around 10:00 a.m.  *See* Pet. Ex.62  (Dockery,  95 – 120, 113 – 114).   Dockery also denied that Brown had ever admitted to having participated in the robbery.   *See* Pet. Ex. 62 (Dockery, at 43, 73, 75, 137).

8.     On April 28, 2003,  the State called Glaspie's girlfriend,  Tonikia Hutchins, as a witness during Grand Jury proceedings.  Under questioning about any admissions Glaspie had made to her about participating in the robbery, Hutchins stated that Glaspie had related to her that Ju Ju, rather than "Doby" (Alfred Brown) had been present at the robbery.  *See* Pet. Ex. 61 (Grand Jury Testimony of Tonikia Hutchins, p. 23,  April 28, 2003).[11]   Glaspie told her that he was present at the scene of the robbery but had not gone inside the store;  Mr. Joubert and "Ju-Ju" were the ones who went into the check cashing store.  *See*  Pet. Ex. 61(Hutchins, at 88 - 89).   She repeated that  Glaspie told her that "Ju Ju" had been present but not  "Doby."  *See*  Pet. Ex. 61 (Hutchins, at 90).

10.     At  Mr. Joubert's trial,  Glaspie  testified  as a key witness regarding Mr.

---

[11] Ju-Ju has been identified as George Morgan Powell.

Joubert's participation in the offense.   Glaspie asserted that  Mr. Joubert, not he, had been

the one to have shot Alfredia Jones  – albeit with Glaspie's pistol -- during the robbery.  [29

R.R.: 64, 65].  He also testified unequivocally that Alfred Brown had been the third individual

present at  the robbery and had accompanied him and Mr. Joubert back to Nichole Collar's

residence.

   11. As part of this testimony, Glaspie testified that he was testifying in exchange

for a  plea bargain agreement of a 30-year sentence to Aggravated Robbery.  [29 R.R.: 9 -

11].  Glaspie  also stated that his plea agreement was contingent upon his being completely

truthful and that if he testified falsely to any matter, his plea agreement would be withdrawn

and he could receive a death sentence.   [29 R.R.: 12]

   12. During closing argument, the prosecutor specifically urged the jury to regard

Glaspie testified truthfully because of the stringency of the plea agreement that Glaspie testify

entirely truthfully, to -wit:

> Glaspie is eligible for the death penalty in Texas.  Glaspie testified heat
> he knows that if he testifies falsely about one thing and it doesn't match
> the evidence and it doesn't match anything, if he testifies falsely about
> one thing, that all deals are off.

> Also, he testified that there's no substantial compliance.  In other words,
> he can testify about 99 percent of – and comply with 99 percent of
> everything, but if one thing he doesn't comply with, he testifies falsely,
> then he can be prosecuted, again, for capital murder.  That's a heavy
> hammer.  That's a bigger hammer than most witnesses have over their
> head.

[31 R.R.:  118]

13.     After Mr. Joubert's and Alfred Brown's trials,   Glaspie plead guilty and pursuant to his plea agreement,  received a 30-year sentence to Aggravated Robbery. *See* Pet. Ex. 110 (TDCJ Inmate Search Information).

14.     Alfred Dwayne Brown has challenged his own capital conviction in state post-conviction proceedings.  Mr. Brown has alleged  that the State withheld favorable evidence consisting of Ericka Dockery's phone records from the date of the offense which would have corroborated Brown's alibi that he was at her home at the approximate time Glaspie testified in both Mr. Joubert's and Brown's trial, thus impeaching Glaspie's testimony.   The state habeas court has entered fact-findings that the State had, in fact, obtained, and failed to disclose Dockery's phone records, and that the record were material toward impeaching Glaspie on his testimony that Brown had participated in the offense. *See* Pet. Ex. 64  (*Ex parte Alfred Dwayne Brown*  Cause 1035159-A, Findings of Fact and Conclusions of Law, Fact Findings 24 - 34, pp.7 - 8).    As of the filing of this state post-conviction writ application, Mr. Brown's state writ is still pending in the Texas Court of Criminal Appeals.

15.     The State did not provide the defense, either directly, or through the trial court, the grand jury transcripts for Ericka Dockery or Tonikia Hutchins.  The defense did not have access to Dockery's or Hutchins grand jury testimony either before, during, or after trial.  The defense had no knowledge of the content of Dockery's or Hutchins'  Grand Jury testimony.

16.     The State did not provide the defense, either directly, or through the trial court, Ericka Dockery's phone records (appended to the state habeas court's Findings and Fact and

Conclusions of Law in *Ex parte Brown*, *supra*, Pet. Ex. 64), which reflect the phone calls from her land line to her employer's phone.  The defense had no knowledge of these records or of the contents of the records.

B.    Argument and Authorities

The State violated Mr. Joubert's right to Due Process of Law by withholding material evidence which impeached Deshon Glaspie's testimony which related to  Alfred Brown's participation in the robbery and which had the effect of bolstering Glaspie's credibility under the State's zero-tolerance plea agreement which was premised on Glaspie's complete truthfulness.  The import of withholding this evidence was to deprive Mr. Joubert of objective and irrefutable evidence which refuted Glaspie's testimony and which cast doubt upon the effect and good faith of the State's zero-tolerance plea agreement premised on Glaspie's 100% truthful testimony.

The State violates a defendant's right to Due Process of Law under the 5th and 14th Amendments to the United States Constitution when it withholds  evidence which is material and  favorable to the defense, either on the issue of guilt, or to punishment.  *Smith v. Cain*, ___ U.S. ___, No. 10-8145, slip op. at 2 (2012);   *Strickler v Greene*, 527 U.S. 263, 280 (1999);   *and*,  *Brady v. Maryland*,   373 U.S. 83, 87 (1963).   Favorable evidence includes evidence which merely serves to impeach a witness.   *Strickler*, 527 U.S. at 280; *and*, *State v. Thomas*,  841 S.W.2d 399, 403, 404 (Tex.Cr.App. 1992). Favorable evidence is material if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different. *Smith v. Cain*, ___ U.S. at ___, slip op. at 2; *and*, *Strickler*, 527 U.S. at 280.   A "reasonable probability" is not the same as a preponderance of the evidence, and confidence in the outcome of the proceedings may result even if a petitioner does not establish that it is more likely than not that the proceedings would have been different.   *Smith*, ___ U.S. at ___ (citing *Kyles v. Whitley*, 514 U.S. 419, 434, (1995)).   The suppression of material and favorable evidence occurs regardless of the good or bad faith of the prosecutor. *Banks v. Dretke*,   540 U.S. 668, 691 (2004).   The prosecutor need not even know of the existence of the favorable evidence; knowledge of the evidence is imputed to the prosecution if it is known by any member of the prosecution team. *Strickler*, 527 U.S. at 281 - 282; *and*,  *Kyles v. Whitley*, 514 U.S. at  433- 434.

Mr. Joubert would seek to show in an evidentiary hearing that the evidence of Dockery's and Hutchins' grand jury testimony and of Dockery's phone records were (1) favorable; (2) material; and (3) withheld from the defense.

The withheld Grand Jury testimony and phone records were favorable because they served to impeach Glaspie on a significant portion of his testimony – that Brown participated in the offense.   Dockery's testimony and her phone records would have impeached Glaspie because – as is evident from the records in the context of Brown's trial – they served to establish that Brown had an alibi and had not been present at the ACE check cashing robbery. This was not simply favorable to Brown – it was likewise favorable to Mr. Joubert because Glaspie's testimony that Mr. Joubert, rather than he, was Alfredia Jones' shooter was

bolstered by the fact that Glaspie was testifying under a zero-tolerance plea agreement.   The prosecutor made clear during Glaspie's testimony that *any* falsity, even a minor one, would render the plea agreement void and subject Glaspie to prosecution for capital murder.    The existence of the  hammer over Glaspie, contingent upon his 100% truthful testimony thus served to guarantee his credibility.

The evidence was material to the issue of punishment.    Glaspie's testimony was highly material on the identity of the shooter.  Even as the prosecutor indicated during his questioning of Glaspie, it was important that Glaspie not be the actual shooter – a distinction which conveys the significant moral distinction necessarily applied in the question of punishment between an actual shooter, and someone merely culpable as a party.    Jurors would necessarily have placed emphasis in Mr. Joubert's status as the individual who actually caused Alfredia Jones's death.   Had the grand jury testimony and records been disclosed and used to impeach Glaspie, one or more  jurors would necessarily have harbored doubts about Glaspie's testimony as a whole, and, more significantly, harbored doubts whether the State was actually holding Glaspie to a zero-tolerance plea agreement.    Presentation of Glaspie's testimony, particularly in light of the phone records, would have  reflected – or at least permitted defense counsel to argue - that  the zero-tolerance plea agreement was illusory, and did not preclude Glaspie from mendaciously shifting the blame for Alfredia Jones' murder to Mr. Joubert, rather than himself.

The evidence was withheld from the defense.   The state habeas court for the 351st

District court of Harris County, Texas has already made a finding that Ericka Dockery's phone records were suppressed and not disclosed to Mr. Brown's trial attorneys.  Mr. Joubert would show that neither Dockery's grand jury testimony, nor her  phone records were disclosed to the defense in Mr. Joubert's case and that counsel were unaware of the contents of the grand jury testimony and records.

> C. The claim is unexhausted and Mr. Joubert requests a reasonable opportunity under *Rhines v. Weber*, 544 U.S. 269 (2005) to demonstrate the issue warrants a stay and abatement to exhaust the claim in state court.

Mr. Joubert concedes that the above claim is unexhausted and procedurally defaulted. Neither counsel on direct appeal, nor state habeas counsel raised the claim in the state courts. Direct appeal counsel could not have raised the claim however, because it is premised on facts which are not established in the trial record.  State habeas counsel did not discover the claim; in fact, Mr. Joubert's state writ petition was filed in December 2006.[12]   By contrast, the state habeas court did not issue its findings of fact and conclusions of law in the *Ex parte Brown* case until May 22, 2013.

Accordingly, the present case presents the  existence  of an unexhausted claim arising out of a factual and legal basis which did not exist at the time Mr. Joubert's writ was filed. Under these circumstances, the claim may be subject to being accepted in a successive petition

---

[12]  Mr. Joubert would seek the opportunity to demonstrate in hearing that state habeas counsel put forth little or no effort in reviewing Mr. Brown's case for evidence which might benefit Mr. Joubert.   State habeas counsel apparently did not review Mr. Brown's post-conviction writ file, and while cooperating with Mr. Brown's post-conviction counsel to procure his an affidavit by his client to assist Mr. Brown, did not obtain any materials on the Brown case which might benefit him.   State habeas counsel did not request to obtain either of trial counsel's files, which have been obtained by the undersigned counsel.

to  the Texas Court of Criminal Appeals under Tex.Code Crim.Pro. Art. 11.071, § 5.   Under

*Rhines v. Weber*, 544 U.S. 269 (2005), this Court has the discretion to stay and abate the

proceedings when there is "good cause" to do so and there is some showing that the claim is

not merritless.   *Id*.,  544 U.S.  at 277.

Mr. Joubert would request the opportunity to develop the facts of this claim to the

extent necessary to make the required showing under *Rhines*, *supra*.

§§§

59

Claim for Relief Number Three (Unexhausted Claims):

> TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE
> PUNISHMENT PHASE OF TRIAL BY COUNSEL'S FAILURE TO UNDERSTAND THE
> BASIS OF THE AVAILABLE MITIGATING EVIDENCE THEREBY UNDERMINING THE
> PRESENTATION OF EVIDENCE THROUGH THE DEFENSE'S EXPERT WITNESSES
> LICENSED SOCIAL WORKER BETTINA WRIGHT AND FORENSIC PSYCHOLOGIST
> MARK CUNNINGHAM.

A.     Facts in Support of Claim

1.     Trial counsel retained and presented Dr. Mark Cunningham, a forensic psychologist to present the jury with an understanding of how the factors of Mr. Joubert's birth through young adulthood had a formative effect upon his development and personality. As part of his presentation and testimony, Dr. Cunningham intended to rely on a PowerPoint presentation of topics relating to the specific information he had obtained about Joubert's past. In a hearing outside the jury's presence, the State objected to the Power Point slides on the basis of hearsay. The trial court sustained the State's objection and excluded the Power Point slides and Cunningham's accompanying testimony based on hearsay or not having already been presented to the jury. [36 R.R.: 90 - 177; 37 R.R. 3 - 4]. The trial court permitted Dr. Cunningham to present a redacted power point presentation based on information which had already been presented before the jury. [36 R.R.: 4]. The court entered both the redacted Power Point presentation, and the original presentation into evidence for appellate purposes as Court's Exhibits 1 and 2.[13] [37 R.R.: 4].

---

[13]   The redacted and unredacted form of the Dr. Cunningham's Power Point presentation are included with this writ application as Trial Court Exhibits 1 (redacted) and Trial Court Exhibit 2 (unredacted). They are included in the appellate record in Volume 45 of the Reporter's Record.

2.     Trial counsel for Mr. Joubert made a lengthy bill of exception in which Dr. Cunningham explained the relevance of the subject matter of the excluded testimony and presentation, and its scientific reliability. [37 R.R.:  5 - 33].   During the bill, the trial court clarified the basis for his ruling, explaining that the excluded matters were irrelevant to the extent that they were based upon hearsay evidence which had not been presented to the jury. [37 R.R.: 31 - 33; 38 R.R.: 91 - 169].

3.     Dr. Cunningham subsequently testified subject to the trial court's limitations. [37 R.R.: 33 - 182; 38 R.R.: 3 - 89].

4.     Dr. Cunningham was the final defense witness to discuss individual aspect of Mr. Joubert's upbringing and circumstances.

5.     Dr. Cunningham's case notes from witness interviews reflects that the information excluded from hearsay was obtained from his interviews of family witnesses who testified at trial, or from other witnesses who were reasonably available to provide the predicate facts in order to render Cunningham's testimony factually supported.   Dr. Cunningham's hand written notes of the family interview are included with this writ application as Petitioner's Exhibits 82, 83 and 87and are referred to as if fully incorporated herein.   His notes reflect the availability of witnesses to support omitted testimony as follows:

  a.     <u>Disorganized and violent neighborhood testimony</u>: The trial court excluded Dr. Cunningham's   testimony relating to Mr. Joubert's growing up in a disorganized and violent neighborhood in which there was easy access to weapons.   [37 R.R.: 144 - 149; 45 R.R.: Court

61

Exhibit 1, p.5 (slide 4)].   Nonetheless,   trial counsel had the factual basis for this information available through witness Roberta Davis, who testified at trial.   In her August 13 meeting with Cunningham and trial counsel described hers and Mr. Joubert's experiences growing up in the neighborhood.   Roberta related to them that both she and her younger brother "saw shooting" – Mr. Joubert would have been around 13 or 14 years old.   Mr. Joubert saw his first murder when he was very young and the older guys were shooting dice – one player shot another at point blanks range.   In addition, she and Joubert "saw shootings." Their mother saw a neighbor Nathan Earl shot dead.   Davis observed the body when it happened. Davis also mentioned to Dr. Cunningham about seeing "another body dumped." at the complex. *See*, Pet. Ex 83 (Roberta Davis Interview, pp. 7, 9).

b.   <u>Insufficient bonding at school</u>:   the trial court also excluded testimony that Mr. Joubert had not been bonding at school.   Dr. Cunningham's notes of the Roberta Davis interview reflects that she advised him that her brother would "never do homework . . . never brought a report card home."   She also mentioned the her brother never received any help with his homework and as a result, he would act  as the "class clown" or leave campus, resulting in his frequent suspensions.

