UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ELIJAH DEWAYNE JOUBERT,　　　　§
　　　　　　　　　　　　　　　　　§
　　　　　　　　　　Petitioner,　　§
　　　　　　　　　　　　　　　　　§
vs.　　　　　　　　　　　　　　　§　　　　CIVIL NO. 4:13-cv-03002
　　　　　　　　　　　　　　　　　§
WILLIAM STEPHENS, Director　　　§　　　***DEATH PENALTY CASE***
Texas Department of Criminal Justice,　§
Correctional Institutions Division,　　§
　　　　　　　　　　　　　　　　　§
　　　　　　　　　　Respondent.　§
_____

**PETITIONER'S UNOPPOSED MOTION TO STAY AND ABEY
FEDERAL PROCEEDINGS PENDING EXHAUSTION OF
STATE REMEDIES AND
AND MEMORANDUM BRIEF IN SUPPORT**
_____

　　　　Mr. Joubert respectfully requests that this Court stay the instant proceedings and hold his

petition in abeyance so that he may return to the Texas Court of Criminal Appeals ("CCA") and

exhaust the following claims:

　　1.　　Claim One:  The prosecution presented a false and misleading impression of its
　　　　　key witness Dashan Glaspie's truthfulness by withholding evidence and by failing
　　　　　to correct testimony which undermined the bolstering effect of the state's zero
　　　　　tolerance plea agreement.

　　2.　　Claim Two:  The prosecution withheld material evidence which impeached its
　　　　　key witness Dashan Glapsie's testimony and which would have undermined the
　　　　　bolstering force of the state's zero tolerance plea agreement.

　　3.　　Claim Three:  Trial counsel rendered ineffective assistance of counsel at the
　　　　　punishment phase of trial by counsel's failure to understand the basis of the
　　　　　available mitigating evidence thereby undermining the presentation of evidence
　　　　　through the defense's expert witnesses licensed social worker Benita Wright and
　　　　　forensic psychologist Mark Cunningham.

1

4.      Claim Four:  Trial counsel rendered ineffective assistance of counsel at the punishment phase of trial for failing to investigate and direct the defense neuro-psychologist, Dr. Lindsay Rosen, to conduct sufficient testing in order to determine the existence of neuro-psychological impairment in the face of potential indicators of damage.

5.      Claim Five:  Mr. Joubert received ineffective assistance of appellate counsel by appellate counsel's failure to raise on direct appeal the trial court's denial of Mr. Joubert's right to due process of law under the Fifth, Eighth, and Fourteenth Amendments by excluding relevant mitigation testimony by Dr. Mark Cunningham relating to Mr. Joubert's future dangerousness.

6.      Claim Twelve:  Mr. Joubert was denied his right to a reliable sentence and due process under law when the state called A. P. Merillat, who presented false and misleading testimony about the conditions of confinement in the Texas Department of Criminal Justice.

As set out in detail below, issuance of a stay of these proceedings is appropriate because (a) Mr. Joubert's claims, although unexhausted, are not procedurally defaulted; (b) recent evolutions in the CCA's treatment of successive habeas applications makes clear that presenting his unexhausted claims to state court would not be futile; and (c) Mr. Joubert meets the two-part test for stay and abeyance set out in *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  If this motion is granted, Mr. Joubert will file his successive petition in the CCA no more than 30 days from the date of the order granting the stay of the instant proceedings and will return to federal court no more than 30 days from the state court's final disposition of his claims.

## I.  INTRODUCTION

The record reflects that on April 3, 2003, three individuals committed an armed robbery of the ACE Cash Express store in Houston.  During the robbery, ACE employee Alfredia Jones and Houston Police Department Officer Charles Clark were both killed by gunshot from separate weapons.  28 R.R.: 95.  On April 4, 2003, officers from the Houston Police Department arrested Mr. Joubert and his two co-defendants, Dashon Glaspie and Alfred Dwayne ("Doby") Brown. 27 R.R.: 105-06; 28 R.R.: 29-32.  There were no eyewitnesses to the robbery itself and the

incident was not captured on video camera.  Several witnesses, however, placed Mr. Joubert in the company of the two co-defendants on the morning of the robbery.  26 R.R.: 177-87, 206-07, 220-223.  A witness who frequented the apartment complex where Mr. Joubert lived testified that Dashon Glaspie approached him and asked him to hold his .45 caliber pistol, the same gun – according to the state's expert – that shot and killed Alfredia Jones.  27 R.R.: 15-22; 28 R.R.: 165-69.

After police played a portion of Glaspie's tape-recorded interrogation, Mr. Joubert provided law enforcement with an oral statement, a video recording of which was presented to his jury. 27 R.R.: 221; 28 R.R.: 10.  Mr. Joubert told police that Glaspie pressured him into participating in the robbery, but that he did not carry a weapon or shot anyone during the incident.  Glaspie loaned Mr. Joubert money to post bond on a drug case, and used that as leverage to intimidate Mr. Joubert into participating in robberies.  Mr. Joubert feared that Glaspie would harm him or his family if he refused to help.

Mr. Joubert informed police that he, Glaspie, and Doby Brown drove to the ACE store on the morning of the robbery.  Mr. Joubert, unarmed, followed an employee into the store and then Doby entered with a small automatic and Glaspie entered with his .45.  A police officer appeared and Doby shot him after gunfire exchange.  Glaspie then shot the ACE store clerk and he and Mr. Joubert fled the store.

Dashon Glaspie was the State's star witness during Mr. Joubert's trial – the only person to place a gun in Mr. Joubert's hand and allege he shot Alfredia Jones.  The truthfulness of Glaspie's testimony has come into serious question, however.  The State has subsequently admitted that it withheld *Brady* evidence concerning Glaspie in Alfred "Doby" Brown's trial and the Texas Court of Criminal Appeals has vacated Mr. Brown's conviction and death sentence as

a result.  *Ex parte Brown,* 2014 Tex. Crim. App. Unpub. LEXIS 984 (Tex. Crim. App. 2014).

Although Glaspie testified under oath that Alfred Brown was the third co-defendant at the ACE

store, several witnesses called before the grand jury repudiated this fact.  *See* Pet. Ex. 61 (Grand

Jury Testimony of Tomika Hutchins, p. 23, April 28, 2003) (testifying that she heard Glaspie

place a telephone call for Brown on the morning of the offense where he was told Brown was

asleep and would not be woken and Glaspie subsequently told her "Ju Ju," and not Brown, was

the third accomplice).  Moreover, Brown's girlfriend, Ericka Dockery, testified that Brown was

at her home from 6:45 am through 10 am on the morning of the robbery.  *See* Pet. Ex. 62 (Grand

Jury Testimony of Ericka Dockery, April 21, 2003).  Brown's phone records, which the State

possessed but failed to disclose, cooborated Dockery's testimony.  Moreover, following Brown's

conviction, at least two witnesses have repudiated their statements linking Brown to the ACE

robbery.  *See* Pet. Ex. 13 (LaTonya Hubbard Declaration) (claiming she was encouraged by

prosecutors and law enforcement to identify Doby Brown as the perpetrator); Pet. Ex. 15

(Lamarcus Collar Declaration) (claiming law enforcement coerced him to identify Brown).

During Mr. Joubert's trail, Glaspie told the jury that his plea offer of 30 years to a reduced

charge was contingent upon his "truthful" testimony and also contingent upon him being the

non-shooter.  29 R.R.: 9-11.  Glaspie acknowledged that the .45 used in the robbery was his

weapon and he habitually carried it with him.  29 R.R.: 128.  He testified that Doby suggested

they rob the ACE store and Mr. Joubert readily agreed.  37 R.R. 36-38.  Before entering the ACE

store, he testified, Mr. Joubert grabbed Glaspie's gun and took it into the store.  29 R.R.: 40-42.

Glaspie claimed he was only supposed to be the driver and was not supposed to enter the store.

29 R.R.: 42-46.

Glaspie grew tired of waiting for his co-defendants, so he entered the ACE store.  He claimed Joubert held his gun to the female clerk's head while she knelt at the store's safe.  29 R.R.: 55.  Glaspie went to the bathroom to search for surveillance cameras when he heard a police radio and ran out to see an officer in the lobby.  29 R.R.: 57-59.  Doby moved into the lobby and Glaspie heard a few shots.  29 R.R.: 62.  Joubert, grabbing the clerk, told Glaspie that "this bitch played us, man," and shot her.  29 R.R.: 64-65.  All three men ran to the car and they drove off with Doby in the driver's seat, and Joubert in the back seat.  29 R.R.: 67-68.  At some point on their way back to the VA, Joubert moved from the back seat to the front passenger seat, leaving Glaspie's pistol with Glaspie in the back seat.  29 R.R.: 67-68.  Doby's gun was also left in the back of the car, on the floorboard.  29 R.R.: 68.

Once they returned to the VA, Glaspie wrapped his .45 pistol in a t-shirt and gave it to his friend "Ju-Ju," who was standing nearby, asking him to hold the weapon because the police were in the area.  29 R.R.: 71-72.  Glaspie and Mr. Joubert then changed clothes in a friend's apartment, and then the three men separated.[1]  27 R.R.: 215, 221; 41 R.R.: SX2.

Glaspie admitted that he initially provided untruthful statements to law enforcement because he was attempting to cover for himself and his co-defendants.  Initially, he stated that Mr. Joubert accidentally shot Alfredia Jones, but after learning that Joubert accused him of shooting Alfredia Jones, he changed his statement and accused Joubert of intentionally shooting her.  29 R.R.: 78-83, 90-91.  Glaspie was scheduled to go to trial before Mr. Joubert, but when he

---

[1] During direct examination, Glaspie denied calling anyone from his phone while inside the friend's apartment and specifically denied to anyone that he shot the woman in the ACE store.  29 R.R.: 74; 165-55.  Under cross-examination, Glaspie changed his testimony by admitting that he did call someone on his cell phone – something proven through cell phone records- but denied stating that he shot the woman in the ACE store.  29 R.R.: 166.  During the defense's case-in-chief, Lamarcus Colar, who lived in the apartment where the men changed clothes, testified that Glaspie made a phone call where he explained killing Alfredia Jones: "Shit, bitch got out of line.  She was taking too long, so I had to do what I had to do."  30 R.R.: 46-47.

accepted the state's 30 year plea offer, he and his attorneys met with law enforcement to prepare the statement that would be the basis for his testimony at Mr. Joubert's trial.  29 R.R.: 84-88. Glaspie admitted that he lied to police in his initial statement: he falsely stated he did not participate in the robbery, 29 R.R.: 98; that he did not own a pistol, 29 R.R.: 99; and that he did not see Mr. Joubert on the day of the robbery, 29 R.R.: 100.  Moreover, once law enforcement confronted him on these dishonesties, he provided new false information: he lied when he stated he did not enter the ACE store and that he saw no shooting, 29 R.R.: 114; and he lied when he stated that Mr. Joubert hit Alfredia Jones in the head with the pistol and it accidentally went off. 29 R.R.: 115, 117.

During Mr. Joubert's punishment phase trial, the State introduced records relating to juvenile adjudications and commitment to the Texas Youth Commission in 1994.  33 R.R.: 23-26, 44 R.R.: SX 226-28.   Witnesses also testified to adjudicated and unadjudicated offenses that occurred when Mr. Joubert was an adult.  33 R.R.: 27-45, 51-153, 210-222, 251-265; 34 R.R.: 4-23, 37-47, 85-128, 162-206.  Several family members testified in Mr. Joubert's defense.  His maternal grandmother testified that Mr. Joubert's mother was a drug addict who had her first child at the age of 14.  35 R.R.: 105-127.  Mr. Joubert's mother, Leona Brown, testified that she had a ninth grade education, had her first child at 14, and had been using crack or cocaine daily since 1983.  36 R.R.: 4-15.  She smoked marijuana while pregnant with Mr. Joubert as a treatment for morning sickness.  36 R.R.: 12.  In 1984 she married Orlando Brown, a Jamaican drug dealer who sold marijuana and cocaine.  36 R.R.: 18-21.  She agreed that she was not present for her children while they were growing up, and they spent much time on the streets.  36 R.R.: 24-31.  Mr. Joubert's sister testified that while growing up in the VA Apartments, a federal housing project, she and her brother witnessed many illegal activities such as drug dealings and

homicides.  36 R.R.: 37-39.  Their mother would disappear for sometimes a year at a time to go and live with a boyfriend, and was often out all night when she was at home.  39 R.R.: 39-41, 60-63.  Orlando Brown's drug dealing resulted in a home with "rolls of money" and plates of cocaine and marijuana everywhere, causing federal agents to raid the apartment.  39 R.R.: 49-46.  Mr. Joubert began selling cocaine at age 10 in order to earn money that the family relied upon to survive.  39 R.R. 63-64.  Several relatives and family friends had drug problems and had been to prison.  39 R.R. 48-51.

Trial counsel presented two expert witnesses during Mr. Joubert's penalty trial: Dr. Mark Cunningham, a forensic psychologist, and Benitta Wright, a clinical social worker.  Both experts attempted to present the jury with an understanding of how the depraved conditions in which Mr. Joubert was raised, coupled with genetics evidenced through family history, prevented him from developing into a healthy, well-adjusted, and functioning adult.  Both experts based their opinions on poignant and moving anecdotes they learned through interviewing family members and records review.  These family members were available and willing to testify about the stories they relayed to the experts, but trial counsel unreasonably failed to call these witnesses and render their critical information admissible.  As a result, a significant portion of both Dr. Cunningham and Benitta Wright's testimony was excluded as hearsay.[2]  36 R.R.:  90-177, 37 R.R.:  3-4, 31-33.