Similarly, Mr. Joubert's mother advised Dr. Cunningham during her pre-trial interview that she  "did not assist with homework," explaining that "school was difficult" for her, and she herself had "dropped out 9th grade." *See* Pet. 82, (Leona Brown Interview  p. 5).

c.   <u>Mr. Joubert's borderline full scale IQ and developmental delays</u>: The trial court excluded testimony that Mr. Joubert had a full scale IQ of 80 and grew up in an isolated family environment which caused him to develop slowly and be abnormally immature.   [Court's Ex. 1, p. 6, slide 1; Ex. Vol. 45 p. 62.].   Dr. Cunningham testified that Mr. Joubert had tested to have a full scale IQ of 80 by a "Dr. Rosen." [37 R.R.: 24].
   Trial counsel's files reflect that Houston-based clinical psychologist and neuro-psychologist Dr. Lindsay Rosen conducted a five-hour neuropsychological evaluation on September 11, 2004.  Dr. Rosen's billing statement is included with this writ application of Exhibit 31 and referred to as if fully incorporated herein.  Dr. Rosen was presumably available to testify about his intelligence testing and related matters.

Similarly, Mr. Joubert's mother, Leona Brown reported to Dr. Cunningham during her interview with him that her son had been slow to walk, and had not learned how to speak until he was two years old. *See*, Pet. 82, <u>Leona Brown Interview.</u>

d.   <u>Mr. Joubert's likely had Attention Deficit Activity Disorder (ADHD)</u>: The trial court excluded testimony that Mr. Joubert exhibited many symptoms of Attention Deficit Hyperactivity Disorder [ADHD] such as hyperactivity in childhood, an inability to focus, constantly getting into trouble in the absence of close supervision.   [36 R.R.: 146; 45 R.R.: Court's Ex. 1, p. 10, slide 1 - 4].   In her interview with Dr. Cunningham, Roberta Davis described her brother in his childhood years as "hyper . . . crawled around the house, wouldn't watch the t.v. . . . wouldn't sit still, would get into things if not watched carefully . . . . was disruptive at school." *See* Pet. 83, <u>Roberta Davis Interview</u>, pp. 16-17.

e.   <u>Mr. Joubert's susceptibility to alcoholism, drug use, conduct disorder and adult criminality as a result of his suspected ADHD</u>:   Dr. Cunningham had anticipated testifying that as a result of ADHD, Mr. Joubert was more susceptible than the average population to alcoholism and drug use, conduct disorder and adult criminality but was precluded from doing so on following the State's objection. [36 R.R.: 104 - 107, 146; 37 R.R.: 13 - 15, 23.].   Dr. Cunningham's notes of his interview with Roberta Davis as well as Leona Brown reflects they advised him that Mr. Joubert started smoking marijuana as young as seven or eight. *See* Pet Ex. 82, (<u>Leona Brown Interview</u>, p. 2); Pet Ex. 83, (<u>Roberta Davis Interview</u>, pp. 17).

f.   <u>Absence of a father-figure</u>:   The trial court excluded Dr. Cunningham's testimony on the detrimental effect of a father-figure's absence on a child's development and its effect in increasing the likelihood that Joubert would engage in criminal behavior, as well as indulge in alcohol and illicit drugs.  The basis of the court's ruling was hearsay – there was a lack of evidence relating to the absence of father figures in Petitioner's life.  [36 R.R.: 113 - 114, 150 - 151; 45 R.R.: Ct Ex 1, p. 14, slides 2- 4].  However, Dr. Cunningham's notes of his interview with Leona Brown reflect she discussed extensively her pregnancy with Joubert and how her subsequent paramours did not provide any father figure for her son. *See* Pet. Ex. 82, Leona Brown

Interview, pp. 1-5; *and*; Pet. Ex. 84,  pp. 3 - 4.

g.     Attachment issues relating to distant  mothering:    The trial court
excluded Dr. Cunningham from discussing the effects of disrupted
primary attachment to  one's mother as a negative factor in personal
development.   Disrupted attachment skews the way a person relates to
and  values other members of society as an adult.    The trial court
excluded as hearsay facts supporting a showing of Leona Brown's
distant mothering – that she was away from home "most of the time,"
that she kept to her room, sleeping when she was home, that she paid
an aunt to watch them,  and that they only saw their mother a few times
a week – as well as directed Dr. Cunningham not to discuss the
conclusion that the quality of attachments relates to how adults value
other members of society.   [36 R.R.:114 – 115,   152 – 153].    Dr.
Cunningham had inquired into the factual basis of these interview
during his interviews with Mr. Joubert's sister and mother.   Roberta
Davis advised Cunningham and trial counsel that her mother was not
home  "a majority of the time," and that she stayed in her room and
slept all day when she was home.   *See*  Pet. Ex. 81, Roberta Davis
Interview, pp. 2, 5-7.  Leona Brown likewise advised the trial team that
she had paid her sister "Paulette" to stay with her  kids while she lived
with one of her paramours, Orlando.  *See*  Pet. Ex. 84, Leona Davis
Interview  p. 4.

6.    Trial counsel was present when Dr. Cunningham interviewed the family

witnesses and/or consulted with him on the same date.    Trial counsel's time sheets, which

reflects his 8 - hour consultation with Dr. Cunningham on the same date as the family

interviews is included with this writ application as Exhibit 88 and referred to as if fully

incorporated herein.

7.  Trial counsel also retained and presented Bettina Wright, a licensed social worker

to explain to the jury how Mr. Joubert's childhood upbringing had deviated from the norm

and how  the effects of his parenting would have affected his development.    The State

objected that Wright's testimony was hearsay. [35 R.R.: 144 - 144].   The trial court sustained the hearsay objection, limiting Wright's testimony to general science behind childhood development, and her own opinion on Mr. Joubert's development, but excluding her discussion of any specific supporting facts gathered from her interviews with Mr. Joubert and his family members.  [35 R.R.:  144 - 145].

8.   Ms. Wright subsequently testified regarding generalities of childhood development, and negative impacts upon a healthy development, but in response to repeated objections to hearsay,  related only limited information tying Mr. Joubert's own upbringing to the field.  [35 R.R.: 145 - 169, 200 - 208].

9.   Ms. Wright attempted, but was specifically prevented by hearsay objections from testifying about the following facts when discussing the  negative influences upon Mr. Joubert's development:

a.   Mr. Joubert's mother, Leona Brown's  using drugs and living chaotic at the time of his birth, [35 R.R.: 153];

b.   Mr. Joubert's own drug use at an early  young age,  [35 R.R.: 153];

c.   the lack of limitations on Mr. Joubert's behavior as a child, [35 R.R.: 157];

d.   Leona's Brown's lack of efforts to her child from negative influences, [35 R.R.: 169]; and

e.   the lack of positive influences on Mr. Joubert as a child,   [35 R.R.: 207].

10.   Although prevented from testifying about the specific facts she learned from

Mr. Joubert and his family members, Ms. Wright did interview prior to trial several family members:  Mr. Joubert's sister Roberta Nicole Davis, his  grandmother,  Mary Carmouche, and his grandfather Elijah White.  Ms. Wright's interview notes were available to trial counsel, if not in counsel's actual possession prior to trial.  Ms. Wright's interview notes are included in this writ application as Exhibits 85 - 86 and referred to as if fully incorporated herein.    Ms. Wright's notes reflect the following information obtained from each witness in relation to Wright's testimony:

    a.    Wright's notes of her interview of Roberta Davis reflect that Davis spoke about the lack of limits provided by Leona Brown – "nothing about right and wrong." Pet. Ex. 85, (<u>Wright – Roberta Davis Interview</u>).   Davis advised Wright that her mother was   "on drugs and did it all " and that as a punishment, she made Davis and Joubert smoke marijuana. According to Davis, Leona refused to even provide her children with lunch when she had money to give. *Id.*

    b.    Leona Brown's mother – Mr. Joubert's grand mother advised Wright of the extent of Leona's drug dependency.  Carmouche related that her daughter  "was smoking weed at age thirteen," and "got into crack" after she left home at age sixteen.   Brown has been "on drugs for thirty years."

    c.    Wright's notes reflect that either Carmouche, or Mr. Joubert's grandfather, Elijah White   advised her that "there was no positive influence in his [Joubert's] life." Pet. Ex. 85,  (<u>Wright – Carmouche - White Interview</u>).

    11.    For both Dr. Cunningham, and Ms. Wright, trial counsel did not re-call the witnesses from whom Cunningham and Wright had obtained the information which was the basis of their testimony.

    12.    Each of the individuals from whom Dr. Cunningham and Ms. Wright obtained

their data had either testified at trial

a.   Roberta Nicole Davis has provided an affidavit in which she states that she met with Dr. Cunningham at her grandmother's residence.  Lead trial counsel, Jerome Godinich was also present through the interview.  After she finished testifying at trial, Nichole was still available as a witness and would have testified to what she had related to Dr. Cunningham.  *See* Pet. Ex. 17 (<u>Declaration of Roberta Nicole Davis</u>).

b.   Mary Carmouche has also provided an affidavit in which she states that she was interviewed by Dr. Cunningham in her home, during which time, Jerome Godinich was present.  Carmouche was also available to be re-called as a witness at trial and would have testified in accordance with what she had related during her interviews.  Pet. Ex. 18 (<u>Declaration of Mary Carmouche</u>).

c.   Leona Brown has also provided an affidavit in which she states that she was interviewed by Dr. Cunningham in her mother's home and that Godinich was present during the interview.  Leona was also available to be re-called as a witness at trial and would have testified in accordance with what she had related during her interviews.  Pet. Ex. 19 (<u>Declaration of Leona Brown</u>).

B.   Argument and Authorities

I.   The law of Ineffective Assistance of Counsel

Trial counsel rendered ineffective representation under the 6th and 14th Amendments to the United Sates Constitution as a result of trial counsel's inadequate investigation into Mr. Joubert's past, and preparation for trial with the information which was obtained from the investigation.   As a result of trial counsel's limited understanding of the available mitigation evidence and inadequate preparation, counsel precluded himself from making meaningful use of Dr. Cunningham and Ms. Wright and present a compelling mitigation presentation.

The standard for reviewing the adequacy of counsel's performance is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to demonstrate that counsel was ineffective, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced by this deficient representation. *Williams v. Taylor*, 529 U.S. 362, 690 - 691 (2000); *and*, *Strickland*, 466 U.S. at 668, 694. Prejudice is established by showing that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different *Williams*, 529 U.S. at 691. A "reasonable probability" has been characterized as a "probability sufficient to undermine confidence in the outcome" of the proceedings, *ibid (*citing *Strickland*, 466 U.S. at 694), but it is not the same as a preponderance of the evidence. Prejudice may be established on a showing of less than a preponderance. *Strickland*, supra, at 693 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland."). And in evaluating the likelihood of prejudice, the Court concerns itself with whether only a single juror might have been affected by the error. *Wiggins v. Smith*, 39 U.S. 510, 537 (2003); *and*, *Rocha v. Thaler*, 626 F.3d 815, 825 (5th Cir. 2010) (citing *Gray v. Epps*, 616 F.3d 436, 442 (5th Cir. 2010)).

*Strickland* is premised on adequacy of investigation and preparation. *Strickland*, 466

U.S. at 690 - 691. Yet even before *Strickland*, both federal and state cases unequivocally held that effective representation requires counsel to be thoroughly familiar with the law as well as the facts of the case. *Caraway v. Beto*, 421 F.2d 636, 637 (5th Cir. 1970) ("Certainly, an attorney cannot render reasonably effective assistance unless he has acquainted himself with the law and facts of the case."); *Ex parte Duffy*, 607 S.W.2d 507, 516 - 517 (Tex.Cr.App. 1980). *See also, Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Cr.App. 1990) (citing *Duffy*). This is because in forming and executing his defensive strategy, counsel must have a reasonable understanding of the alternatives. *See Sowell v. Anderson*, 663 F.3d 783, 790 (6th Cir. 2011) ("Because they were not aware of this additional mitigating evidence, Sowell's attorneys were not in a position to make a conscious, strategic decision about the type of mitigation case to present at sentencing . . . Sowell's attorneys did not make a conscious choice among available alternative strategies because they overlooked an entire category of compelling mitigating evidence."); *and*, *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) ("was no strategic decision at all because Shook was ignorant of various other mitigation strategies he could have employed."). Counsel is unable to formulate or execute a defensive strategy if he is unaware of his options.

Even where counsel has formed and pursued a strategy, counsel may be ineffective through deficient execution of that strategy. *See Smith v. Spisak*, ___ U.S. ___, 130 S.Ct. 676, 691 (2010) (Stevens, J., concurring) ("[S]urely, a strategy can be executed so poorly as to render even the most reasonable of trial tactics constitutionally deficient under

*Strickland*").  *See also, Hooks v. Workman*, 689 F.3d 1148, 1203 (10th Cir. 2012).   Along this line, appellate courts have recognized that the decision to utilize an expert in order to present the mitigating theory entails the competent use of that expert.   Counsel may render deficient representation by failing to conduct a sufficient investigation of the case or preparation of the expert to present the mitigation theory.   *See* e.g.,   *Hovey v. Ayers*, 458 F.3d 892, 924 - 931  (9th Cir. 2006) (holding counsel to be ineffective at the punishment phase of trial due to counsel's failure to prepare  defense mental health expert for his testimony);   *Richey v. Mitchell*, 395 F.3d 660, 683 - 688  (6th Cir. 2005) (counsel held to be ineffective for, inter alia, failing to provide information to expert as well as failing to monitor work of expert), *rev'd and remanded on other grounds*, *Bradshaw v. Richey*, __ U.S. __, 126 S.Ct. 602 (2005); *and*,   *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002) (holding counsel ineffective for presenting expert testimony which opened door to damaging report and  for  presenting  psychological  evidence  "in  an  unprepared,  uninformed  and,  thus, disastrous manner.")

    ii.    The facts before the court raise a bona fide issue of whether trial counsel rendered ineffective assistance of counsel through failure to establish the predicate facts for the expert testimony through witnesses on hand.

Undoubtedly, trial counsel adopted a strategy of presenting mitigating factors about Mr. Joubert's childhood and then explaining through expert witnesses how the facts and circumstances of his childhood had a formative effect upon him as a young adult.   Yet counsel presented only brief, and incomplete testimony by Mr. Joubert's family members,

relying instead upon social worker Bettina Wright and clinical psychologist Mark Cunningham to build upon the family members' testimony and develop the primary mitigating thrust of such testimony.   A major part of the defense presentation was thwarted by the trial court's exclusion of relevant testimony on state hearsay grounds.   While state counsel had the means available to remedy the trial court's limits on the expert testimony by merely recalling the available family witnesses and eliciting the desired factual predicate, trial counsel failed to do so, resulting in a truncated and emasculated mitigation presentation.

 Mr. Joubert would seek to show that counsel's failure to respond to the trial court's  severe limits on the defense experts' testimony was not a calculated and strategic decision, but resulted from trial counsel's own lack of preparation and unawareness of the content of his family  witnesses' potential testimony.   This lack of familiarity with his case resulted in deficient representation. *See*,  *Caraway*, 421 F.2d at  637; *and*,  *Duffy*, 607 S.W.2d at  516 - 517.   In the alternative, even if counsel's explanation is premised upon "strategy," the critical inquiry is "not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). *See also*,  e.g., *Burger v. Kemp*, 483 U.S.  776,  789 n. 7 (1987) ("Th[e] issue is whether counsel acted reasonably in deciding not to introduce the evidence . . . ").   Mr. Joubert request the opportunity to demonstrate that counsel's actions in this point were not strategic or tactical, nor were they objectively reasonable.