Benitta Wright, a certified social worker, testified that Mr. Joubert's mother appeared to have been absent and neglectful, failing to provide him with and environment in which he could complete all of the developmental stages of maturation.  35 R.R.: 153-69.  Because trial counsel failed to call the necessary predicate witnesses, she was prohibited from testifying that Mr.

---

[2] The trial court excluded in its entirety Dr. Cunningham's testimony regarding the probability that Mr. Joubert would constitute a future danger.  37 R.R.: 3-4, 30-31; 38 R.R.: 91-169.

Joubert's mother abused drugs and was neglectful towards her children, and that Mr. Joubert began using drugs at a young age.  35 R.R.: 153, 169, 207.  Dr. Cunningham testified that Mr. Joubert grew up in an environment containing many risk factors: he did not have a stable father-figure, 37 R.R.: 121-124; his mother was physically abusive and emotionally neglectful, 37 R.R.: 129-130, 134-135; he grew up in a neighborhood where crimes, such as drug dealing, were the norm, 37 R.R.; 157; and because of poverty and his mother's absence, he began dealing drugs at a young age.  37 R.R.: 157.  Dr. Cunningham suspected, but counsel failed to conduct the necessary investigation to confirm, that Mr. Joubert had "wiring problems" in his brain that likely contributed to his delinquent behavior. 39 R.R.: 91, 98.  Moreover, Mr. Joubert likely had undiagnosed ADHD, a correlative factor that increased the likelihood of alcoholism, drug abuse, antisocial personality disorder, and being incarcerated.  37 R.R.: 103.  Dr. Cunningham was prohibited from testifying that Mr. Joubert grew up in a crime-ridden and violent community, his IQ measured in the borderline range,  he exhibited delayed development during his childhood, he likely had ADHD, and that  these factors contributed to his substance abuse and criminality.

Trial counsel retained the services of a third expert, neuro-psychologist Dr. Lindsay Rosen, who did not testify at trial.  Dr. Rosen's invoice submitted to the trial court indicated that he spent five hours testing Mr. Joubert, although the extent and content of this testing is unknown because neither Dr. Rosen or trial counsel possess any documentation memorializing the results. Pet. Ex. 20 (Declaration of Dr. Lindsay Rosen).  One significant mitigating circumstance that has been identified from this testing is that Mr. Joubert has a Full Scale IQ of 80, making him borderline intelligent.  Dr. Cunningham was prepared to testify to this fact, and explain to the jury how Mr. Joubert's IQ affected his development and behavior, however, counsel failed to

call Dr. Rosen as a witness, rendering Mr. Joubert's IQ score inadmissible.  37 R.R.: 11, 25, 27-28, 108.

Larry Fitzgerald, a former public information officer for TDCJ, advised the jury about the prison classification system, daily prison regimen, and relayed TDCJ's published statistical compilation of violent incidents, which reflected low overall rates of aggressive misconduct in prison.  39 R.R.: 44-59.  Fitzgerald reviewed Mr. Joubert's records and opined that the prison system would be able to incarcerate him successfully.  39 R.R.: 59.  In rebuttal to Fitzgerald, the State presented testimony by A. P. Merillat, an investigator for the Special Prosecution Unit, which prosecutes prison offenses in TDCJ.  39 R.R.: 77-124.  Merillat contended that TDCJ's statistical compilations were inaccurate and greatly underestimated the amount of violence and misconduct that occurs within the prison system.  39 R.R.: 97-100.  He transmitted sensational prison horror stories to the jury through unreliable and non-confronted hearsay he collected on a haphazard basis.  *See* 39 R.R.: 91-95, 100-108.  He incorrectly informed the jury that, if not given a death sentence, Mr. Joubert would automatically enter TDDJ under mid-range security and would be allowed many freedoms and privileges.  39 R.R.: 82-83 (Mr. Joubert would be housed in general population, hold a job, move throughout the prison without restraint, and enjoy visitation just as an inmate convicted of a lesser felony).  In addition, he defined criminal acts of violence, as used in special issue one, as any act of disobedience to a guard.  39 R.R.: 101, 118-19.  The Texas Court of Criminal Appeals has twice held that A. P. Merillat testified falsely in capital trials, requiring reversal of both death sentences.  *See Estrada v. State,* 313 S.W.3d 274, 286-88 (Tex. Crim. App. 2010);  *Velez v. State*, 2012 Tex. Crim. App. Unpubl. LEXIS 607 (Tex. Crim. App. 2012).

9

At the conclusion of the punishment trial, Mr. Joubert's jury answered Texas Code of Criminal Procedure article 37.071 special issues one and two affirmatively, and answered special issue three negatively. Accordingly, on October 21, 2004, the trial court set his punishment at death. The Texas Court of Criminal Appeals affirmed his conviction on October 3, 2007. *Joubert v. State,* 235 S.W.3d 729 (Tex. Crim. App. 2007). The Supreme Court denied certiorari on February 25, 2008. *Joubert v. Texas,* 552 U.S. 1232 (2008). On December 20, 2006, Mr. Joubert filed his initial state application for writ of habeas corpus pursuant to Texas Code of Criminal Procedure article 11.071. *Ex parte Elijah Dewayne Joubert,* WR-78-119-01. After conducting an evidentiary hearing and subsequently entering findings of fact and conclusions of law, the trial court recommended that relief be denied. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions, denying Mr. Joubert relief on September 25, 2013. *Ex parte Joubert,* 2013 Tex. Crim. App. Unpub. LEXIS 1025 (Tex. Crim. App. 2013). Mr. Joubert filed his first federal petition for writ of habeas corpus with this Court on September 24, 2014. He filed an amended petition on May 15, 2015, which remains pending.

## II.  MR. JOUBERT'S UNEXHAUSTED CLAIMS BEFORE THIS COURT ARE NOT PROCEDURALLY DEFAULTED.

The doctrines of exhaustion and procedural default, though their enforcement is often intertwined, are not co-extensive. Exhaustion ensures that state courts are provided with an opportunity to correct federal constitutional errors marring state convictions before the claims are presented to federal courts. *See Rose v. Lundy*, 455 U.S. 509, 518 (1982). In accordance with this principle, Congress has prohibited federal courts from granting habeas relief when the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

10

Before passage of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal courts were required to dismiss without prejudice habeas petitions that contained both exhausted and unexhausted claims.  *Lundy*, 455 U.S. at 518.  Petitioners faced with the dismissal of these mixed petitions routinely returned to state court to exhaust their claims before returning to federal court.  AEDPA, however, "dramatically altered the landscape for federal habeas corpus petitions," and imposed a one-year statute of limitations for the filing of federal habeas petitions. *Rhines v. Weber*, 544 U.S. 269, 274 (2005); 28 U.S.C. § 2244(d).  Because the pendency of a federal petition does not toll the statute of limitations, *see Duncan v. Walker*, 533 U.S. 167, 181 (2001), the total exhaustion requirement threatened to foreclose review altogether for petitioners who arrived in federal court with mixed petitions and whose limitations period expired after the filing of the federal petition.  To avoid this dilemma, the Supreme Court unanimously adopted a stay-and-abeyance procedure in *Rhines v. Weber,* 544 U.S. 269 (2005).  The Court held that district courts should stay federal proceedings (1) when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court; and (2) the claims presented are not "plainly meritless." *Id.* at 277.  The Fifth Circuit has held that the Supreme Court did not intend the phrase "good cause" in *Rhines* in the "technical sense," but "rather intended the district court [to] find 'good cause' in the equitable sense."  *Ruiz v. Quarterman*, 504 F.3d 523, 529 n.17 (5th Cir. 2007).

The procedural default doctrine's underpinnings are similar to those of the exhaustion doctrine: it is a comity doctrine grounded in respect for the state's interest in enforcement of its procedural rules. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default generally occurs in one of two circumstances. First, when a claim has been exhausted in the state courts, the claim may nevertheless be procedurally defaulted in federal court if the state court

denied relief on a state procedural rule that is both independent of the federal claim and adequate to support the decision. *Id.* at 729.  Second, a petitioner's claim may be procedurally defaulted in federal court when the claim is unexhausted *and* "the court to which he would be required to return [to exhaust the federal claim] . . . would now find the claim procedurally barred." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). However, unless it is "entirely clear" that the state court would apply an independent and adequate procedural bar to petitioner's claim, "the State should be allowed to make the procedural, *vel non*, determination." *Wilder v. Cockrell*, 274 F.3d 255, 262 (5th Cir. 2001) (holding that a claim not previously raised in state court should not be treated as "procedurally defaulted" because it was not "entirely clear" that Texas' subsequent-application bar would prohibit consideration of the claim, and ordering dismissal without prejudice to let the state court make that determination); *see also Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995), *cert. denied*, 516 U.S. 1056 (1996) ("If a federal court is unsure whether a claim would be rejected by the state courts, the habeas proceeding should be dismissed without prejudice or stayed while the claim is fairly presented to them.").  When a federal claim has been procedurally defaulted, the federal court may nevertheless review the claim if (1) the petitioner shows cause for the default and prejudice as a result of the underlying federal violation; or (2) the petitioner demonstrates that failure to consider the federal claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Because Mr. Joubert's claims demonstrate that, "but for a violation of the United States Constitution no rational juror could have found [him] guilty beyond a reasonable doubt," his unexhausted claims can be heard by a Texas Court.  Tex. Code Crim. Proc. Art. 11.071 § 4(a)(2). As such, this Court should stay Mr. Joubert's proceedings and allow the State to make the

procedural bar determination on his potentially meritorious claims.  *See Wilder*, 274 F3d at 262.

Accordingly, it is premature for this Court to find that his claims are procedurally defaulted.

### III.   MR. JOUBERT MEETS *RHINES'S* CRITERIA FOR STAYING FEDERAL PROCEEDINGS PENDING EXHAUSTION.

In *Rhines v. Weber*, the Supreme Court approved the use of stay and abeyance procedures

to ensure that a federal petitioner filing petitions with unexhausted claims could present those

claims in state court and still return to federal court after the state proceedings concluded.  544

U.S. at 275-278.  *Rhines* held that a federal court should grant a stay and abeyance for exhaustion

of state remedies where: (1) a petitioner has good cause for his failure to exhaust; (2) his

unexhausted claims are not "plainly meritless;" and, (3) there is no indication that the petitioner

engaged in intentionally dilatory tactics.  *Id*. at 277 - 278.  As demonstrated below, Mr. Joubert's

case meets these criteria.

### A.     Mr. Joubert has "good cause" under *Rhines* for his failure to exhaust.

In *Ruiz*, the Fifth Circuit considered the *Rhines* "good cause" requirement and found that

the deficiencies of Ruiz's state habeas counsel and the failures of the state habeas process

provided "good cause" for Ruiz's failure to raise his *Strickland* claim in his initial state habeas

petition.  The court explained that *Rhines* used "good cause" in the equitable sense and not in the

technical sense as it is used with respect to the "cause and prejudice" requirements for

overcoming a procedural default. *Ruiz*, 504 F.3d at 529 n.17. This conclusion is certainly

supported by the different interests at stake. Imposing a strict "cause" requirement before a

federal court can address the merits of a claim that was procedurally defaulted in state court

protects the interests of comity.   On the other hand, granting a "stay and abeyance" for

exhaustion under *Rhines* promotes comity and calls for a more lenient and equitable standard.

13

The Fifth Circuit emphatically rejected the Director's argument in *Ruiz* that because "ineffective assistance" of state habeas counsel does not excuse procedural default, then it also must prohibit the exhaustion of unexhausted claims. 504 F.3d at 531. For if the standard for "good cause" under *Rhines* were equivalent to the standard for cause for procedural default, "a district court could simply excuse the failure to exhaust on the spot." *Id.* at 529 n.17; s*ee also Rhines*, 544 U.S. at 279 (Stevens, J., concurring) (*Rhines* good cause standard is not intended to impose strict and inflexible requirement).

As in *Ruiz*, the state court's appointment of deficient and ineffective state habeas counsel to represent Mr. Joubert operated to preclude him from presenting his potentially meritorious claims in his initial state habeas application.   Under the Fifth Circuit's decision in *Ruiz*, the deficiencies and dereliction of Mr. Joubert's appointed state habeas counsel constitute "good cause" for his failure to adequately raise his claims in the initial state habeas proceedings.

### B.      Mr. Joubert's unexhausted claims are not "plainly meritless."

*Rhines* does not set forth a test for determining when a claim is "plainly" meritless. Mr. Joubert respectfully suggests that the appropriate test is the same as the test for determining whether the claims would be subject to summary dismissal under the Rules Governing Section 2254 Cases (hereinafter "Habeas Rules"), *i.e.*, whether it appears from the face of the petition that the petitioner is not entitled to relief.  *See* Habeas Rule 4.  Mr. Joubert's claims easily clear this hurdle.