        Further, Mr. Joubert would seek to show in these proceedings that counsel's failure

to introduce the available background facts necessary to render Dr. Cunningham's and Ms. Wright's testimony admissible prejudiced Mr. Joubert at the punishment phase by depriving the jury of the very evidence, and explanatory testimony on which the defense hinged its punishment phase strategy.  As a result of the exclusion of evidence, the jury was deprived of information and an explanation of how  Mr. Joubert's borderline IQ, ADHD, and the combined influence of both affected his behavior and judgment,   deprived of information and an explanation regarding the formative effect of growing up in a chaotic and crime-ridden neighborhood, deprived of learning about the significant limitations from growing up without a stable father figure in the home, and  deprived of information and explanation of how his mother's parenting had a formative effect on his maturation and character.

Notably, it was not simply the facts of Mr. Joubert's severely disadvantaged upbringing which presented the full weight of the available mitigation,  but those facts, coupled with Dr. Cunningham's and Wright's explanation which was essential into demonstrating the mitigating significance.  The evidence presented, as well as excluded, is not intuitively mitigating (although many individuals recognize there to be some mitigating aspect to the disadvantages experienced by Mr. Joubert).  The jurors needed to know not only *what* had occurred in Mr. Joubert's past, but *why* those instances mattered, and *how* they might effect his future behavior.    But through the exclusion of this type of evidence, Mr. Joubert's jury was precluded from  hearing a particularly significant portion of the available mitigation, and the basis which could have explained Joubert's  development and resulting

criminal conduct.  In Mr. Joubert's case in particular, the omitted testimony had the power

to "blunt" the considerable misconduct evidence introduced against him by placing it in

context.  Accordingly, after a full hearing and presentation of the omitted  evidence and

testimony, Mr. Joubert expects to demonstrate  that there is a reasonable probability that had

such evidence been admitted at trial, at least one juror would have reached a different

conclusion on the punishment issues.

> C.    The claim is unexhausted and Mr. Joubert requests a reasonable opportunity
>        under *Martinez* and *Trevino* to establish sufficient cause and prejudice for the
>        default.

Mr. Joubert concedes that the above claim is unexhausted and procedurally defaulted.

Neither counsel on direct appeal, nor state habeas counsel raised the claim in the state courts.

Direct appeal counsel could not have raised the claim however, because it is premised on

facts which are not established in the trial record - the information known to both the expert

and trial counsel, and the availability of alternative sources of the information from which

counsel could have presented the evidence to support the discussion by the two mitigation

expert witnesses.

But by contrast, state habeas counsel did not discovery this information – counsel did

not  obtain Dr. Cunningham's, nor trial counsel's files – and did not raise the claim in state

court post-conviction proceedings.    Mr. Joubert would seek to show that this failure to

investigate  and subsequently raise the claim  resulted from state habeas counsel's own

deficient representation in state post-conviction proceedings.    Such an inquiry into state

habeas counsel's representation is warranted  by *Martinez* and *Trevino*, and guided by applicable guidelines detailing the professional responsibilities of post-conviction counsel.

The ABA Guidelines on death penalty representation  direct post-conviction counsel to undertake the same level of factual investigation as that undertaken by trial counsel.  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 10.7 & 10.15.1,  published in  31 Hoffstra Law Rev, 913, 1015 - 1027, 1078 - 1087  (Feb. 2003).   Similarly, Texas statutory authority and state precedent reflect that post-conviction proceedings are not substitutes for raising record-based claims, but requires the development of extra-record claims.  *See   Ex parte Banks*, 769 S.W.2d 539, 540 (Tex.Cr.App. 1989) ("The Great Writ should not be used to litigate matters which should have been raised on appeal.");   *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Cr. App. 1996) (applying procedural default to appellate claim raised in post-conviction writ);  *and*, Tex.Code Crim.Pro. Art. 11.071 § 3 (a) (directing counsel to investigate the "factual and legal grounds for the filing of an application for writ of habeas corpus.").   *See also*, Guidelines and Standards for Texas Capital Counsel Guideline 12.2 (B)(1) (admonishing that habeas counsel must be "prepared to undertake the comprehensive extra-record investigation") & ( B )(3)(a) (directing habeas counsel to "to conduct a thorough and independent investigation of both the conviction and sentence" and to obtain necessary investigative resources.),  published in Texas Bar Journal, Vol. 69 No. 10,  966, 976 (Nov. 2006).

Accordingly, the nature and extent of state post-conviction counsel's factual and legal investigation compels inquiry under *Martinez* and *Trevino*, both of which establish that a petitioner seeking to prove cause and prejudice must prevent evidence that state habeas counsel's representation was deficient, *and* that there is some substantive merit to the underlying ineffective assistance of trial counsel claim.   Further,  the inquiry required under *Rhines v. Weber*, similarly calls for a petitioner to demonstrate both "good cause" for the unexhausted claim, as well as some showing that the claim is not meritless in order to support a request for a stay and abeyance.   *Id.*,  544 U.S. 269, 277 (2005).  Plainly, there is overlap on the proof in a *Martinez-Trevino* inquiry, as well as a *Rhines* inquiry.   Mr. Joubert requests the opportunity to prove the required facts in order to support a stay and abeyance of his federal post-conviction writ.

§§§

Claim for Relief Number Four (Unexhausted Claim):

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE
PUNISHMENT PHASE OF TRIAL  FAILING TO INVESTIGATE AND DIRECT THE
DEFENSE NEURO-PSYCHOLOGIST, DR. LINDSAY ROSEN, TO CONDUCT
SUFFICIENT TESTING TO DETERMINE THE EXISTENCE OF NEURO-
PSYCHOLOGICAL IMPAIRMENT IN THE FACE OF POTENTIAL INDICATORS OF
BRAIN DAMAGE.

A.     Facts in Support of Claim

1.     Defense counsel at trial retained the services of Dr. Lindsay Rosen, a Houston-
based clinical psychologist and neuro-psychologist.   Dr. Rosen did not testify at trial.

2.     Dr. Rosen submitted an invoice for his professional services which indicates
he conducted five hours of unspecified neuro-psychological testing.  *See* Pet. Ex. 31 ( Dr.
Lindsay Rosen Invoice).

3.     Dr. Rosen has provided an affidavit in federal post-conviction proceedings in
which he has stated that he does not recall anything about his participation in the case and
that his file is unavilable, and had probably been disposed of.  *See*  Pet. Ex 20 ( Declaration
of Dr. Linsday Rosen).

4.     The neuro-psychological evaluation conducted by Dr. Rosen resulted in the
discovery that Mr. Joubert had a Full scale IQ of 80.   But due to the trial court's exclusion
of this evidence through the defense's  psychologist,  Dr. Mark Cunningham,  on the basis
of hearsay, the jury did not learn of Mr. Joubert's Full Scale IQ score of 80 or its possible
ramifications as mitigation. [37 R.R.: 11, 25, 27 - 28,  108].

5.     Dr. Cunningham  has  provided  an  affidavit  in  federal  post-conviction

proceedings in which he has explained the following:

a.  As a matter of practice, Dr. Cunningham requests any reports of neuro-psychological testing conducted on behalf of the defense and retains such reports in his files.  His case files in Mr. Joubert's case do not contain any such report, although he does have notes that Mr. Joubert measured a Full Scale IQ of 80 on the WAIS-III test.

b.  As a result of the lack of a report, Dr. Cunningham does not know what neuro-psychological testing was administered on Joubert.

c.  In reviewing Dr. Rosen's invoice reflecting five hours of neuro-psychological testing, Dr. Cunningham believes that Rosen could not have conducted a full battery of neuro-psychological testing based on the limited time involved.   Instead, it is more likely that Dr. Rosen administered only a preliminary screening test.

*See*, Pet. Ex. 19 (Declaration of Mark D. Cunningham, ¶¶ 2, 3, 4, 5).

6.  It is Dr. Cunningham's practice to advise defense counsel to conduct a full neuro-psycholgoical evaluation in order to confirm the existence of, or to rule out neuro-psychological impairment.   In Mr. Joubert's specific case, he exhibited potential indicators of impairment: (a) his mother used drugs while she was pregnant with him; (b) as an infant, he exhibited developmental delays in walking and learning to speak; ( c ) as a child, he displayed symptoms indicative of hyperactivity; (d)   he demonstrated learning difficulties while in school, and ( d ) he measured at a low IQ score which reflected cognitive limitations.

*See*  Pet. Ex.  19 (Cunningham, ¶4)

B.    Argument and Authorities

Trial counsel rendered ineffective assistance of counsel under the 6th and 14th Amendments  to the United Sates Constitution as a result of trial counsel's limited

77

investigation into whether Mr. Joubert had brain damage, particularly where counsel had already learned of possible indicators of such impairment.    The existence of such undiscovered brain damage  would be sufficient to prejudice Mr. Joubert's punishment case by depriving him of potentially significant mitigating evidence.

The standard for reviewing the adequacy of counsel's performance is set out in *Strickland v. Washington*,  466 U.S. 668 (1984).  In order to demonstrate that counsel was ineffective, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced by this deficient representation. *Williams v. Taylor*,  529 U.S. 362,  690 - 691 (2000); *and*,   *Strickland v. Washington*,  466 U.S.  at 668, 694.  Prejudice is established by showing that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different   *Williams,* 529 U.S. at 691.    A "reasonable probability" has been characterized as a "probability sufficient to undermine confidence in the outcome" of the proceedings,   *ibid (*citing *Strickland*, 466 U.S. at 694), but it is not the same as a preponderance of the evidence.   Prejudice may be established on  a showing of less than  a preponderance.   *Strickland*, supra, at 693 ("[W]e believe  that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986)  ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*.").   And in evaluating the likelihood of prejudice, the Court concerns itself

78

with whether only a single juror might have been affected by the error. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *and*, *Rocha v. Thaler*, 626 F.3d 815, 825 (5th Cir. 2010) (citing *Gray v. Epps*, 616 F.3d 436, 442 (5th Cir. 2010)).

*Strickland* is founded on adequacy of investigation. *Wiggins v. Smith*, 539 U.S. at 521 - 521; *and*, *Strickland*, 466 U.S. at 690 - 691. Trial counsel has a duty to make a reasonable investigation of the potential defenses in the case, or make such a sufficient investigation which indicates which permits counsel to make a reasoned decision that further investigation is unnecessary, or counter-productive. *Wiggins*, 539 U.S. at 525, 527; *Strickland*, 466 U.S. at 690 - 691; *and*, *Butler v. State*, 716 S.W.2d 48, 54 (Tex.Cr.App. 1986). The necessity of a through investigation is based on the need for counsel to have an adequate understanding of the alternatives when formulating and executing his defensive strategy. *See* *Sowell v. Anderson*, 663 F.3d 783, 790 (6th Cir. 2011); *and*, *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001)

Several courts of appeals, as well as the Fifth Circuit, have recognized that the existence of organic brain damage or other neurological impairment possesses significant mitigating potential because it provides an explanation for a defendant's aberrant behavior. *See*, *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); *Frazier v. Huffman*, 343 F.3d 780, 394 (6th Cir. 2003); *Lockett v. Anderson*, 230 F.3d 695, 713 - 714 (5th Cir. 2000); *and*, *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J, concurring)).

Mr. Joubert would seek to demonstrate that counsel in the present case retained Dr.

Mark Cunningham, a forensic psychologist, and Dr. Lindsay Rosen, a neuro-psychologist, were aware of facts pointing to potential neurological impairment, yet failed to ensure that Dr. Rosen administered a full neuro-psychological battery in order to either confirm and develop, or conclusively rule out the existence of such impairment.   While trial counsel directed Dr. Rosen to evaluate Mr. Joubert's intelligence,  as reflected by his billing records, Dr. Rosen did not likely administer  a full neuro-psychological battery.   The  inquiries into intelligence and neurological impairment were not mutually exclusive.  Confirmation or exclusion of neurological impairment would not have interfered with the defense's chosen strategy, especially in light of counsel's intent to present Mr. Joubert's low IQ as mitigation.

Mr. Joubert would further show that a conscious decision not to seek full testing of him to determine the existence of  neurological impairment was not professionally reasonable based on the information known to counsel which suggested that Mr. Joubert might have impairment, and, in the opinion of the testifying expert, *should* be evaluated.

Finally, counsel would show that the failure to develop and present evidence relating to neurological impairment was sufficient  to undermine confidence in the outcome of the punishment verdict given the mitigating  potential of neurological impairment evidence.  The existence of neurological impairment is significant to the issue of mitigation because it is highly relevant toward explaining a defendant's conduct and serving to mitigate the severity of his moral blame worthiness.   Individuals with neurological impairment, particularly to the frontal lobe portion of the brain may often exhibit extreme impulsiveness and a lack of

impulse control.   *See*  Floden, D., Alexander, M.P., Kubu, C.S., Katz, D., & Stuss, D.T., "Impulsivity and risk-taking behavior in focal frontal lobe lesions." Neuropsychologia 46, 213-223 (2008).   Individuals with damage to the frontal lobe region of the brain may also exhibit an impaired ability to predict future consequences of their actions.   *See*   Stuss DT, Gow CA, Hetherington CR. "'No longer Gage': frontal lobe dysfunction and emotional changes" *Journal of Consulting and Clinical Psychology* 60 (3): 349–59 (June 1992).  These cognitive impairments are not mutually exclusive, however.   Each type of impairment, if established through neuro-psychological testing would have had a potentially mitigating effect with regard to Mr. Joubert's past behavior by explaining the behavior and putting it in context.   Equally significant, evidence of neurological impairment producing these kinds of limitations were consistent with the defense's adopted strategy in the present case.   Dr. Cunningham anticipated, but was precluded from testifying about the behavioral manifestations from Mr. Joubert's borderline Full Scale IQ of 80.   This too, like actual neurological damage, would have a palpable influence on his day to day behavior, including his ability to control his impulses, plan ahead, or recognize the likely effects of his conduct. Upon development of this evidence, Mr. Joubert will show that had trial counsel confirmed evidence of neurological impairment and presented it to the jury along with testimony explaining its behavioral significance, there is a reasonable probability that at least one juror would have been influenced and returned a different verdict at punishment.

    And in the alternative, Mr. Joubert would seek to show that the failure to develop and

present any evidence of neurological impairment had a cumulatively prejudicial effect when evaluated in conjunction with trial counsel's errors in establishing the predicate facts to facilitate admission of Dr. Cunningham's testimony, as detailed in the preceding ground for relief.

> C.    The claim is unexhausted and Mr. Joubert requests a reasonable opportunity under *Martinez* and *Trevino* to establish sufficient cause and prejudice for the default.

Mr. Joubert concedes that the above claim is unexhausted and procedurally defaulted. Neither counsel on direct appeal, nor state habeas counsel raised the claim in the state courts. Direct appeal counsel could not have raised the claim however, because it is premised on facts which are not established in the trial record - the information known to both the expert and trial counsel, and the availability of alternative sources of the information from which counsel could have presented the evidence to support the discussion by the two mitigation expert witnesses.