> **1.      Claim for Relief Number One:  THE PROSECUTION PRESENTED A FALSE AND MISLEADING IMPRESSION OF KEY WITNESS DASHAN GLASPIE'S TRUTHFULNESS BY WITHHOLDING EVIDENCE AND BY FAILING TO CORRECT TESTIMONY WHICH UNERMINED THE BOLSTERING EFFECT OF THE STATE'S ZERO TOLERANCE PLEA AGREEMENT.**

Dashon Glaspie testified as the state's key witness during Mr. Joubert's trial.  He was the only witness to put a gun in Mr. Joubert's hand and the only witness to allege that Mr. Joubert shot Alfredia Jones.   29 R.R.: 64, 65.   Glaspie also testified unequivocally that Alfred "Doby" Brown was the third individual present at the ACE robbery and that Brown shot Houston Police Officer Charles Clark.   The state emphasized that Glaspie's plea agreement to a lesser charge was contingent upon his "truthful" testimony in Mr. Joubert's trial.   29 R.R.: 9-11.   The State has subsequently conceded that material and exculpatory evidence was withheld from the defense in Alfred Brown's case that would have impeached Glaspie's testimony claiming that Brown participated in the robbery.  *Ex parte Brown,* 2014 Tex. Crim. App. Unpub. LEXIS 984 (Tex. Crim. App. 2014).  The Texas Court of Criminal Appeals vacated Doby Brown's conviction and death sentence on this basis.  *Id.*   Because Mr. Joubert's jury was not aware that Glaspie's "truthful" assertions could easily be impeached, his conviction and death sentence were obtained in violation of due process and cannot stand.  *See Banks v. Dretke,* 540 U.S. 668, 703 (2004) (all three elements of a *Brady* claim were satisfied when the state failed to disclose impeachment evidence concerning informant whose testimony was critical to the prosecution's theory of defendant's death eligibility).

Law enforcement arrested Dashan Glaspie on October 4, 2003, one day after the ACE store robbery.   Glaspie gave police a statement that day claiming that Alfred "Doby" Brown participated in the robbery and that he shot and killed Houston Police Officer Charles Clark.  Pet. Ex. 21 (Statement of Glaspie, pp. 30-33).  However, Brown's girlfriend, Ericka Dockery, and her son informed police that Brown was at Dockery's apartment during the time of the robbery.  *See* Pet. Ex. 90 (Trial counsel's notes on

15

Ericka Dockery's statement to Houston Police Department); Pet. Ex. 91 (Trial counsel's notes on Reginald Jones' statement to Houston Police Department); Pet. Ex. 16 (Reginald Jones Declaration).   As further confirmation to Brown's alibi, Ericka Dockery's employer, Alma Berry, informed police that that Alfred Brown called her from Ericka Dockery's land line at the time of the robbery.  *See* Pet. Ex. 110 (Houston Police Offense Report page 1.006).  Houston police obtained Ericka Dockery's phone records, which reflected a call from her residence to Alma Berry at the time of the robbery, corroborating the claims that Alfred Brown was at his girlfriend's home at the time Glaspie was at the ACE store.  *See* Pet. Ex. 64 (*Ex parte Alfred Dwayne Brown,* Cause 1035159-A, Court's Findings of Fact and Conclusions of Law); Pet. Ex. 92 (Trial Counsel's notes on Berry's statement to Houston Police).

Grand Jury testimony also corroborated Brown's alibi.  Ericka Dockery testified that Brown was asleep at her home when she left for work at 8:30 am and that Brown called her from her landline at 10 a.m., the time of the ACE robbery.  *See* Pet. Ex. 62. Glaspie's girlfriend, Tomika Hutchins, testified that Glaspie told her "Ju Ju" and not Alfred Brown, participated in the robbery.  *See* Pet. Ex. 61.  In fact, Hutchins testified, Glaspie attempted to call Alfred Brown on the morning of the offense, but the person who answered informed Glaspie that Brown was sleeping and he would not be woken. *See id.*  The state failed to provide Mr. Joubert with copies of any of these Grand Jury testimonies.  *See* Pet. Ex. 93 (email from Allen Isabel to Jerome Godnich Aug. 12, 2004).

Since Alfred Brown's conviction, at least two witnesses have repudiated their testimony given during his trial, claiming that their false statements were a product of police encouragement.  LaTonya Hubbard claimed that she was encouraged by law

enforcement and the prosecution to identify Alfred Brown as the individual she had seen with Glaspie the day of the robbery, even though she told them she was unsure of whether she had seen Brown and she could not identify him in a photograph. *See* Pet. Ex. 13 (LaTonya Hubbard Declaration). Lamarcus Collar recanted his testimony placing Brown with Glaspie on the day of the robbery, stating that his identification of Brown was a result of police coercion. *See* Pet. Ex. 15.

The jury's assessment of Glaspie's truthfulness was of critical importance in Mr. Joubert's trial. Glaspie was the only witness to claim Mr. Joubert shot Alfredia Jones-albeit with Glaspie's gun that Glaspie was in possession of by the time the men returned to the VA apartments immediately following the offense. 29 R.R.: 64-65. If Mr. Joubert's jury had known that Glaspie's testimony that Alfred Brown shot Officer Clark could be impeached from many different angles, they would have logically presumed there was at least a possibility his testimony that Mr. Joubert shot Alfredia Jones could likewise be suspect. After all, Glaspie had motivation to obtain the prosecution's favor – his plea agreement to a 30 year sentence while his co-defendants were facing the death penalty – was contingent upon him being a non-shooter in the robbery. Certainly the *Brady* violation Mr. Joubert complains of in Claim One places his "whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995). Indeed, the Texas Court of Criminal Appeals vacated Alfred Brown's death sentence for this exact reason only a few months ago. As such, Mr. Joubert should return to state court to allow the Texas judiciary to address this claim first.

Although this claim is unexhausted and procedurally defaulted, a Texas Court will hear the claim. Counsel on direct appeal could not have raised the claim because it is

premised on facts that are not established in the trial record. Counsel in Mr. Joubert's initial state habeas writ failed to develop this claim because of the "state's suppression of the relevant evidence," *Strickler v. Greene,* 527 U.S. 263, 282 (1999), and Albert Brown did not file his state post-conviction petition, including the previously secret grand jury testimony, until October 27, 2007. The state habeas court did not issue its findings of fact and conclusions of law in Mr. Brown's case until May 22, 2013. As such, this is an unexhausted claim arising out of a factual and legal basis that did not exist at the time Mr. Joubert's initial state post-conviction writ was filed. Under these circumstances, the claim may be accepted in a successive petition to the Texas Court of Criminal Appeals pursuant to Texas Code of Criminal Procedure article 11.071, section 5. *Rhines v. Weber* permits this court to stay and abate the proceedings when there is "good cause" to do so and there is some showing that the claim is not meritless. 544 U.S. at 277.

> **2.**   **Claim for Relief Number Two: THE PROSECUTION WITHHELD MATERIAL EVIDENCE WHICH IMPEACHED DASHAN GLASPIE'S TESTIMONY AND WHICH WOULD HAVE UNDERMINED THE BOLSTERING FORCE OF THE STATE'S ZERO TOLERANCE PLEA AGREEMENT.**

Within hours of the ACE robbery, law enforcement spoke to Alisha "Lisa" Hubbard, who lived in the VA Apartments. Lisa Hubbard told police that she observed Dashan Glaspie, Mr. Joubert, and Ernest Matthews, also known as "Deuce," standing in a parking lot. 28 R.R.: 56; 44 R.R.: 8. Glaspie was holding a loaded .45 caliber semi-automatic pistol.[3] *Id.* Lisa Hubbard's sister, LaTonya Hubbard, also told police that she saw Dashan Glaspie, Mr. Joubert and Ernest Matthews at a gas station that morning. *See* Pet. Ex. 94.

---

[3] Dashon Glaspie owned a .45 caliber pistol. According to the state's expert, his .45 pistol shot and killed Alfredia Jones. 27 R.R.: 15-22; 28 R.R.: 165-69.

The day after the ACE robbery, Lamarcus Collar, also a resident of the VA apartments, told police that at around 10:30 a.m. the day before, Dashan Glaspie, Mr. Joubert, and another individual came to his apartment.  While there, Collar overheard Glaspie speaking on his cell phone.  Glaspie admitted that he shot Alfredia Jones during the robbery.  41 R.R.: 8.  Police arrested Dashan Glaspie that same day and he provided a statement indicating that Alfred Brown was the third accomplice in the ACE robbery and that Brown shot and killed Officer Charles Clark.  *See* Pet. Ex. 21.

In April 2003, Alfred Brown's girlfriend, Ericka Dockery, testified before the Grand Jury that Brown slept on her couch the night before the ACE robbery and that he was still asleep there when she left for work in the morning at 8:30 a.m.  *See* Pet. Ex. 62.  Moreover, at 10 a.m. – the exact time the ACE robbery was occurring – Alfred Brown called her from the landline in her apartment, indicating that while the ACE robbery was occurring Brown was still in her home.  *Id.*  Ericka Dockery's employer, Alma Berry also told police that she received a telephone call from Alfred Brown at the exact time the ACE robbery occurred.  *See* Pet. Ex. 10; Pet. Ex. 92.  Police subsequently issued a subpoena for Ericka Dockery's phone records, which indicated a call from her landline to Alma Berry at 10:08 a.m.  *See* Pet. Ex. 64.  These phone records corroborated Alma Berry and Ericka Dockery's assertion that Alfred Brown was at Dockery's apartment while the ACE robbery was happening.

Dashan Glaspie's girlfriend, Tomika Hutchins, also testified before the Grand Jury.  She stated that Glaspie told her that "Ju Ju," and not Alfred Brown, was the third accomplice of the ACE robbery.  *See* Pet. Ex. 61.  Hutchins testified that Glaspie attempted to call Alfred Brown on the morning of the offense, but the person who answered informed Glaspie that Brown was sleeping and he would not be woken.  *See id.*  The state failed to provide Mr. Joubert with copies

of any of these Grand Jury testimonies.  *See* Pet. Ex. 93 (email from Allen Isabel to Jerome

Godnich Aug. 12, 2004).

The state presented Dashan Glaspie as its key witness during Mr. Joubert's trial.  He was

the only witness to place a gun in Mr. Joubert's hand and the only witness to testify that Mr.

Joubert shot Alfredia Jones – albeit with Glaspie's gun.  29 R.R.: 64-65.  The jury had to lend

credibility to his testimony in order to find the necessary facts required for a conviction of capital

murder and sentence of death.  Glaspie also testified unequivocally that Alfred Brown was the

third individual present at the ACE robbery.  The State emphasized that Glaspie's plea offer to a

lesser charge was contingent upon his "truthful" testimony in Mr. Joubert's trial and that if he

testified falsely to any matter, the agreement would be withdrawn and he could receive a death

sentence.  29 R.R.: 12.  During closing argument, the state vouched for Glaspie's credibility:

> Glaspie is eligible for the death penalty in Texas.  Glaspie testified that he
> knows that if he testifies falsely about one thing and it doesn't match the
> evidence and it doesn't match anything, if he testifies falsely about one
> thing, that all deals are off.
>
> Also, he testified that there's no substantial compliance.  In other words, he
> can testify about 99 percent of – and comply with 99 percent of everything,
> but if one thing he doesn't comply with, he testifies falsely, then he can be
> prosecuted, again, for capital murder.  That's a heavy hammer.  That's a
> bigger hammer than most witnesses have over their head.

31 R.R.; 118.

After Mr. Joubert's trial, Glaspie took advantage of his plea agreement and pled guilty to

a reduced charge of Aggravated Robbery, and was sentenced to 30 years imprisonment.  *See* Pet.

Ex. 110.  Since Mr. Joubert's conviction, the State has conceded that it withheld evidence that

was both favorable and material concerning the substance of Glaspie's testimony during Alfred

Brown's trial.  *Ex parte Brown*, 2014 Tex. Crim. App. Unpub. LEXIS 984 (Tex. Crim. App. 2014).  The Texas Court of Criminal Appeals vacated Alfred Brown's conviction and death sentence because of this *Brady* violation.  *Id.*

Just as in Alfred Brown's case, where relief has been granted, the State failed to provide Mr. Joubert with the grand jury transcripts for Ericka Dockery or Tomika Hutchins.  At no point before, during, or after trial did the defense have any knowledge of the grand jury testimony given by either of these women indicating that Glaspie was incorrect in stating Alfred Brown was an accomplice.  Moreover, the State failed to provide Mr. Joubert with Ericka Dockery's phone records, which reflect a call from her landline to her employer at the time of the ACE robbery, corroborating Dockery's claim that Alfred Brown was at her home during the time of the robbery.  *See* Pet. Ex. 64.  The defense had no knowledge of the content of these records, which would have impeached Glaspie's testimony given during Mr. Joubert's trial and caused the jury to question his truthfulness.

This evidence was material to the issue of punishment.  Dashan Glaspie was the only eyewitness to testify that Mr. Joubert shot and killed Alfredia Jones.  In order to avail himself of the State's plea offer, Glaspie had to be the non-shooter.  A jury's determination of moral culpability is highly dependent upon an individual's degree of participation in a crime – if Mr. Joubert was present but did not shoot anyone, a jury might assess his punishment in a different manner than if he shot and killed the store clerk.  Had the suppressed *Brady* evidence concerning Glaspie's testimony been disclosed, at least one juror would have harbored doubts about Glaspie's testimony as a whole and perhaps question if Glaspie was actually the shooter. After all, Alfredia Jones was killed with his gun.