But by contrast, state habeas counsel did not discovery this information – counsel did not  obtain Dr. Cunningham's, nor trial counsel's files – and did not raise the claim in state court post-conviction proceedings.    Mr. Joubert would seek to show that this failure to investigate  and subsequently raise the claim  resulted from state habeas counsel's own deficient representation in state post-conviction proceedings.   Such an inquiry into state habeas counsel's representation is warranted by *Martinez* and *Trevino*, and guided by applicable ABA and state guidelines detailing the professional obligations of post-conviction

counsel.

The ABA Guidelines on death penalty representation direct post-conviction counsel to undertake the same level of factual investigation as that undertaken by trial counsel. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 10.7 & 10.15.1, published in 31 Hoffstra Law Rev, 913, 1015 - 1027, 1078 - 1087 (Feb. 2003). Similarly, Texas statutory authority and state precedent reflect that post-conviction proceedings are not substitutes for raising record-based claims, but requires the development of extra-record claims. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex.Cr.App. 1989) ("The Great Writ should not be used to litigate matters which should have been raised on appeal."); *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Cr. App. 1996) (applying procedural default to appellate claim raised in post-conviction writ); *and*, Tex.Code Crim.Pro. Art. 11.071 § 3 (a) ( directing counsel to investigate the "factual and legal grounds for the filing of an application for writ of habeas corpus."). *See also*, Guidelines and Standards for Texas Capital Counsel Guideline 12.2 (B)(1) (admonishing that habeas counsel must be "prepared to undertake the comprehensive extra-record investigation") & ( B )(3)(a) (directing habeas counsel to "to conduct a thorough and independent investigation of both the conviction and sentence" and to obtain necessary investigative resources.), published in Texas Bar Journal, Vol. 69 No. 10, 966, 976 (Nov. 2006).

Accordingly, the nature and extent of state post-conviction counsel's factual and legal

investigation compels a hearing under *Martinez* and *Trevino*, in order to establish the reason for the procedural default of the claim in state post-conviction proceedings and the substantive merit of the underlying claim.  Further,  this mirrors that required under *Rhines* to demonstrate both "good cause" for the unexhausted claim, and some showing of merit to support a request for a stay and abeyance.  *Id*.,  544 U.S. 269, 277 (2005).

Therefore, Mr. Joubert  requests the opportunity to develop and make a showing of the required facts under *Martinez/Trevino* or *Rhines*.

§§§

Claim for Relief Number Five (Unexhausted Claim):

> MR. JOUBERT RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL BY
> APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL THE TRIAL
> COURT'S DENIAL OF MR. JOUBERT HIS RIGHT TO DUE PROCESS OF LAW UNDER
> THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS BY EXCLUDING
> RELEVANT MITIGATION TESTIMONY BY DR. MARK CUNNINGHAM RELATING
> TO MR. JOUBERT'S FUTURE DANGEROUSNESS.

A.      Facts in Support of Claim

1.      During trial, counsel sought to present testimony by clinical forensic psychologist Mark Cunningham.

2.      The trial court held a lengthy hearing outside the jury's presence during which it excluded portions of Dr. Cunningham's testimony and Power Point presentation in support of his testimony.

3.      The following morning, during a lengthy defense bill of exception on Dr. Cunningham's excluded mitigation presentation, Mr. Joubert submitted to the trial court a package consisting of Power Point slides entitled "Violence Risk Assessment" accompanied by Dr. Cunningham's affidavit,   Defense Exhibit 14, which explained  his qualifications, experience,  and methodology in conducting the type of future dangerousness assessment, based on the individual defendant compared against actuarial-type data.[14]   Pet. Ex.  120 (Affidavit of Dr. Mark Cunningham and Power Point on Actuarial Risk Assessment).  [37

---

[14]   Dr. Cunningham's listed experience testifying on future dangerousness in Texas courts utilizing his methodology  consisted of the following cases: *State v. Ronald Springer* (1995),  *State v. Thomas Howard* (1995), *State v. Allen Bridges* (1998),   *State v. Texas v. Julius Murphy* (1998),  *State v. Larry Davis* (1999), *State v. Hall* (2000), *State v. Ivan Cantu* (2001),  *State v. Michael Sigala* (2001), *State v. Johnny Penry* (2002), *and*, *State v. Joshua Maxwell* (2002).

R.R.: 30; 45 R.R.: DX 14].  During the general proffer of evidence, however, trial counsel did not question Dr. Cunningham on the details or methodology of his violence risk assessment *at that time*.

4.      The trial court found the "offer of evidence from the Defense [to be] irrelevant [and] inadmissible" and that the "probative value [was] greatly outweighed by the confusion that it would give the jury . . ."  [37 R.R.: 30 - 31].   The trial court cited the Texas Court of Criminal Appeals decisions in *Rachel v. State*, 917 S.W.2d 799 (Tex.Cr.App. 1996); *Mosley v. State*, 983 S.W.2d 249 (Tex.Cr.App. 1998); *and*, *Sells v. State*, 121 S.W.3d 748 (Tex.Cr.App. 2003).

5.      Mr. Joubert sought to introduce Dr. Cunningham's testimony on future dangerousness later that morning on the ground that the State had opened the door to the introduction of this testimony. [38 R.R.: 71 - 73].  The trial court denied the request.  [38 R.R.: 75].

6.      Still later during Dr. Cunningham's testimony,  Mr. Joubert requested to present Dr. Cunningham's testimony on the basis that the State had opened the door.  [38 R.R.: 91 - 92].   The  trial court declined the request.    [38 R.R.: 92].

7.      At the conclusion of his testimony on re-direct examination,  Dr. Cunningham answered a single question about Mr. Joubert's propensity to commit acts of violence in prison.  He opined, without elaboration, that based on the disciplinary incidents reflected in Mr. Joubert's prison records, he would not be a "disproportionate risk [of] violence in

prison." [38 R.R.: 87 - 88].

8.      In a renewed bill of exception that same morning, Dr. Cunningham explained in more detail the methodology of his violence risk assessment of Mr. Joubert.   Dr. Cunningham's risk analysis is based on an actuarial risk assessment.   An actuarial risk assessment involves gathering of relevant data for a group population which forms a base rate. The probability of Mr. Joubert engaging in specific violent conduct is measured against the base rate of that conduct.  In Mr. Joubert's case, he would be measured against other offenders in the general prison population, measured against other murderers in the prison system, and measured with other inmates according to their age across stages of incarceration.  [38 R.R.: 162 - 168;  45 R.R.: DX 17].  The trial court denied Mr. Joubert's request to present Dr. Cunningham's testimony of his actuarial risk analysis.  [38 R.R.: 169].

9.      Dr. Mark Cunningham has presented an affidavit to federal post-conviction counsel. Dr. Cunningham has stated that he provided his Power Point presentation to counsel prior to trial.   The Power Point slides were designed to enable Dr. Cunningham to present and explain the scientific principles of Mr. Joubert's individual facts to the jury in a more easily understandable manner.  *See* Pet. Ex. 19 (Cunningham, ¶ 6).

10.     Mr. Joubert was represented by appointed counsel, Henry Burkholder,  on direct appeal to the Texas Court of Criminal Appeals.    Appellate counsel filed a brief which raised seven claim.  Appellate counsel  did not include a claim challenging the trial court's exclusion of Dr. Cunningham's testimony and Power Point presentation on the issue of future

dangerousness.  *See* Pet. Ex. 71 (<u>Opening Brief on Direct Appeal</u>).

11.     Mr. Joubert was represented by appointed counsel, Mr. Kurt Wentz, in state post-conviction proceedings.  Although Wentz filed an application for post-conviction writ for habeas corpus in the state court, he did not include an issue addressing the exclusion of Dr. Cunningham's testimony.  *See* Pet. Ex. 72 (<u>Ex parte Elijah Dewayne Joubert</u>,  No 944,756-A,  Application for Post-Conviction Writ of Habeas Corpus).

B.     Argument and Authorities

Mr. Joubert was denied his right to Due Process of Law under the 5th, 8th and 14th Amendments to the United States Constitution through the exclusion of relevant mitigating evidence by clinical psychologist, Mark Cunningham regarding the probability that Mr. Joubert would commit future acts of violence.

The Eighth and Fourteenth Amendments to the United States Constitution mandate the State permit a defendant to present to, and have the jury consider as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.  *Lockett v. Ohio*, 438 U.S. 586 (1978);  *Eddings  v. Oklahoma*,  455 U.S. 104 (1982).  In  *Jurek v. Texas,*  the Supreme Court upheld the constitutionality of the Texas death penalty scheme, specifically citing a defendant's ability to present mitigating evidence rebutting the State's case that a defendant would constitute a future danger to society.  *Id*., 428 U.S. 262, 272 - 273 (1976). Mitigating evidence need only be relevant to be admissible under 8th Amendment

jurisprudence, and mitigating evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Tennard v. Dretke*, 542 US 274, 284 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

Both the Supreme Court, as well as Texas Court of Criminal Appeals have held expert testimony from mental health professionals are admissible on the issue of predicting future dangerousness. *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983); *Griffith v. State*, 983 S.W.2d 282, 288 (Tex.Cr.App. 1998) (approving expert opinion about future dangerousness based on review of investigative reports, crime scene photos, autopsy photos, witness statements, and defendant's school and personnel records); *and, McBride v. State*, 862 S.W.2d 600, 609 (1993) (permitting psychiatrist to give testimony on the issue of future dangerousness through a hypothetical question based on the hypothetical question based upon facts in evidence).

Mr. Joubert would show that the trial court erred by excluding Dr. Cunningham's testimony and Power Point presentation relating to future dangerousness. He would further show that the defense presented sufficient evidence to demonstrate that Dr. Cunningham's prospective testimony on the probability that Mr. Joubert would constitute a future danger was sufficiently individualed to Mr. Joubert's personal circumstances to render Dr. Cunningham's testimony and Power Point slides admissible under *Tennard v. Dretke*, *supra*. Dr. Cunningham specifically testified that while risk of future violence can only be validly

89

assessed by comparing the frequency of violence committed by other inmates similar in age, conviction and custody status to Mr. Joubert, the use of group statistics to determine risk of future danger does not negate the individualization of the prediction.   [38 R.R.: 162].

Mr. Joubert would further show that the exclusion of such evidence is of such a nature that its exclusion is never harmless, and compels reversal.  *See  Penry v. Lynaugh*, 492 U.S. 302, 328 (1989);   *and*,   *Nelson v. Quarterman*, 472 F.3d 287, 314 (5th. Cir. 2006) (specifically rejecting a harmless error analysis).

Finally,  to the extent that the error is one based on facts sufficiently ascertained in the appellate records,  Mr. Joubert would seek to demonstrate that appellate counsel rendered ineffective assistance of counsel on appeal by failing to raise the claim in his direct appeal brief.  *See*, *Smith v. Robbins*, 528 U.S. 259, 285 - 286 (2000); *and*, *Evitts v. Lucey*, 469 U.S. 387, 392 (1985).   A claim of ineffective assistance of appellate counsel is established by demonstrating:  (1) that appellate counsel rendered professionally unreasonable representation; and (2), that but for appellate counsel's errors, he would have prevailed on appeal.  *Robbins*, 528 U.S. at 285 - 286.

One manner in establishing deficient performance of appellate counsel is by showing that appellate counsel has failed to raise stronger claims in favor of weaker ones.  *Robbins*, 528 U.S. at 288 (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of ineffective assistance of counsel be overcome."));  *Bell v. Jarvis*,  236 F.3d 149, 164 (4th

Cir. 2000);   *Banks v. Reynolds*,   54 F.3d 1508, 1515 (10th Cir. 1995) (""an appellate advocate may deliver deficient performance and prejudice a defendant by omitting a `dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal.").  Yet even when deciding which issues to pursue on appeal, appellate counsel must do so with a sufficient understanding of the facts in the appellate record and the guiding case precedent in order for his decision to be respected as "strategic."  *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2006).

Mr. Joubert would show in a hearing that the present claim is has substantive merit. But appellate counsel did not present the issue, despite presenting several other demonstrably weaker issues, many of which had been consistently denied by the Texas Court of Criminal Appeals well before appellate counsel raised them on direct appeal.  Accordingly, Mr. Joubert would seek to show in an evidentiary hearing that: (1)  appellate counsel's failure to raise the issue was not a conscious  decision based upon a through understanding of the factual and legal evaluation of the error, or if the decision was a conscious one, it was not a reasonable "strategy" given the strength of the omitted claim in light of the claims which were raised, and (2) had appellate counsel raised the issue on direct appeal, it would have resulted in punishment phase relief.

> I.    As an alternative ground, if the trial court was correct in excluding Dr. Cunningham's testimony due to the absence of a proffer of predicate facts, then trial counsel rendered ineffective assistance of counsel.

Although the appellate record clearly demonstrates Dr. Cunningham's future

dangerousness was sufficiently individualized under the facts presented to the trial court to have been relevant, should this court conclude that trial counsel failed to make a sufficient showing of predicate facts, then Mr. Joubert requests to raise an alternative claim that trial counsel provided ineffective assistance of counsel in presenting Dr. Cunningham as a witness.   The proponent of evidence bears the burden of establishing the admissibility of proffered evidence. *Winson v. State*, 252 S.W.3d 336, 340  (Tex.Cr.App. 2008). Additionally, counsel is charged with having a sufficient understanding of both the facts of the case, but also the relevant case law. *Ewing v. State*, 549 S.W.2d 392,  398 (Tex.Cr.App. 1977).  If counsel failed to establish the admissibility of Dr. Cunningham's testimony, then Mr. Joubert would show in a hearing that counsel's failure to do so resulted from counsel's inadequate preparation for trial, either by neglecting to prepare to make the predicate showing of admissibility, or simply by a sub-professional execution of strategy.  Under either scenario, Mr. Joubert would show that to the extent the error is attributable to trial counsel, then counsel's actions or omissions were not a sound and reasonable strategy.

Further, Mr. Joubert would show that the failure to properly admit Dr. Cunningham's full testimony and demonstrative exhibits was prejudicial because it deprived the jury of a considerable portion of the defense presentation as it related to the future dangerousness punishment issue.   Upon further evidentiary development in a hearing, Mr. Joubert would show that Dr. Cunningham was prepared to present cohesive and compelling testimony relating Mr. Joubert's personal characteristics, including his past criminal record, to the

future dangerousness punishment issue.   Dr. Cunningham would have ultimately presented the opinion that Mr. Joubert poses a low llikelihood of committing future violence in prison and that he would likely have acclimatized to prison.  In light of this testimony, at least one juror would reasonably have returned a different punishment verdict.

 And in the alternative, if Dr. Cunningham's excluded testimony was not properly preserved in the bill of exception, then trial counsel necessarily provided deficient representation by failing to adequately preserve the issue for appellate review.

C.      The claim is unexhausted and Mr. Joubert requests a reasonable opportunity under *Martinez* and *Trevino* to establish sufficient cause and prejudice for the default.

Mr. Joubert concedes that the above claim is unexhausted and procedurally defaulted. Neither direct appeal counsel,  nor state habeas counsel raised the claim in the state courts. Direct appeal counsel could have raised the claim, however,  because it is premised on facts which are established in the trial record.   Similarly, state habeas counsel did not raise the issue either, although the appellate record had been prepared, and appellate counsel had filed the direct appeal brief well prior to the state post-conviction writ of habeas corpus

Mr. Joubert would seek to show that any procedural default from either appellate, or trial counsel's failure to raise the issue of the exclusion of Dr. Cunningham's future dangerousness testimony is subject to excusal to a showing of cause and prejudice under *Martinez v. Ryan* and *Trevino v. Thaler*.  In *Nguyen v. Curry*,  736 F.3d 1287 (9th Cir. 2013), the Ninth Circuit concluded that *Martinez* is not limited to deficient state post-conviction

counsel, but implicitly extends to claims of ineffective assistance of direct appeal counsel. *Id*., at 1293 - 1296.