In addition to using this evidence to impeach Glaspie's testimony, Mr. Joubert could have used it to attack the reliability of the police investigation of the offense. Glaspie was at the ACE robbery, and Alfredia Jones was shot with his gun. At the very least, knowing that multiple sources of information contradicted Glaspie's assertion that Mr. Joubert was the shooter would have discredited the caliber of the investigation and the choice to charge Mr. Joubert instead of Dashon Glaspie. *See Lindsey v. King,* 769 F.2d 1034, 1042 (5th. Cir. 1985). The suppressed phone records corroborating Alfred Brown's alibi would have provided trial counsel with a great tool to allege police negligence in blindly taking Glaspie's self-serving statement as gospel.

Mr. Joubert expects the state court to likewise hold that similar prejudice ensued in his case as in Alfred Brown's, where the same key witness testified to the same key facts, and grant him relief. *See Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (to prevail on a *Brady* claim, a "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."). The constitutional error Mr. Joubert complains of is almost identical factually to that addressed by the Supreme Court in *Kyles*:

> [T]he "essence of the state's case" was the testimony of eyewitnesses, who identified Kyles as Dye's killer. Disclosure of their statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. To begin with, the value of those two witnesses would have been substantially reduced or destroyed.

*Kyles,* 514 U.S. at 442. This Court should thus stay his proceedings and allow the Texas Courts to first resolve the issue.

    **3.**    **Claim for Relief Number Three:  MR. JOUBERT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BECAUSE TRIAL COUNSEL FAILED TO UNDERSTAND THE BASIS OF THE AVAILABLE MITIGATING EVIDENCE, THEREBY UNDERMINING THE PRESENTATION OF EVIDENCE THROUGH THE DEFENSE'S EXPERT WITNESSES**

22

## LICENSED SOCIAL WORKER BETTINA WRIGHT AND FORENSIC PSYCHOLOGIST MARK CUNNINGHAM.

Trial Counsel retained and presented expert witness Dr. Mark Cunningham, a forensic psychologist, to provide the jury with an understanding of how the circumstances of Mr. Joubert's birth through young adulthood had a formative effect upon his development and personality.  As part of his testimony, Dr. Cunningham intended to rely upon a Power Point presentation of topics relating to specific information he obtained concerning Mr. Joubert's past. In a jury-out hearing, the State objected to the Power Point slides on the basis of hearsay.  The trial court sustained the State's objection and excluded the Power Point slides and Cunningham's accompanying testimony based upon hearsay because the underlying evidence had not been presented to the jury.  36 R.R.:  90-177; 37 R.R.:  3-4.  The trial court permitted Dr. Cunningham to present a redacted power point presentation, including only evidence that had already been presented to the jury.  36 R.R.:  4.  For appellate purposes, the trial court entered both the redacted and proposed Power Point presentations into evidence as Court's Exhibits 1 and 2.[4]  37 R.R.: 4.

Trial counsel made a bill of exception where Dr. Cunningham explained the importance and scientific reliability of the excluded testimony and Power Point slides.  37 R.R.:  5-33. During the bill, the trial judge clarified that the proposed testimony was excluded because it was based upon hearsay evidence that had not been presented to the jury.  37 R.R.:  31-33; 38 R.R.: 91-169.  Dr. Cunningham subsequently testified subject to the trial court's limitations.  He was prohibited from presenting many significant pieces of evidence he intended to relay to Mr.

---

[4] Dr. Cunningham's proposed and redacted Power Point presentations are included with Mr. Joubert's writ application as Trial Court Exhibit 1 (redacted) and Trial Court's Exhibit 2 (unredacted).  They are included as Volume 45 of the Reporter's Record on appeal.

Joubert's jury.  37 R.R.: 33-182; 38 R.R.:  3-89.   He was the final defense witness to discuss how Mr. Joubert's upbringing and circumstances contributed to the offense.

The evidence excluded as hearsay was obtained through Dr. Cunningham's interviews of Mr. Joubert's family members who testified during trial and from other witnesses who were available to testify to the predicate underlying facts.   Dr. Cunningham's handwritten notes of family member interviews are included in his writ as Petitioner's Exhibits 82, 83, and 87.  His notes reflect the availability of witnesses to support prohibited testimony as follows:

    a.    <u>Mr. Joubert grew up in a violent and disorganized neighborhood</u>:  The trial court excluded as hearsay Dr. Cunningham's testimony regarding Mr. Joubert growing up in a violent and disorganized neighborhood where there was easy access to weapons.   37 R.R.: 144-149; 45 R.R.:  Court Exhibit 1, p. 5 (slide 4).   Trial counsel could have elicited testimony from witness Roberta Davis concerning this topic, eliminating any hearsay objection.  Prior to Mr. Joubert's trial, Ms. Davis met with Dr. Cunningham and trial counsel.  During this meeting, she described both her and Mr. Joubert's experiences growing up in the VA neighborhood.  Ms. Davis, who was Mr. Joubert's sister, informed trial counsel and Dr. Cunningham that she and Mr. Joubert "saw shooting" when Mr. Joubert was only 13 years old. Moreover, she relayed that Mr. Joubert witnessed his first murder at a very young age when one man shot another during a dice game he was watching.  Both Davis and Mr. Joubert's mother witnessed a neighbor, Nathan Earl, being shot dead. Ms. Davis also informed trial counsel and Dr. Cunningham that she saw "another body dumped" in the VA apartment complex near her home.  *See* Pet. Ex. 83 (Roberta Davis Interview, pp. 7-9).  However, counsel failed to question Ms.

Davis about these matters, thus rendering the evidence inadmissible hearsay when Dr. Cunningham proposed testimony regarding it.

b.   <u>Insufficient bonding at school</u>:   The trial court excluded Dr. Cunningham's proposed testimony that Mr. Joubert did not bond at school.   His notes of the Roberta Davis interview reflect that she advised him that her brother would "never do homework . . . never brought a report card home."   She also reported that Mr. Joubert never received any help with his homework, and as a result he would act as the "class clown" or leave campus, resulting in his frequent suspensions.   Moreover, Mr. Joubert's mother advised Dr. Cunningham during her pre-trial interview that she "did not assist with homework," explaining that "school was difficult" for her and she had "dropped out 9th grade."   Pet. Ex. 82 (Leona Brown Interview, p.5).   Trial counsel failed to question Ms. Davis or Mr. Joubert's mother about these issues, rendering the evidence inadmissible hearsay when Dr. Cunningham attempted to speak of it.

c.   <u>Mr. Joubert's borderline full scale IQ and developmental delays</u>:   The trial court excluded Dr. Cunningham's testimony that Mr. Joubert had a full scale IQ of 80 and grew up in an isolated family environment that caused him to develop slowly and be abnormally immature.   Court's Ex. 1, p. 6, slide 1; Ex. Vol. 45, p. 62.   Dr. Cunningham noted that Mr. Joubert had tested to have a full scale IQ of 80 by a "Dr. Rosen."   37 R.R.:   24.   Trial counsel's files reflect that Houston-based clinical psychologist and neuro-psychologist Dr. Lindsay Rosen conducted a five-hour neuropsychological evaluation on September 11, 2004.   Dr. Rosen's billing statement is included with Mr. Joubert's writ as Exhibit 31.   There is nothing in

the record to indicate that Dr. Rosen was unavailable to testify about Mr. Joubert's intelligence testing and related matters.  Moreover, Mr. Joubert's mother, Leona Brown, informed Dr. Cunningham that Mr. Joubert was slow to walk and did not speak until he was two years old.  Pet. Ex. 82, Leona Brown Interview.  However, because counsel failed to call Dr. Rosen and failed to question Mr. Joubert's mother about his slow development, Mr. Joubert's IQ score was rendered inadmissible hearsay when Dr. Cunningham attempted to testify about it.

d.    <u>Mr. Joubert likely suffered from Attention Deficit Hyperactivity Disorder</u>: The trial court excluded Dr. Cunningham's proposed testimony that Mr. Joubert exhibited many symptoms of Attention Deficit Hyperactivity Disorder (ADHD) such as hyperactivity in childhood, an inability to focus, and constantly getting into trouble in the absence of close supervision.  36 R.R.:  146; Court's Ex. 1, p. 10, slide 1-4.  In her interview with Dr. Cunningham, Roberta Davis described Mr. Joubert in his childhood years as "hyper . . . crawled around the house, wouldn't watch the TV. . . . . wouldn't sit still, would get into things if not watched carefully . . . was disruptive at school."  Pet. Ex. 83 (Roberta Davis Interview, p. 16-17).

e.    <u>Mr. Joubert's susceptibility to alcoholism, drug use, conduct disorder, and adult criminality as a result of his suspected ADHD</u>:  Dr. Cunningham anticipated testifying that, as a result of ADHD, Mr. Joubert was more susceptible than the average person to alcoholism, drug use, conduct disorder, and criminal behavior. The trial court prohibited this testimony on the basis of hearsay.  36 R.R.: 104-07,

146; 37 R.R.: 13-15, 23.  Notes from Dr. Cunningham's interview with Roberta Davis and Leona Brown reflect that they told him that Mr. Joubert began smoking marijuana at seven years old.  Pet. Ex. 82 (Leona Brown Interview, p.2; Pet. Ex. 83 (Roberta Davis Interview, p. 17).  Counsel failed to question either Ms. Brown or Roberta Davis about this during their testimony, which would have rendered such evidence not hearsay.

f.   <u>Absence of a father figure</u>:  The trial court excluded Dr. Cunningham's testimony regarding the detrimental effect of the absence of a father figure on a child's development and the increasing likelihood that Mr. Joubert would engage in criminal behavior and indulge in alcohol and illicit drugs.  The basis of the court's ruling was that the evidence was hearsay – trial counsel presented no evidence relation to the absence of a father figure in Mr. Joubert's life.  36 R.R.: 113-114, 150-51; 45 R.R.: Court Ex. 1, p. 14, slides 2-4.  However, Dr. Cunningham's notes reflect that Leona Brown discussed her pregnancy with Mr. Joubert extensively and how her subsequent paramours failed to provide a father figure to her son.  Pet. Ex. 82, Leona Brown Interview, p. 1-5; Pet. Ex. 84, p. 3-4.  Had counsel questioned Mr. Brown about this information, any hearsay objection would have been overruled and Dr. Cunningham could have informed Mr. Joubert's jury of this mitigating circumstance.

g.   <u>Attachment issues caused by a distant mother</u>:  The trial court prohibited Dr. Cunningham from testifying that Leona Brown was a distant mother – that she was away from home "most of the time" and that when she was home she slept in her room; that she paid and aunt to watch her children; and that Mr. Joubert only

saw his mother a few times each week.  He was also prevented from discussing the effects of disrupted attachment to one's mother as a negative factor in personal development that skews the way a person relates to and values other members of society. 36 R.R.: 114-115, 152-153.  During his pre-trial interviews, however, Mr. Joubert's sister told Dr. Cunningham that their mother was not home most of the time, and that she slept in her room all day when she was home.  Pet. Ex. 81, Roberta Davis Interview, p. 2-7.  Mr. Joubert's mother informed Dr. Cunningham that she paid her sister "Paulette" to stay with her children when she moved in with one of her boyfriends, Orlando.  Pet. Ex. 84, Leona Davis Interview, p. 4.  Had trial counsel questioned these witnesses about the above facts, the evidence would not have been subject to a hearsay objection.

Trial counsel was present when Dr. Cunningham interviewed Mr. Joubert's family witnesses and/or consulted with Dr. Cunningham immediately following the interviews.  Counsel's time sheets, which reflect an 8-hour consultation with Dr. Cunningham on the same day as the family interviews, is included in Mr. Joubert's writ application as Exhibit 88.  Trial counsel knew or should have known that Mr. Joubert's family members could have testified to each piece of evidence mentioned above.  Had counsel questioned these witnesses concerning the topic, the evidentiary foundation for Dr. Cunningham's proposed testimony would have been satisfied and any hearsay objection would have been overruled.  Because counsel failed to question witnesses concerning these topics, Dr. Cunningham's testimony was severely curtailed and Mr. Joubert's jury was not presented with many significant mitigating factors that could have influenced at least one juror to vote for life.

Trial counsel also retained and presented licensed social worker Bettina Wright to explain to the jury Mr. Joubert's depraved childhood upbringing and the effects poor parenting had on his development.   The State objected that Wright's testimony was hearsay.   35 R.R.: 144.   The trial court sustained the objection, limiting Wright's testimony to the general science behind childhood development and her own opinion of Mr. Joubert's development, but excluding discussion of any specific supporting facts gathered from her interviews with Mr. Joubert and his family members.  35 R.R.: 144-45.

Ms.   Wright   subsequently   testified   regarding   generalities   of   childhood development and negative impacts upon a healthy development, but in response to repeated objections to hearsay, she was only able to relay limited information linking Mr. Joubert's own upbringing to these topics.  35 R.R.:  145-169, 200-208.  Ms. Wright was attempted, but was specifically prevented by hearsay objections, from testifying about the following facts when discussing mitigating circumstances in Mr. Joubert's development:

a.   Mr. Joubert's mother used drugs and lived a chaotic life at the time of his birth. 35 R.R.:  153.

b.   Mr. Joubert began using drugs at a very young age.  35 R.R.:  153.

c.   Mr. Joubert was unsupervised and had little behavioral guidance in childhood.  35 R.R.:  157.

d.   Leona Brown was a distant and detached mother.  35 R.R.:  169.

e.   Mr. Joubert had no positive influences or role models as a child.  35 R.R.: 207.