The ABA Guidelines on death penalty representation direct appellate counsel, as well as post-conviction counsel to " litigate all issues, whether or not previously presented, that are arguably meritorious . . ."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 10.15.1( C ), published in 31 Hoffstra Law Rev at 1079.   The exclusion of Dr. Cunningham's testimony is cognizable on direct appeal because it is wholly established in the appellate record.   In the alternative, appellate counsel's failure to raise the claim is cognizable in state post-conviction proceedings as a claim of ineffective assistance of direct appeal counsel. *See e.g., Ex parte Butler*,   884 S.W.2d 782 (Tex.Cr.App. 1994).

Accordingly, the nature and extent of direct appeal counsel's and   state post-conviction counsel's review of, and development of issues, warrants   an inquiry under *Martinez* and *Trevino*.   Further,   the analysis under required under *Rhines v. Weber* for a stay and abeyance similarly requires a petitioner to demonstrate both "good cause" for an unexhausted claim, as well as some showing that the claim is not meritless in order to support a request for a stay and abeyance. *Id*., 544 U.S. 269, 277 (2005).   Plainly, there is overlap on the proof between a *Martinez-Trevino* inquiry, and *Rhines*' inquiry.   Accordingly, Mr. Joubert requests the opportunity to develop and prove the predicate facts to make a showing under either *Martinez-Trevino* or *Rhines*.

§§§

Claim for Relief No. Six (Exhausted Claim):

> MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF
> COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED
> STATES CONSTITUTION DUE TO TRIAL COUNSEL'S FAILURE TO OBJECT TO
> SEVERAL INSTANCES OF HEARSAY EVIDENCE DURING THE PENALTY PHASE OF
> TRIAL.
> (STATE WRIT APPLICATION ISSUE NUMBER ONE)

A.    Facts in Support of claim

1.    During the punishment phase of Mr. Joubert's trial, the State presented several law enforcement witnesses who testified about both adjudicated and unadjudicated acts of misconduct committed by Mr. Joubert.  These included instances in which the witnesses testified to matters outside their personal knowledge, and related to them by others, specifically:

> a.    When testifying about the Foodarama store robbery, Houston Police Detective John Wehr testified based on information conveyed by others that Mr. Joubert had been armed with a gun, had been the individual standing by the cigarettes, and that his juvenile case had been adjudicated;  [35 R.R.: 55, 77],
>
> b.    Houston Police Officer Steve Guerra, testified about an incident in which Mr. Joubert escaped from TYC, as well as an escape from a child and adolescent development center;  [33 R.R.: 103 - 105],
>
> c.    Texas Youth Commission officer Arthur McBride testified that he learned from another officer that Mr. Joubert was not reporting on his juvenile probation; [33 R.R.: 123],
>
> d.    Houston Police Department Officer W.H. Cowles was permitted to relate Mr. Joubert's and the other suspects' actions during the O.S.T. robbery. [33 R.R.: 280].

3.    In state post-conviction proceedings,   Mr. Joubert alleged he had received

ineffective assistance of counsel as a result of trial counsel's failure to object to the instances of hearsay.  *Ex parte Eliljah Dewayne Joubert*, WR 78-119-01,  State Habeas Clerk's Record (SHR), pp. 7  - 10.

4.     The state habeas court held an evidentiary hearing in which trial counsel, Jerome Godinich testified. [*Ex parte Eliljah Dewayne Joubert*, WR 78-119-01,  State Writ Hearing (SWH), 9 - 58].

5.     The state habeas court adopted the State's Proposed Findings of Fact and Conclusions of Law which rejected Mr. Joubert's claim as follows:

> a.     HPD Officer John Wehr:  the court found ( i ) Wehr's testimony about Mr. Joubert's juvenile court adjudication was based on Wehr's personal knowledge; and  ( ii ), Wehr's relation of details from the robbery were no hearsay because they were not admitted for the truth of the matter, but merely to show *how* Mr. Joubert became a suspect;

> b.     HPD Officer Steven Guerra: the court found that Guerra's testimony about what he learned from Mr. Joubert's mother, that he had run away from a juvenile placement center, did not constitute inadmissible hearsay testimony;

> c.     TYC Officer Archie McBride: the court found that McBride, whose job was to apprehend juveniles who did not report to their juvenile parole officer, testified within his personal knowledge, and therefore, his testimony was not inadmissible hearsay;   and

> d.     HPD Officer W.H. Cowles: the court found Cowles testimony about the information related to him by the complainants in the OST robbery was not admitted to prove the truth of the matter asserted, but only to show *how* Mr. Joubert became a suspect in the robbery.

The adopted findings recited trial counsel had not been deficient for failing to object to the officers' testimonies because the testimony had been admissible and not hearsay.  The adopted findings additionally recited that Mr. Joubert had failed to demonstrate prejudice in

light of the other evidence.   *Joubert*,  SHR, 243 - 248.

  6.  The Texas Court of Criminal Appeals adopted the state habeas court's findings

of fact and denied relief.  *Ex parte Elijah Dewayne Joubert*, WR 78,119-01, <u>Order</u> at 2

(September 25, 2013).

  B.  Argument and Authorities

  The lower courts' resolution of Mr. Joubert's claim, rejecting a relief on the ground

of ineffective assistance of counsel is an unreasonable application of clearly established case

law in *Strickland v. Washington*,  466 U.S. 668 (1984).  *See*, 28 U.S.C. § 2254(d)(1).  In the

alternative, the state habeas court's decision lies in such a fundamental mis-characterization

of the state law underscoring  trial counsel's duties, that the decision rests on an unreasonable

application of the law to the facts.  28 U.S.C. § 2254(d)(2).

  In order to show ineffective assistance of counsel, a defendant must demonstrate that

counsel rendered a deficient performance, that is, counsel's errors or omissions fell below

objective standards of reasonableness, and that the deficient performance prejudiced the

defense.  *Williams v. Taylor*,  529 U.S.  at  690 - 691; *and*,   *Strickland*,  466 U.S.  at 668,

694.  Prejudice is established by showing that there is a reasonable probability that but for

counsel's error, the result of the proceeding would have been different  *Williams,* 529 U.S.

at 691.  A "reasonable probability" is a "probability sufficient to undermine confidence in

the outcome" of the proceedings,   *Ibid* (citing *Strickland*, 466 U.S. at 694).  It is not the

same, however, as a preponderance of the evidence; prejudice may be established on a

showing of less than a preponderance.    *Strickland*, supra, at 693 ("[W]e believe  that a

defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case");   *Nix v. Whiteside*, 475 U.S.  at  175.     And in evaluating the likelihood of prejudice, the Court concerns itself with whether only a single juror might have been affected by the error. *Wiggins v. Smith*,  39 U.S.  At 537; *and*,  *Rocha v. Thaler*,  626 F.3d at 825  (5th Cir. 2010).

The state habeas court's rejection of Mr. Joubert's *Strickland* claim was premised upon an egregious misapplication of state evidentiary law by mis-characterizing the *detailed* statements made to officers Wehr, Guerra, Taylor and Cowles by others individuals as non-hearsay.   But this is not simply a misstatement of the facts of the appellate record when read in context of the actual testimony,   it is a serious misstatement of controlling evidentiary law.  The Texas  Court of Criminal Appeals, in  *Schaffer v. State* 777 S.W.2d 111 (Tex.Cr.App. 1989), cautioned about the introduction of "back door hearsay" by law enforcement, relating detailed explanations by witness under the guise of showing how a defendant came to become a suspect.  *Id*., at 113 - 114.     The Court expressly rejected this practice, plainly categorizing such detailed statements by witnesses to officers as inadmissible hearsay.  *Id*., at 113 (citing McCormick on  Evidence, § 249, p. 735 (3rd Ed. 1984),  115.

The Court explained that it would be permissible for an officer to explain the reason for his investigation as stemming from information received from others:

> Frequently, testimony will have an impermissible hearsay aspect along with a permissible nonhearsay aspect.  Almost always it will be relevant for a testifying officer to relate how she happened upon the scene of a crime or accident;  thus, it is permissible for her to testify that she was acting in response to "information received."  . . .  The police officer, however, <u>should</u>

> not be permitted to relate historical aspects of the case, replete with hearsay
> statements in the form of complaints and reports on grounds that she was
> entitled to tell the jury the information upon which she acted.

*Id*., at 114 - 115 (emphasis added).

The Court of Criminal Appeals has subsequently reaffirmed this holding;  detailed witness statements are not admissible through a police officer in order to demonstrate  how a defendant became a suspect. *Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex.Cr.App. 2005) (" . . . testimony by an officer that he went to a certain place or performed a certain act in response to generalized "information received" is normally not considered hearsay . . . But details of the information received are considered hearsay and are inadmissible . . ."); *and*, *Burks v. State*,  876 S.W.2d 877, 898 (Tex.Cr.App. 1994).  *See also Gochicoa v. Johnson*, 118 F.3d 440, 445  (5th Cir. 1997) ("Although a testifying officer may refer to a tip from a confidential informant in order to show why he happened upon the scene of a crime, the officer may not otherwise relate the substance of that communication to the jury.").

The state habeas court sidestepped the question of trial counsel's deficient performance by mischaracterizing the testimony in light of controlling precedent under *Schaffer*.  For none of the complained of witnesses – Wehr, Guerra, McBride, or Cowles – was the probable cause to arrest Mr. Joubert an issue before the jury.   And in the context in which the witnesses testified at Mr. Joubert's trial, it is evident that the prosecution's intent was not to explain the why and how Mr. Joubert became a suspect.  Rather, the appellate record demonstrates on its face that  the prosecution plainly presented Wehr's, Guerra's, McBride's, and Cowles' testimony for substantive truth of the matter asserted.

The appellate record plainly belies by clear and convincing proof the state habeas court's characterization of the testimony.  *See* 28 U.S.C. § 2254(e)(1).

In resolving the substantive merits of the ineffective assistance claim, the state habeas court has misconstrued the controlling case law in relation to the facts in the appellate record. And the mis-application of *Schaffer* to the operative facts of the claim is not incidental – it is material to the basis of the state court's resolution of the underlying constitutional claim. The state habeas court, while recognizing that trial counsel had not objected to any of the complained of testimony, nevertheless  concluded he had not been deficient for failing to object because the testimony was not hearsay, and hence, not objectionable.    The finding of  trial  counsel's  adequate  performance  is  inextricable  with,  and  contingent  upon  the complained of testimony being non-hearsay.   Yet this is a plainly incorrect conclusion of the facts in light of the applicable authority.

A state habeas court's conclusions may be objectively unreasonable under 28 U.S.C. §2254 (d)(2) for a variety of reasons, including circumstances in which the state court has misconstrued the law and facts applicable to the claim.   *Taylor v. Maddox*, 366 F. 3d 992, 1001 (9th Cir. 2004); *and*, *Ward v. Sternes*, 334 F.3d 696, 703 - 704 (7th Cir. 2003). "Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it." *Taylor*, 366 F. 3d at 1001.   The state habeas court's misapplication of the state court *Shaffer* decision was material because it formed the basis for the conclusion that the complained of testimony was not hearsay, obviating counsel's professional obligation to have

posed an objection.

In a similar fashion, the misinterpretation of facts is highly relevant to whether the state court findings and conclusions are objectively reasonable.   Where a petitioner shows the state court determined a fact against the clear and convincing weight of the evidence, he has "gone a long way towards proving that it committed unreasonable error" because "[a] state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Ward*, 334 F.3d at 704 (internal quotations and citation omitted).   In Mr. Joubert's case, the state habeas court adopted incorrect legal conclusions *vis-a-vis Schaffer*, but did so by failing to recognize the context in which the prosecutor elicited the testimony.  In another context, the complained of testimony might not have been hearsay, but in the context in which the testimony was elicited in the present case refutes by clear and convincing proof the state habeas court's findings and conclusions.

The state habeas court's conclusion that trial counsel rendered objectively reasonable representation by failing to object to the hearsay testimony of Officers Wehr, Guerra, McBride and Cowles was objectively unreasonable under § 2254(d)(2) because it stemmed from a misapplication of the controlling legal standard in light of the facts before the court.

Further, the state habeas court's conclusion that Mr. Joubert suffered no prejudice is contrary to *Strickland*'s prejudice inquiry. [*Joubert*, SHR, at 248, ¶ 44].   By concluding Mr. Joubert failed to demonstrate prejudice "in light of the extensive evidence presented at punishment" the state habeas court has misapplied *Strickland* in two ways.  First, the court

has  treated the prejudice inquiry as a mere sufficiency of the evidence analysis, a focus which  has been rejected by the courts. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) ("an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."); *Johnson v. Scott*, 68 F.3d 106 , 109 (5th Cir. 1995); *and*, *Weekley v. Jones*,  56 F.3d 889, 897 (8th Cir. 1995).   The state habeas court made no inquiry into the likely effect that the error had upon the jurors, plainly focusing instead upon the probable outcome in light of the countervailing evidence.  This is an outcome determinative test, and it applies *Strickland* contrary to the prejudice inquiry established by clear Supreme Court precedent.

Secondly, by addressing the effect of the evidence upon the jury as a whole, the state habeas court failed to make the requisite inquiry into whether only an individual juror might have been influenced by counsel's error. *Wiggins*,  39 U.S. at 537;   *Rocha v. Thaler*, 626 F.3d at  825; *and*, *Gray v. Epps*,  616 F.3d at  442.   The state habeas court's  cursory conclusion gives no hint, and permits no reasonable inference, that it directed its inquiry toward the potential effect of the error upon *individual* jurors.   As with the state habeas court's application of an outcome determinative test, the focus upon whether trial counsel's errors influenced the jury as a single deliberative unit is contrary to clearly established Supreme Court precedent.  *See Wiggins*, *supra*.

The State habeas court's resolution of Mr. Joubert's state writ claim alleging ineffective assistance of trial counsel for failing to object to inadmissible hearsay testimony was contrary to, and an unreasoanble application of clearly established Supreme Court precedent.   For this reason, this court should, consistent with the A.E.D.P.A.  reverse the lower court and grant relief on this issue.

§§§

Claim for Relief Number Seven (Exhausted Claim):

> MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE OF TESTIFYING CO-DEFENDANT'S COMMUNITY REPUTATION FOR UNTRUTHFULNESS.
>                   (STATE WRIT APPLICATION ISSUE NUMBER SIX)

A.      Facts in Support of Claim

1.      During Mr. Joubert's trial, the State presented testimony by cooperating co-defendant,  Deshon Glaspie, to identify Mr. Joubert as the individual who specifically shot Alfredia Jones. [29 R.R.: 40 - 41, 43, 64, 65].

2.      During the defense's case - in - chief at guilt-innocence, the defense presented Lamarcus Colar, who testified that he overheard Glaspie admit to shooting a woman during the robbery. [30 R.R.: 46 - 47].

3.      The defense presented no other witnesses regarding Glaspie; Colar was the sole defense witness at guilt-innocence.