Although she was prevented from testifying about specific facts she learned from Mr. Joubert and his family members, Ms. Wright did interview many witnesses prior to trial,

including Mr. Joubert's sister Roberta Davis, his grandmother Mary Carmouche, and his grandfather Elijah White.  Her interview notes were available to trial counsel and should have been in trial counsel's possession prior to trial.  Ms. Wright's interview notes are included in Mr. Joubert's writ as Exhibits 85-86.  They reflect the following information obtained from each witness:

> a. Roberta Davis informed Wright that her mother provided no limits on Mr. Joubert and taught him "nothing about right and wrong."  Pet. Ex. 85.  Mr. Joubert's mother was "on drugs and did it all," and that she made Mr. Joubert smoke marijuana as a punishment.  *Id.*  Davis reported that her mother refused to provide Mr. Joubert, or any of her children, with lunch money even when she had it to give.  *Id.*

> b. Mr. Joubert's grandmother told Wright that Leona Brown was addicted to drugs, was "smoking weed at age thirteen," and "got into crack" after she ran away from home at age sixteen.  Mr. Joubert's mother has been addicted to drugs for "thirty years."

> c. Either Mr. Joubert's grandmother or grandfather informed Wright that "there was no positive influence in [Mr. Joubert's] life."  Pet. Ex. 85.

Just as the case with Dr. Cunningham, trial counsel failed to question the witnesses listed above about these topics.  Because of counsel's failure, Wright was prevented from relaying significant mitigating circumstances to Mr. Joubert's jury.  Had the jury heard this evidence, at least one juror would have not voted to sentence Mr. Joubert to death.

Each of the family members from whom Dr. Cunningham and Ms. Wright obtained their data either testified during Mr. Joubert's trial or were available and willing to testify.  Mr.

Joubert's sister, Roberta Davis, signed an affidavit indicating that she met with Dr. Cunningham and trial counsel prior to trial. During her trial testimony, she would have testified to what she told Dr. Cunningham if trial counsel had questioned her. Even if counsel failed to elicit the information during her initial testimony, she was available and willing to be re-called as a witness in order to lay the evidentiary foundation for the defense experts' testimony. Pet. Ex. 17. Mary Carmouche, Mr. Joubert's grandmother, signed an affidavit stating that Dr. Cunningham and trial counsel interviewed her in her home. She was available and willing to be called as a witness during trial and would have testified in accordance to what she related during her interview. Pet. Ex. 18. Mr. Joubert's mother, Leona Brown, averred that she was interviewed by Dr. Cunningham with trial counsel present. She likewise would have testified about the circumstances she relayed to them and would have been available for re-call if counsel had so requested. Pet. Ex. 19.

This claim is not plainly meritless and this Court should stay the proceedings in order to allow the State court the first opportunity to rule on this matter. Because Mr. Joubert's right to the effective assistance of counsel was violated, his jury never heard significant mitigating circumstances that would have convinced at least one juror not to vote for death. *See Wiggins v. Smith,* 39 U.S. 510, 537 (2003); *Rocha v. Thaler,* 626 F.3d 815, 825 (5th Cir. 2010) (citing *Gray v. Epps,* 616 F.3d 436, 442 (5th Cir. 2010)). Counsel failed to question witnesses about significant factors and occurrences in Mr. Joubert's life – facts and occurrences of which counsel was well aware. Moreover, counsel knew that this evidence was crucial to the expert testimony attempting to explain how Mr. Joubert's background and character affected his moral culpability of the crime. *See Penry v. Lynaugh,* 492 U.S. 302, 320 (1989). Counsel was aware during the hearings out of the jury's presence regarding both Dr. Cunningham's and Ms. Wright's

31

testimony that the court severely restricted their testimony because it was based upon hearsay. Counsel also knew available witnesses who were willing to be re-called to lay the evidentiary foundation to get all of the objectionable evidence properly admitted.  Yet counsel exhibited deficient performance and did nothing. *See Strickland,* 466 U.S. at 668, 694; *Williams v. Taylor,* 529 U.S. 362, 690-91 (2000).

Trial counsel adopted a strategy of presenting mitigating factors about Mr. Joubert's childhood and explaining through expert witnesses how the circumstances of his childhood had a formative effect upon his adult life.  However, counsel presented only a brief and incomplete glimpse into Mr. Joubert's upbringing through their testimony, relying instead upon Ms. Wright and Dr. Cunningham to develop the primary mitigating thrust of such testimony.  The major portion of the defense presentation was thwarted by the trial court's exclusion of relevant testimony on hearsay grounds.  Trial counsel had the means available to remedy the trial court's limits on the expert testimony by either asking relevant questions of family witnesses in the first case or merely re-calling the available witnesses and eliciting the desired factual predicate.

Because counsel failed to perform as a reasonable attorney in the circumstances, Mr. Joubert's jury failed to hear the most significant mitigating circumstances in his life and failed to have these circumstances and their connection to the offense explained by an expert.  Because of the exclusions of evidence, the jury was deprived of learning how Mr. Joubert's borderline IQ combined with ADHD affected his behavior and judgment; deprived of learning how his mother's drug use and absence, coupled with an absence of a father figure, had a formative effect on his maturation and character.  Counsel was ineffective for not just failing to introduce the facts into evidence, but failing to couple those facts with Dr. Cunningham and Dr. Wright's explanations which demonstrated their mitigating significance.  Jurors needed to know not only

*what* occurred in Mr. Joubert's life but also why those instances mattered, and *how* they affect his behavior. The omitted testimony had the power to "blunt" the considerable misconduct evidence introduced against him by placing it in context. Counsel's failure to respond to the trial court's severe limits on the defense experts' testimony was not a calculated and strategic decision, but resulted from counsel's own lack of preparation and failure to remedy an easily cured situation. *See Caraway v. Beto,* 421 F.2d 636, 637 (5th Cir. 1970); *Ex Parte v. Duffy,* 607 S.W.2d 507, 516-17 (Tex. Crim. App. 1980).

Because this claim is unexhausted, this Court should allow state court the first opportunity to correct the constitutional error. Mr. Joubert has shown just cause because direct appellate counsel could not have raised this claim, as it is premised upon facts which are not established in the trial record. State post-conviction counsel's failure to investigate and raise this claim were a result of deficient representation under Texas guidelines. *See* Tex. Code Crim. Pro. Art. 11.071 § 3(a) (directing counsel to investigate the "factual and legal grounds for the filing of an application for writ of habeas corpus"); Guidelines and Standards for Texas Capital Counsel 12.2(B)(1) (habeas counsel must be "prepared to undertake the comprehensive and extra-record investigation") & (B)(3)(a) (habeas counsel must "conduct a thorough and independent investigation of both the conviction and sentence" and obtain necessary investigative resources). State habeas counsel failed to attempt any discovery regarding this clam whatsoever – counsel did not obtain Dr. Cunningham's files and did not obtain trial counsel's files.

    **4.**    **Claim for Relief Number Four:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF TRIAL BY FAILING TO INVESTIGATE AND DIRECT NEURO-PSYCHOLOGIST DR. LINDSAY ROSEN TO CONDUCT SUFFICIENT TESTING IN ORDER TO DETERMINE THE EXISTENCE OF NEURO-PSYCHOLOGICAL IMPAIRMENT.**

Trial counsel retained the services of Dr. Lindsay Rosen, a Houston-based clinical psychologist and neuropsychologist.  Dr. Rosen did not testify at trial, but submitted an invoice indicating he conducted five hours of unspecified neuro-psychological testing.  Pet. Ex. 31.  Dr. Rosen provided an affidavit in federal habeas proceedings stating he does not recall anything about his participation in the case and that his file is unavailable and probably disposed of.  Pet. Ex. 31.  The neuro-psychological evaluation conducted by Dr. Rosen resulted in the discovery that Mr. Joubert had a full scale IQ of 80.   Dr. Cunningham, the defense's testifying psychologist, attempted to present this mitigating evidence to the jury, but the trial court excluded it as hearsay.  37 R.R.: 11, 25-28, 108.  As a result, Mr. Joubert's jury never learned of his borderline IQ or subsequent ramifications.

Dr. Cunningham provided an affidavit in federal habeas proceedings indicating that as a matter of practice he requests any reports of neuro-psychological testing conducted on behalf of the defense and he retains such reports in his file.  Pet. Ex. 19.  His case files for Mr. Joubert do not contain any such report, although he does have notes indicating Mr. Joubert measured a full scale IQ of 80 on the WAIS-III test.  *Id.* Because he has no reports, Dr. Cunningham does not know what neuro-psychological testing was administered on Mr. Joubert.  *Id.*  Upon review of Dr. Rosen's five hour invoice for professional services, Dr. Cunningham believes that Rosen could not have conducted a full battery of neuro-psychological testing within that time.  It is more likely that Dr. Rosen administered only a preliminary screening test.  *Id.*

It is Dr. Cunningham's practice to advise defense counsel to conduct a full neuro-psychological evaluation in order to confirm the existence of, or to rule out, neuro-psychological impairment.  Pet. Ex. 19.  Mr. Joubert exhibited the following potential indicators of impairment: (a) his mother used drugs while she was pregnant with him; (b) as an infant he exhibited

34

developmental delays in walking and learning to speak; (c) as a child he displayed symptoms of hyperactivity; (d) he demonstrated learning difficulties while in school; and (d) he measured a low IQ score reflecting cognitive limitations.  *Id.*

Mr. Joubert's right to the effective assistance of counsel was violated when counsel failed to competently investigate whether Mr. Joubert had brain damage, especially after counsel learned of possible indicators of such impairment.  *Strickland* is founded upon adequacy of investigation.  *Wiggins v. Smith*, 539 U.S. at 521.  Counsel retained Dr. Cunningham, a forensic psychologist, and Dr. Lindsay Rosen, a neuro-psychologist, and was aware of red flags indicating potential neurological impairment.  Despite this, counsel failed to ensure that Dr. Rosen administered a full neuro-psychology battery in order to explore the existence of such impairment.  While counsel directed Dr. Rosen to evaluate Mr. Joubert's intelligence, he was not instructed to administer a full neuro-psychological battery to confirm brain damage.

Trial counsel has a duty to make a reasonable investigation of the potential defenses in a case, or to make a sufficient investigation which permits counsel to make a reasoned decision that further investigation is unnecessary or counter-productive.  *Id.* at 525, 527; *Strickland*, 466 U.S. at 690-91; *Butler v. State,* 716 S.W.2d 48, 54 (Tex. Crim. App. 1986).  Both the Supreme Court and the Fifth Circuit have recognized the existence of organic brain damage and other neurological impairment as significant mitigating evidence because it provides an explanation for a defendant's aberrant behavior.  *See Porter v. McCollum,* 558 U.S. 30, 41 (2009) (*per curiam*); *Sears v. Upton,* 561 U.S. 945, 949 (2010) (*per curiam*); *Lockett v. Anderson,* 230 F.3d 695, 713-14 (5th Cir. 2000).   Counsel's failure to investigate and present evidence of neurological impairment is sufficient to undermine confidence in the outcome of Mr. Joubert's punishment verdict given the potential of neurological impairment evidence.  Had Mr. Joubert's

jury been informed that neurological impairment caused him to lack impulse control and impaired his ability to predict future consequences of his action, at least one juror would have not voted to sentence him to death.

Moreover, because trial counsel failed to call Dr. Rosen to testify that Mr. Joubert had a borderline full-scale IQ of 80, Dr. Cunningham was prohibited from testifying about the behavioral manifestations arising from it. This too, like actual neurological damage, would have significantly influenced Mr. Joubert's day-to-day behavior, including his ability to control impulses, plan ahead, or recognize the likely effects of his conduct. Had trial counsel confirmed evidence of neurological impairment and presented it to the jury along with evidence of Mr. Joubert's borderline IQ and the behavioral ramifications of these circumstances, at least one juror would have been influenced to return a different verdict at punishment. This claim is not meritless and as such this Court should permit the state court an opportunity to correct such constitutional error.

Moreover, Mr. Joubert has shown just cause for failure to exhaust this claim. Neither counsel on direct appeal or state habeas counsel raised this claim in the state courts. Direct appeal counsel could not have raised this claim, however, because it is premised on facts which are not established in the trial record. By contrast, state habeas counsel was ineffective for failing to investigate and raise this claim. Counsel failed to obtain Dr. Cunningham's files and failed to review trial counsel's files. The ABA Guidelines on death penalty representation direct post-conviction counsel to undertake the same level of factual investigation as that undertaken by trial counsel. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 10.7 & 10.15.1, published in 31 Hoffstra Law Rev, 913, 1015 - 1027, 1078 - 1087 (Feb. 2003). Similarly, Texas statutory authority and state precedent reflect

that post-conviction proceedings are not substitutes for raising record-based claims, but require

the development of extra-record claims. *See* Tex. Code Crim. Pro. art. 11.071 § 3(a) (directing

counsel to investigate the "factual and legal grounds for the filing of an application for writ of

habeas corpus."); *Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989) ("The Great

Writ should not be used to litigate matters which should have been raised on appeal."); *Ex parte

Gardner,* 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) (applying procedural default to appellate

claim raised in post-conviction writ); Guidelines and Standards for Texas Capital Counsel

Guideline 12.2 (B)(1) (admonishing that habeas counsel must be "prepared to undertake the

comprehensive extra-record investigation") & (B)(3)(a) (directing habeas counsel to "to conduct

a thorough and independent investigation of both the conviction and sentence" and to obtain

necessary investigative resources.), published in Texas Bar Journal, Vol. 69 No. 10, 966, 976

(Nov. 2006).