4.      In state post-conviction proceedings,  Mr. Joubert alleged he had received ineffective assistance of counsel as a result of trial counsel's failure to investigate, develop and present evidence that Deshon Glaspie had a bad reputation in the community for truthfulness.  *Ex parte Eliljah Dewayne Joubert*, WR 78-119-01,  <u>State Habeas Clerk's Record </u>(SHR), pp. 20 - 22.

5.      Lead trial counsel, Jerome Godinich testified in the State post-conviction hearing.  [*Ex parte Eliljah Dewayne Joubert*, WR 78-119-01, <u>State Writ Hearing</u> (SWH),

9 - 58].  Godinich learned Deshon Glaspie would be called as a witness against is client some months prior to trial. [SWH, 23].  Second chair counsel, however, Allen Isbell was the one who ultimately cross-examined Glaspie. [SWH, 22, 25].  Upon learning Glaspie would be a witness, Godinich began to research ways of impeaching his credibility.  [SWH, 24]. Godinich claimed he spent "hours and days" with "those people" but did not question them about Glaspie's reputation for truthfulness.  [SWH, 29].   Godinich conceded he had not searched for witnesses who might provide an opinion about Glaspie's character for truthfulness. [SWH, 29].   He could not recall whether he met with potential witnesses, Terrence Simmons,   Frank Moaning, Frederick Pittman, or Tia Joubert.   [SWH, 30].  On cross-examination, Godinich claimed that the defense had "collected all the information that [they] could on Mr. Glaspie." [SWH,  51].  He agreed with the prosecutor's leading question that given the cross-examination done on Glaspie, coupled with Lamarcus Colar's testimony of Glaspie's admission, reputation witnesses to Glaspie's truthfulness would not have been helpful, particularly those related to Mr. Joubert. [SWH, 53].

      6.    Mr. Joubert presented several witnesses during the hearing to discuss their knowledge of Glaspie's poor reputation for truthfulness, and their availability to testify to that fact.

          a.    Frederick Pittman, a neighborhood acquaintance of both Mr. Joubert and Glaspie testified that he knew Glaspie sufficiently to opine that he was not a truthful person; he was also aware that Glaspie's reputation the community for truthfulness was poor.   [SWH, 60 - 62, 68 - 69]. Pittman was not contacted by Joubert's lawyers at the time of trial, but he had been available and would have testified about Glaspie's reputation for truthfulness. [SWH, 63 - 64].

b.    Sharenda White, Mr. Joubert's cousin, testified that she had grown up in the same community as Glaspie. [SWH, 71].  White had heard from others  that Glaspie was "not truthful, he's sneaky."   [SWH, 72].  White met with trial attorney Jerome Godinich one time, but did not discuss with him Glaspie's poor reputation.  He would have discussed Glaspie had she been asked. [SWH, 73].

c.    Roberta Nicole Davis,  Mr. Joubert's sister, was familiar with Glaspie from growing up in the same neighborhood. [SWH, 75 - 76].   Davis had the personal opinion that Glaspie was untruthful and manipulative.  She was also aware of his reputation in the community as being untruthful. [SWH, 76 - 77, 81- 82].  Davis met with Godinich on several occasions but they never discussed Glaspie's reputation for truthfulness. [SWH, 77].  Had Godinich asked her about Glaspie, Davis would have discussed his reputation. [SWH, 78].

d.    Tia Joubert, another cousin to Mr. Joubert, testified she knew Glaspie from childhood and that she had a poor opinion of his truthfulness; he also had a bad reputation in the community for truthfulness. [SWH, 85].  Tia was present when Godinich came to the family home to discuss the case, but he did not discuss with her anything one-on-one. [SWH, 86].  She would have discussed Glaspie's poor reputation had counsel inquired. [SWH, 86].

e.    Terrence Simmons, another cousin of Mr. Joubert lived throughout his life in the same community as Glaspie. [SWH, 90].  Simmons had met Glaspie on numerous occasions and had a poor opinion of Glaspie's character for truthfulness.   Glaspie also had a bad reputation for truthfulness in the community.   [SWH, 91].   Simmons was not contacted by Mr. Joubert's trial attorneys, but would have discussed his opinion of Glaspie and Glaspie's reputation had he been contacted. [SWH, 92].

f.    Frank Moaning,  Mr. Joubert's father, was aware of Glaspie's reputation  from living in the same community. [SWH, 96 - 97].  From his interactions with  Glaspie,  Moaning had the opinion he was not truthful.  [SWH, 97].   Moaning was not contacted by Mr. Joubert's attorneys pending trial, but affirmed that he would have discussed with them his opinion of Glaspie had they contacted him. [SWH, 98].

g.    Lamarcus Colar, the same witness who testified at trial, stated that he

was familiar with Glaspie from his personal interaction with him over the years.  In Colar's opinion, Glaspie was not truthful.  [SWH, 101]. Glaspie also had a bad reputation in the community for being truthful. [SWH, 102].  Colar had not discussed Glaspie's qualities when speaking with Mr. Joubert's attorneys, but would have discussed the subject with them.   [SWH, 102].

7.     Second chair trial counsel, Allen Isbell, who had  cross-examined Glaspie at trial, was not called as a witness during the State post-conviction proceedings.

8.     The state habeas court adopted the State's Proposed Findings of Fact and Conclusions of Law which rejected Mr. Joubert's claim.   *Joubert*, SHR,  252 - 258, 266 - 267.The findings related that while Godinich had met with several members of Mr. Joubert's family, he did not inquire into Glaspie's reputation for truthfulness because he "assumed" it would be bad.  *Joubert*, SHR, 253 ¶ 55.   The findings further explained that  Godinich believed it would "undercut" the "same witnesses" effect at punishment, and that  by having Lamarcus Colar testify about Glaspie's reputation for truthfulness would "lessen the impact" of his testimony about Glaspie's admission to having shot Alfredia Jones.  *Joubert*, SHR, 253,  ¶ 55.   The findings further rejected the testimony of all the witnesses but Lamarcus Colar to have been uncredible.  *Joubert*, SHR, 255 - 256,  ¶¶ 69 - 70.   The findings ultimately recited  counsel's  strategy was "reasonable . . . not to present witnesses to testify at guilt/innocence regarding Glaspie's allegedly poor reputation for truthfulness.  *Joubert*, 256  ¶ 71.   Finally, the findings recited that Mr. Joubert had not demonstrated that  the results of the proceedings "would have been different" but for the alleged errors.  *Joubert*, 256 ¶ 72.

9.     The Texas Court of Criminal Appeals adopted the state habeas court's findings of fact and denied relief. *Ex parte Elijah Dewayne Joubert*, WR 78,119-01, Order at 2 (September 25, 2013).

B.     Argument and Authorities

The lower courts' resolution of Mr. Joubert's claim, rejecting a relief on the ground of ineffective assistance of counsel is an unreasonable application of clearly established case law in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See*, 28 U.S.C. § 2254(d)(1).  In the alternative, the state habeas court's decision lies in such a fundamental mis-characterization of the state law underscoring trial counsel's duties, that the decision rests on an unreasonable application of the law to the facts.  28 U.S.C. § 2254(d)(2).

In order to show ineffective assistance of counsel, a defendant must demonstrate that counsel rendered a deficient performance, that is, counsel's errors or omissions fell below objective standards of reasonableness, and that the deficient performance prejudiced the defense. *Williams v. Taylor*, 529 U.S. at 690 - 691; *and*, *Strickland*, 466 U.S. at 668, 694.  Prejudice is established by showing that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different *Williams,* 529 U.S. at 691.  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of the proceedings, *Ibid* (citing *Strickland*, 466 U.S. at 694).  It is not the same, however, as a preponderance of the evidence; prejudice may be established on a showing of less than a preponderance.  *Strickland*, at 693 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in

107

the case"); *and, Nix v. Whiteside*, 475 U.S. at 175. And in evaluating the likelihood of prejudice, the Court concerns itself with whether only a single juror might have been affected by the error. *Wiggins v. Smith*, 39 U.S. at 537; *and*, *Rocha v. Thaler*, 626 F.3d at 825.

 *Strickland*'s rule is founded on the adequacy of trial counsel's investigation. *Strickland*, 466 U.S. at 690 - 691; *and*, *Wiggins*, 539 U.S. at 521 - 523. An "[i]nformed evaluation of potential defenses to criminal charges . . . [is the] cornerstone[ ] of effective assistance of counsel." *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir.1981). While decisions made upon a thorough investigation are largely unchallengeable, the Court admonished that decisions following upon a less than thorough investigation are entitled to deference only to the extent that counsel's truncated investigation was itself reasonable. *Strickland*, 466 U.S. at 690 - 691. Counsel's adoption of a defensive strategy before conducting a reasonable investigation among the alternatives cannot be categorized as reasonable strategy because it is made without a sufficient awareness of the alternatives. *See Soffar v. Dretke*, 368 F.3d 441, 474 (5th Cir. 2004) ("an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results."); *Richey v. Mitchell*, 395 F.3d 660, 685 (6th Cir.2005) ("even if counsel had reasonably believed that this defense had merit, he could not have made an informed choice without reasonably investigating the alternatives'), *rev'd on other grounds*, *Bradshaw v. Richey*, 546 U.S. 74 (2005); *White v. Godinez*, 301 F.3d 796, 800, 803 (7th Cir.2002) ("if the alleged inadequate consultation caused counsel to misapprehend or fail to investigate the facts necessary for an adequate defense, then his later "missteps . .

. are almost necessarily not attributable to sound strategic decisions."); *Rios v. Rocha*, 299 F.3d 796, 805-07 (9th Cir.2002) (" A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney ]neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so. . . we conclude, . . . that [attorney] Castro's failure to reasonably investigate Rios's case prior to selecting a defense strategy constitutes deficient performance.")(internal quotations omitted); *and*, *Battenfield v. Gibson*, 236 F.3d at 1229.

The state habeas court's conclusions as to the strategic basis for trial counsel's decision are  objectively unreasonable applications of *Strickland* because they are factually unsupported by the evidence developed in the state court hearing.  *See  Maddox*, 366 F. 3d at 999 (observing that challenges under the "unreasonable determination" clause may arise when "the finding is unsupported by sufficient evidence.").  *Strickland* ties a counsel's *reasoned* strategy to  an *informed* consideration of the alternatives, a consideration necessarily following from his investigation of the available alternatives. Though characterizing Godinich's decision not to present testimony of Glaspie's poor reputation for truthfulness as a reasonable strategy,  *Joubert*, 256  ¶ 71,  the  facts in the hearing reflected Godinich undertook no investigation into this issue.   Godinich admitted that he simply assumed Glaspie was considered to be untruthful by the community at large, but made no effort to question any potential witnesses on this matter. [SWH, 29].   Although he spoke with several members of Mr. Joubert's family,  the  evidence was undisputed  that the topics of conversation did not include Glaspie's reputation.   And   Godinich could not recall

109

speaking with potential Terrence Simmons, Frederick Pittman, Fank Moaning, or Tia Joubert.  [SWH, 30].   In short, the record evidence reflects  Godinich did not investigate whether impeaching Glaspie on this ground might be a viable defensive tactic.   In this vein, counsel - either Godinich, or Isbell's  decision not to impeach Glaspie could not have been a "strategic" decision because the defense was unaware of it as an option.   Given the lack of investigation, Godinich's agreement with the prosecutor's suggestion that  testimony on Glaspie's reputation would not have been helpful "resembles more a post hoc rationalization of [his] conduct than an accurate description of" his strategic decision.  *Wiggins,* 539 U.S. at 526 - 527.

Accordingly, the state habeas court conclusion that trial counsel made a reasonable strategic decision was objectively unreasonable in light of the undisputed evidence presented in the state writ hearing.   The defense did not inquire into available testimony about Glaspie's community reputation - it conducted no investigation.  Absent this investigation, the decision could not have been a reasoned one.

While the state habeas courts' resolution of the performance prong of Mr. Joubert's *Strickland* claim was an unreasonable determination under § 2254(d)(2), it resolution of the prejudice prong is contrary to *Strickland*.  *See*  § 2254(d)(1).  A showing of prejudice under *Strickland* requires only a showing of a "reasonable probability" of a different result.  *Id*., 466 U.S. at 694.   A "reasonable probability" is not analogous to a showing by a preponderance of the evidence the result would have been different, and the Court has clarified on several occasions that a reasonable probability may be established on less than

a showing of a preponderance of the evidence.  *See*   *Strickland*, 466 U.S. at 693;  *and, Nix v. Whiteside*, 475 U.S.  at  175.   *See also*, *Kyles v. Whitley*,  514 U.S.  at 434 (discussing "reasonable likelihood" standard and noting it does not require a showing of harm by a preponderance of the evidence).

The state habeas court concluded Mr. Joubert had not proven prejudice because he had not shown that "the results of the proceeding would have been different."  *Joubert*,   SHR, 253 ¶ 72.   In support, the Court cited *Harrington v. Richter*, 562 U.S. ___, 09-587 (2011) for the proposition that "under *Strickland*'s prejudice prong the likelihood of a different result must be substantial."  *Id*., 562 U.S. at ___, slip op. at 22.   In basing prejudice on a showing that the results "would have been different" the state court imposed a higher burden than that in *Strickland*, superimposing a preponderance of the evidence standard upon *Strickland*'s reasonable probability standard.   The state court's citation to *Harrington* merely highlights the misapplication of *Strickland*'s reasonable probability standard.   While *Harrington* explained that a showing of prejudice entailed showing a "substantial" likelihood, what is plain in the context of *Harrington* was the Court was attempting to distinguish hypothetical prejudice from a demonstrating the likelihood of real prejudice resulting from counsel's errors.   The state habeas court failed to recognize this nuance, and misinterpreted the applicable prejudice standard.

Indeed given that the key issue throughout trial, both a guilt, and in the decision to impose death, was Glaspie's credibility that Mr. Joubert – rather than he – had shot Alfredia Jones, the basis for any evidence which challenged Glaspie's credibility was significant.

While counsel cross-examined Glaspie thoroughly about his lies to the police, the available testimony reflects that additional probative evidence was available to prove that Glaspie was widely known in his community to have been a liar.  Such evidence would have been highly probative to the jurors' evaluation of Glaspie's credibility, if not at guilt, then definitely at the punishment phase where the State urged the death sentence on the questionable premise that Mr. Joubert had been the shooter.    And while the state habeas court' found the witnesses to be uncredible, this finding itself must be scrutinized in the context of how it was made.  As noted above, the state habeas court adopted out of whole cloth the findings of fact and conclusions of law submitted to it by the prosecution.   But  the state court fact-findings are intrinsically undermined by the lack of evidentiary support.  The fact findings recited the witnesses – with the exception of Lamarcus Colar, which the court declined to address – were not credible yet did not provide a basis for concluding why their testimony had been incredible: whether it found that they had lied about Glaspie's community reputation, whether they came across as shifty, whether their records made them *per se* not believable, or some other reason  The fact-findings, drafted without any input from the court's regarding its thought process offers only conclusory assertions, and provide no insight into the court's independent thought process.  In general, the  objective reasonableness of the court's recitations on this matter, must be viewed in context with the other deficiencies under both § 2254(d)(1) and (d)(2).

For these reasons, this Court should conclude that the state habeas court resolved the present claim in an objectively unreasonable manner and contrary to clearly established

precedent from *Strickland*.  This Court should reverse the state court resolution of this issue

and grant relief.