 

**5.     Claim for Relief Number Five:  MR. JOUBET RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL THE TRIAL COURT'S DENIAL OF HIS RIGHT TO DUE PROCESS UNDER THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS FOR EXCLUDING RELEVANT MITIGATION TESTIMONY FROM DR. MARK CUNNINGHAM RELATING TO MR. JOUBERT'S FUTURE DANGEROUSNESS.**

During trial, counsel sought to present testimony by clinical forensic psychologist Mark

Cunningham.  The trial court held a lengthy hearing outside of the presence of the jury, during

which it excluded portions of Dr. Cunningham's testimony and the accompanying power point

he created to support his testimony.[5]  During a bill of exception on Dr. Cunningham's excluded

---

[5] Dr. Cunningham's listed experience testifying on future dangerousness in Texas courts utilizing

mitigation presentation, trial counsel submitted power point slides regarding "Violence Risk Assessment" and Dr. Cunningham's affidavit explaining his qualifications, experience, and methodology for conducting a future danger assessment based on the individual defendant compared against actuarial-type data. Pet. Ex. 120; 37 R.R.: 30, 45 R.R.: Defense Ex. 14. The trial court held this offer of evidence "irrelevant and inadmissible," and that the "probative value [was] greatly outweighed by the confusion that it would give the jury . . . ." 37 R.R.: 30-31. The court relied upon authority from the Texas Court of Criminal Appeals in reaching its decision. *See Sells v. State,* 121 S.W.3d 748 (Tex. Crim. App. 2003); *Mosely v. State,* 983 S.W.2d 249 (Tex. Crim. App. 1998); *Rachel v. State,* 917 S.W.2d 799 (Tex. Crim. App. 1996).

Later that morning, Mr. Joubert sought to introduce Dr. Cunningham's testimony regarding future dangerousness on the ground that the State had opened the door to introduction of such testimony. 38 R.R.: 71-73. The trial court denied his request. 38 R.R.: 75. At the conclusion of re-direct examination, Dr. Cunningham was able to opine, without elaboration, that based upon the disciplinary incidents reflected in Mr. Joubert's prison records, he would not be a "disproportionate risk [of] violence in prison." 38 R.R.: 87-88.

In a renewed bill of exception that same morning, Dr. Cunningham expounded upon the methodology in his violence risk assessment of Mr. Joubert, explaining it was based upon an actuarial risk assessment. This involves gathering relevant data for group populations that form a base rate. The probability of Mr. Joubert engaging in specific violent conduct is then measured against the base rate for that conduct. In Mr. Joubert's case, he would be measured against other

---

his methodology consisted of the following cases: *State v. Ronald Springer* (1995), *State v. Thomas Howard* (1995), *State v. Allen Bridges* (1998), *State v. Julius Murphy* (1998), *State v. Larry Davis* (1999), *State v. Hall* (2000), *State v. Ivan Cantu* (2001), *State v. Michael Sigala* (2001), *State v. Johnny Penry* (2002), and *State v. Joshua Maxwell* (2002).

offenders in the general prison population, measured against other murderers in the prison system, and measured with other inmates according to their age across stages of incarceration. 38 R.R.: 162-168; 45 R.R.: Defense Ex. 17.  The trial court denied Mr. Joubert's request to present Dr. Cunningham's testimony of his actuarial risk analysis.  38 R.R.: 169.

Dr. Cunningham presented an affidavit to this Court stating he provided his power point presentation to counsel prior to trial, and this presentation was designed to explain the scientific principles of Mr. Joubert's individual mitigating circumstances to the jury.  Pet. Ex. 19.  Mr. Joubert was represented by appointed counsel, Henry Burkholder, on direct appeal to the Texas Court of Criminal Appeals.   Appellate counsel failed to raise the issue of the trial court's exclusion of Dr. Cunningham's testimony and power point presentation concerning future dangerousness.  Pet. Ex. 71.  Mr. Joubert was represented by appointed counsel, Mr. Kurt Wentz, in state post-conviction proceedings.  Post-conviction counsel also failed to raise the issue of the trial court's exclusion of Dr. Cunningham's testimony.  Pet. Ex. 72.

Mr. Joubert was denied his right to Due Process of Law under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because his jury was prevented from hearing relevant mitigating evidence from Dr. Cunningham concerning the probability that he would commit future acts of violence.  The Eighth and Fourteenth Amendments require the State to permit a defendant to present, and have the jury consider as a mitigating factor, any aspect of a defendant's character or record of any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.  *Lockett v. Ohio,* 438 U.S. 586 (1978); *Eddings v. Oklahoma,* 455 U.S. 104 (1982).   In *Jurek v. Texas*, the Supreme Court upheld the constitutionality of the Texas death penalty scheme, specifically citing a defendant's ability to present mitigating evidence rebutting the State's case that a defendant would constitute a future

39

danger to society.  428 U.S. 262, 272-73 (1976).  Mitigating evidence need only be relevant to be admissible under Eighth Amendment jurisprudence, and such evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  *Tennard v. Dretke,* 542 U.S. 274, 284 (citing *McKoy v. North Carolina,* 494 U.S. 433, 440 (1990)).

Both the Supreme Court and the Texas Court of Criminal Appeals have held that expert testimony from mental health professionals is admissible on the issue of predicting future dangerousness.  *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983); *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) (approving expert opinion about future dangerousness based on review of investigative reports, crime scene photos, autopsy photos, witness statements, and defendant's school and personnel records); *McBride v. State*, 862 S.W.2d 600, 609 (Tex. Crim. App. 1993) (permitting psychiatrist to give testimony on the issue of future dangerousness through a hypothetical question based on the hypothetical question based upon facts in evidence).   The trial court erred by excluding Dr. Cunningham's testimony and power point presentation relating to future dangerousness.   Trial counsel presented sufficient evidence to demonstrate that Dr. Cunningham's testimony regarding the probability that Mr. Joubert would commit future acts of violence was sufficiently individualized to Mr. Joubert's personal circumstances to render this evidence and accompanying power point presentation admissible under *Tennard v. Dretke*.   Moreover, the exclusion of this evidence is never harmless, and requires reversal.  *See Penry v. Lynaugh,* 492 U.S. 302, 3228 (1989); *Nelson v. Quarterman,* 472 F.3d 287, 314 (5th Cir. 2006) (specifically rejecting harmless error analysis).

As an alternative ground, Mr. Joubert argues that he was denied the constitutional right to the effective assistance of counsel because trial counsel failed to proffer the proper predicate

facts regarding Dr. Cunningham's testimony to the trial court.  The proponent of evidence bears the burden of establishing the admissibility of the proffered evidence.  *Winson v. State,* 252 S.W.3d 336, 340 (Tex. Crim. App. 2008).   Counsel is charged with having a sufficient understanding of both the facts of the case and also relevant case law.  *Ewing v. State,* 549 S.W.2d 392, 398 (Tex. Crim. App. 1977).  Counsel's failure to establish the admissibility of Dr. Cunningham's testimony resulted from inadequate preparation for trial, thus failing to make the predicate showing of admissibility.     Mr. Joubert was prejudiced by counsel's deficient performance because his jury failed to hear a considerable portion of relevant mitigating evidence concerning an important and decisive sentencing issue, future dangerousness.  Mr. Joubert has shown that Dr. Cunningham was prepared to present cohesive and compelling testimony relating to Mr. Joubert's personal characteristics and moral blameworthiness to the jury.  Because Mr. Joubert was denied his right to the effective assistance of counsel, Dr. Cunningham failed to inform his jury that Mr. Joubert posed a low likelihood of committing future violence in prison and that he would have likely acclimatized to prison.  If counsel had presented this testimony, at least one juror would have not voted to sentence Mr. Joubert to death.

6.     **Claim for Relief Number Twelve:  MR. JOUBERT WAS DENIED HIS RIGHT TO A RELIABLE SENTENCE AND DUE PROCESS UNDER LAW WHEN THE STATE CALLED A.P. MERILLAT, WHO PRESENTED FALSE AND MISLEADING TESTIMONY ABOUT THE CONDITIONS OF CONFINEMENT IN THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE.**

Mr. Joubert's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the State offered into evidence the testimony of A.P. Merillat, which consisted of inflammatory, inaccurate, and constitutionally unreliable hearsay. Trial counsel rendered ineffective assistance by failing to object to this testimony, failing to

impeach Merillat, failing to object to Merillat's status as a fact witness, and failing to request a hearing in order to ascertain if he was offering expert testimony.

Mr. Joubert's jury most certainly considered A.P. Merillat's testimony "expert," as he claimed to have "written three books," "given lectures," "taught prosecutors," and "written articles" on the classification protocol of the Texas prison system.  39 R.R.:  81.  Merillat's testimony regarding prison classification was inaccurate and misleading, leaving the jury with a false impression about the safety precautions the Texas Department of Criminal Justice (TDCJ) utilizes to prevent prison violence.  As the final witness heard by the jury, Merillat's testimony was prominent in their mind when they were deciding Mr. Joubert's sentence and thus particularly prejudicial.

Trial counsel was ineffective for failing to request a hearing outside the jury's presence to ascertain whether Merillat was offering properly qualified and substantiated "expert" testimony, failing to make relevant legal arguments about why it was error to allow Merillat to testify as a fact witness, and failing to object to the admissibility of his testimony.  Counsel also failed to inform Mr. Joubert's jury that Merillat's testimony was inaccurate and unreliable because it did not give a true depicting of the prison conditions that would have been applicable to Mr. Joubert.

Because trial counsel failed to sufficiently object to Merillat's testimony, Mr. Joubert's jury was presented with data and opinions delivered by a supposed "fact" witness, which were not actually based upon that witness' own perceptions, but the product of his *ad hoc* interactions with unidentified individuals within TDCJ.  Mr. Joubert's jury considered evidence concerning the housing, treatment, and behavior of inmates that was factually incorrect, speculative, prejudicial, and misleading.  Because counsel failed to lodge the proper objections to exclude or

limit Merillat's testimony, the defense failed to present a reasonable sentencing alternative to the death penalty, and the State was permitted to portray a materially prejudicial and false picture of TDCJ's capability of securely confining Mr. Joubert.

### A.  Defense Expert Larry Fitzgerald

During Mr. Joubert's penalty trial, the defense presented Larry Fitzgerald, a retired Public Information Officer for TDCJ.  39 R.R.: 5.  Fitzgerald used a TDCJ generated chart to explain levels of classifications for inmates, testifying that a capital murder defendant would enter the penitentiary as a G-5, the most restrictive classification aside from administrative segregation.  39 R.R.: 6-8.  He explained that a defendant entering TDCJ spends his first five weeks at an intake facility, where a Classification Committee studies the inmate and conducts psychological and medical examinations in order to determine which classification he should receive when he is transported to prison.  *Id.* at 10-11.  At best a capital murder offender could expect to be placed in a G-5 classification and at worst he could be placed in administrative segregation, the two most restrictive classifications available in TDCJ.  *Id.*  at 11-12.

In addition to classification procedures, Fitzgerald explained the TDCJ Emergency Action Center Statistics, a monthly report prepared by TDCJ regarding all incidents that occur within the prison system.  39 R.R. 44-45 (reflecting escapes, attempted escapes, homicides, natural deaths, etc.).  In the year 2004, two inmates out of 154,000 escaped, and another two attempted escape.  *Id.* at 48.  Three homicides occurred, and inmate fights occurred only 74 times in the year.  *Id.* at 54.  After reviewing Mr. Joubert's juvenile and adult criminal records, his jail records concerning behavior, and summaries of his behavior in the free world, Fitzgerald concluded that TDCJ could securely house him for the rest of his life.  *Id.* at 59.

B.        State Rebuttal Witness A.P. Merillat

After the defense rested Mr. Joubert's penalty phase, the State called Merillat as a rebuttal witness.  39 R.R.:  76.  Trial counsel failed to object to Merillat as a witness or to request a hearing in order to determine his "expert" status under Texas Rules of Evidence 104, 702, or 705.  Merillat informed the jury that he was a "certified peace officer" who previously worked with the Houston Police Department before working as an investigator with the Special Prosecution Unit ("SPU") in Huntsville for 15 years.  39 R.R.:  77.  He was employed by Walker County – never employed by TCDJ.  *Id.*  at 79.  He investigated crimes occurring within the prison system or "conspiracies" committed in the "free world" that are "ordered from within the prison system."  *Id.* at 77-78.  Merillat explained that, in contrast to defense experts who were paid for their services, he did not charge and received no monetary compensation for his testimony. *Id.* at 78-79.