§§§

Ground for Relief Number Eight (Exhausted Claim)

> MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF
> COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED
> STATES CONSTITUTION DUE TO TRIAL COUNSEL'S FAILURE TO REASSERT HIS
> OBJECTION TO THE ADMISSION OF PRISON DISCIPLINARY RECORDS DURING
> THE PENALTY PHASE OF TRIAL.
> (STATE WRIT APPLICATION ISSUE NUMBER EIGHT)

A.      Facts in Support of the claim:

1.      During trial, the State attempted to admit into evidence a Texas Department of

Criminal Justice Penitentiary Packet, State's Exhibit 228, which contained disciplinary

records – "TDCJ Disciplinary Report and Hearing Records" detailing misconduct committed

by Mr. Joubert while incarcerated for a 1998 conviction for Aggravated Assault.  Trial

counsel objected  and  the court admitted a redacted exhibit, State's Exhibit 228-A, which

excluded the disciplinary records.  [33 R.R.: 24 - 25].

2.      During the defense's punishment case-in-chief, licenced social worker Bettina

Wright testified about Mr. Joubert's personal and character development based on the

circumstances of his childhood.

3.      On re-cross examination, the prosecutor inquired whether Ms. Wright, as a part

of her review of the records relating to Mr. Joubert  had reviewed the prison disciplinary

records excluded from State's Exhibit 228-A.  [35 R.R.: 188 - 189].   Wright responded that

she had reviewed the records, but explained that her:

> opinion about [Mr. Joubert's development I based on childhood  – information
> from his childhood and TYC documents, Juvenile Probation documents, much
> more so than TDC or Harris County Jail documents. . . . [The TDJ records are]

not the most important records in forming an opinion about his developmental deficits.

[35 R.R.: 189 - 190].

4.      Subsequently, on re-cross examination, the State moved to admit the disciplinary records into evidence as part of an un redacted State's Exhibit 228.   [35 R.R.: 207].

5.      Trial counsel, Jerome Godinich did not object to the admission into evidence of the previously excluded prison disciplinary records. [35 R.R.: 207 - 208].

6.      The prosecutor subsequently presented as a rebuttal witness at punishment, A.P. Merillat, a police officer, to testify about the inability of the Texas prison system to control inmate violence.   During his testimony,  Merillat volunteered that any disobedience in prison constituted an act of violence. [39 R.R.: 105, 123].

7.      During closing arguments, the prosecutor specifically directed the jurors to consider Mr. Joubert's TDCJ disciplinary records as it related to his future dangerousness, reciting a litany of his disciplinary violations in prison. [39 R.R.: 206 - 208].

8.      In his state post-conviction writ application Mr. Joubert challenged the admission of the disciplinary records as a violation Mr. Joubert's Sixth Amendment right to confront and cross-examine the unavailable TDCJ witnesses who created the disciplinary records, and as an ineffective assistance of counsel claim for trial counsel's failure to object to the admission of the disciplinary records. *Joubert*, SWR, 5.

9.      The state habeas court held an evidentiary hearing in which trial counsel,

Jerome Godinich testified.  *Joubert*, SWH, 9 - 58.  He did not testify about his decision not to object to the introduction of Mr. Joubert's prison disciplinary records.

10.      The state habeas court adopted the State's Proposed Findings of Fact and Conclusions of Law which rejected Mr. Joubert's claims relating to the admission of his prison disciplinary records.  The findings related that trial counsel's failure to object "was a matter of trial strategy" by "demonstrat[ing] that defense expert Wright reviewed all available information regarding the applicant . . . during the presentation of defense expert Wright."  *Joubert*, SHR, 258¶ 80.    The findings also recited that the admission of the records "did not prejudice the defense or contribute to the applicant's conviction or punishment in light of the other evidence elicited at trial. . ."  *Joubert*, SHR, 258, ¶ 81.  The conclusions recited counsel had not been ineffective.  *Joubert*, SHR, 258 ¶ 8.

11.      The Texas Court of Criminal Appeals adopted the state habeas court's findings of fact and denied relief.  *Ex parte Elijah Dewayne Joubert*, WR 78,119-01, Order at 2 (September 25, 2013).

B.      Argument and Authorities

The lower courts' resolution of Mr. Joubert's claim, rejecting a relief on the ground of ineffective assistance of counsel is an unreasonable application of clearly established case law in *Strickland v. Washington*, 466 U.S. 668 (1984), because the findings and conclusions are factually unsupported by the evidence presented in the state court hearings, and fail to correctly apply *Stridkland*'s inquiry into the objective *reasonableness* of trial counsel's strategy.  Furthermore, the court's conclusion as to the lack of prejudice is an objectively

unreasonable determination of the facts in the record before the court.

To prove ineffective assistance of counsel, a defendant must demonstrate that counsel committed errors or omissions which fell below objective standards of reasonableness, and that the errors prejudiced the defense. *Williams*, 529 U.S. at 690 - 691; *and*, *Strickland*, 466 U.S. at 668, 694. Prejudice is established by showing that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different *Williams*, 529 U.S. at 691. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of the proceedings, *Ibid*. It is not enough to characterize a given course of conduct as strategic. Even if arguably strategic, counsel's actions must be objectively reasonable according to professional norms of practice. *Roe v. Flores-Ortega*, 528 U.S. at 481.

The Supreme Court has held that the Confrontation Clause precludes the admission of out-of-court testimonial statements in a criminal case unless the declarant is unavailable, or the defense has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 49 (2004). The introduction of testimonial hearsay statements in a criminal trial violates a defendant's right to Confront and Cross-Examine the witnesses against him. The information possessed by adverse witnesses is not exempted from the Confrontation Clause. An expert witness may not convey the substantive facts related to him by another which were made in preparation for an adversarial proceeding because such statements likewise require the opportunity to confront and cross-examine the declarant. *See Bullcoming v. New Mexico*, 564 U.S. ___, slip op. at 12 - 13, 14 (2011); *and*, *Melendez-*

117

*Diaz v. Massachusetts*, 557 U.S. 305, 310 - 312, 317 - 321 (2009).

The Texas Court of Criminal Appeals has specifically addressed the issue at present – the admissibility of prison disciplinary records in a capital case, and held that such records constitute testimonial hearsay and are subject to exclusion under the Confrontation Clause. *Russeau v.* State, 171 S.W.3d 871, 880 - 881 (Tex.Cr.App. 2005). *See also*, *Smith v. State*, 297 S.W.3d 260, 276 - 277 (Tex.Cr.App. 2009); *and*, *Grant v. State,* 218 S.W.3d 225, 231 - 232 (Tex.App.-Hous. [14th Dist.] 2007). Recitations in prison disciplinary records which go beyond "stale descriptions" of an offense, and which include "descriptions of specific facts and observations" are simply inadmissible hearsay because they are testimonial in nature. *Smith*, 297 S.W.3d at 276 - 277.

The state habeas court's conclusions as to the strategic basis for trial counsel's decision are objectively unreasonable applications of *Strickland* because they are factually unsupported by the evidence developed in the state court hearing. *See Maddox*, 366 F. 3d at 999 (observing that challenges under the "unreasonable determination" clause may arise when "the finding is unsupported by sufficient evidence."). Godinich did not explain the reason for his failure to object and so the state habeas court's characterization of the omission as a strategy is optimistic. Strategy presumes a conscious decision between two alternatives, and in the record before the state court, there was no evidence that Godinich made a conscious decision. A reasonable interpretation of his actions in light of the record as a whole would support a finding that the omission was not strategic, given that he initially Godinich objected to the admission of the disciplinary records, while unquestionably

knowing that he would ultimately be presenting Bettina Wright.   Further, the issue of re-introducing the records did not arise until the prosecutor abruptly requested re-introduction, on re-cross examination, well after eliciting the fact that Wright had reviewed Mr. Joubert's TDC records.   At that juncture, the point was clear to the jury that Wright had reviewed Mr. Joubert's TDCJ records as a matter of being thorough, although they bore little relevance to her testimony.   In light of the actual record, the conclusion that Godinich's failure to object to the disciplinary records resulted from a reasoned strategy "resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526 - 527.   The state court's application of the law to the facts is an objectively unreasonable application of the facts to the law. *See*, 28 U.S.C.§ 2254(d)(1).

The state court findings and conclusions further misapply *Strickland* by ignoring the inquiry into whether counsel's conduct, even if strategic, was an objectively reasonable one. *Strickland*, 466 U.S. at 688 - 689.   Here, the record reflected that Mr. Joubert's previously excluded disciplinary records reflected numerous detailed instances of misconduct while in prison: threatening to rape a female guard, threatening to beat up another guard, physical assault on another inmate, disrupting feeding,  tampering with a cell door to prevent it being locked, refusing to work, refusing to obey an order, destroying prison property, and masturbating in public.   These are acts of misconduct that no trial attorney would want exposed to the jury, particularly a jury charged with determining a death sentence based in part on a defendant's prison behavior.   Having been excluded, and not subject to disclosure

119

even if reviewed by the defense expert,  it would have been an objectively unreasonable trial to acquiesce to the introduction of this testimony.   At a minimum, trial counsel could have requested a balancing test and limiting instruction under Tex.R.Evid. Rule 705(d).   The findings  do not permit the assumption that the trial court determined the objective reasonableness of counsel's "strategy."   The state court's conclusion is contrary to clearly established precedent in *Strickland*.  *See* 28 U.S.C.§ 2254(d)(2).

Finally, the state court's determination of prejudice on this ground is an unreasonable application of the facts under *Strickland*.   It is unclear whether the state court applied the *Strickland*'s standard –  the reference to "prejudic[ing] the defense or contribut[ing] to applicant's conviction or punishment, *Joubert*, SHR, 258, ¶ 81, alludes to prejudice inquiries under *Chapman v. California,* 386 U. S. 18 (1967),  and *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in which case *de novo* review on the prejudice inquiry is warranted.

But presuming the state habeas court applied *Strickland* at all the court's conclusion is unreasonable under *Strickland* given the nature of the disciplinary violations, and the State's exploitation of their admission at his trial.   The introduction of Mr. Joubert's prison disciplinary violations was not mere cumulative evidence.   A.P. Merillat, the last witness to testify opined that any act of disobedience could be an act of violence.   And further, during the State's concluding argument, the prosecutor capitalized upon the evidence, directing the jurors to the violations as proof that Mr. Joubert constituted a future danger.   The violations themselves were not trivial in the context of the jury's consideration of whether Mr. Joubert would be a future danger, an inquiry largely premised on his behavior *in prison*.      The

violations included a threat of rape against one guard, a threat of physical attack against another.   He had a physical assault against an inmate, and had refused orders on two occasions.  These were not insignificant to the determination of whether Mr. Joubert would commit future acts of violence in prison.

Moreover, the state court's cursory analysis suggests that, to the extent it did apply *Strickland*, it applied it as a simple outcome determinative test, rather than one directed toward the potential influence upon each of the individual jurors.   Absent the detailed evidence of disciplinary violations, a juror  could have reasonably concluded that he was a danger outside of prison, but that prison would control his behavior.   But given the detailed introduction of the violations, there is no likelihood that any juror would conclude that Mr. Joubert would conform his behavior to the requirements of a prison regimen.

The state habeas court's resolution of this claim for relief is contrary to 28 U.S.C. § 2254(d).  Relief should be granted on this issue.

§§§

Claim for Relief Number Nine (Exhausted Claim):

THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. JOUBERT AS A PRINCIPLE TO THE CAPITAL MURDER BASED ON CO-DEFENDANT DESHON GLASPIE'S TESTIMONY WHERE THE STATE FAILED TO ADEQUATELY CORROBORATE GLASPIE'S TESTIMONY UNDER THE STATE ACCOMPLICE-WITNESS RULE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT. (STATE DIRECT APPEAL ISSUE NUMBER FOUR)

Claim for Relief Number Ten (Exhausted Claim):

THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. JOUBERT AS A PARTY TO THE CAPITAL MURDER BASED ON CO-DEFENDANT DESHON GLASPIE'S TESTIMONY WHERE THE STATE FAILED TO PRESENT EVIDENCE THAT MR. JOUBERT ACTED WITH INTENT TO CAUSE DEATH IN THE COMMISSION OF THE OFFENSE OR THAT HE COULD REASONABLY ANTICIPATE THE DEATHS, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT. (STATE DIRECT APPEAL ISSUE NUMBER FIVE)

A.     Facts in Support of Claim

1.     On direct appeal, Mr. Joubert challenged the sufficiency of the evidence to prove he had committed the capital murder as a principal.   He contended that the evidence was legally insufficient, when excluding co-defendant Deshon Glaspie's testimony under the State accomplice-witness rule, to prove that Mr. Joubert had acted as a principal in the offense by actually shooting Alfredia Jones.  *See* Pet. Ex. ___ (Brief on Direct Appeal).

2.     Mr. Joubert also challenged the sufficiency of the evidence to prove he had committed the capital murder as a party to the offense.   In this ground he contended that the evidence was legally insufficient to prove that Mr. Joubert had acted as a party to the capital murder because it did not show that he had either intended, or reasonably foresaw that a murder would occur in the course of the robbery, or that two murders would have resulted

in the course of the event. *See* Pet. Ex. 71 (Brief on Direct Appeal).

  3. The Texas Court of Criminal Appeals rejected both of Mr. Joubert's claims.

*Joubert v. State*, 235 S.W.3d 729 (Tex.Cr.App. 2007).  The Court held:

> Article 38.14 provides that a conviction cannot stand on accomplice testimony unless there is other evidence tending to connect the defendant to the offense. The corroborating evidence under 38.14 need not be sufficient, standing alone, to prove beyond a reasonable doubt that a defendant committed the offense. . . .
>
> All that is required is that there is some non-accomplice evidence *tending to connect* the defendant to the offense. Further, there is no requirement that the non-accomplice testimony corroborate the accused's connection to the specific element which raises the offense from murder to capital murder. . . . There need be only some non-accomplice evidence tending to connect the defendant to the crime, not to every element of the crime.  . . .  Houston Police Officer James Binford testified that he interviewed the appellant, who confessed in detail about his involvement in the instant offense. The interview with Binford and another officer was videotaped. The videotaped statement was played for the jury and admitted into evidence. In the video, the appellant admitted to participating in the instant offense, but he denied shooting either victim. The videotaped statement was sufficient to "tend to connect" him to the offense.  The appellant's liability as a principal or under a parties theory is of no relevance under an Article 38.14 analysis. The question is whether some evidence "tends to connect" him to the crime; the connection need not establish the exact nature of his involvement (as a principal or party). The appellant's admission that he participated in the crime, although he denied being a shooter, is enough to tend to connect him to the offense. Points of error four and five are overruled.

*Id*., 235 S.W.3d at 731 (footnotes omitted).


  B. Argument and Authorities

  The Texas Court of Criminal Appeal's rejection of Mr. Joubert's challenges to the

sufficiency of the evidence is contrary to/unreasonable application of clearly established

Supreme Court precedent in *Jackson v. Virginia*, 443 U.S. 307 (1979).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the state to prove each and every essential element of the offense in a criminal prosecution. *In re Winship*, 397 U.S. 358, 361 - 362 (1970); *and*, *Jackson v. Virginia*, 443 U.S. at 319. The essential elements of the offense to measure the sufficiency of the evidence are defined by state criminal law. *Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000). When evaluating the sufficiency of the evidence, although the court reviews the evidence in a light most favorable to the jury, the reviewing court may not compensate for gaps in proof or draw overly broad inferences. *United States v. Harris*, 420 F.3d 467, 474 (5th Cir. 2005); *and*, *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). If the evidence gives equal or nearly equal circumstantial support for a theory of guilt and one of innocence, the conviction should be reversed. *United States v. Rose*, 587 F.3d 695, 702 (5th Cir. 2009).