Merillat alleged to have authored books and articles on TDCJ's classification system, in addition to educating prosecutors on this subject.   39 R.R.:  82.   Contrary to Fitzgerald's testimony, he claimed that convicted capital murderers enter TDCJ as a G-3 classification, a mid-level of security that enabled them to hold jobs, have a cell mate, move through the prison in the general population without restraints or escort, and enjoy visitation just as an inmate convicted of a much less severe felony.  39 R.R.:  82-83.   The prison system, he said, was "not much concerned" with the inmate's offense of conviction, only the length of his sentence.  *Id.* at 84.  He told the jury that he knew of capital murders who lived in dormitories –- open barracks with cots and radios, fans – and not cells.  *Id.* at 86-87.  He cautioned that the only restriction placed on a capital murder defendant is that "they can't work outside the fences as they used to."  39 R.R.:  83-84.

Merillat told the jury that the most restrictive classification in TDCJ, administrative segregation ("ad seg") is "one of the most dangerous places in the State of Texas."  39 R.R.:  91. A "locked door does not mean anything when inmates can get out of those locked doors to hurt, rape, and stab people . . . . It's dangerous to walk by those cells because spears come out and stab officers" and "feces and urine and other bodily fluids come out of those cells onto officers."  39 R.R.:  123.  Merillat investigated murders and escapes from ad seg, as well as guards being raped.  *Id.*  He claimed to have received a package bomb in the mail made by an inmate in ad seg. *Id.*

In addition to telling the jury that defense expert Fitzgerald was wrong when he testified that an capital defendant would enter TDCJ as a G-5, but would instead enter as a much more free G-3, Merillat also told the jury that the TDCJ statistical report Fitzgerald showed them was incorrect and inaccurate.  39 R.R.: 97, 117.  Merillat told the jury that TDCJ underreported the number of incidents of violence within the prison system.

Merillat told the jury that TDCJ underreported the number of homicides in prison:

> Everybody wants to know about murders in the prison.  There were three homicides in 2003.  There wasn't just one as you'll see on that form.  It says one.  That's not true.  The one that they're talking about is an inmate named Bottenfield (sic).  They're not even including the guard who was killed last year.

39 R.R.: 97-98; *see also* 39 R.R.: 117 (contending TDCJ erred in the number of homicide incidents it listed in the report).  He also testified that TDCJ allowed incidents to go unreported, relating an unreliable hearsay anecdote alleging two inmates were mistakenly paroled, but not included in TDCJ statistics as escapes.  39 R.R.: 99-100.  Without documentation, Merillat told the jury that Fitzgerald's citation of a TDCJ report documenting 9,000 disciplinary convictions

for offender assaults and 31 staff assaults in 2003 was grossly inaccurate, claiming there were actually 20,000 assaults on inmates and guards. *Id.* at 54-56, 100.  Merillat considered TDCJ's definition of assaults to be too restrictive, and he considered "any act of disobedience . . . by a convicted felon in a penitentiary" to be an act of violence and a threat to those inside and outside prison. *Id.* at 101.  He also invented his own definition of escape, claiming the definition TDCJ used resulted in unreported escape attempts. *Id.* at 117.

C.      Merillat's Testimony was False and Materially Misleading

Merillat's testimony regarding TDCJ classification, the security of inmates, and incidents of prison violence was materially false and misleading to the jury.  TDCJ sends an inmate first to an intake facility where a Classification Committee intensively monitors and researches a defendant before categorizing him; Merillat told the jury that all capital murder defendants automatically enter the prison system as a G-3 status. 39 R.R.:  82.  No capital murder defendant can gain a G-1 classification; Merillat told the jury that offenders move up or down the level of classification according to their behavior. *Id.* at 81.  Merillat grossly overstated the amount of freedom and privileges provided to a G-5 offender, leaving the jury with a false impression of what life would be like for Mr. Joubert if they did not sentence him to death. *Id.* at 84.   Finally, Mr. Joubert has a good faith belief that Merillat testified falsely that he was not paid a fee for his testimony in order to look more credible in the eyes of the jury. *Id.* at 78-79.

Merillat's testimony that a capital defendant would enter TDCJ at a G-3 classification is directly contradicted by the 2003 Classification Plan TDCJ utilized at the time.  *See* Pet. Ex. 132. TDCJ's plan expressly provided that an offender who committed a violent crime could enter prison no higher than a G-4 status.  Pet. Ex. 132 (2003 Classification Plan), p. 80.  TDCJ's

classification plan at the time of Mr. Joubert's trial prohibited a capital murder defendant from ever obtaining a G-1 status, although Merillat mislead the jury into thinking that Mr. Joubert could reach this status, moving "up or down from that G level depending upon his behavior within the prison system."  39 R.R.: 83.  Merillat's bold assertion that TDCJ disregards the nature of an inmate's offense in reaching classification decisions is untenable in light of the actual Classification Plan.  Further, he mischaracterized the quality of restrictions imposed upon a G-5 offender – claiming they are eligible for contact visits when they are not; claiming they may be housed with different security levels when they cannot; and claiming they can enroll in education classes when TDCJ policy finds them "generally ineligible" for such programs.   Pet. Ex. 132, p. 83.  He also misrepresented to the jury the degree of freedom a G-3 inmate enjoyed, claiming that such inmates had no real restrictions placed upon them aside from being prohibited from working outside the prison walls.  39 R.R.: 83-84.  TDCJ policy at that time required that all G-3 inmates must be housed within the main building of a prison and were severely limited in the type of work they were allowed to perform (banning any maintenance, factory, clerk, or dock position).[6]  *See* Pet. Ex. 132.

Most importantly, Mr. Joubert has a good faith belief that Merillat testified falsely with regard to whether he was receiving compensation for his testimony.   Merillat received

---

[6] The exclusion of G-3 inmates from factory work is particularly significant given Merillat's unrestrained tendency to discuss prison violence in anecdotal format, spontaneously offering specific instances to back up his general claims of prison violence. In Mr. Joubert's case, he related the murder of TDCJ guard Stanley Wiley by inmate Travis Reynolds inside a TDCJ shoe factory. 39 R.R.: 104 - 105. The implication is quite plain given Merillat's suggestion that G-3 inmates had unrestricted work opportunities – G-3 offenders had ample opportunity to commit violence, and near unlimited access to deadly weapons. But equally plain, relating the details of a prison murder under circumstances that would not apply to Mr. Joubert falsely conveyed the idea of a heightened opportunity for violence which would not exist for Mr. Joubert.

compensation for his testimony in many other Texas cases.  In 2007, he received $495 payment from the Travis County District Attorney's Office for testimony in state post-conviction proceedings of defendant Paul Gilbert Devoe, D-1-DC-07-3020930A.  *See* Pet. Ex. 134.  In fact, Travis County records reflect that the District Attorney has paid Merillat a total of $3,230 for four unspecified cases between the years of 2008-2010.  *See id.*  The State Prosecuting Attorney advertises in a document entitled "Services Available through the Special Prosecution Unit" that its investigators are available to testify in "death penalty cases on the future danger issues, and violence in the prison system," directing prosecutors to contact A.P. Merillat.  *See* Pet. Ex. 136. Merillat falsely conveyed to the jury that, in contrast to defense expert Larry Fitzgerald, he was testifying as a disinterested public servant rather than a paid "expert."  Moreover, his acceptance of compensation implicates Texas Penal Code § 36.07, which prohibits a public servant from accepting an "honorarium in consideration for services that would not have been requested to provide but for official position or duties."  *Id.*

Merillat portrayed a false and misleading impression of prison violence through his assertion of factually unsupported and unverified statements.  Defense expert Larry Fitzgerald explained that TDCJ monitored and compiled monthly statistics of prison incidents through its Executive Services Division, detailing the number of homicides, escapes, and assaults.  39 R.R.: 44-49.  In 2003, TDCJ reported three inmate-on-inmate homicides, 31 serious assaults, and 9,298 general assaults.  39 R.R.: 56.  Merillat told the jury that these numbers were inaccurate and underreported violence.  39 R.R.: 99.  He had no sources or statistics to back up this contention. He alleged TDCJ's statistics did not "even includ[e] a guard who was killed last year," but he failed to identify the guard.  39 R.R.: 99.  He claimed there were actually 20,000 assaults in 2003, not the 9,298 reported by TDCJ.  39 R.R.: 101-02.  Again, he cited no statistics or support

for this claim.

Merillat invented his own definition of "acts of violence" to include "any act of disobedience in prison."  39 R.R.: 101.  This *ad hoc* definition rendered his unfounded and unreliable "expert" testimony even more prejudicial to the jury, as they were required to consider a special issue concerning "criminal acts of violence" in order to sentence Mr. Joubert.  The State used an unqualified "expert" with unverified data in order to undercut Mr. Joubert's scientifically and objective evidence supporting the premise that TDCJ could safely house him and that death row was not the only option for his sentence.  Merillat's testimony rendered Mr. Joubert's sentence unreliable.  It confused the jury and the jury failed to properly consider special issue one, future dangerousness.

Due Process prohibits the State from obtaining a conviction or death sentence through the use of false or misleading evidence.  *See* U.S. Const. amends. V, VIII, XIV; *Napue v. Illinois,* 360 U.S. 264, 269 (1959) ("a conviction obtained through the use of false evidence . . . must fall under the Fourteenth Amendment"); *Alcorta v. Texas,* 355 U.S. 28, 31 (1957) (Due Process violated when witness' testimony left a "false impression" with the jury regarding a material issue at trial).  A constitutional violation occurs regardless of the good or bad faith of the prosecutor; the error stems from the presentation of false or misleading testimony and its corruption of the truth-finding process.  *Kylesv.Whitley*, 514 U.S. 419, 432 (1995); *Giglio v. United States*, 405 U.S. 150 (1972); *Miller v. Pate*, 386 U.S. 1, 7 (1967). "[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." . . . Hence, "[e]vidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true." *Untied States v.*

*Bartko*, 728 F.3d 327, 335 (4th Cir. 2013) (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967)); *United States v. DeMarco*, 407 F. Supp. 107, 114 n.8 (C.D. Cal. 1975) (citing *Hamric*). Texas courts have similarly acknowledged that it is not necessary to prove that testimony was "technically incorrect or "false" . . . [merely that] . . . the witness's testimony gives the trier of fact a false impression." *Ramirez v. State*, 96 S.W.3d 386, 395 (Tex. App. 2003) (citing 42 George E. Dix & Robert O. Dawson Texas Practice: Criminal Practice and Procedure § 22.53 (2d ed. 2002)).

In *Kyles v. Whitley*, the Supreme Court held that knowledge of the falsity of evidence may be imputed to the prosecution if any member of the prosecution team is aware of the false or misleading nature of the evidence. 514 U.S. at 437. The prosecution team is a fluid concept, and extends beyond the prosecutors directly on the case to include law enforcement and to other cooperating governmental agencies or individuals, regardless of whether they are part of the same governmental unit. *See, e.g.*, *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (imputing knowledge of state law enforcement team that witness' lawyer had been paid from state funds to federal prosecuting team where state and federal prosecutors co-operated); *Martinez v. Wainwright*, 621 F.2d 184, 186 - 187 (5th Cir. 1980) (imputing knowledge to prosecutor of information contained in files of medical examiner); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (finding imputed knowledge of information within postal service files); *Ex parte Castellano*, 863 S.W.2d 476, 485 (Tex. Crim. App. 1993) (police officer acting ultra vires in assisting investigation to frame defendant); *O'Rarden v. State*, 777 S.W.2d 455, 458 (Tex. App. - Dallas 1989) (DHR investigator); *People v. Uribe*, 76 Cal. Rptr 3d 829 (Cal. App. 2008) (medical center which performed rape examination were part of the prosecution team); *State v. Farris*, 656 S.E.2d 121 (W.Va. 2007) (forensic psychologist hired by police to

conduct examination on complainants was part of prosecution team); *Williams v. State*, 831 A.2d 501 (Md. App. 2003)]; *Harridge v. State*, 534 S.E.2d113 (Ga. App. 2000) (state crime laboratory was part of prosecution team, even though distinct from local law enforcement and prosecutor's office).

Merillat plainly fell within the prosecution team in Mr. Joubert's case. He was an employee of the Special Prosecution Unit, a State-funded prosecutorial entity charged with investigating and prosecuting prison-based offenses. He was an investigator for the SPU, actively active participant in the investigation and prosecution of prison offenses. And his employer "advertised" him as an expert witness in the area of prison violence and he frequently testified on this basis in penalty phase of capital murder prosecutions.

Notably, the Texas Court of Criminal Appeals has implicitly held Merillat to be a member of the prosecution team in its grant of sentencing phase relief based upon his false testimony in *Estrada v. State*, 313 S.W.3d 274, 286 – 288 (Tex. Crim. App. 2010), and *Velez v. State*, 2012 Tex. Crim. App. Unpub. LEXIS 607 (Tex. Crim. App. June 13, 2012). In both *Estrada* and *Velez*, the Court of Criminal Appeals held Merillat presented false testimony relating to the G-3 classification of life sentenced capital offenders. In each case, such misstatements were held to be material misstatements of the facts and compelled reversal of the sentences.