Capital murder is defined as a knowing or intentional murder coupled with an aggravating circumstance, in the present case, in the course of committing an underlying felony, such as a robbery. *Santana v. State*, 714 S.W.2d 1, 9 (Tex.Cr.App. 1986); *and* Tex.Penal Code § 19.03(a)(2). Capital murder is a related, but distinct offense from plain murder. *See* Tex.Penal Code §§ 19.03(a), *and*, 19.02(b)(1). *See also*, *Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Cr.App. 2002). Felony murder, the unintentional killing of an individual during the course of an underlying felony is also a distinct offense. *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex.Cr.App. 1999); *and*, *Sendejo v. State*, 953 S.W.2d 443,

453 (Tex.App.-Waco 1997).

Texas law permits a finding of guilt on a theory of party liability where a defendant "act[s] with the intent to promote or assist the commission of *the* offense." Tex.Penal Code § 7.02(a)(2) (emphasis added). Party liability may be premised on a theory of transferred intent, but only where the state proves that the defendant "should have anticipated [the different offense] as a result of carrying out of the conspiracy." Tex.Penal Code § 7.02(b). This latter provision is contingent upon satisfactory proof that the unplanned offense was reasonably foreseeable.

Finally, Texas law imposes additional assurances on whether an accomplice's testimony against a defendant is legally sufficient to establish guilt. The "accomplice witness rule" under Tex.Code Crim.Pro. Art. 38.14 requires proof in the form of corroborative evidence "tending to connect the defendant with the offense committed." *Ibid*. Further, "corroboration is not sufficient if it merely shows the commission of the offense." *Ibid*. In a review of the sufficiency of the evidence, the appellate court excludes the accomplice witnesses' testimony to determine whether the remaining evidence sufficiently tends to connect a defendant to the offense. *Beets v. State*, 767 S.W.2d 711, 724 (Tex.Cr.App. 1987).

The Texas Court of Criminal Appeals' sufficiency review was an objectively unreasonable application of *Winship* and *Jackson* by over stretching the inferences permitted under those cases.

The evidence was legally insufficient to prove Mr. Joubert committed the capital murder as a principle. Apart from Glaspie's testimony inculpating his co-defendant, the

record was devoid  of any evidence that  Mr. Joubert personally shot Alfredia Jones.    In fact, the evidence inferentially tended to exculpate Mr. Joubert and implicate Glaspie: Glaspie's gun fired the bullet which killed Jones, the three traveled to and from the  offense in Glaspie's girlfriend's car, and the idea to rob a cash checking store originated with Glaspie.  Further,  Lamarcus Colar's testimony of Glaspie's phone conversation further exculpated Mr. Joubert.  Mr. Joubert's video recorded statement – the only evidence to establish his presence during the  offense – was not sufficient in and of itself to prove he personally shot Jones.

The evidence was similarly deficient in establishing Mr. Joubert was guilty as a party to capital murder.  While the evidence reflected Mr.  Joubert had planned to participate in a robbery, the evidence, even viewed in the light most favorable to the verdict did not establish that he had intended that one or more  individuals be killed in the course of the robbery,   or that he reasonably foresaw that one or more individuals would be killed.   In the absence of specific evidence of Mr. Joubert's intent as a party – evidence which was *not* established through Glaspie's self-serving testimony – there was insufficient evidence, either direct or circumstantial, that he possessed the requisite mental state to act as a party.   The question of Mr. Joubert's mental state in acting as a party was too speculative to support the jury's inference from the facts before it.

The Court of Criminal Appeals' resolution of Mr. Joubert's fourth and fifth grounds for relief in his direct appeal claims was an unreasonable application of *Winship* and *Jackson*

126

to the facts of the case.  Accordingly, this Court should reverse the lower court's decision and grant relief to Mr. Joubert.

§§§

Ground for Relief Number Eleven (Exhausted Claim):

THE TRIAL COURT DENIED MR. JOUBERT OF HIS RIGHT TO DUE PROCESS UNDER THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY PREVENTING TRIAL COUNSEL FROM ARGUING  THE CO-DEFENDANT'S 30-YEAR SENTENCE SHOULD BE CONSIDERED IN MITIGATION. (STATE DIRECT APPEAL ISSUE NUMBER SIX)

A.      Facts in Support of Claim

1.      At trial, the State elicited from Deshon Glaspie that he had received a 30 - year plea offer to Aggravated Robbery in exchange for his agreement to testify against Mr. Joubert. [28 R.R.: 8 - 11].   Prior to closing argument at punishment, the trial court granted the State's motion in limine to preclude Mr. Joubert from arguing that his co-defendant's plea sentence could be considered as mitigation against the imposition of a death sentence.   [39 R.R.: 126, 128].

2.      On direct appeal, Mr. Joubert challenged the court's preclusion of counsel arguing that the co-defendant's lenient sentence should be considered as a mitigating factor, relying upon the Supreme Court's decision in  *Lockett v. Ohio*, 438 U.S. 586  (1978).

3.      The Texas Court of Criminal Appeals denied relief on the issue on the basis that a co-defendant's sentence was not mitigating under Texas law.  *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Cr. App. 2007).

4.      Mr. Joubert sought writ of certiorari to the United States Supreme Court on this issue, but was denied certiorari. *Joubert v. State*, No. 07-7830, 552 U.S. ___ (February 25,

2008).

B.    Argument and Authorities

The Texas Court of Criminal Appeals affirmance of the trial court's preclusion of Mr. Joubert from arguing his co-defendant's sentence should be considered as mitigation against a death sentence was an unreasonable application of clearly established case law in *Lockett v. Ohio*, 438 U.S. 586 (1978) through *Tennard v. Dretke*, 542 U.S. 274 (2004).

 The Eighth Amendment requires the State afford capital defendants' a meaningful opportunity to present and argue any relevant basis for the jury to return a sentence of less than death.  *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Boyde v. California*,  494 U.S. 370, 377 - 378 (1990) ("The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner.").

Concededly, in *Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir.1986), the Fifth Circuit upheld the excluding evidence of a co-defendant's sentence, adopting a narrow interpretation of *Lockett*'s holding to apply only to a defendant's character, prior record, or the circumstances of the offense.  *Id.*, at 1169.  Several other courts have concluded that the admission of evidence relating to a co-defendants' lenient treatment is a relevant mitigating factor.  *Ex parte Burgess*, 811 So.2d 617, 628 (Ala.2000) (the lenient treatment of accomplices was appropriate mitigating factor that trial court should have given greater weight), *State v. Ferguson*, 642 A.2d 1267, 1269 (Del.Super.1992) (the disposition of co-

defendants' cases is relevant, mitigating evidence), *and*, *State v. Marlow*, 163 Ariz. 65, 786 P.2d 395, 402 (1989) (disparity between sentences of accomplices must be considered and may be found a mitigating circumstance and weighed against any aggravating circumstances in determining whether to impose death penalty); *and Brookings v. State*, 495 So.2d 135, 146 (Fla. 1986).   These decisions rest upon the unquestioned premise that  "[a] just legal system seeks not only to treat different cases differently but also to treat like cases alike." *United States v. Meirick*,  674 F.3d 802, 806 (8th Cir. 2012).

In *Parker v. Dugger*, 498 U.S. 308 (1991), the Supreme Court implicitly recognized that a co-defendant's life sentence constituted relevant mitigating evidence under the Eighth Amendment.  In *Parker*, the Court reversed a decision sustaining a death sentence where th Florida Supreme Court failed to credit  non-statutory mitigation found by the trial court.  In course of its analysis, the Court found it necessary to highlight the sentencing factors which supported a sentence of less than death:

> What did the trial court conclude about nonstatutory mitigating evidence? There is no question that Parker presented such evidence.  For example . . . Parker's attorney emphasized to the jury that none of Parker's accomplices received a death sentence for the . . . murder.
> . . .
>
> . . . We must assume that the trial judge considered all this evidence before passing sentence.  Under both federal and florida law, the trial judge could not refuse to consider any mitigating evidence.

*Parker*, 498 U.S. at 314- 315; *see also*, id., at 315 ("Parker's nonstatutory mitigating evidence" included "more lenient sentencing" given to the "perpetrator of the crime.").  The

Florida Supreme Court affirmed Parker's death sentence based on its view that the trial judge found no relevant mitigation.  The Supreme Court reversed, however, because Parker had plainly offered evidence supporting a life sentence, evidence which included his co-defendants' lesser sentences.  *Id*., at 322.   According to the Court, the Florida Court's "affirmance was invalid because it deprived Parker of the individualized treatment to which he is entitled under the Constitution."  *Id*.

In holding that the  court's refusal to consider a co-defendant's disparate sentence violated the Eighth Amendment, the Court plainly acknowledged that the evidence was constitutionally relevant as mitigation. *See State v. Getsy*, 702 N.E.2d 866, 892 (Ohio 1988) ("In *Parker* . . . the United States Supreme Court implicitly recognized that a co-defendant's sentence could be considered a nonstatutory mitigating factor.") (internal citation omitted).

The Court of Criminal Appeals sought to distinguish *Parker* on the basis that in *Parker*, the co - defendant's sentence was relevant merely as a matter of Florida state law. *See Joubert*, 235 S.W.3d at 734.   But this constituted a significant misreading of *Parker*. If the Supreme Court had regarded the co-defendant's lesser sentences as falling outside the individualization requirement,  the state court's failure to consider such evidence would not have constituted Eight Amendment error.

The Supreme Court's decision in *Tennard v. Dretke* sheds further light upon the unreasonableness of the state court's overly narrow construction of relevant evidence.  In *Tennard*, the Supreme Court reversed the Fifth Circuits' and Texas Court of Criminal

Appeals' narrow construction of "relevant" mitigating evidence necessary to require a mitigation jury instruction – the instruction which is currently statutorily mandated as the third special punishment issue.   The Court observed that in Eighth Amendment jurisprudence, there is a "low threshold for relevance" applicable to mitigating evidence in capital cases.  *Id*., 542 U.S. at 284.   Citing to its decision in *McKoy v. North Carolina*, 494 U. S. 433 (1990), the *Tennard* Court clarified that:

> . . . . the "'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context, and thus the general evidentiary standard — 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'—applies.' . . . We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" . . . Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U. S., at 441.

*Tennard*, 542 U.S. at 284 - 285 (internal citations omitted).

The state court's conclusion that Glaspie's lenient sentence was constitutionally irrelevant as mitigation flatly conflicted with the decisions in *Parker,* as well as *Tennard* because disparate treatment of a similarly situated co-defendant was plainly relevant to a juror's evaluation of whether a defendant was death worthy.   Texas' mitigation special issue, itself constitutionally compelled through the Supreme Court's *Penry* line of cases, was designed to be a broad vehicle permitting the jury to consider all relevant evidence in making its evaluation of a defendant's moral culpability.  In fact the Court of Criminal Appeals has

held that the "mitigation" special issue is not  limited to a defendant's own characteristics,

but is, in fact, a broad catch all:

> Article 37.071, § 2(e)(1) directs the court to instruct the jury to "tak[e] into consideration all of the evidence" when determining whether there are sufficient mitigating circumstance to warrant the imposition of a sentence of life imprisonment. . . . By its plain language, the statute requires the jury to look at *all* of the evidence and not just evidence a juror might consider to be mitigating.   For example, victim-impact evidence may be relevant to counteract the mitigating evidence the defendant is entitled to introduce. *See, e.g., Prystash v. State*, 3 S.W.3d 522, 536 (Tex.Crim.App. 1999). . . . the jury is entitled to consider all of the evidence.

 *Schenette v. State*, 144 S.W.3d 503, 507 - 508 (Tex.Cr.App.  2004) (emphasis added).

 *Schenette* is at logical odds with the Court of Criminal Appeals' later  decision in

Mr. Joubert's case for *Schenette* concludes that the mitigation special issue is open to *all*

evidence,  not simply that which is traditionally deemed to be mitigating.   Certainly, the

Court's restrictive view that the mitigation issue permits only admission of evidence relating

to the defendant's own qualities or conduct is  inconsistent with the Court's decision in

*Mosley v. State*, 983 S.W.2d 249, 262 (Tex.Crim.App. 1998),   which held victim impact

evidence – which has *nothing* to do with a defendant's personal characteristics – is relevant

under the mitigation  punishment issue.   It is a questionable proposition that leniency toward

an equally culpable co-defendant is irrelevant to the jury's normative evaluation of whether

a defendant is death-worthy.   But *Schenette*, as well as *Mosely* highlight the inconsistent, if

not objectively unreasonable limitations imposed by the Court of Criminal Appeals on

*Lockett*'s conception of constitutional relevance.

   While  it was true that the jury had *heard* testimony about Glaspie's plea offer,

counsel was precluded from making effective and meaningful use of this testimony as mitigation by the trial court's limitation on closing argument.  The Supreme Court has recognized the significance of closing argument and held that  limitations on argument may violate the constitution.   *See  Herring v. New York*, 422 U.S. 853 (1975).  The Court has additionally made clear through its Eighth Amendment jurisprudence that a defendant must be able to make meaningful use of relevant mitigating   evidence.  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 226 (2007) ("A careful review of our jurisprudence in this area makes clear that well before our decision in Penry I, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual . . .")

In light of the error, and the significance of the precluded argument to the jury's punishment deliberations, this Court should grant relief and reverse Mr. Joubert's sentence of death.  *See Penry v. Lynaugh*,  492 U.S. 302, 328 (1989) ("Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.) (internal quotations omitted); *and*, *Abdul-Kabir*, 550 U.S. at 263 - 265.


§§§


134

# VIII.

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, Petitioner, Elijah Dewayne Joubert, prays that this Court:

A.     Order Respondent to provide this Court with the record of all state court proceedings;

B.     Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

C.     Grant discovery and other appropriate means of expanding the record before this Court

D.     Grant an evidentiary hearing so that he may present evidence in support of these claims; and

E.     Grant such other relief as law and justice require.

<div style="margin-left:40%;">

Respectfully Submitted,
ALEXANDER L. CALHOUN
Attorney at Law
Texas Bar No. 00787187
4301 W. William Cannon Dr.  Ste. B-150  # 260
Austin, Texas 78749
(512) 420-8850 (telephone)
(512) 233-5946 (facsimile)
(512) 731-731-3159 (cell)
Email:        alcalhoun@earthlink.net

</div>

By: /s/ *Alexander L. Calhoun*

      Alexander L. Calhoun

      Member of the Bar of this Court

GERALD BIERBAUM

Attorney at Law

Texas Bar No. 24025252

2013 Paradise Peak

Las Vegas, NV 89134

(702) 945-6017(telephone)

(702) 243-0735(facsimile)

By: /s/ *Gerald Bierbaum*

Gerald Bierbaum

Member of the Bar of this Court

Attorneys for Petitioner, Elijah Dewayne Joubert

## Verification

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.

Dated: September 23, 2014        /s/ *Alexander L. Calhoun*

                                Alexander L. Calhoun

136

**Certificate of Service**

I certify that on September 24, 2014, I served, a true and correct copy of this

Petition for Writ of Habeas Corpus by a Person in State Custody upon opposing counsel

via email by filing the writ in this Court's EF/ECM system:


Hon. Greg Abbott
attn:   Matthew Ottoway
Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548


/s/   *Alexander L. Calhoun*
Alexander L. Calhoun