Mr. Joubert has shown just cause because neither direct appellate or state post-conviction counsel investigated or presented this claim to the Texas State Courts.  State post-conviction writ counsel's omission of this *Napue / Alcorta* claim was objectively unreasonable because it fell below the standards of investigation and evaluation in Texas post-conviction practice as reflected

through the Guidelines and Standards for Texas Capital Counsel, 69 Tex. Bar. Journ., 975 - 982 (Nov. 2006), Guideline 12.2 (Duties of Post- Conviction Counsel), 1c (setting out duty to investigate all constitutional violations), 1(e) (warning of potential procedural default for failure to raise issue), 3(a) – (e) (setting out duty of investigation) & 7(a) (setting out duty to present all potentially meritorious issues); *See* Pet. Ex. 137.

7.    **Claim for Relief Number 13:  MR. JOUBERT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE COUNSEL FAILED TO REQUEST A PRE-TRIAL HEARING REGARDING MERILLAT'S TESTIMONY, AND THEREFORE MISSED THE OPPORTUNITY TO EXCLUDE HIS TESTIMONY ON THE BASIS OF ITS UNRELIABILITY UNDER THE TEXAS RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE TO THE UNITED STATES CONSTITUTION.**

Trial counsel was ineffective for failing to object or request a pre-trial hearing to challenge Merillat's qualifications as an expert witness.  A.P. Merillat testified during Mr. Joubert's penalty trial as a rebuttal witness to defense expert Larry Fitzgerald, who provided the jury with evidence regarding TDCJ's classification and capability of securely housing capital murder inmates.  The trial court held no inquiry into Merillat's qualifications or knowledge base, and the defense did not request a jury-out hearing authorized by Texas Rules of Evidence 104, 702, and 705, in order to preview his qualifications and basis for knowledge.   The only qualifications Merillat proposed to the jury were that he was a "Criminal Investigator with the Special Prosecution Unit" (SPU) in Huntsville for the past fifteen years.  39 R.R.:  77-78.  The SPU prosecuted "on behalf of local district attorneys, crimes that occurred[d] within the prison system.  39 R.R.:  78.

Although he was never employed by TDCJ, Merillat testified at length that he was "familiar with" the prison system, discussing the classification process and living and working

conditions of inmates.  39 R.R.:  81-81, 92-96.  He alleged that TDCJ's statistics reporting incidents of violence were incorrect and inaccurate as they underreported acts of violence.  *Id.* at 98-99 ("What you don't see in that report that these are convicted felons locked in concrete buildings, 24-hour security, with restrictions placed on them by the courts, and they're committing whatever assault it is, be it throwing urine on somebody or stabbing them or cutting their head off.").  Merillat told the jury that TDCJ did not accurately report officer homicides. *Id.* (claiming TDCJ's reported number of homicides is "not true" and there was an officer killed which TDCJ failed to report).  Without documentation, Merillat recounted, in horrific hearsay, an anecdote about an officer who had throat cut by an inmate working in the shoe factory.  *Id.* at 104-05.  Again, without documentation, Merillat told the jury that inmates are judged by how "tough" and "strong" they are and weak inmates are targeted as soon as they enter prison.  *Id.* at 87-88.  The only method for an inmate to gain respect, he testified, was to engage in violence or join a gang.  *Id.* (explaining the process of "ho checking," where new inmates are challenged to fight).

Merillat told the jury that administrative segregation, the most restrictive of all TDCJ classifications, is an "extremely dangerous place," "one of the most dangerous places in the State of Texas."  39 R.R.:  91.  Guards are raped and people are murdered in Ad Seg, and Merillat claimed to have received a package bomb in the mail that was made in this unit.  *Id.*  He also told the jury that assaultive inmates are not placed into Ad Seg until they had committed numerous violent acts.  *Id.* at 122-23.

Trial counsel failed to request a jury-out hearing in order to determine Merillat's qualifications as a rebuttal witness to Larry Fitzgerald or to determine the scope and basis of his knowledge.  Mr. Joubert had a right to such a hearing under the Texas Rules of Evidence.  *See*

Tex. R. Evid. 104.  Moreover, the introduction of specialized testimony – testimony beyond the knowledge of the average juror – is circumscribed by Texas Rule of Evidence 702.  *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App.1992). The Rule conditions the admission of "expert" testimony contingent upon the witnesses' qualification as an expert and the reliability of the underlying data. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 498 (Tex. 2001).  An expert's expertise must go to the "very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *Vela v. State*, 209 S.W.3d 128, 131 - 132 (Tex. Crim. App. 2006) (citing *Broders*).  It is not sufficient that the proposed expert have some familiarity with the subject beyond the knowledge of the average jurors. *Vela*, 209 S.W.3d at 131 - 132.  Nor is the expert's unsupported claim to have expertise in the area sufficient in and of itself. *Id*. at 136 ("a trial judge need not "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Apart from the expert's own personal qualifications, the underlying basis of the testimony must itself be reliable. Even where an expert possesses the requisite qualifications:

> there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. . . If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. . . . Further, an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. ...

*Helena Chem. Co. v. Wilkins*, 47 S.W.3d at 499 (citations omitted).  The standard of proof to introduce expert testimony is upon the proponent of the evidence to establish by clear and convincing evidence.  *Kelly*, 824 S.W.2d at 573.

Further, Rule 705 expressly authorizes the opposing party to challenge outside the jury's

presence the factual basis of the proposed expert's testimony:

> (b) Voir dire. Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall, or in a civil case may, be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.
>
> ( c ) Admissibility of opinion. If the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, the opinion is inadmissible.

Tex. R. Evid. 705(b), (c); *see also Vela*, 209 S.W.3d at 133; Steven Goode, et al., Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal § 705.2, at 71 (2d ed. 1993) (noting that Rule 705(c) "gives counsel a chance to make timely objection to the admissibility of the [expert's] opinion on the ground that it lacks a sufficient basis. Criminal Rule 705(c) explicitly provides that the court should not admit the testimony of an expert who lacks a sufficient basis for his opinion").

The trial court's obligation to conduct a preliminary hearing upon request is not discretionary; the court abuses its discretion for failing to hold a hearing in response to a request by the defense. *Combs v. State*, 6 S.W.3d 319, 321 (Tex. App. – Hous. [14th Dist.] 1999). Accordingly, had counsel so requested, the court would have been obligated to hold preliminary hearing to determine Merillat's qualifications to testify in rebuttal to Fitzgerald, and evaluate the factual basis for his testimony.

Mr. Joubert's was prejudiced by counsel's failure to challenge Merillat's expertise. Merillat was a criminal investigator, assigned to a prosecuting agency, who investigated prison crime.  He was never a prison guard and was never employed by TDCJ.  He did not possess the requisite knowledge to testify regarding TDCJ classification procedures or the work and housing

limitations inherent to each G-level classification.  Even if Merillat had been exposed through his work to inmate classifications, *some* familiarity with the subject matter is insufficient to render him qualified to testify regarding classification procedures.  *Vela*, 209 S.W.3d at 131-32.  His employment would have had to pertain to the "very matter" on which he proposed to testify. *Broders*, 924 S.W.2d at 153 (Tex. 1996).  A cursory glance at TDCJ's 2003 Classification Plan would have revealed that Merillat made material misrepresentations to the jury regarding the classification process: capital murder offenders are not *automatically* assigned a G-3 classification and he overexaggerated both G-3 and G-5 freedoms and privileges.  Because counsel failed to request this mandatory hearing, the jury was considered his prejudicial and unfounded assertions when sentencing Mr. Joubert.

Mr. Joubert was further prejudiced when Merillat was permitted to testify that the TDCJ statistics Fitzgerald relayed to the jury were incorrect and inaccurate.  Without evidentiary support, Merillat told the jury that the true number of assaults within the prison was twice that TDCJ reported.  Neither the State or Merillat produced any objective or methodologically verifiable basis for his contentions that TDCJ's statistics were grossly underreporting incidents of violence.  His testimony was unexplained, unfounded, and unverifiable.

Apart from Merillat's own observations, to the extent that his testimony was based on his review of investigative reports of fellow SPU investigators or other law enforcement personnel, they would have been inadmissible hearsay if presented at trial. *See* Tex. R. Evid. 803(8)(B); *Cole v. State*, 839 S.W.2d 798 (Tex. Crim. App. 1990). Law enforcement- generated reports are inadmissible at trial due to the absence of guarantees of reliability arising out of the adversarial context of criminal investigations. *Fischer v. State*, 252 S.W.3d 375, 382 - 383 (Tex. Crim. App. 2008). "An expert's opinion should be excluded if it is based on 'unrealible foundational data' or

if the 'expert's methodology is flawed.'"  *Helena Chem.,* 47 S.W.3d at 499.  A juror lending credence to Merillat's claims that violence is twice as common in prison as TDCJ reports had a right to know how Merillat arrived at that number.  If there was no sound methodology backing up his statistics, the jury should have never heard such prejudicial information.

The facts in support of this claim are undeveloped due to state habeas counsel's failure to investigate and present this issue in state post-conviction proceedings.  Counsel's omission of this issue fell below objectively reasonable standards of practice, resulting in deficient post-conviction representation. *See* Guidelines and Standards for Texas Capital Counsel, 69 Tex. Bar. Journ., 975 - 982 (Nov. 2006), Guideline 12.2 (Duties of Post-Conviction Counsel), 1(c) (setting out duty to investigate all constitutional violations), 1(e) (warning of potential procedural default for failure to raise issue), 3(a) – (e) (setting out duty of investigation) & 7(a) (setting out duty to present all potentially meritorious issues).

### C.    No Intentional Delay.

Regarding the third *Rhines* element, there is no evidence that Mr. Joubert has engaged in any intentional delay or abusive tactics. With the assistance of federal counsel, Mr. Joubert raised his claims in his federal petition to protect all of his available constitutional claims from being barred by the federal statute of limitations, and he simply asks that these proceedings be stayed only so long as is necessary to permit the Texas Courts to first consider the claims. Having satisfied *Rhines*, Mr. Joubert is entitled to a stay of these proceedings while he seeks relief in the Texas courts.

### CONCLUSION

Decisions of the Texas Court of Criminal Appeals and the Fifth Circuit firmly establish that Mr. Joubert may be able to obtain review of the merits of his claims in the Texas Courts in a

subsequent habeas application and that relief is not absolutely foreclosed by any state law or decision. Thus, it is not entirely clear that the claims will be disposed on an independent and adequate state ground.  Because the outcome in state court is unclear, these claims cannot be treated as procedurally defaulted by this court before the state court has been given an opportunity to address them. *Wilder*, 274 F.3d at 262 (holding that claim cannot be procedurally defaulted when it is not "entirely clear" how state court will apply its procedural rules.).  Because Mr. Joubert meets all three requirements of the *Rhines* test and returning to state court would not be futile, this Court should stay these proceedings so that he can present his claims to the state court.

For the foregoing reasons, Mr. Joubert requests that this Court grant this motion to stay the proceedings in this cause and place them in abeyance pending the filing and disposition of a subsequent state habeas application raising the unexhausted claims enumerated herein.

Respectfully submitted,

ALEXANDER L. CALHOUN
Attorney at Law
Texas Bar No. 00787187
4301 William Cannon Dr.  Ste B-150 #260
Austin, Texas 78749
(512) 420-8850 (telephone)
(512) 233-5946 (facsimile)
(512) 731-3159 (cell)
Email: alcalhoun@earthlink.net

By:  /s/ Alex  Calhoun
Alexander L. Calhoun
Member of the Bar of this Court

MELISSA ANN FRANKLIN
Attorney at Law
Texas Bar No. 24084919

58

PO Box 667
Austin, Texas 78767
Tel: (865) 599-5082
Fax: (512) 309-5936
Email: mfranklinlegal@gmail.com

By: /s/ *Melissa Ann Franklin*
Melissa Ann Franklin
Member of the Bar of this Court

## Certificate of Conference

I hereby certify that on the 30th day of September 2015, I conferred with opposing counsel regarding the relief sought in this motion and that opposing counsel has advised that he is UNOPPOSED to the relief sought in this motion subject to the following qualifications:

Respondent is not opposed to a stay and placement of the case in abeyance to return to state court. Respondent's non-opposition to this remedy is not an agreement with the allegations made by Mr. Joubert, and Respondent expressly reserves the right to deny every allegation of fact and law made by Petitioner. Respondent's non-opposition is also not an explicit or implicit waiver of any defense, including, without limitation, an agreement that the present or any future petition or claim is or will be filed within the applicable limitations period, an agreement that any current or future evidence is or will be properly before the Court, and/or an agreement that the present or future petition is or will not be second or successive. Respondent reserves the right to raise any defense or argument, including but not limited to those described in Rule 5 of the Rules

Governing Section 2254 Cases, or those found in 28 U.S.C. §§ 2241, 2244, 2254, with respect to

the present or future petition, claim, and/or evidence attached or raised therein.


/s/ Alexander L. Calhoun
Alexander L. Calhoun

**Certificate of Service**

I certify that on  October 12, 2015, I served a true and correct copy of this Motion for

Stay and Abeyance upon opposing counsel via email by filing the Motion in this Court's

EF/ECM system:

Hon. Greg Abbott
Attn.:  Matthew Ottoway
Texas Attorney General
Postconviction Litigation Division
PO Box 12548
Austin, Texas 78711-2548

/s/ Alexander L. Calhoun
Alexander L. Calhoun