United States District Court
Southern District of Texas
**ENTERED**
September 24, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Elijah Dwayne Joubert, | § | |
| | § | |
| Petitioner, | § | |
| v. | § | CIVIL ACTION No. 13-cv-3002 |
| | § | |
| Bobby Lumpkin, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Twenty years ago, a Texas jury found Elijah Dewayne Joubert guilty of capital murder. A separate punishment hearing resulted in a death sentence. After unsuccessfully availing himself of Texas appellate and post-conviction remedies, Joubert now petitions for federal habeas corpus relief.

Having considered the extensive record, the pleadings, and the applicable law, the Court finds that Joubert has not shown an entitlement to the relief he requests. Therefore, the Court **denies** Joubert's federal petition. The Court will not certify any issue for appellate review.

## BACKGROUND

On April 3, 2003, a robbery at the America Cash Express ("ACE store") check-cashing store in Houston, Texas resulted in the murder of store employee

Afredia Jones and Houston Police Department Officer Charles Clark. The police investigation moved quickly. The following day, the police arrested three men: Elijah Dwayne "Ghetto" Joubert, Dashan "Shon"/"P-Real" Glaspie, and Alfred "Dobie" Brown. Joubert's incriminating statement to the police after his arrest marked the initial step toward his capital prosecution.

## I.    Joubert's Confession

For the first two and a half hours of the interrogation, Joubert denied any involvement in the crime. By that point, his co-perpetrator Glaspie had already given a police statement inculpating himself, Joubert, and Brown. Police officers played Joubert a portion of Glaspie's police statement. Glaspie said Joubert had shot Ms. Jones and Brown shot Officer Clark. After hearing Glaspie's account of the crime, Joubert said: "Mother Fucker is telling y'all everything. They're going to kill me." (Docket Entry No. 88-25 at 16, 26). Joubert then gave the police a videotaped statement. (Docket Entry No. 93-2 at 27-35; No. 93-3 at 1-25).

From the outset, Joubert claimed that he did not shoot any of the victims. (Docket Entry No. 93-2 at 29). Still, Joubert laid out a narrative admitting to the armed robbery. Joubert described Glaspie as a man who "sells drugs" and "robs" for a living. *Id.* at 31. Joubert said that Glaspie had recently bonded him out of jail. Glaspie threatened him unless he participated in a robbery as repayment. *Id.* at 30, 33-34.

2

The men first planned on robbing the tellers at a different check-cashing business. Glaspie, who was driving his girlfriend's car, picked up Joubert early in the morning on August 3, 2003. Brown was already in the car. *Id.* at 34-35. The three men drove to a check-cashing business which they had scoped out to rob. Joubert and Brown exited the car, but retreated when they saw the business owner standing outside with a gun. (Docket Entry No. 93-2 at 3).

Brown suggested that they rob another store. *Id.* at 2. The men drove to the ACE store which had not yet opened. The men waited until employee Ms. Jones arrived to open the store. Joubert said that he exited the car and confronted Ms. Jones. Joubert claimed that he did not have a weapon but ran "up [to her] with [his] hand in [his] coat like [he] got a gun." *Id.* at 3. Joubert told Ms. Jones that they would not hurt her if she gave them money. *Id.* Ms. Jones let Joubert into the store.

Glaspie and Brown soon followed them inside. Brown had his gun out, which Joubert described as a "little" automatic. *Id.* at 4, 15. Joubert forced Ms. Jones over to the store's safe after letting her make a phone call. *Id.* Joubert said that Ms. Jones "was acting like she couldn't get in the safe." *Id.* Brown then exclaimed, "damn that's the police," and began running for the door. *Id.*

3

Officer Clark entered the store, but quickly began to back out as he talked on his radio. *Id.* at 5. Joubert said that Officer Clark fired off one shot before Brown shot at him. *Id.* Officer Clark fell to the ground.

When Joubert saw Officer Jones on the floor he told Glaspie, "let's go." *Id.* at 7. Joubert said that Glaspie, who had been holding Ms. Jones by the back of the neck, shot her. *Id.* at 8-9. Joubert identified a photograph of the .45-caliber handgun Glaspie used in the murder. *Id.* at 30.

Joubert said that the men fled the store. *Id.* at 9. Brown got in the driver's seat, with the other two men in back. *Id.* at 10. The men went back to a friend's apartment and then separated. *Id.* at 10-11, 20. Joubert said that he burned the clothes he wore in the crime. *Id.* at 20.

## II.  The Trial

The State of Texas charged Joubert with capital murder. The indictment alleged that: (1) while committing or attempting to commit the robbery of Alfredia Jones, Joubert intentionally caused her death by shooting her with a firearm; or (2) during the same criminal transaction, Joubert intentionally and knowingly caused the death of Officer Clark and Ms. Jones by shooting them both with a firearm. (Docket Entry No. 87-1 at 11, 21). Joubert stood trial in the 351st Judicial District Court for Harris County, Texas with the Honorable Judge Mark Kent Ellis

presiding. The trial court appointed Jerome Godinich and Allen C. Isbell to represent Joubert.

### A.     Guilt/Innocence Phase

The trial of Joubert's guilt began on October 4, 2004. Trial testimony confirmed many of the details Joubert provided in his police statement. Trial testimony showed that the men had first tried to rob a different check-cashing business. A woman testified that Glaspie, Joubert, and Brown were together at the location where they abandoned the first robbery. (Docket Entry No. at 89-1 at 205-09). Witnesses established that Glaspie, Joubert, and Brown entered a nearby furniture store while waiting to rob the ACE store. (Docket Entry No. 89-6 at 262-70, 298-303).[1] Later, a witness saw three men run out of the ACE store, presumably after the murders. (Docket Entry No. 89-1 at 69-71).

No eyewitnesses or security footage, however, could prove what each man had done when inside the store. Forensic evidence provided few clues about what had transpired. The police recovered bullets from three weapons: (1) a 9-millimeter bullet believed to have been fired by Officer Clark; (2) two .380 caliber shell casings; and (3) a .45 caliber shell casing from a gun later recovered from Glaspie. The question of who held Glaspie's gun during the robbery was a matter

---

[1]     One of the employees specifically identified Brown from a live police line-up. (Docket Entry No. 89-4 at 192).

of dispute by the parties.  Glaspie said that Joubert borrowed his gun.  Joubert,
however, said that he did not have a weapon when he robbed the ACE store.

In short, eyewitness testimony and forensic evidence could not confirm who
shot Ms. Jones or Officer Clark.  Only the men inside the store could describe what
had happened.  The jury had to weigh the credibility of two sources of information:
Joubert's confession and Glaspie's testimony.

Joubert's confession formed an integral part of the State's case.  The State's
opening argument emphasized that its case rested on Joubert's own words: "in his
statement . . . he makes himself guilty as a party to the capital murder.  In his
statement he admits that he was part of the aggravated robbery that ended up
resulting in the death of Mrs. Jones and Officer Clark making himself guilty to a
capital murder." (Docket Entry No. 89-1 at 45).  The prosecutor assured the jury
that "there won't be any doubt based on his statement alone that he's guilty of
capital murder as a party as a non-shooter." *Id.*

The prosecutor, however, also told jurors that the evidence would reveal "the
truth," which is that Joubert "is the killer, based upon the evidence . . . ." *Id.*  The
State pointed to the following factors to help demonstrate that Joubert was the
gunman:

- Joubert said that he knew "[i]f the laws showed up, . . . she was dead," showing that he anticipated her death;
- He walked Ms. Jones into the store, which was unlikely to have occurred if he did not possess a weapon;

- He knew that Ms. Jones had called the police;
- He was angry just before she was shot because Glaspie "played" them and allowed her to contact the police.

*Id.*

While the State relied on Joubert's confession, the State would also depend on Glaspie who "did get a deal" because the State "believed him to be the non-shooter." *Id.* By the time of trial, Glaspie had pleaded guilty to aggravated robbery. Glaspie, however, would not be sentenced until after testifying at Joubert and Brown's trials. The State agreed to a thirty-year sentence for Glaspie, if he testified truthfully.

Glaspie's testimony assigned roles to each man in the planning and commission of the robbery/murder. Glaspie provided many details which harmonized with Joubert's description of the crime. For example, Glaspie described the abandoned attempt to rob one check-cashing establishment. Glaspie explained about selecting the second crime location and the events which transpired as the men waited for it to open. Glaspie told jurors about how Joubert entered the ACE store. Glaspie said that he saw Officer Clark enter the store, saw Brown run toward the front, and then heard gunshots. *Id.* at 66-70.

Glaspie's description of the crime, however, differed from Joubert's confession in some respects. Importantly, Glaspie described how Joubert carried a

gun, held Ms. Jones at gunpoint, and then shot her. *Id.* at 71-72. Immediately after shooting Ms. Jones, Joubert said: "this bitch played us." *Id.* at 72.

Joubert's attorneys faced a difficult challenge in defending against a capital conviction. Joubert had confessed to involvement in the ACE store robbery. The defense's efforts to keep Joubert's confession from coming before jurors were unsuccessful. Joubert did not have an alibi to the crime. With his confession, the defense encouraged jurors to convict Joubert only of aggravated robbery. (Docket Entry No. 89-6 at 95). The defense conceded that Joubert was "involved in the robbery, but not [in] killing anyone." *Id.* The defense's case pitted the truth of Glaspie's account against Joubert's. The defense tried to put the gun that killed Ms. Jones into Glaspie's hand by pointing out that witnesses saw him with it before and after the robbery.

The defense, however, only called one witness in the guilt/innocence phase, Lamarcus Collar. Colar testified that Joubert, Glaspie, and Brown came to his apartment after the crime. Colar said he overheard Glaspie on the telephone say, "Shit, bitch got out of line. She was taking too long, so I had to do what I had to do." (Docket Entry 89-5 at 46). Colar took this to mean Glaspie "had to shoot her." *Id.*

Still, the State did not proceed under a theory which required Joubert to have shot either victim. The jury instructions allowed for Joubert's conviction as the

principal actor, as a party, or as a conspirator. The jury could find Joubert guilty as the principal if, as alleged by the prosecution, he was the one who shot Ms. Jones. The jury, however, could find him guilty as a party or conspirator if he had "act[ed] with the intent to promote or assist the commission of the offense" or "should have anticipated [the murder] as a result of carrying out of the conspiracy." Tex. Penal Code at § 7.02(a), (b).[2]

The jury found Joubert guilty of capital murder. Texas allows for a general verdict which does not require jurors to specify under which theory they found the defendant guilty. *See* Tex. Code Crim. Pro. art. 37.07 § 1(a) ("The verdict in every criminal action must be general. . . . ."); *see also Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone."). The record does not indicate which theory the jury used to find Joubert guilty of capital murder.

### B.     Penalty Phase

A Texas jury decides a capital convict's fate by answering special-issue questions after a separate punishment hearing. The jury's answers to the special issues would result in either sentence of death or of life without the possibility of

---

[2]      The jury instructions authorized Joubert's capital conviction under six different theories. (Docket Entry No. 90-2 at 30-31) (outlining different theories).

parole for forty years.  (Docket Entry No. 87-2 at 93).  In this case, the jury had to answer three questions:

### SPECIAL ISSUE NO. 1
Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant Elijah Dwayne Joubert would commit criminal acts of violence that would constitute a continuing threat to society?

### SPECIAL ISSUE NO. 2
Do you find from the evidence beyond a reasonable doubt that Elijah Dwayne Joubert, the defendant himself, actually caused the death of Alfredia Jones or caused the death of C. Clark and A. Jones, on the occasion in question, or if he did not actually cause the death of Alfredia Jones or cause the death of C. Clark and A. Jones, that he intended to kill Alfredia Jones, or intended to kill C. Clark and A. Jones or that he anticipated that a human life would be taken?

### SPECIAL ISSUE NO. 3
Do you find from the evidence taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Elijah Dwayne Joubert, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

*Id.* at 96-98.

The State presented extensive testimony and evidence demonstrating Joubert's lawlessness.  Joubert's criminal history began at age fourteen when he was charged with aggravated assault and the unlawful carrying of a weapon. Through his teenage years, Joubert committed numerous crimes and bad acts, including punching a thirteen-year-old girl in the eye, robbing a grocery store with several other armed youth, committing aggravated robbery, possessing controlled

substances, delinquent conduct, and carrying weapons. Joubert escaped from Texas Youth Commission custody and failed to comply with his parole.

As an adult, Joubert sold drugs, shot a man in the leg, and was convicted of aggravated assault. Joubert used drugs, stole cars, and assaulted others. He possessed weapons as a felon. Joubert committed other aggravated assaults and robberies with Glaspie. Importantly, testimony showed Joubert's involvement in another murder with Glaspie.

The defense presented evidence to mitigate against a death sentence. Joubert was born to a young, drug-addicted mother who raised him in a crime-ridden environment. His mother was not affectionate and treated him poorly. Joubert began using drugs at age eleven. A licensed social worker testified that he could not become a functioning, productive adult with all the neglect and abuse in his life. A clinical and forensic psychologist testified that Joubert's background lessened his choices and moral blameworthiness. An expert testified that Texas Department of Criminal Justice could successfully house and incarcerate Joubert. In rebuttal, the State called an expert witness, A.P. Merillat, who testified about the TDCJ classification system and described an inmate's potential for violence even when under highly restricted incarceration.

The jury's verdict resulted in a death sentence. The trial court sentenced Joubert to death on October 21, 2004. After sentencing, the trial court appointed

Henry L. Burkholder III to represent Joubert on direct appeal. The trial counsel also appointed Kurt B. Wentz to represent Joubert on state habeas review.

## III. Appeal, Initial Post-Conviction Proceedings, and Initiation of Federal Review

Joubert filed an appellate brief raising seven grounds for relief. On October 3, 2007, the Texas Court of Criminal Appeals denied Joubert's direct appeal. *Joubert v. State*, 235 S.W.3d 729 (Tex. Crim. App. 2007). The United States Supreme Court denied certiorari review. *Joubert v. Texas*, 552 U.S. 1232 (2008).

Direct appeal and state habeas review proceeded concurrently. On December 20, 2006, Joubert filed a state habeas application in the state trial court. Under Texas procedure, the trial court does not make any final decision in a capital habeas case. "On post-conviction review of habeas corpus applications, the convicting court is the 'original factfinder,' and [the Court of Criminal Appeals] is the 'ultimate factfinder.'" *Ex parte Lane*, 670 S.W.3d 662, 670 (Tex. Crim. App. 2023) (quoting *Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017)). The lower court's role is to prepare findings of fact and conclusions of law for the Court of Criminal Appeals' review. The Court of Criminal Appeals will "defer to and accept a trial judge's findings of fact and conclusions of law when they are supported by the record." *Ex parte Storey*, 584 S.W.3d 437, 439 (Tex. Crim. App. 2019). The Court of Criminal Appeals, however, may exercise its authority "to

make contrary or alternative findings and conclusions." *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

Both parties submitted proposed findings of fact and conclusions of law. The lower habeas court signed the State's filing and recommended the denial of state habeas relief. (Docket Entry No. 91-1 at 248-79). The Court of Criminal Appeals adopted the lower court's recommendation and denied relief on September 25, 2013. *See Ex Parte Joubert*, 2013 WL 5425127, at *1 (Tex. Crim. App. 2013).

In 2013, Joubert moved for the appointment of federal counsel. This Court appointed counsel to represent Joubert throughout the course of federal review. On September 24, 2014, Joubert filed a federal petition for a writ of habeas corpus raising eleven claims. (Docket Entry No. 19). Joubert subsequently amended his federal petition. (Docket Entry No. 34). Joubert's petition, however, included claims which he had not raised in state court. Federal law imposes a strict exhaustion requirement which "ensure[s] that the state courts have the first opportunity to correct any error with a state conviction and that their rulings receive due respect in subsequent federal challenges." *Skinner v. Switzer*, 562 U.S. 521, 541-42 (2011); *see also* 28 U.S.C. § 2254(b). Joubert, accordingly, filed an unopposed motion to stay federal consideration of his petition while he presented unexhausted claims to the state courts. (Docket Entry No. 39). The Court stayed

13

this action so that Joubert could resolve various legal issues in state court. (Docket Entry No. 41).

## IV.   Successive State Habeas Proceedings and the Alfred Brown Case

Texas law restricts an inmate's ability to file subsequent habeas applications. Successive state habeas review proceeds only in limited circumstances, including when an inmate could not raise the claims earlier "because the factual or legal basis for the claim was unavailable on the date [he] filed the previous application . . . ." Tex. Code Crime Pro. art. 11.071 § 5(a)(1).   Joubert moved for successive state review of several claims.   On October 5, 2016, the Court of Criminal Appeals found that two of Joubert's claims satisfied the requirements of section 11.075 § 5(a)(1).   *Ex parte Joubert*, 2016 WL 5820502, at *1 (Tex. Crim. App. 2016).   Both involved post-trial developments in the State's prosecution of Joubert's co-defendant Alfred Brown.

The State had charged Brown with capital murder for his role in the ACE robbery/murder.   Brown stood trial a year after Joubert's conviction.   In Brown's case, the State relied on Glaspie's testimony again to blame Brown for Officer Clark's murder. *See Brown v. State*, 270 S.W.3d 564, 566 (Tex. Crim. App. 2008). The State, however, relied on testimony from Brown's girlfriend who said that he had confessed to the crime. *See id.* at 567-68.   Also, other testimony placed Brown

near the ACE store and with his co-defendants around the time the crime occurred. *See id*. at 568.  Brown received a death sentence.

New, exculpatory information came to light nearly a decade after Brown's conviction.  Brown had claimed innocence throughout his trial proceedings and incarceration.  As described in Joubert's petition, "Brown maintained that he was not present at the scene and provided an alibi: he was in his girlfriend's (Ericka Dockery) apartment; two of Ms. Dockery's nephews were also home with him; Ms. Dockery was at work, and he called her at her place of employment around 10:00 a.m., from her apartment, which made it impossible for him to have participated in the ACE robbery and murders." (Docket Entry No. 74 at 46-47).

Joubert describes the discovery of evidence which supported Brown's alibi, and which excluded him from participation in the ACE robbery:

> In responding to a discovery request in a civil suit brought by Alfred Brown in 2017, the State, through Harris County District Attorney Kim Ogg, located email correspondence between members of the prosecution team that had been conducted through the DA's domain. This included an email on April 22, 2003 (the day after Erika Dockery's testimony before the grand jury) from HPD Detective Breck McDaniel to ADA Dan Rizzo. No one else was copied on the email. Attached to the email was a draft of an application and proposed court order for a subpoena *duces tecum* to obtain records of calls from Ericka Dockery's home phone. Det. McDaniel explained that the records had already been provided and described what they contained:
>
> > I was hoping that it would clearly refute Erica's [sic.] claim that she received a call at work (residence on Hartwick street) from Doby [Alfred Brown] at about

> 10:00 a.m. or so from her apartment, thereby putting him at the apartment as an alibi as the nephew claims. But, it looks like the call detail records from the apartment shows that the home phone dialed Erica's place of employment on Hartwick Street at about 8:30 a.m. and again at 10:08 a.m. Erica claimed that the caller identification at the Hartwick house showed the apartment.
>
> In the email, Det. McDaniel flagged a citation in the attached documents (the subpoena application and proposed order) and asked ADA Rizzo to confirm that it was correct. Two days later, ADA Rizzo filed an application and form of order that was identical to the draft sent by Det. McDaniel except that the citation flagged in the email had been corrected on both the application for the phone records and the proposed order.
>
> The State, through Harris County District Attorney Kim Ogg, has acknowledged the email suggests "that well before Brown's trial, Rizzo was informed about the existence of the records, yet failed to disclose them to the defense counsel or the jury."

(Docket Entry No. 74 at 68-69) (citations omitted).

During Brown's successive state habeas proceedings, Detective McDaniel "was subpoenaed by Brown's counsel to testify at a hearing regarding phone records" and 'volunteered that he might have some materials from the case in a box stored in his home garage." (Docket Entry No. 74 at 84). A search of the box revealed "Ericka Dockery's landline phone records" which verified that someone made a phone call from Dockery's apartment to her place of employment. *Id.* at 84. The prosecution had not turned the phone records over to Brown or his co-defendants. On that record, the Court of Criminal Appeals vacated Brown's

conviction and sentence, specifically based on a claim that the State had suppressed evidence.  The Court of Criminal Appeals remanded the case to the trial court for a new trial. *Ex parte Brown*, 2014 WL 5745499, at *1 (Tex. Crim. App. 2014).

In 2015, the Harris County District Attorney's moved to dismiss the charges against Brown.  Brown was released from prison.  During proceedings for compensation under Texas' Tim Cole Act, Tex.' Civ. Prac. & Rem. Code § 103.001, et seq,[3] the Harris County District Attorney ordered an independent investigation into Brown's claim of actual innocence.  "In March 2019, the investigation report concluded that by clear and convincing evidence, no reasonable juror would fail to have a reasonable doubt about whether Brown is guilty of murder." *Brown v. City of Houston, Texas*, 538 F.Supp.3d 725, 728 (S.D. Tex. 2021) (citation omitted and cleaned up).  Brown received state compensation for his conviction. *See Brown v. City of Houston*, 660 S.W.3d 749, 750 (Tex. 2023).

---

[3]      Under Tim Cole Act, a person who was incarcerated under state law may receive lump-sum compensation and other benefits if that person: (a) "received a full pardon on the basis of innocence"; (b) was granted habeas corpus relief "based on a court finding or determination that the person is actually innocent of the crime for which the person was sentenced"; or (c) was granted habeas corpus relief and the state court dismissed the charge against the person "based on a motion to dismiss in which the state's attorney states that no credible evidence exists that inculpates the [person]" and "that the state's attorney believes that the [person] is actually innocent." Tex. Civ. Prac. & Rem. Code § 103.001(a).

## V.    The Court of Criminal Appeals' Decision on Successive Review

Joubert's successive state habeas application alleged that the State suppressed evidence and presented false testimony relating to Brown's involvement in the ACE robbery. After extensive proceedings, the lower habeas court signed Joubert's proposed findings and conclusions which recommended that the Court of Criminal Appeals grant habeas relief. (Docket Entry No. 94-3 at 5-73). Joubert treats that recommendation as binding on this Court.

As previously mentioned, the trial court only serves as a preliminary factfinder under Texas law. When it adopts the lower court's findings, they become as if the Court of Criminal Appeals made them. When the Court of Criminal Appeals rejects a lower court's findings, they are unwritten from the state decision. *See Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008) ("[A] state habeas trial court's factual findings do not survive review by the [appellate court] where they were neither adopted nor incorporated into the appellate court's peremptory denial of relief, but instead were directly inconsistent with the appellate court's decision.").

Here, the Court of Criminal Appeals did not adopt the lower court's findings and conclusions, but explicitly rejected them. The Court of Criminal Appeals acknowledged the lower court's findings, but then stated that it "disagree[d]" with them. (Docket Entry No. 94-6 at 4). Thus, the lower court's recommendation,

findings, and conclusions did not survive appellate review. *See Micheaux v. Collins*, 944 F.2d 231, 232 (5th Cir. 1991) (finding that a federal court is not bound by the lower court's recommendation when "[n]ot only were the 'proposed findings' not adopted nor incorporated in the action of the Texas Court of Criminal Appeals, they are directly inconsistent with that court's peremptory denial of relief.").

The Court of Criminal Appeals' opinion addressed Joubert's claims concisely. The Court of Criminal Appeals, "[b]ased upon [its] review, . . . den[ied] relief" on two claims it had remanded to the lower court. (Docket Entry No. 94-6 at 5). The Court of Criminal Appeals also found that the other claims raised in Joubert's successive state habeas application failed to meet the requirements of Texas law and, without considering the merits of the claims, dismissed them as an abuse of the writ.

## VI.   Joubert's Second Amended Federal Petition

The Court reopened this case on August 4, 2021. (Docket Entry No. 62). Joubert again amended his federal petition which now raised ten constitutional claims. As described in second amended petition, Joubert claims:

1.  Under the Eighth and Fourteenth Amendments, the State's use of false and misleading testimony to convict Joubert and sentence him to death invalidates the judgment. (Docket Entry No. 74 at 44-77).

2.    The judgment imposed on Joubert is invalid under the Eighth and Fourteenth Amendments due to the State's suppression of evidence favorable to the defense and material to the verdicts. (Docket Entry No. 74 at 77-93).

3.    The judgment imposed on Joubert is invalid under the Eighth and Fourteenth Amendments because the prosecutor impermissibly vouched for and bolstered the testimony of the State's star witness. (Docket Entry No. 74 at 93-101).

4.    Joubert's conviction and sentence are invalid under the Eighth and Fourteenth Amendments due to the State's repeated and egregious misconduct before, during and after the trial. (Docket Entry No. 74 at 102-21).

5.    Joubert was denied his right to a reliable sentence and due process under law when the State called A. P. Merillat, who presented false and misleading testimony about the conditions of confinement in the Texas Department of Criminal Justice. (Docket Entry No. 74 at 121-36).

6.    The State imposed a death sentence on Joubert in violation of the Sixth Amendment right to effective assistance of counsel. (Docket Entry No. 74 at 137-65).

7.    The State imposed a capital murder conviction and death sentence on Joubert in violation of the Sixth Amendment right to effective assistance of counsel. (Docket Entry No. 74 at 165-73).

8.    The State imposed a death sentence on Joubert in violation of the Sixth Amendment right to effective assistance of counsel due to appellate counsel's failure to challenge on direct appeal the trial court's exclusion of relevant mitigation evidence. (Docket Entry No. 74 at 173-91).

9.    Joubert's constitutional rights were violated with the trial court prevented him from presenting mitigation evidence. (Docket Entry No. 74 at 191-96).

10.  The State imposed a capital murder conviction and death sentence on Joubert in violation of the Eighth and Fourteenth Amendments because the evidence presented at trial was insufficient to support the verdicts. (Docket Entry No. 74 at 196-202).

Respondent has submitted an answer which argues that procedural and substantive law bars federal habeas relief. (Docket Entry No. 83). Respondent's Answer sufficiently complies with all requirements of the federal rules. Joubert has filed a lengthy reply to the answer. (Docket Entry No. 102). Joubert's reply, however, raised various issues for the first time in this litigation. At the Court's invitation (Docket Entry No. 103), Respondent has submitted additional briefing. (Docket Entry No. 108). This case is now ripe for adjudication.

## LEGAL STANDARDS

Honoring principles of comity and federalism, Congress enacted AEDPA "to impose significant limits on the discretion of federal courts to grant habeas relief." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998); *see also Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (observing that the courts have "adjust[ed] the scope of the writ in accordance with equitable and prudential considerations"). Federal habeas review is limited in scope and secondary to the state court process. States "hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982); *see also Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (explaining that federalism guarantees the States "an initial

opportunity to pass upon and correct alleged violations of its prisoners' federal rights." (cleaned up)).

The Anti-Terrorism and Effective Death Penalty Act provides for a deferential federal review.[4]   Under AEDPA's rigorous requirements, a federal court reviews "[c]laims presenting questions of law" under Section 2254(d)(1). *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023).  That provision "is . . . divided into two categories: the 'contrary to' standard, and the "unreasonable application" standard."  *Id.*  An inmate may only secure relief after showing that the state court's rejection of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2).[5]

---

[4]    Under a heading entitled "Texas Relies on Unconstitutional Statutory and Judicially Created Constraints on the Habeas Privilege for State Prisoners," Joubert's Reply contains over fifty pages which challenge the constitutionality of AEDPA and many principles of modern habeas practice.   Joubert's extensive briefing ignores the quarter century of federal precedent confirming the constitutionality of AEDPA, and asks this Court to return the habeas writ to its understanding when "created in 1867." (Docket Entry No. 102 at 3). Judicial economy favors the summary rejection of arguments which run contrary to firmly established and prevailing law.  Respondent has provided an extensive refutation of Joubert's groundless arguments and has demonstrated the complete lack of constitutional support for Joubert's excessive briefing on this point. (Docket Entry No. 108 at 12-36).   Joubert's baseless attack on the current state of habeas law is not helpful and not worthy of serious discussion.

[5]    AEDPA requires an inmate to show that "the adjudication of the claim" resulted "in a decision" that "was contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d). Fifth Circuit law has long focused the AEDPA analysis on "the state court's actual decision, not the written opinion on which it is based."  *See Green v. Thaler*, 699 F.3d 404, 414 (5th Cir. 2012); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002); *see also Brown v. Davenport*, 596 U.S. 118,

In performing the AEDPA review, a federal court generally cannot "develop and consider new evidence." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022). AEDPA limits "review of factual determinations under § 2254(d)(2)" to "'the evidence presented in the State court proceeding,'" and "review of legal claims under § 2254(d)(1) . . . 'to the record that was before the state court.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "A federal court may admit new evidence only in two limited situations: Either the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme Court], or it must rely on 'a factual predicate that could not have

---

141 (2022) ("This Court has long stressed that the language of an opinion is not always to be parsed as though we were dealing with the language of a statute.") (quotation omitted and cleaned up). Concerns about the *Neal* decision have resulted after Supreme Court's decision in *Wilson v. Sellers*, —— U.S. ——, 138 S. Ct. 1188 (2018) which said that a federal court should "train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and . . . give appropriate deference to that decision." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (quotation omitted). The Fifth Circuit initially continued to follow *Neal* after the *Wilson* decision. *See see also Russell v. Denmark*, 68 F.4th 252, 262 (5th Cir. 2023). The Fifth Circuit has "observe[d], without deciding, that it is far from certain that *Wilson* overruled sub silentio the position—held by most of the courts of appeals—that a habeas court must defer to a state court's ultimate ruling rather than to its specific reasoning." *Sheppard v. Davis*, 967 F.3d 458, 468 n.5 (5th Cir. 2020); *see also Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019) (qualifying *Wilson*). A Fifth Circuit panel, however, recently considered "the possible tension between *Wilson* and *Neal*" and held that "*Wilson* requires us to look to the state court's reasoning, meaning we cannot follow *Neal*'s instruction to look only to the state court's conclusion." *Wooten v. Lumpkin*, 2024 WL 3964354, at *3 (5th Cir. 2024). After *Wilson* and *Wooten*, when the Court of Criminal Appeals provides reasoning for its decision, a federal habeas court must "'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims.'" *See Wooten*, 2024 WL 3964354, at *2 (quoting *Wilson*, 584 U.S. at 125).

been previously discovered through the exercise of due diligence.'" *Twyford*, 596 U.S. at 812 (quoting 28 U.S.C. § 2254(e)(2)(A)).

Claims presenting questions of fact are reviewed under two sections of AEDPA. First, a federal habeas court presumes the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit."). Second, a petitioner must show that the state court's ultimate decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)." *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023).

Under 28 U.S.C. § 2254(b)(1), a federal habeas petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  The exhaustion doctrine precludes federal consideration of any claim raised for the first time in federal court.  As a corollary to exhaustion, the procedural-bar doctrine prescribes that "federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392 (2004).  "That rule procedurally bars federal habeas petitions where 'the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar.'" *Mullis v. Lumpkin*, 47 F.4th 380, 387 (5th Cir. 2022) (quoting *Gonzales v. Davis*, 924 F.3d 236, 243 (5th Cir. 2019)).  For example, a Texas state court's decision to dismiss a habeas petition on the grounds that the petition represented a successive petition and the abuse of the writ would represent "an independent and adequate state ground" that would trigger the procedural-bar doctrine in any federal habeas petition containing the same claims. *Gutierrez v. Stephens*, 590 Fed. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).

A petitioner bears the burden to overcome any applicable procedural bar. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).  A petitioner meets this burden by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has

probably resulted in the conviction of one who is actually innocent.'" *Haley*, 541 U.S. at 393 (cleaned up).

Before turning to Joubert's claims for relief, the Court pauses to discuss his litigation strategy in this case. Joubert's pleadings propose a course of review that runs contrary to Congressional intent and long-established practice. Joubert labels this the "pleading" stage of habeas review, which he anticipates will be followed by "fact-development procedures." (Docket Entry No. 74 at 54). Joubert believes that, at this stage, he "does not have the burden to prove that § 2254(d)'s bar is inapplicable or satisfied." *Id.* at 56. Instead, Joubert faults Respondent for not sufficiently showing that he has not met the AEDPA standard. Joubert presumes that this Court should now "conduct an evidentiary hearing" and "[a]llow [him] to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by his Petition." *Id.* at 203.

Federal habeas law and practice proceeds in manner different from Joubert's proposed course of litigation. The Supreme Court has plainly stated that "[t]he petitioner carries the burden of proof" under 2254(d). *Pinholster*, 563 U.S. at 181.[6] It is unclear when—if ever—Joubert believes a federal court should decide

---

[6]   *See also Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy . . . AEDPA."); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (stating that "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner"); *Cortez v. Davis*, 683 F. App'x 292, 295 (5th Cir. 2017) ("The burden of proof is on the petitioner seeking relief.")

whether he has met his burden under AEDPA. Instead of complying with his burden, Joubert claims that "Texas . . . failed to prove its assertion that the state decision is objectively reasonable." (Docket Entry No. 102 at 43) (quotation omitted and cleaned up). Joubert is the one who must meet the AEDPA standard.

Congress intended AEDPA "to eliminate delays in the federal habeas review process," *Holland v. Florida*, 560 U.S. 631, 648 (2010), but Joubert's proposed course of litigation inserts unnecessary delay into the process. Joubert invoked federal jurisdiction over a decade ago. Through repeated amendments of his federal petition and the submission of a lengthy reply, Joubert has enjoyed a full and fair opportunity to shoulder his AEDPA burden. "Under long-standing practice in this circuit, a petitioner is expected to have complied with AEDPA's demanding requirements after he has filed a petition and submitted a reply . . . ." *Thuesen v. Lumpkin*, 2024 WL 1468366, at \*13 (S.D. Tex. 2024). Extending these proceedings beyond the established pattern in habeas cases runs directly contrary to "the principles of comity, finality, and federalism" enshrined in AEDPA. *Williams v. Taylor*, 529 U.S. 420, 436 (2000). The time for Joubert to make his case has passed. Relief is now only available to him if he has met his AEDPA burden.

## ANALYSIS

The Court will consider Joubert's claims using the standards laid out above. Many of Joubert's federal habeas claims require an assessment of the evidence supporting his conviction. Addressing Joubert's sufficiency-of-the evidence claim first sets the foundation for adjudicating his other constitutional claims.[7] In the interests of economy, the Court will address Joubert's insufficiency-of-the-evidence claim before discussing his other ones.

## I.   Sufficiency of the Evidence (claim ten)

Joubert alleges that "the evidence presented at trial was insufficient to support" his "capital murder conviction and death sentence . . . ." (Docket Entry No. 74 at 196).[8]   Joubert exhausted this claim on direct appeal.   There, Joubert raised two separate arguments relating to the sufficiency of the evidence: (1) "Glaspie's testimony, as accomplice-witness testimony, was not sufficiently corroborated to support [his] conviction as a principal" and (2) "Glaspie's testimony was insufficiently corroborated to support his conviction under a parties

---

[7]    The Court, however, stresses that it does not import the sufficiency-of-the-evidence standard itself into Joubert's other constitutional claims.   Insufficiency claims differ fundamentally from the other arguments, such as the false-testimony or suppression claim.   The Court discusses Joubert's tenth claim first to reduce repeating the evidence supporting the State's theory that he acted as a principal actor, party, or conspirator to the offense.

[8]    In the heading to this claim, Joubert says that the State presented insufficient evidence to support his death sentence, but his subsequent briefing does not address that argument.   Joubert has insufficiently briefed any argument that the evidence did not justify the jury's answers to the special issue questions.

theory." *Joubert*, 235 S.W.3d at 731. The Court of Criminal Appeals rejected both arguments when Joubert raised them on direct review. Joubert must show that the state-court decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## A. *Jackson* Standard

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's conviction if, considering all the evidence in a light most favorable to the prosecution, any rational trier of fact could have returned a verdict unfavorable to the defendant. This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict. *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990). In assessing the sufficiency of the evidence, "federal habeas courts should independently analyze the governing statute, the indictment, and the jury charge to measure the constitutional sufficiency of the evidence and determine what are the essential elements required by the *Jackson* sufficiency inquiry." *Bledsue v. Johnson*, 188 F.3d 250, 260 (5th Cir. 1999). The federal constitutional issue in this case is "whether the evidence was constitutionally sufficient to convict [petitioner] of the crime charged." *Id.* at 262 (quoting *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991)).

A federal court's *Jackson* analysis, however, is "limited to a review of the record evidence presented at trial." *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991). To the extent that an inmate presents evidence outside the trial record—as Joubert does in this case—a court only reviews the evidence as it was before trial jurors. The constitutional question focuses on the evidence at trial and whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *See Jackson*, 443 U.S. at 324-25.

AEDPA augments the deferential *Jackson* analysis, creating an enhanced barrier to federal habeas relief. *See Coleman v. Jackson*, 566 U.S. 650, 651 (2012); *Perez v. Cain*, 529 F.3d 588, 599 (5th Cir. 2008). Together, *Jackson* and AEDPA create a "double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011). A federal habeas court focuses only on whether the state court reasonably applied the *Jackson* standard.

## B.   Corroboration of Witness Testimony

The State argued that jurors could convict Joubert as the principal actor, as a party, or as a conspirator. The fact that Joubert was involved in the ACE store robbery/murder was not seriously in dispute. The only question for jurors was what role Joubert played in the crime. The only accounts of what happened inside the ACE store came from Joubert's own police statement and his accomplice

Glaspie's trial testimony.  While the stories told by both men harmonized on various points, they differed on who shot Ms. Jones.

In his first insufficiency-of-the-evidence argument, Joubert alleges that the State did not sufficiently corroborate Glaspie's testimony.  Texas' accomplice-witness rule, codified in Article 38.14 of the Texas Code of Criminal Procedure, prohibits a conviction "upon the testimony of an accomplice unless [it is] corroborated by other evidence tending to connect the defendant with the offense committed  .  .  .  ."  Texas law does not place a strict requirement on the admissibility of accomplice-witness testimony.  Texas law only requires some non-accomplice testimony or other evidence which "connect the accused to the offense."  *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016).

Joubert strays far beyond *Jackson*'s constitutional underpinnings in asking for federal habeas relief on an alleged failure to corroborate Glaspie's testimony. The Supreme Court has based its *Jackson* jurisprudence on a discrete premise: "The Constitution prohibits the criminal *conviction* of any person except upon proof of guilt beyond a reasonable doubt."  *Jackson*, 443 U.S. at 309 (emphasis added).  "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,'" not other evidentiary requirements.  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 324 n. 16).

Compliance with Texas' accomplice-witness rule is not an element of capital murder, nor is it enforced under a reasonable-doubt standard. Instead, the accomplice-witness corroboration rule is solely a creation of state law. *See Thompson v. State*, 691 S.W.2d 627, 634 (Tex. Crim. App. 1984) ("[T]he accomplice witness rule set out in Art[icle] 38.14 . . . is not constitutionally mandated, and therefore, it is up to the legislature to expand or restrict its scope."). Accordingly, "the Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence." *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991); *see also Clay v. Cockrell*, No. 02-20183, 2002 WL 31017137 at *5 (5th Cir. Aug. 20, 2002). "[T]he prosecution's failure to satisfy the requirements of the accomplice-witness sufficiency rule, and a state court's failure to enforce that purely state rule, simply [does] not warrant constitutional attention." *See Brown*, 937 F.2d at 182 n.12.

On that basis, Respondent argues that the accomplice-witness rule is not a concern in a federal sufficiency-of-the-evidence claim. (Docket Entry No. 83 at 200). Joubert does not provide any response to that argument, but rests entirely on the arguments in his petition. (Docket Entry No. 102 at 205). Joubert has not shown any constitutional violation based on his accomplice-witness arguments.[9]

---

[9]    **Error! Main Document Only.**Even if this claim sounds under the federal constitution, Joubert has not shown that it merits relief. The *Jackson* standard requires a reviewing court to consider "all the evidence" before the jury and do so in "the light most

## C.    Conviction as a Principal, Party, or Conspirator

Joubert also says that the evidence at trial was insufficient to convict him as the principal actor or as a party.  Joubert has not shown that the evidence was insufficient to sustain his conviction.

### 1.    Texas Law

The State of Texas sought Joubert's conviction as the principal actor, but also sought a capital-murder conviction whether or not he shot any of the victims. Texas law provides two avenues for the capital conviction of the non-triggerman. First, a non-triggerman may be convicted of capital murder under Texas' law-of-parties when, "if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."  Tex. Penal Code § 7.02(a)(2).  "In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the

---

favorable to the verdict . . . ."  *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).  The Court of Criminal Appeals observed that "[a]ll that is required is that there is some non-accomplice evidence *tending to connect* the defendant to the offense."  *Joubert*, 235 S.W.3d at 731.  The Court of Criminal Appeals rejected this claim because Joubert's confession "adequately corroborated Glaspie's account" because Joubert "admitted to participating in the instant offense" which "tend[ed] to connect" him to the murders.  *Id.* Joubert's confession was self-serving and minimized his involvement, yet his "admission that he participated in the crime, although he denied being a shooter, is enough to tend to connect him to the offense."  *Id.*  Otherwise, in a light most favorable to the prosecution, the evidence was sufficient to allow for his conviction as a principal.  Joubert has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

defendant which show an understanding and common design to do the prohibited act." *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985).

Second, under Texas Penal Code § 7.02(b) co-conspirators are responsible for each other's actions:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The jury instructions provided a broad basis for Joubert's conviction as the principal actor, a party, or a conspirator. Under the instructions, the jury could find Joubert guilty if he:

(1) intentionally killed Jones by shooting her while in the course of robbing or attempting to rob her;

(2) promoted or assisted Glaspie, Brown, or both in the intentional shooting death of Jones during the course of a robbery or attempted robbery;

(3) engaged in a conspiracy with Glaspie, Brown, or both to rob Jones and either of them, or both, intentionally and foreseeably killed her;

(4) intentionally shot and killed Jones and Officer Clark in the same criminal transaction;

(5) promoted or assisted Glaspie, Brown, or both in shooting and killing of Jones and Officer Clark in the same criminal transaction; or

(6)     engaged in a conspiracy with Glaspie, Brown, or both, to rob
        Jones and either of them, or both, intentionally and foreseeably
        killed Jones and Officer Clark in the same criminal transaction.

(Docket Entry No. 83 at 39-40) (citing Docket Entry No. 87-2 at 67-69).

The law allows jurors to return a general verdict. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("[A] general jury verdict [is] valid so long as it was legally supportable on one of the submitted grounds . . . ."); *see also Schad v. Arizona*, 501 U.S. 624, 632 (1991). Here, the jury's general verdict meant that it could have based Joubert's conviction on any theory pleaded in the indictment. "If the evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict." *United States v. Garza–Robles*, 627 F.3d 161, 166 (5th Cir. 2010). Joubert's capital conviction will stand if the evidence supports any of the capital crimes authorized by the jury instructions. As discussed below, the jury had sufficient evidence to convict him under all submitted theories.

## 2.     *Sufficient Evidence as a Principal*

No forensic evidence or eyewitness testimony established who killed which victim. Joubert's participation in the ACE robbery was undisputed. Joubert and Glaspie provided different versions of Ms. Jones' murder. Joubert argues that "[b]esides Glaspie's testimony inculpating his co-defendant, the record is devoid of evidence that Joubert shot Alfredia Jones." (Docket Entry No. 74 at 200).

35

The State provided jurors a vehicle to convict Joubert as the principal based on Glaspie's testimony. The *Jackson* standard, and particularly when buttressed by the AEDPA's deferential scheme, requires reviewing courts to resolve all inferences in favor of the jury's verdict. *See Cavazos v. Smith*, 565 U.S. 1, 7 (2011). Glaspie's account which blamed Joubert for shooting Ms. Jones was a sufficient basis to support his conviction beyond a reasonable doubt.

### 3.   *Sufficient Evidence as the Non-Triggerman*

While Glaspie's testimony allowed for Joubert's conviction as a principal actor, the State encouraged jurors to find him guilty as a party or a conspirator. Joubert misstates the record by saying that the State only mentioned "in passing that [he] could be convicted under a theory of party liability . . ." (Docket Entry No. 74 at 74). Far from only mentioning the issue "in passing," the prosecution told jurors that "[t]he law of parties, law of conspiracy, inculpates all three of these suspects." (Docket Entry No. 89-6 at 18); *see also* Docket Entry No. 83 at 59-61 (listing times when the prosecutor encouraged jurors to find Joubert guilty as a party). The State's discussion of party and conspirator liability spans numerous pages of the state court record. (Docket Entry No. 89-6 at 19-25).[10]   Throughout its argument, the State repeatedly encouraged jurors to find Joubert guilty even if

---

[10]     In the paragraphs that follow, the Court discusses the opening and closing arguments of counsel. Arguments are not evidence, but the Court views the arguments as a useful framework for summarizing the evidence before the jury, particularly that supporting the State's argument that Joubert was a party or conspirator to the crime.

he was not the triggerman.  In essence, the State assured jurors that "[u]nder the law of parties [or] the law of conspiracy, you don't have to resolve the issue of who the shooter was." *Id.* at 26.

The prosecutor's closing extensively encouraged jurors to find Joubert guilty as a party. *Id.* at 19-22.[11]  The prosecutor assured jurors that "Defendant wasn't merely present" at the crime, "he was involved. Did he have the intent to promote or assist in the commission of this offense?  . . .  [T]his offense was committed because of him. He initiated this offense." *Id.* at 21.  The prosecutor emphasized that, by his own confession, Joubert was the one who approached Ms. Jones outside the store and "walk[ed] her in" when committing the robbery. *Id.* at 21. Referencing the law of parties, the prosecutor asked: "Did he intend to promote or assist in the commission of the offense?  Yeah, he got the ball rolling.  He got in the door with her.  He got in the back with her.  He's the one that gave them the gateway to commit the offense." *Id.* at 22.  The prosecutor argued that Joubert "bears sole responsibility for . . . get[ting] the whole ball of wax rolling." *Id.* at 23.

---

[11]     From the start of the trial, jurors knew that the State would seek Joubert's conviction as the non-triggerman.  The prosecutor told jurors in opening arguments that, even though he did not tell the truth in his confession, Joubert "makes himself guilty as a party to the capital murder." (Docket Entry No. 89-1 at 45).  In fact, the prosecutor told jurors that, "based on his statement alone, . . . he's guilty of capital murder as a party, as a non-shooter." *See also* Docket Entry No. 89-1 at 50 ("[B]ased on the Defendant's own statement that you're going to hear, he's going to be guilty of capital murder as a party, as a non-shooter[.]").

Knowing that jurors might disbelieve Glaspie's testimony that Joubert shot Ms. Jones, prosecutors argued that they did not "need[] [Glaspie] to prove this case. We really didn't. We had the Defendant guilty of capital murder." *Id.* at 117. The State told jurors that "who the shooter was . . . is not a dispositive issue. Let me say that again. Who shot Ms. Jones and shot [Officer] Clark today is not a dispositive issue." *Id.* at 15-16. Which of the men shot the victims "in the end it makes no difference . . . because [Joubert] still can be held criminally responsible for this offense. He is involved in this capital murder. He bears responsibility for those deaths." *Id.* at 25. The State argued that Joubert's own police statement established his active involvement in planning and committing the crime. Joubert's confession to confronting Ms. Jones, taking her into the store while demanding money from her, and holding her sufficiently shows that he promoted or assisted in the offense. Taking into account the whole of the evidence, and most particularly Joubert's own confession, the evidence was sufficient to support his conviction as a party.

Joubert's federal insufficiency-of-the-evidence claim does not specifically challenge his conviction as a conspirator. Joubert admitted that he was an active participant in planning and committing the robbery. Joubert's own confession

indicates that he could foresee that the robbery could end in murder.[12]   The

evidence sufficiently supported Joubert's conviction as a conspirator to capital

murder.

Thus, in light of the evidence placed before jurors and with particular

emphasis on Joubert's own words, the Court of Criminal Appeals was not

unreasonable in rejecting his argument that insufficient evidence supported his

conviction.  The Court denies Joubert's tenth claim.

## II.    False and Misleading Testimony (claim one)

In his first ground for relief, Joubert argues that "[u]nder the Eighth and

Fourteenth Amendments, the State's use of false and misleading testimony to

convict [him] and sentence him to death invalidates the judgment." (Docket Entry

---

[12]    The prosecution argued that the evidence easily proved that the three men had conspired to commit the crime:

> You've got to ask yourself: Did these guys these three guys . . . possess the intent to go out and commit a felony of robbery[?]  We know they did.  We know they did commit one at the ACE Cash America Store.  We know they tried to do one earlier when they were confronted by [a man] and his weapon.  We know clearly that's what was on the state of mind of these three suspects on that morning.  So they had an agreement to commit an offense.

(Docket Entry No. 89-6 at 24).  The prosecutor argued that "the deaths of Ms. Jones and Officer Clark [were] done in the furtherance of that conspiracy" because the assailants were "trying to get away with this, that's why they killed these two people."  *Id.* at 25.  The prosecutor emphasized that Joubert said in his confession that he knew Ms. Jones would die.  In his police statement, Joubert explained that he knew that, as a result of the conspiracy, Ms. Jones could die: ". . . I'm already knowing if some laws show up what's fixin' to happen to her.  I'm already knowing. . . .  [T]hat's why I was trying to tell her, "Give it up," because if the laws come she, she gonna die . . . ."  (Docket Entry No. 93-3 at 4).

No. 74 at 44-77). Joubert's allegations of false and misleading testimony center on co-defendant Alfred Brown's alleged role in the crime. All evidence at the time of Joubert's trial—including Joubert's own confession—pointed toward Brown's involvement. Joubert now claims that the evidence which ultimately led to Brown's exoneration means that the State·presented false testimony in his own trial.

The Supreme Court has held that a conviction obtained through false testimony or evidence, "known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A false-testimony claim requires a petitioner to show that: (1) the witness testimony was actually false; (2) the prosecution knew or should have known that the testimony was false; and (3) the testimony was material. *See Giglio v. United States*, 450 U.S. 150, 153-54 (1972). False testimony is material if "there is any reasonable likelihood that [it] could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Giglio*, 405 U.S. at 154). A petitioner must meet all three prongs of the *Napue* analysis. Failure to meet one of the *Napue* prongs makes it unnecessary for a court to consider the other elements of the constitutional test.

For the reasons discussed below, the Court finds that Joubert has not met his burden of showing that the Court of Criminal Appeals' decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## A.   Joubert's *Napue* Claim

Based on the events in Brown's case, Joubert claims that "the State knowingly presented false and misleading testimony that (1) Alfred Brown participated in the robbery of the ACE check-cashing store and (2) the State's star witness, Dashan Glaspie was being truthful, offering false assurances that Glaspie's plea agreement required that his testimony be 100% truthful." (Docket Entry No. 74 at 63). Other than the State's "main (and essential) witness Dashan Glaspie," Joubert also lists "no less than five witnesses that led the jury to believe that Alfred Brown participated in the capital offense":

- "LaTonya Hubbard falsely testified for the prosecution that she saw Brown with Joubert and Glaspie at a gas station on the morning of the robbery."

- "Alisha Hubbard also falsely testified for the State that she saw Brown with Joubert and Glaspie that morning."

- "The State presented false testimony from Shoukat Hussein that Brown and Glaspie were together in the furniture store where Mr. Hussein worked the morning of the robbery."

- "Sheikah Mohammed Afzal also falsely testified for the State that he saw Brown in the furniture store that morning."

- "Lamarcus Colar falsely testified for the State that he saw Brown with Glaspie the morning of the robbery."[13]

- Detective Breck McDaniel "falsely represented to the jury that Brown called Glaspie on the phone between 8:45 a.m. and 10:54 a.m. that morning. Through Det. McDaniel, the State knowingly gave jurors the false impression that cell phone records linked Brown, Joubert, and Glaspie 'and placed Joubert at the scene of the crime.'"

*Id.*

The jury heard only two accounts of what transpired inside the ACE store—Glaspie's trial testimony and Joubert's police statement. Glaspie and Joubert blamed each other for shooting Ms. Jones. Nevertheless, the co-perpetrators' accounts harmonized on several points, such as attributing Officer Clark's murder to Brown. Joubert now argues that testimony about Brown's role in the crime should result in federal habeas relief both from his own capital conviction and his death sentence.

## B.   State Court Adjudication

Joubert raised this claim in his successive state habeas application. (Docket Entry No. 92-1 at 54). The lower habeas court recommended that the Court of

---

[13]    Joubert's pleadings provide incorrect information about Colar's role in the trial. Contrary to Joubert's pleadings, Colar did not "testif[y] *for the State* that he saw Brown with Glaspie the morning of the robbery." (Docket Entry No. 74 at 66) (emphasis added). Colar did not " testif[y] in Brown's trial *but not Joubert's* that Brown was with Glaspie and Joubert immediately after the murders." (Docket Entry No. 102 at 119) (emphasis added). In reality, the defense called Colar as a witness. The defense itself brought out testimony from Colar that Brown was in the company of Joubert and Glaspie on the morning of the murder. (Docket Entry No. 89-5 at 42-43, 45, 55). Joubert does not explain why he blames the State for testimony he adduced at trial.

Criminal Appeals grant relief on this claim. The Court of Criminal Appeals'
"disagree[ment]" and failure to adopt that recommendation means that it did not
survive appellate review. The Court of Criminal Appeals denied relief based on its
own examination. *Joubert*, 2021 WL 2560170, at *2.

The Court of Criminal Appeals did not provide extensive reasoning when
rejecting Joubert's *Napue* claim. The Court of Criminal Appeals' brief discussion
of the *Napue* claim followed its resolution of Joubert's related *Brady* claim. With
regard to the *Brady* claim, the Court of Criminal Appeals observed:

> The State presented evidence that three people participated in the
> instant offense. Glaspie and [Joubert] both named Brown as the third
> participant, but the true identity of the third participant does not
> ultimately matter in light of [Joubert's] own statement to police.
> [Joubert] admitted that he actively participated in the offense and he
> knew Jones was "gonna die" if the police came to the scene.
> Therefore, the suppressed evidence supporting Brown's alibi does not
> undermine our confidence in the outcome of [Joubert's] trial.

(Docket Entry No. 94-5 at 4-5). The Court of Criminal Appeals then turned to
Joubert's *Napue* claim:

> With regard to [Joubert's] *Napue* claim, [he] must show by a
> preponderance of the evidence that (1) false testimony was presented
> at his trial and (2) the false testimony was material to the jury's
> verdict. *See Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim.
> App. 2015), citing *Ex parte Weinstein*, 421 S.W.3d 656, 659, 665
> (Tex. Crim. App. 2014). We review *de novo* the ultimate legal
> conclusion of whether such testimony was "material." *See Weinstein*,
> 421 S.W.3d at 664.

> The State now concedes that Glaspie falsely testified at [Joubert's]
> trial about Brown's participation in the instant offense. However, it is

not reasonably likely that Glaspie's false testimony about Brown's participation in the offense affected the judgment of the jury in [Joubert's] trial. *See id.* at 665 (holding that false testimony is "material" only if there is a "reasonable likelihood" that it affected the judgment of the jury). Based upon our own review, we deny relief on Claim[] One . . . .

(Docket Entry No. 94-5 at 4-5).[14]

## C.   AEDPA Review

Joubert argues that "[i]n at least two ways, each one individually sufficient, [the Court of Criminal Appeals'] decision was contrary to or involved an unreasonable application of Supreme Court precedent." (Docket Entry No. 102 at 147).   First, Joubert argues that the Court of Criminal Appeals "applied a materiality test that is more demanding than the requirements of the Supreme Court's precedent." *Id.* at 147.   Second, Joubert says that the state court "failed to

---

[14]   Joubert, however, contends that the state court decision does not amount to an adjudication on the merits, particularly regarding the falsity and knowledge components of the *Napue* analysis.   The Supreme Court recognizes a rebuttable presumption that, when an inmate fully and fairly presents a claim to the state courts, they have adjudicated it on the merits. *See Lucio v. Lumpkin*, 987 F.3d 451, 464 (5th Cir. 2021) (citing *Johnson v. Williams*, 568 U.S. 289, 298 (2013)).   AEDPA's adjudicated-on-the-merits language "refers solely to whether the state court reached a conclusion as to the substantive matter of a claim, as opposed to disposing of the matter for procedural reasons.   It does not speak to the quality of the process." *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001) (citations omitted); *see also Freeney v. Davis*, 737 F. App'x 198, 205 (5th Cir. 2018)).   Here, the Court of Criminal Appeals' brief decision only mentioned a portion of all the arguments Joubert made in his first ground for relief.   But section 2254(d) applies "when a 'claim,' not a component of one, has been adjudicated." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).   Joubert seems to accept that the Court of Criminal Appeals "reject[ed] . . . Joubert's claim on materiality alone . . . ." (Docket Entry No. 102 at 124).   An inmate's failure to meet any prong of the *Napue* analysis is a sufficient basis to deny relief.   The Court of Criminal Appeals adjudicated the merits of this claim.

consider the impact of Glaspie's false testimony about Brown in light of the record as a whole . . . . "  *Id.* at 147.  Neither of these arguments provides a basis for habeas relief.

1.    *Contrary to Federal Law*

A state-court decision is contrary to clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Joubert complains that the Court of Criminal Appeals applied an incorrect materiality standard when deciding his *Napue* claim.  Under an ordinary formulation of the materiality standard, an inmate must show "there is *any reasonable likelihood* that the false testimony *could have affected* the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added).    Joubert argues that the state court omitted an important component of the materiality standard by holding that "it is not reasonably likely that Glaspie's false testimony about Brown's participation in the offense *affected* the judgment of the jury in [Joubert's] trial." *Joubert*, 2021 WL 2560170, at *2 (emphasis added).  Joubert contends that the Court of Criminal Appeals' "omission of the words 'could have' from the test" is "a clear error of law that demanded more of a petitioner than the Supreme Court's prejudice standard, and it *never* inquired under the correct standard." (Docket Entry No. 102 at 149).

The state court issued a brief opinion which gives little insight into its full adjudicative reasoning. The Court of Criminal Appeals did not include the "could have" language when deciding the *Napue* claim. The Court of Criminal Appeals often uses the same articulation of the materiality test: "False testimony is material if there is a reasonable likelihood that the testimony affected [an inmate's] conviction or sentence." *Ex parte Thomas*, 2023 WL 7382706, at *1 (Tex. Crim. App. 2023).[15] This is apparently the first case in which a petitioner has alleged that the Texas language is contrary to federal law.

When reviewing a state-court decision, a federal court should be careful not to exhibit a "readiness to attribute error . . . ." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Instead, the federal courts employ a "presumption that state courts know and follow the law" and give their articulation of legal standards "the benefit of the doubt." *Id.* The Supreme Court has indicated that incomplete or inaccurate shorthand recitations of a constitutional standard do not warrant relief, if state court clearly understands the correct standard. *See Holland v. Jackson*, 542 U.S. 649, 654-55(2004); *Visciotti*, 537 U.S. at 22-24; *see also Charles v. Stephens*, 736 F.3d

---

[15] *See also Ex parte Escobar*, 676 S.W.3d 664, 668 (Tex. Crim. App. 2023); *Ex parte Thomas*, 2023 WL 7382706, at *1 (Tex. Crim. App. 2023); *Ex parte Dixon*, 2023 WL 4095154, at *3 (Tex. Crim. App. 2023); *Ex parte Gonzales*, 2023 WL 4003783, at *2 (Tex. Crim. App. 2023); *Ex parte Chaney*, 563 S.W.3d 239, 263 (Tex. Crim. App. 2018); *Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014); *Ex Parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

380, 392-93 (5th Cir. 2013) (omission of "reasonable probability" modifier in conclusion was not contrary to *Strickland*).  The question is whether the state court misunderstood governing law.  *See Charles*, 736 F.3d at 392-93; *Sussman v. Jenkins*, 636 F.3d 329, 359-60 (7th Cir. 2011).

The omission of the "could have" language from the materiality standard is not unfamiliar in the law.  Federal courts regularly recite the *Napue* materiality standard without using the "could have" language.  *See United States v. Nanda*, 728 F. App'x 401, 402 (5th Cir. 2018); *Devoe v. Davis*, 717 F. App'x 419, 427 (5th Cir. 2018); *United States v. Renzi*, 690 F. App'x 487, 490 (9th Cir. 2017); *United States v. Stanford*, 823 F.3d 814, 839 n.26 (5th Cir. 2016); *Brown v. Rudek*, 533 F. App'x 805, 806 (10th Cir. 2013); *Solomon v. Quarterman*, 213 F. App'x 294, 295 (5th Cir. 2007); *Dye v. Stender*, 208 F.3d 662, 667 (8th Cir. 2000); *Untied States v. Bueno-Sierra*, 99 F.3d 375, 380 (11th Cir. 1996); *Bonin v. Calderon*, 59 F.3d 815, 844 (9th Cir. 1995); *United States v. Duke*, 50 F.3d 571, 580 (8th Cir. 1995); *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994); *Depree v. Thomas*, 946 F.2d 784, 797 (11th Cir. 1991).[16]   In essence, the Court of Criminal Appeals' formulation of the materiality standard echoed that endorsed by federal courts.

---

[16]     In other cases, the Fifth Circuit has modified the language for the materiality standard, asking "[u]nder the proper materiality standard" whether 'it is not reasonably likely that [the] false testimony *would* have affected the jury's judgment." *Spence v. Johnson*, 80 F.3d 989, 1005 (5th Cir. 1996) (emphasis added); *see also Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *United States v. Ruiz-Mendoza*, 1995

Joubert's argument presupposes that there is some meaningful difference in asking whether there is a *reasonable likelihood* that false testimony *could have affected* the verdict and asking whether there is a *reasonable likelihood* that it *affected* the verdict. Joubert, however, does not clearly communicate how the state court's articulation of the standard resulted in an analysis different from that required by Supreme Court precedent.[17] The reasonable-likelihood language used by the state court frames the inquiry in probabilistic terms which already looks at whether any false testimony could have made a difference. Excluding the "could have" language from the standard does not impose a higher burden on an inmate. The effect of the recited standard is not "diametrically different," "opposite in

---

WL 696846, at *1 (5th Cir. 1995); *United States v. Joseph*, 1992 WL 352612, at *3 (5th Cir. 1992).

[17]     Supreme Court justices, in fact, have "noted that there [is] little, if any, difference" between *Napue* materiality using the "could have" language and a harmless-error standard which does not. *See United States v. Bagley*, 473 U.S. 667, 680 n. 9 (1985) (relying on *Chapman v. California*, 386 U.S. 18, 24 (1967)). The equivalent harmless-error standard under *Chapman* requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of *did not contribute* to the verdict obtained," suggesting that the "could have" language is not essential. *Chapman*, 386 U.S. at 24 (emphasis added). By way of comparison, the Supreme Court has enunciated the *Strickland* standard as being "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would have been* different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (emphasis added). The Fifth Circuit, however, has recited the *Strickland* standard as being whether "there is a reasonable probability *it made a difference* to the outcome of the proceeding," using language like that in this case. *Young v. Spinner*, 873 F.3d 282, 285 (5th Cir. 2017) (emphasis added); *see also Schillereff v. Davis*, 766 F. App'x 146, 154 (5th Cir. 2019); *King v. Davis*, 898 F.3d 600, 605 (5th Cir. 2018).

character or nature," and "mutually opposed" to clearly established Supreme Court precedent. *Williams*, 529 U.S. at 405-06.

In short, the Court finds that Joubert has not shown that the Court of Criminal Appeals' decision was contrary to federal law because it omitted the phrase "could have" from the legal standard.[18]

### 2.    *Unreasonable Application*

Federal habeas relief is only available if Joubert can show that the state habeas court unreasonably applied federal law.[19]   As previously discussed, the Court of Criminal Appeals' decision only discussed *Napue*'s materiality element.

---

[18]    Proving that the Court of Criminal Appeals' decision was contrary to federal law does not guarantee relief, it only removes the AEDPA standard and provides for *de novo* federal review.   The Court has reviewed Joubert's claim and would deny relief even under *de novo* review.

[19]    Joubert argues that he satisfies AEDPA's unreasonable-application requirement because the state court "failed to consider the impact of Glaspie's false testimony about Brown in light of the record as a whole . . . ." (Docket Entry No. 102 at 147). Joubert is correct that a court must evaluate materiality considering all of the evidence. *See Coulson v. Johnson*, 2001 WL 1013186, at *10 (5th Cir. 2001). The Court of Criminal Appeals' brief order gives little insight into what material it took into consideration when adjudicating this claim. Nothing suggests that the Court of Criminal Appeals neglected to consider the full trial record when addressing this claim. The fact that the Court of Criminal Appeals' terse decision did not address every argument he made does not deprive it of AEDPA deference. *See Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016) ("Reasonable jurists could not debate the federal district court's conclusion, despite the state court's not fully addressing Castillo's argument about the opening statement. State courts need not explain their habeas decisions to be entitled to AEDPA deference.").   "When reviewing a state habeas court's decision under AEDPA's deferential standard of review, we review 'only the ultimate legal determination by the state court—not every link in its reasoning.'" *Charles v. Stephens*, 736 F.3d 380, 387-88 (5th Cir. 2013) (quoting *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013)); *see also Green v. Thaler*, 699 F.3d 404, 414 (5th Cir. 2012).

Because AEDPA review "look[s] to the state court's reasoning," the Court assumes that the testimony about Brown's involvement in the crime was false and that the State knew it was false. *Wooten v. Lumpkin*, 2024 WL 3964354, at *3, ___ F. 4th ___ (5th Cir. 2024). This Court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). Under AEDPA's "highly deferential . . . standard" the Court can only grant relief if the decision was "objectively unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (citation omitted). As discussed below, the Court of Criminal Appeals' materiality decision was not unreasonable.

### a.   Differences between Brown and Joubert's cases

Before turning to Joubert's specific claim, the Court pauses to distinguish this case from the exoneration of his co-defendant Brown. Brown consistently maintained that he was not involved in the robbery/murder. Brown provided an alibi, but lacked the evidence to support it. When withheld evidence confirmed his alibi, the Court of Criminal Appeals vacated Brown's conviction based on a suppression-of-the-evidence claim. The Court of Criminal Appeals did not enter any decision or judgment relating to Glaspie's testimony at Brown's trial. The Harris County District Attorney's Office eventually dismissed all charges against Brown.

Brown's alibi evidence itself does not exculpate Joubert under the evidence as it was at trial—Joubert never had an alibi, never denied participating in the ACE store robbery, and never claimed to have been with Brown at the time of the robbery/murder. At trial, the defense admitted to Joubert's involvement and asked jurors to "find Mr. Joubert guilty of aggravated robbery." (Docket Entry No. 89-6 at 94). The trial's focus was on Joubert's actions, not Brown's. Brown's alleged involvement was a minor theme that did not approach the jury's primary concern: whether Joubert's actions inside the ACE store made him a principal actor, a party, or a conspirator.

One important way in which Joubert's case also differs from Brown's exoneration is that any allegedly false information about Brown did not only come from state actors. In Joubert's trial, information about Brown's involvement in the ACE robbery/murder came from four sources: (1) Glaspie's testimony; (2) the State's witnesses who saw Brown with Joubert and Glaspie before the murders; (3) Joubert's own police statement which provided explicit details about Brown's involvement in the crime; and (4) the defense's only trial witness who said that Brown was with the other men after the murder. Joubert's statement and his chosen defense, not just the State's witness, were also the source of information about Brown's alleged role in the crime.

Joubert himself blamed Brown for shooting Officer Clark. Joubert apparently knew the truth about the third man's identity during trial, but still called a witness who inculpated Brown. Joubert shares the blame for putting the allegedly false narrative about Brown's involvement before jurors. *See Thomas v. Douglas*, 2023 WL 7211292, at *5 (6th Cir. 2023) ("Thomas does not cite any Supreme Court authority that requires the prosecution to correct false testimony elicited by the defense."); *Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (finding that *Napue* does not stand for "[t]he proposition that defense counsel's knowledge of the truth is irrelevant").

Joubert provides no explanation for why he and Glaspie both cast blame on Brown. Joubert's arguments about false testimony allege that Glaspie lied—and by extension that Joubert himself lied—about Brown's participation in the crime.[20]

---

[20]    Joubert also makes a confusing argument that the State presented false testimony relating to "Glaspie's plea deal and [its] guarantees of his truthfulness." (Docket Entry No. 74 at 67). Joubert does not allege that Glaspie lied about the deal he received from the State. Instead, it appears that Joubert claims that any statements by the prosecution about Glaspie's deals or his testimony themselves amounted to false testimony. It is hornbook law, however, that statements by the parties are neither testimony nor evidence. *See United States v. Ganji*, 880 F.3d 760, 775 (5th Cir. 2008) ("[I]t is axiomatic that argument is not evidence."). Joubert's is, at its core, about prosecutorial misconduct, not false evidence or testimony. Even so, Joubert's own citations to the state court record indicate that when the State relied on Glaspie "truthfully" "about [his] role or any other role that's in this case and what happened," the State told jurors that "if [he] lie[d] about anything … then [he]'d be prosecuted for capital murder." (Docket Entry No. 102 at 106). The State reserved the right to prosecute Glaspie if he lied on the stand. Joubert has shown that Glaspie's testimony contained untruths, but he has not shown that the prosecutor necessarily lied in his statements before the jury. The Court will discuss the

It is now unclear whether Glaspie, Joubert, or some unknown third man shot Officer Clark. The most relevant question is how any false testimony could have impacted Joubert's liability in light of the jury instructions.

### b.   *What the jury had to decide in this case*

Joubert claims that the false testimony was prejudicial because it incorrectly proved that "Alfred Brown participated in the robbery" and was "the murderer of Officer Clark." (Docket Entry No. 74 at 65). Nothing in the charge required jurors to decide whether Brown was involved in the crime. Nothing in the jury instructions required them to specify whether Brown shot Officer Clark. True, the jury charge allowed for Joubert's conviction if he shot Ms. Jones. (Docket Entry No. 87-2 at 67). The State's arguments relied heavily on that theory and emphasized it, but did not do so exclusively. As extensively discussed above, the jury could convict Joubert for his actions as the triggerman, as a party, or as a conspirator. (Docket Entry No. 87-2 at 67-70).[21]

Joubert, nonetheless, says that the State only "suggested in passing" that the jury could convict him as a party. (Docket Entry No. 74 at 74). Accordingly, Joubert spends little time discussing how any false testimony impacted a party-

---

core of Joubert's complaints about the prosecutor's comments relating to Glaspie in his third ground for relief.

[21]   The Court reiterates that it does not import the sufficiency-of-the-evidence standard into its *Napue* analysis.

liability or conspiracy theory. As previously discussed, the State repeatedly and extensively discussed Joubert's culpability as a party or conspirator at trial. To argue otherwise misconstrues the trial record. The Court must decide whether the state court was reasonable in finding that any false testimony was not material under any of the possible theories for conviction.

            *c.*     *Did false testimony about Brown influence the jury's verdict?*

Joubert struggles to show a reasonable likelihood that any false information about Brown could have affected the judgment of the jury. Here, the State's case did not depend on proving whether Brown or another man shot both victims. The prosecutor told jurors: ". . . who the shooter was today is not a dispositive issue. Let me say that again. Who shot Ms. Jones and shot [Officer] Clark today is not a dispositive issue." (Docket Entry No. 89-6 at 16). After extensively discussing party liability and its application in this case, the State told jurors: "Under the law of parties, under the law of conspiracy, you don't have to resolve the issue of who the shooter was." (Docket Entry No. 89-6 at 26).

The state court was not unreasonable in finding that it was not reasonably likely that any false testimony about Brown could have affected the jury's verdict, particularly concerning Joubert's liability as a non-triggerman. *See Strickler v. Greene*, 527 U.S. 263, 292 (1999) (reviewing the effect suppressed material had on the State's "joint perpetrator" theory even if it did not show he was the "dominant

partner"). No matter which man fired the killing shots, the State argued that the evidence proved Joubert's guilt as a party or conspirator beyond a reasonable doubt. As the Court of Criminal Appeals mentioned when resolving Joubert's related *Brady* claim, "Glaspie and [Joubert] both named Brown as the third participant, but the true identity of the third participant does not ultimately matter in light of [Joubert's] own statement to police." *Joubert*, 2021 WL 2560170, at *2. Joubert himself confirmed his role as a party or conspirator when he "admitted that he actively participated in the offense and he knew Jones was 'gonna die' if the police came to the scene." *Id.*

The greatest value for Joubert in Brown's alibi evidence was its use as impeachment evidence. Witnesses called by both the State and the defense provided testimony that placed Brown in company of the other two men, but only Glaspie and Joubert provided information about the actual robbery/murder. Brown's alibi evidence certainly calls into question Glaspie's credibility on some points—but, as Respondent points out, his testimony was already "significantly" impeached at trial. (Docket Entry No. 83 at 65). Joubert predicates his discussion of materiality on a false assumption: that the State's entire case depended on using Glaspie to prove that Joubert was the man who shot Ms. Jones.[22] Any false

---

[22]   Joubert says: "The State's theory of the case, as presented to the jury and supported by the testimony of Glaspie (and others), was that Joubert shot and killed Ms. Jones while robbing the ACE check-cashing store, rendering Joubert a principal in the

testimony about Brown does not necessarily undercut all support for Glaspie's account, particularly that which matched Joubert's own police statement.

Joubert's own confession was powerful evidence establishing his role in the crime. *See Parker v. Randolph*, 442 U.S. 62, 72 (1979) (plurality opinion) (stating that a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." (quotation omitted and cleaned up). According to Respondent, even if "Brown's participation is entirely removed from the evidentiary mix at trial, Joubert was guilty from his words alone" because his own statement still

> proved Joubert's culpability of capital murder in at least three ways: (1) promoting and assisting in the killing of Jones (Joubert admitted he walked her into the store and knew she'd die if the police came), (2) engaging in a conspiracy to rob Jones, her murder occurring in the course of a robbery or attempted robbery (Joubert admitted he agreed to work with Glaspie to commit a robbery and Jones was shot and killed during the offense), and (3) engaging in a conspiracy to rob Jones, with her and Officer Clark being murdered in the same criminal transaction (Joubert admitted he agreed to work with Glaspie to commit a robbery and Jones and Officer Clark were shot in the same criminal transaction during the offense).

(Docket Entry No. 83 at 59). Joubert does not allege that the State presented false testimony by putting his own words before the jury.

Unlike Brown, Joubert confessed. Unlike any alibi evidence which freed Brown, independent evidence of Joubert's guilt meant that there is not a reasonable

capital murder. The State's theory was also that Brown shot and killed Officer Clark, and Glaspie, its cooperating witness, was a non-shooter." (Docket Entry No. 74 at 74).

likelihood that false testimony could have affected the judgment of the jury. The Court of Criminal Appeals acted reasonably in evaluating any false testimony.

Joubert contends that the prejudice from any false testimony bled over into the penalty phase. The jury had to answer a special-issue question which asked if Joubert personally killed either victim or, if he did not, whether he intended to kill them, or that he anticipated that a life would be taken. (Docket Entry No. 87-2 at 97). Joubert has not shown that any false testimony about Brown's role in the crime influenced the jury's consideration of that special issue. The State told jurors that Joubert's own statement answered the special issue beyond a reasonable doubt. The prosecutor told jurors:

> He obviously did anticipate a human life would be taken. . . . His own statement, his own statement, said that. "That if the laws come I knew she was dead." He said that. That is anticipation. . . . Anticipation is something that you know is coming. That's one thing that shows that he anticipated a human life would be taken.

(Docket Entry No. 89-14 at 220). From the record, the Court of Criminal Appeals was not unreasonable in finding no materiality in either phase of trial.

### D.    Conclusion of Claim One

The Court finds that the Court of Criminal Appeals was not unreasonable in rejecting Joubert's *Napue* claim. This does not excuse the State's use of any false testimony, which is unacceptable in the legal process. However, Joubert's false-testimony claim differs fundamentally from the circumstances which led to relief

on Brown's case suppression-of-evidence claim. Glaspie was a flawed witness at Joubert's trial, and more so in light of what is known now. Still, Brown's alibi evidence does not challenge Joubert's confession to the robbery/murder as party or conspirator. Joubert's own words guaranteed the jury's guilty verdict. Accordingly, the state habeas court's rejection of Joubert's first claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## III.   Suppression of Evidence (claim two)

Joubert claims that the State knowingly suppressed favorable evidence that was material to his defense. An inmate raising a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), must show that "(1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018). Claim two covers much of the same ground relating to Brown's alibi as Joubert's *Napue* claim. As with the previous claim, the Court of Criminal Appeals found that any suppressed evidence was not material in Joubert's case. Joubert must show that the state court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## A.     Background

The Court has already discussed how the discovery of suppressed information led to the vacatur of Brown's capital conviction. Joubert largely bases his *Brady* claim on the material proving Brown's alibi:

- Telephone records that corroborated Ericka Dockery's grand jury testimony providing an alibi for Alfred Brown;

- An email from Detective Breck McDaniel to Assistant District Attorney Dan Rizzo documenting that McDaniel and Rizzo knew that Dashan Glaspie's account of the robbery was false, and other witnesses' accounts of seeing Glaspie and Joubert with Alfred Brown were false, because Brown was at Dockery's apartment at the time of the robbery.

(Docket Entry No. 74 at 80). [23]

---

[23]     In addition to information about the phone calls, Joubert also alleges that the prosecution did not divulge that it had subjected witnesses to "intimidation and threats" during the grand jury process. (Docket Entry No. 74 at 85). Joubert says that the State suppressed "[t]ranscripts of grand jury testimony from Reginald Jones, Ericka Dockery, and Tonika Hutchins providing an alibi for Alfred Brown and demonstrating the bias of the prosecutor and grand jury foreman who attempted to coerce Ericka Dockery and Tonika Hutchins." *Id.* at 80. Respondent, however, provides important context to this argument:

> Regarding grand jury transcripts, defense counsel moved for access to them (though providing no particularized need). [T]he [grand jury] testimony was given to the [c]ourt to review for that purpose." When the motion was first brought up, however, the court had "not completed [its] review of the all the [g]rand [j]ury testimony." A few days later, it denied the motion with the exception of a portion of Lamarcus Colar's grand jury testimony but noted that it would change its ruling and order greater disclosure if something came up during trial requiring it.

> While Joubert submitted an email between his trial counsel that the State couldn't provide them with transcripts of the individuals who testified before the grand jury without a court order, he again didn't obtain affidavits

Joubert raised this claim in his successive state habeas application. The Court of Criminal Appeals' adjudication did not address the first two prongs of the *Brady* analysis because "[t]he State [did] not contest that it suppressed favorable evidence." *Joubert*, 2021 WL 2560170, at *2. The Court of Criminal Appeals instead denied this claim on *Brady*'s third prong, finding that "the suppressed evidence, considered collectively and balanced against the evidence supporting [Joubert's] conviction, is not material." *Id.* The Court of Criminal Appeals' decision only contained a brief discussion:

> The State presented evidence that three people participated in the instant offense. Glaspie and [Joubert] both named Brown as the third participant, but the true identity of the third participant does not ultimately matter in light of [Joubert's] own statement to police. [Joubert] admitted that he actively participated in the offense and he knew Jones was "gonna die" if the police came to the scene. Therefore, the suppressed evidence supporting Brown's alibi does not undermine our confidence in the outcome of [Joubert's] trial.

*Id.*

---

from those attorneys averring that they never got them at any point thereafter, or that the substance of the testimony wasn't provided from something like a police report. Joubert therefore failed to prove suppression in state court.

(Docket Entry No. 83 at 76-77) (citations omitted). Joubert does not respond to this argument. The Court summarily denies Joubert's claim insofar as it involves the grand jury testimony. The Court notes, however, that the materiality discussion above applies with full force to any grand jury testimony.

**B.     Analysis**

The Court of Criminal Appeals applied the correct legal standard to Joubert's *Brady* claim; relief is only available if it unreasonably applied Supreme Court precedent. When discussing the related false-testimony claim, the Court has already explored the effect that information about Brown's involvement had on Joubert's trial. "[D]ifferent standards of materiality apply" to *Brady* and *Napue* claims. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). The materiality standard for *Brady* claims asks whether there is a *reasonable probability* that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different. See Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Courts have described this materiality standard as "considerably" more "onerous" for a petitioner to meet than the *Napue* materiality standard. *Coulson v. Johnson*, 2001 WL 1013186, at *9 (5th Cir. Aug. 7, 2001); *see also Dennes v. Davis*, 797 F. App'x 835, 846 (5th Cir. 2020) (stating that, for petitioners, *Napue* has a "more lenient standard to establish prejudice").

Resolution of *Brady* materiality echoes the resolution of Joubert's *Napue* claim. As with his false-testimony claim, Joubert argues that the suppressed evidence "reached beyond being only impeachment evidence against Glaspie and puts the entire case in a different light." (Docket Entry No. 74 at 87). Joubert says that the suppressed evidence undercuts the "version of events" presented by the

prosecution, particularly "Glaspie's account of Joubert as the shooter of Alfredia Jones." *Id.* at 87. Joubert argues that the evidence "spread a cloud of doubt over the investigation—raising questions about how the police convinced witnesses to identify someone who wasn't there—and the prosecution's emphasis on Joubert as principal." *Id.* at 88.

Still, as previously discussed, the prosecution's case did not depend on proving that Joubert shot anyone. The jury could convict Joubert as a party or a conspirator. The identity of the third robber did not matter under those theories. Whether Glaspie and Joubert both lied about who assisted in the robbery was of little importance—Joubert's own words fully inculpated him as a party or conspirator. For that reason, the Court of Criminal Appeals was not unreasonable in deciding that "the true identity of the third participant does not ultimately matter" because Joubert's statement inculpated him as a non-triggerman. *Joubert*, 2021 WL 2560170, at *2.

Joubert faults the Court of Criminal Appeals for not "conduct[ing] a cumulative analysis and consider[ing] how the evidence would have been used by the defense . . . ." (Docket Entry No. 74 at 92). The Court of Criminal Appeals' decision was succinct and did not fully divulge the path it took in deciding Joubert's claim. But the deference afforded state court judgments does not require more. The Court of Criminal Appeals' written opinion focused on the most salient

point: how the suppressed evidence would impact Joubert's culpability. The written decision did not address each piece of suppressed evidence in detail, analyze every nuance, or discuss the broader implications of the claim. However, the Court of Criminal Appeals discussed what Joubert had emphasized: "the alibi presented by his codefendant, Alfred Brown at his own subsequent trial, and the effect the alibi posed to the credibility and veracity of testifying co-defendant, Dashan Glaspie." (Docket Entry No. 92-1 at 43). The Court cannot impose any stricter opinion-writing requirements on the state courts.

There is not a reasonable probability that the result of the proceeding would have been different if the suppressed evidence had been disclosed to the defense. For the same reasons that Joubert does not merit relief under the more-stringent *Napue* materiality prong, the Court of Criminal Appeals was not unreasonable in finding that the suppressed evidence was not material as understood by *Brady*. This claim is denied.

## IV.   Vouching for a Witness (claim three)

In his third ground for relief, Joubert contends that his conviction "is invalid under the Eighth and Fourteenth Amendments because the prosecutor impermissibly vouched for and bolstered the testimony of the State's star witness," Dashan Glaspie. (Docket Entry No. 74 at 93-101). Respondent argues that this claim is both procedurally barred and without merit.

## A.   Procedural Status of this Claim

Respondent argues that Joubert failed to exhaust this claim in state court, thus resulting in a federal procedural bar.   Joubert did not raise a separate "vounching" claim in state court as he does in his federal petition.   In briefing the *Napue* claim in his successive state habeas application, Joubert argued that "[t]he State . . . falsely vouch[ed] for Glaspie's credibility based on the zero-tolerance plea agreement which was premised upon Glaspie's complete truthfulness." (Docket Entry No. 92-1 at 54).   On that basis, Respondent argues that this claim is wholly unexhausted.

Read broadly, Joubert complained about the prosecutor's assurance of truthfulness, but did so without emphasizing it as a separate constitutional claim. Even assuming that Joubert's state briefing sufficiently raised the claim, however, he did not base his state court claim on "the Eighth and Fourteenth Amendments" as he does in his petition.   (Docket Entry No. 74 at 93).   "[I]n order for a claim to be exhausted, the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions."   *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006).   Joubert has not exhausted any vouching claim based on the Eighth Amendment.[24]

---

[24]   Joubert does not explain how prosecutorial misconduct in the form of vouching violates the Cruel and Unusual Punishment Clause.   The Court would deny the Eight Amendment claim had Joubert presented it properly.

Insofar as Joubert intends the reassert any Fifth Amendment claim, the Court will consider the issue to be exhausted by his state briefing. The exhaustion and adjudication of claim three, however, comes at a price for Joubert. Even though the Court of Criminal Appeals did not discuss his issue at length, the summary rejection of its merits is worthy of AEDPA deference. *See also Cullen v. Pinholster*, 563 U.S. 170, 187 (2011); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Joubert must show that the Court of Criminal Appeals' adjudication of his claim was contrary to, or an unreasonable application of, federal law. *See* 28 U. S. C. § 2254(d)(1).

### B.     Analysis

Joubert briefs his third claim as a special category of case when a prosecutor vouches for a witness's credibility. In doing so, Joubert primarily relies on precedent derived from federal criminal cases where "[p]rosecutorial statements of personal belief or disbelief in the testimony of a witness have been held to be reversible error . . . ." *Houston v. Estelle*, 569 F.2d 372, 378 n.8 (5th Cir. 1978). Federal habeas review differs from a court's supervisory role in federal criminal cases. "[T]he permissible scope of prosecutorial argument in state court prosecutions is not . . . necessarily equal to that permitted in federal court. For a state habeas petitioner to prevail on a claim that an improper jury argument marred his trial, the asserted error must be one of constitutional magnitude." *Id.*; *see also*

*Whittington v. Estelle*, 704 F.2d 1418, 1421 (5th Cir. 1983). Federal courts, however, treat similar habeas claims under a general prosecutorial-misconduct framework. *See United States v. Young*, 470 U.S. 1, 18 (1985) (finding that "concerns underlying . . . reactions against improper prosecutorial arguments to the jury are implicated" because of "[t]he prosecutor's vouching for the credibility of witnesses"); *see also United States v. Robinson*, 485 U. S. 25, 33 n. 5 (1988).

For a prosecutorial-misconduct claim, a constitutional violation occurs only where "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v Wainwright*, 477 US 168 (1986) (quoting *Donnelly v DeChristoforo*, 416 US 637 (1974)). Federal courts rarely grant relief on prosecutorial-misconduct claims because "a prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most 'egregious cases.'" *Menzies v Procunier*, 743 F2d 281, 288-89 (5th Cir 1984) (quoting *Houston v. Estelle*, 569 F.2d 372, 382 (5th Cir. 1978). A prosecutor's comments only render a trial unfair where the improper argument was "a crucial, critical, highly significant factor in the jury's determination of guilt." *Whittington v Estelle*, 704 F.2d 1418, 1422 (5th Cir 1983).

The jury's role in judging Glaspie's credibility flowed throughout the parties' arguments. The prosecutor began the case by qualifying that his comments were "not evidence" (Docket Entry No. 89-1 at 28). In the opening statements, the

prosecutor told jurors: "Do I know that he's going to testify truthfully[?]   No. That's going to be . . . your job to figure it out."  *Id.* at 48.   The prosecutor's comments reminded jurors of their role "in trying to determine whether or not [Glaspie] is testifying truthfully." *Id.* at 48.

Joubert complains most strenuously about the prosecutor's closing argument.  This is not a case in which the prosecutors said that the jurors should believe a witness just because prosecutors believed him.   After, trial counsel objected to the State's arguments,[25] the prosecutor continued that jurors themselves should find Glaspie credible.[26]  Yet instead of merely asking jurors to trust in the State's own credibility evaluations, the prosecutor told jurors to assess Glaspie's credibility by reflecting on his demeanor and by seeing how "each and every piece of evidence, physical evidence corroborates what Glaspie said."  (Docket Entry

---

[25]    When the prosecutor told jurors Glaspie "told the truth when he testified . . . [a]nd he had a good reason to," trial counsel objected: "the Prosecutor is putting his own personal credibility behind the credibility of a witness," but the objection was overruled. (Docket Entry No. 89-6 at 107).  Later, the prosecutor discussed Glaspie's credibility and assured jurors that he "was telling the truth. And the reason—." (Docket Entry No. 89-6 at 117).  The defense again interrupted by saying that the prosecutor was "putting his own credibility behind any witness's testimony as being credible . . . ." *Id.* at 117.

[26]    The prosecutor told jurors that the deal with Glaspie caused him "to give a truthful account" because if he "testifies falsely about one thing, that all deals are off" and he faces a capital murder prosecution."  (Docket Entry No. 89-6 at 119).  The prosecutor assured jurors that "the reason that Glaspie was telling the truth" was "because [his testimony] matches each and every small piece of evidence, is what it does. And, also, the demeanor of him testifying." *Id.* at 117.

No. 89-6 at 117).  The trial court instructed jurors that they "were the exclusive judges . . . of the credibility of witnesses . . . ."  (Docket Entry No. 87-2 at 79).

The record does not suggest that the prosecutor's statements crossed a line which tried to take any responsibility from the jurors.  Importantly, Joubert has not shown that any alleged "'misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.'"  *Geiger v. Cain*, 540 F.3d 303, 308 (5th Cir. 2008) (quoting *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988)); *see also Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) ("A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted").  Glaspie was an important witness for the State, but one whose credibility the defense challenged on several grounds.  Glaspie's testimony differed from Joubert's confession on points, particularly in that he blamed Joubert for shooting Jones.  (Docket Entry No. 89-4 at 71-72).  Even so, Joubert's statement proved his culpability in promoting and assisting in the killing of Jones, conspiring to rob Jones and then her murder occurred, and conspiring to rob Jones ending in her and Officer Clark's murder.  Glaspie's testimony verified Joubert's own words which proved him to be a party or conspirator to the offense.

The Court of Criminal Appeals gave little insight into its reasoning.  Still, taken in the context of the entire trial, the Court of Criminal Appeals was not

unreasonable in deciding that the prosecution did not engage in misconduct and that any error did not infect the trial with unfairness. Joubert has not shown that the state court decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court will deny claim three.[27]

## V.    Prosecutorial Misconduct (claim four)

In his fourth claim, Joubert argues that his "conviction and sentence are invalid under the Eighth and Fourteenth Amendments due to the State's repeated and egregious misconduct before, during and after the trial." (Docket Entry No. 77 at 102-21).    Joubert points to thirteen ways in which the prosecution—and primarily lead prosecutor Dan Rizzo—allegedly committed misconduct during the grand jury process in his and a different case, during the investigation and preparation for trial, during the trial itself, and during the state habeas process. Respondent argues that this claim is unexhausted, procedurally barred, and barred by AEDPA's strict limitations period.

### A.    Exhaustion and Procedural Bar

Joubert has never raised this claim in state court.[28]   AEDPA enforces a "total exhaustion requirement as prerequisite for a district court to grant a petition."

---

[27]     The Court would reach the same conclusion under *de novo* review.

[28]     Joubert bases some of this claim on a report issued by a special prosecutor in 2019 (the "Raley Report"). The report was part of the state court record during Joubert's last trip through state court, yet he made no effort to raise claims either during or after that

*Neville v. Dretke*, 423 F.3d 474, 482 (5th Cir. 2005); *See* 28 U.S.C. § 2254(b)(1)(A). While Joubert alleges that he has presented some elements of this claim to the state courts at various points in his state habeas litigation, he concedes that "Claim 4 is an unexhausted claim." (Docket Entry No. 102 at 165). Joubert, however, disputes Respondent's argument that the operation of state law bars federal consideration of this claim.

Joubert alleges that an avenue of state relief lies open to him under Tex. Code Crim. Pro. art. 11.071 § 5(a). Joubert also says that this Court "should stay the case, *see Rhines v. Weber*, 544 U.S. 269 (2005), so that [he] can present the claim to the state courts . . . ." (Docket Entry No. 102 at 166). Joubert's briefing on these points, however, is insufficient to show that an avenue of state relief remains open to him and that the federal proceedings should pause while he avails himself of them.

Texas law strictly precludes successive habeas proceedings except under certain circumstances. *See* Tex. Code of Crim. Pro. art. 11.071, § 5(a). Joubert does not discuss, under the specific requirements of article 11.071 § 5(a) and Texas case law, why the Texas courts would allow him to proceed on a successive habeas

---

proceeding. Joubert does not explain why he has made no attempt to litigate this claim in state court during the past five years.

application.[29]   Also, Joubert does not make any effort to meet the specific requirements for a stay of these proceedings under *Rhines v. Weber*.  "A district court abuses its discretion in denying a *Rhines* stay . . . if (1) there was good cause for failing to exhaust the claim in state court, (2) the claim is potentially meritorious, and (3) 'there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.'" *Tong v. Lumpkin*, 90 F.4th 857, 859 (5th Cir. 2024) (quoting *Rhines*, 544 U.S. at 278).  Joubert does not specifically brief the three *Rhines* requirements, but only makes conclusory statements about staying the case. *See Joseph v. Vannoy*, 2016 WL 8710200, at *2 (W.D. La. June 17, 2016) (finding "conclusory allegations" provide "insufficient support" to enable the court to make a preliminary determination under *Rhines*).

Joubert could have raised this claim in state court five years ago.  Joubert provides no sufficient excuse for not doing so.  And Joubert fails to address the specific factors that allow for a stay under federal law.   Joubert's failure to brief the *Rhines* requirements disqualifies him for a stay.  This claim is unexhausted and procedurally barred.

---

[29]   Instead, Joubert points to a place during his last successive habeas proceedings where the State said that some of the facts on which this claim relies were "arguably fodder for a subsequent writ of habeas corpus." (Docket Entry No. 102 at 166). This, however, is far from a prior representation from the State that the Court of Criminal Appeals should authorize successive review, much less that the State would not oppose it. The State's earlier rhetoric does not allow Joubert to sidestep the requirements of Texas' abuse-of-the-writ doctrine, nor does Joubert specifically demonstrate that he meets each element of the relevant statute.

## B.     AEDPA's Limitations Period

Respondent also argues that Joubert failed to advance this claim in a timely manner.   AEDPA "enacted a one-year period of limitation for federal habeas proceedings that runs, unless tolled, from the date on which the petitioner's conviction became final at the conclusion of direct review . . . ."  *Cantu-Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir. 1998).   Joubert's conviction became final when the Supreme Court denied his petition for certiorari from direct appeal on February 25, 2008.   AEDPA's limitation period usually begins running on that date.

A "pending" application for state post-conviction relief tolls the one-year limitations period.   28 U.S.C. § 2244(d)(2).   State post-conviction habeas proceedings in capital cases run concurrently to the direct appeal.  *See* Tex. Code Crim. Pro. art. 11.071, § 4(a).   Joubert filed a state habeas application during the pendency of direct appeal.   The Texas Court of Criminal Appeals eventually denied state habeas relief on September 25, 2013.   Joubert had one year from that date to file his claims in federal court.

Joubert's initial federal petition, filed on September 24, 2014, complied with AEDPA's limitations period.  (Docket Entry No. 19).   Joubert, however, did not include this claim in his initial federal petition.   Joubert raised this claim in his successive state habeas application on June 23, 2021.

Joubert argues that the "gravamen of Joubert's claim became apparent on May 3, 2019—when the State and the trial court concluded that Brown was actually innocent of the crimes." (Docket Entry No. 102 at 169). The time to file a habeas claim, however, does not start when its importance becomes clear to a petitioner. Instead, AEDPA creates four separate starting points for the limitations period, the latest of which starts the clock. *See* 28 U.S.C. § 2244(d)(1). The triggering date in this instance would be the date when Joubert could have discovered the factual predicate for his claims by exerting due diligence. *See* 28 U.S.C. § 2244(d)(1)(D). Even using the latest possible date—when a report issued in March 2019 which addressed Brown's innocence—Joubert had a year from that date to submit a federal petition containing this claim.

Joubert's successive habeas application was pending when the March 2019 report issued. The time "which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" tolls AEDPA's limitations period. 28 U.S.C. § 2244(d)(2). Joubert's properly filed subsequent habeas application was pending in the state courts until June 23, 2021. Joubert did not advance this claim until he filed his second amended petition on July 14, 2022. 386 days passed between the end of the state successive proceedings and the filing of this claim. Joubert did not comply with AEDPA's limitations period.

Joubert makes no effort to demonstrate equitable tolling.  Instead, Joubert asks this Court to invalidate Congress' action in AEDPA by erasing years of case law and returning the writ to the "original public meaning of the habeas privilege for state prisoners."  (Docket Entry No. 102 at 169).  Joubert also argues that his limitation problem would be "rendered moot if the state court were to grant relief on Joubert's claim." *Id.* at 169.  Both arguments lack any serious merit.

This claim is barred by AEDPA's limitation period.

### C.    Alternate Review of the Merits

The Court has reviewed this claim and would deny relief if the issues were properly before the Court.  After considering the pleadings, the record, and the law, the Court finds that Respondent's briefing correctly points out the various reasons for which federal relief would be unavailable.  (Docket Entry No. 83 at 102-10).  For those reasons, and after its own review, the Court would deny this claim if Joubert had presented it in a procedurally proper manner.

## VI.   Expert Testimony (claim five)

In his fifth ground for relief, Joubert raises two challenges to the testimony of A.P. Merillat, an expert witness who testified for the State in the penalty phase.  The defense had called a prison conditions specialist, Larry Fitzgerald, who explained that life-sentenced inmates can be housed safely.  In rebuttal, the State called Merillat, an investigator with the Special Prosecution Unit.   Merillat

disagreed with some of Fitzgerald's interpretations of TDCJ classification procedures and the opportunities a life-sentenced capital inmate would have for violence in prison.

Joubert raises two arguments based on Merillat's testimony about TDCJ classification guidelines. First, Joubert claims that he "was denied his right to a reliable sentence and due process under law when . . . Merillat . . . presented false and misleading testimony about the conditions of confinement in the Texas Department of Criminal Justice." (Docket Entry No. 74 at 121). Second, Merillat alleges ineffective assistance of counsel by not "tak[ing] . . . basic steps to prevent Merillat's false and highly prejudicial testimony," which include challenging his status as an expert, clarifying his testimony for jurors, and cross-examining him with the TDCJ Classification Plan. *Id.* at 116-17.

Respondent argues that two procedural defects prevent federal consideration of this claim. First, Respondent contends that Joubert did not comply with AEDPA's limitations period. Second, Respondent argues that Joubert defaulted federal consideration by raising this claim in his subsequent state habeas application which the state court dismissed as an abuse of the writ.

## A.     Limitations Period

Joubert did not include this claim in his timely initial federal habeas petition. By the time Joubert first raised this claim in his amended petition filed on May 18,

2015, the AEDPA limitations period had already expired. (Docket Entry No. 34 at 135). Joubert does not refute Respondent's argument that this claim is time barred. Joubert makes no argument that Respondent has calculated AEDPA's limitations period incorrectly, that claim five relates back to the original petition,[30] or that equitable tolling forgives the strict application of AEDPA's filing requirements. This claim is barred from federal consideration.

## B.    Procedural Bar

Aside from the time bar, Respondent argues that Joubert defaulted this claim by raising it in his successive habeas application. Joubert contends that *Martinez v. Ryan*, 566 U.S. 1 (2012) allows federal review of this claim. *Martinez*, however, is a "narrow" exception which is "highly circumscribed" and available only in "limited circumstances." *Davila v. Davis*, 582 U.S. 521, 531 (2017); s*ee also Speer v. Stephens*, 781 F.3d 784, 785 & n.4 (5th Cir. 2015) (noting the "limited nature" and "narrowness" of the *Martinez* exception). *Martinez* would only apply to the ineffective-assistance-of-trial-counsel portion of this claims. *See Davila*, 582 U.S. at 525; *see also Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017) (holding *Martinez* only applies to a claim of ineffective assistance by state trial counsel).

---

[30]    Under Rule 15(c)(1)(B), Federal Rules of Civil Procedure, an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." *See Mayle v. Felix*, 545 U.S. 644, 664 (2005).

*Martinez* allows for federal review of a defaulted ineffective-assistance claim after an inmate has shown: (1) "his claim . . . is *substantial—i.e.*, has some merit, " *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016) (emphasis added); (2) habeas counsel was ineffective under *Strickland* for not raising the underlying claim; and (3) actual prejudice resulted, which in this context means "a reasonable probability that he would have succeeded on state habeas review had the claims been raised," *Gates v. Davis*, 648 F. App'x 463, 470 (5th Cir. 2016).

Joubert argues that he has "satisfie[d] all of the *Martinez* factors," and accordingly, "the Court should find that he has shown cause." (Docket Entry No. 102 at 191). But he makes no effort to demonstrate actual prejudice. Joubert does not show a reasonable probability that, had state habeas counsel raised this claim, the state court would have granted relief. Joubert has failed to brief his *Martinez* argument adequately.[31] A procedural bar forecloses federal review of claim five.

### C.   Alternative Consideration of the Merits

Joubert raises numerous challenges to Merillat's testimony. In doing so, Joubert relies on primarily on an affidavit from a prison classification expert, Frank

---

[31]   Further, federal review of this claim falls under two layers of deference. A reviewing court defers to a state habeas attorney's strategic selection of issues to raise. Joubert has not suggested why counsel chose not to raise this claim, much less that his decision was contrary to prevailing professional norms. Additionally, this Court's review of the substance of the claim indicates that counsel was not ineffective for proceeding as they did at trial.

AuBuchon. With AuBuchon's opinion, Joubert identifies numerous areas in which he alleges that Merillat testified falsely.

AuBuchon does not agree with Merillat's interpretation of the prison-classification policies. "This is not the first, nor will it likely be the last, debate between Merillat and AuBuchon . . . addressing what the Fifth Circuit has accurately described as the TDCJ's 'labyrinthine' and 'voluminous and convoluted' prisoner classification system." *Brewer v. Director, TDCJ-CID*, 2021 WL 6845600, at *27 (N.D. Tex. Sept. 30, 2021) (quoting *Ruiz v. Davis*, 819 F. App'x 238, 244 (5th Cir. July 7, 2020)), *aff'd*, *Brewer v. Lumpkin*, 66 F.4th 558, 560 (5th Cir. 2023). Disagreement between experts generally is insufficient to show that one of them testified falsely. *See Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996); *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000).

In the end, "[t]he Texas prison classification system is complex." *Ruiz*, 819 F. App'x at 244. Joubert has not shown that the prosecutors understood the intricacies of TDCJ classification system and allowed an expert witness to testify falsely about them.[32] More importantly, Joubert has not shown that any falsity in Merillat's testimony was material. The State's case argued in rebuttal that Joubert

---

[32]    Joubert makes the unsupported allegation that "when false testimony is about a governmental policy, the prosecution is charged with knowing about the falsity as soon as it occurs." (Docket Entry No. 102 at 177). Joubert has not shown any legal support for his argument of presumptive knowledge when a witness testifies about a government policy.

was a security threat in prison, but its punishment-phase case-in-chief showed that his actions outside the prison walls made him a future societal threat.  The State abundantly showed Joubert's violent and lawless disposition.  Joubert committed numerous crimes and eschewed opportunities for reformation through probation and parole.  Joubert committed armed robberies and shot victims during them.  In addition to the other overwhelming evidence against him, the State presented evidence that Joubert had committed "another murder—the most powerful imaginable aggravating evidence."  *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (quotation omitted).   Joubert has not shown that his fifth claim merits habeas relief.

The Court denies this claim as time barred, procedurally barred, and without merit.

## VII.   Ineffective Assistance of Counsel (claims six, seven, and eight)

Joubert raises three challenges to his prior legal representation.  Joubert's claims attack his attorneys' efforts in the guilt/innocence phase (claim seven), during the punishment proceedings (claim six), and on appeal (claim eight). Joubert has only presented some of his ineffective-assistance arguments in a procedurally proper manner.  For the reasons discussed below, federal habeas review is not available on his claims.

## A.   *Strickland* **Standard**

A court reviews allegations of ineffective assistance under the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668 (1984): an attorney's representation violates a criminal defendant's Sixth Amendment rights when his "*performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In a "highly deferential" review, the deficient-performance prong "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms" yet still "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 688-89. A petitioner must also show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694; *see also Wiggins*, 539 U.S. at 534.

Federal courts defer to a state court's assessment of whether an attorney's representation complied with constitutional expectations. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). When the state courts have adjudicated an inmate's *Strickland* claim, AEDPA provides a "doubly deferential" judicial which affords "both the state court and the defense attorney the benefit of the doubt."

*Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190).  In

fact, "deference to the state court should [be] near its apex" in such cases.  *Sexton*

*v. Beaudreaux*, 585 U.S. 961, 968 (2018).  "The question is whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard.*"*

*Richter*, 562 U.S. at 105.

### B.    Guilt/Innocence Phase (claim seven)

Joubert claims that his trial attorneys were deficient for failing to call

witnesses who could discuss Glaspie's poor reputation for truthfulness in the

community.  In his state habeas application, Joubert complained that trial counsel

should have investigated and called witnesses to impeach Glaspie's character and

credibility.  In the state habeas court evidentiary hearing, Joubert called witnesses

who could have told jurors that "Glaspie had a reputation in the community for

being untruthful" and who could opine that Glaspie was "street-smart and

manipulative." (Docket Entry No. 91-1 at 262).

The state habeas court rejected this claim.  The state habeas court found that

"as soon as counsel received notice that co-defendant Glaspie was testifying for the

State in the primary case counsel began to investigate Glaspie and seek ways to

impeach or undermine his anticipated testimony and reduce Glaspie's credibility

before the jury." *Id.* at 259.  The state habeas court found that trial counsel

"conducted a thorough and effective cross-examination of Glaspie," identifying

several areas in which trial counsel impeached his testimony and "implied that Glaspie was one of the shooters." *Id.* at 259-60. The state habeas court found that trial counsel did not question several "witnesses about Glaspie's reputation for truthfulness because he just assumed that Glaspie's reputation was bad" and decided that "presenting witnesses who were related to Joubert to testify on the issue of Glaspie's poor reputation for truthfulness would have undercut those same witnesses' testimony at punishment" and also "lessened the impact of the defense's guilt/innocence witness Lamarcus Colar whose testimony implicated Glaspie as the shooter of Alfredia Jones." *Id.* at 260.

The state habeas court found that trial counsel's decision not to call those witnesses was "reasonable." *Id.* at 263. The state habeas court found that the defense "would not have benefitted from the testimony of [Joubert's] proffered witnesses" because of "their criminal records, the poor quality of their proffered testimony, their admissions to telling lies, and their obvious bias for" Joubert. *Id.* at 262-63. Further, the state habeas court found that Joubert "fail[ed] to demonstrate that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." *Id.* at 263. The state habeas court concluded: "Trial counsel conducted an effective and thorough cross-examination of Glaspie and presented witness [Lamarcus] Colar for purposes of implicating Glaspie as the shooter of complainant Alfredia Jones. The fact that other counsel

might have pursued a different strategy will not support a finding of ineffectiveness of counsel." *Id.* at 273.

The Court of Criminal Appeals adopted these findings and conclusions. *See Ex Parte Joubert*, 2013 WL 5425127, at *1 (Tex. Crim. App. 2013). Based on the lower court findings "and [its] own review" the Court of Criminal Appeals denied relief. *Id.* AEDPA's "doubly deferential" review of *Strickland* claims affords "both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, 578 U.S. 113, 117 (2016). Federal habeas relief is only available if Joubert can show that the state decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 420 (2014) (quotation omitted). Joubert falls short of meeting this demanding requirement.

The testimony in the state habeas hearing demonstrated that trial counsel was aware of Glaspie's poor character, even though the defense may not have questioned all witnesses about it. Trial counsel feared the repercussions of aggressively challenging Glaspie's character through witness testimony. Trial counsel instead relied on attacking Glaspie's character during cross-examination. The state habeas court endorsed trial counsel's strategic decision making. Joubert has shown that other attorneys may have approached Glaspie's testimony

differently and could have reach different conclusions about which witnesses would benefit the defense. *Strickland* itself prohibits second-guessing his attorneys' strategy. AEDPA only amplifies the deference to the decisions made by the attorneys who were on the ground.

Further, Joubert has not shown that the state courts were unreasonable in finding no reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Joubert's own confession, despite any error or weakness in Glaspie's testimony, provided a solid—almost overwhelming—basis for the jury to find Joubert guilty as a party or conspirator. Challenging Glaspie's character would not have changed the fact that Joubert's own words inculpated him. Even if trial counsel had acted as Joubert now wishes, the state habeas court was not unreasonable in finding that it did not prejudice the defense. Joubert has not shown that the state court's decision on this claim was unreasonable.

### C.   Penalty Phase (claim six)

Joubert raises two complaints about his trial counsel's representation in the penalty phase. First, Joubert faults trial counsel's defense against the State's case for future dangerousness, primarily through expert witness Dr. Mark Cunningham. Second, Joubert faults trial counsel for not objecting to the admission of his TDCJ disciplinary records. The Court finds that the first argument is both procedurally

barred and without merit.  Joubert has not met the AEDPA standard with regard to his second argument.

### 1.    *Testimony about Future Dangerousness*

Joubert bases his first argument on the testimony of Dr. Cunningham, his penalty-phase expert on future dangerousness.  Dr. Cunningham, "a forensic psychologist, nationally recognized for his research concerning factors that predict violence in prison and his research in capital sentencing," has testified in around 200 capital trials.  *Coble v. Davis*, 728 F. App'x 297, 300 (5th Cir. 2018).  "Dr. Cunningham often testifies based on a Power Point presentation which explains the factors he uses to assess a capital defendant's threat in prison."  *Thuesen v. Lumpkin*, 2024 WL 1468366, at *38 (S.D. Tex. 2024).  Here, the prosecution objected to several of the slides in Dr. Cunningham's Power Point.  The trial court sustained the State's hearsay objection to the slides.  Joubert claims that the defense should have presented the excluded information through other admissible sources.  Joubert claims that the excluded evidence would have undercut the State's case for future dangerousness.

In particular, Joubert claims that trial counsel should have presented the excluded information through testimony from his mother, his grandmother, and his older sister.  Trial counsel was present when Dr. Cunningham interviewed those three family members so he knew what information they could provide.  Joubert

also says that trial counsel should have presented testimony through Dr. Diane Bailey, a psychologist who examined Joubert when he was 15 years old, and Dr. Lindsay Rosin, a psychologist who performed testing on Joubert before trial. (Docket Entry No. 74 at 148-57).

Joubert raised this claim in his successive state habeas application. The Court of Criminal Appeals dismissed this claim for abusing the habeas writ. The dismissal of the claim bars federal review unless Joubert can make an adequate procedural showing. Joubert argues that state habeas counsel provided deficient representation by not raising this claim, thus allowing federal review under *Martinez v. Ryan.* As discussed previously, an inmate cannot succeed on his *Martinez* argument without showing actual prejudice, which means a reasonable probability exists that he would have been granted state habeas relief had his habeas counsel's performance not been deficient. *See Soliz v. Davis*, 750 F. App'x 282, 290 (5th Cir. 2018); *Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018). Joubert has not shown that the state habeas court would have granted relief had he properly presented this claim.

At any rate, Joubert has not adequately supported this claim. Joubert faults trial counsel for not calling Dr. Rosin and Dr. Bailey as witnesses but he has not presented any affidavit testimony from them. A viable *Strickland* claim based on uncalled witnesses requires an inmate to "demonstrate that the witness was

available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see also Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010). Joubert's claim is inherently speculative because he has not verified that the uncalled witnesses would have said.

Here, the jury heard significant testimony which followed the general themes from Joubert's *Strickland* claim. The jury knew that Joubert had low intellectual functioning, his mother abused substances while pregnant, he experienced cognitive difficulties as a child, his background may have contributed to his substance abuse, his mother was not a positive force in his life, he did not receive educational support at home, he did not have a male figure in his life, and that he grew up in a violent, drug-ridden, scary neighborhood. Even though he has not verified all his allegations, Joubert says that trial counsel should have presented more information along those themes.

Against that testimony, the jury considered Joubert life-long tendency toward violence and lawlessness. The Supreme Court has recently reminded that the *Strickland* prejudice inquiry requires an assessment of "the totality of the evidence before the judge or jury—both mitigating and aggravating." *Thornell v. Jones*, ___ U.S. ___, 144 S. Ct. 1302, 1310 (2024) (quotation omitted). The

Supreme Court emphasized "where the aggravating factors greatly outweigh the mitigating evidence, there may be no reasonable probability of a different result." *Id.* (quotation omitted). Joubert had a long history of lawless acts, beginning with charges for aggravated assault with a deadly weapon and unlawfully carrying a weapon at age fourteen. Joubert violently assaulted young women. While on probation, Joubert committed the armed robbery of a grocery store during which he shot an employee in the stomach. He possessed drugs. He absconded from a youth placement facility. He shot a man who encouraged him to stop selling drugs, a crime for which he was convicted of aggravated assault and was sentenced to four years' imprisonment.

Joubert was violent in prison, committing many vicious acts and threatening others. He threatened to rape and assault correctional offers. Joubert would not obey prison rules. Incarceration, however, did not end Joubert's lawlessness. After his release, Joubert stole vehicles, fled from the police, kept weapons, and used drugs. He participated in the armed robbery of a convenience store. He committed a revenge killing in which he repeatedly shot a man, leaving a fist-sized hole in the victim's head.

Joubert has alleged that different attorneys could have performed differently, but has not shown a reasonably probability of a different result. Joubert has not shown that, had his state habeas attorney raised the claim in his federal petition

(and then supported it with adequate evidence, unlike in his federal petition), there is a reasonable probability that the state habeas court would have granted relief on this claim.   Joubert, therefore, fails to meet the *Martinez* standard to allow consideration of his defaulted claim.

Alternatively, the same review indicates that, if the merits of the barred claim were fully available for federal review, it would be denied.

### 2.   *Failure to Object*

Joubert's second argument contends that trial counsel provided deficient representation by not objecting to the admission of *unredacted* prison disciplinary records in the penalty phase.   On state habeas review, Joubert argued that trial counsel should have objected to State's Exhibit 228, a "pen packet" which included Joubert's disciplinary records from his time in custody.   (Docket Entry No. 89-8 at 35, 217).   The State initially agreed to redact "disciplinary records" and introduce the pen pack as State's Exhibit 228-A.   *Id.* at 36.   The record is not clear on that point, but Joubert assumes that "[t]he parties appeared to agree that they would determine what should and should not be included [in the redaction] and modify the exhibit accordingly."   (Docket Entry No. 74 at 158).

The defense called Betina Wright, a social worker, to provide mitigating testimony about Joubert's background.   During the cross- and recross-examination of Wright, she explained that she had prepared by reviewing the unredacted

version of State's Exhibit 228. (Docket Entry No. 89-10 at 199-200, 218). After White's testimony, the State moved to introduce the unredacted copy of State's Exhibit 228 "in its total" because she had relied on it in her testimony. *Id.* at 217. The defense had no objection to its introduction. *Id.* at 217-18. The trial court wanted to "make something clear" and said that it "believed that those records were not relevant" when it had allowed the redaction of the pen packet but the trial court "believe[d] they did become relevant with the testimony of [Wright] so [it] admitted the entire document, the pen packet." *Id.* at 224-25.[33] The record only contains a full, unredacted copy of the records. (Docket Entry No. 89-17 at 125-43).[34]

On state habeas review, Joubert claimed that trial counsel should have objected that the disciplinary records contained testimonial statements, and thus were inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004). The state habeas court denied this claim on two grounds. First, the state habeas court found trial counsel decided "as a matter of trial strategy" not to object to the unredacted records because counsel wanted "to demonstrate that defense expert Wright

---

[33]     Dr. Mark Cunningham and Larry Fitzgerald confirmed that they had also reviewed Joubert's disciplinary records. (Docket Entry No. 89-13 at 12-14; Docket Entry No. 89-14 at 79-80).

[34]     It is not clear from the record what material was redacted by the parties in proposed State's Exhibit 228-A. The trial court announced that the redacted copy of State's Exhibit 228 would not be in the official record. (Docket Entry No. 89-10 at 225).

.

reviewed all available information regarding" Joubert. (Docket Entry No. 91-1 at 265). The habeas court agreed that "[s]uch testimony was effective in demonstrating that the defense expert had reviewed all available information in forming her opinions regarding [Joubert]." (Docket Entry No. 91-1 at 274). Second, the state habeas counsel found that the admission of the unredacted records did not prejudice the defense, particularly considering:

> the other evidence elicited at trial concerning the facts of the primary offense. [Joubert's] juvenile offenses, [his] aggravated assault of Albert Butler, [his] murder of Todd Prophet, and [his] adult extraneous offenses including the December 2002 assault possession of a controlled substance, and unauthorized use of Ricky Pendergrass's truck; the December 2002 arrest for felon in possession of a weapon; the March 2003 possession of a controlled substance and marijuana; and the March 2003 aggravated robbery of a convenience store.

*Id.* at 265.

Joubert renews this claim on federal review. Joubert alleges that the failure to object prejudiced the defense because it "permitted the State to admit extraordinarily impactful proof of Joubert's alleged future dangerousness: (1) Joubert's alleged physical assaults against guards and inmates . . . and (2) his alleged threats of physical and sexual assaults against guards . . . ." (Docket Entry No. 74 at 164). Joubert must show that, had trial counsel objected to the introduction of the unredacted records, the trial court would not have allowed the information contained in the redacted portion of State's Exhibit 228 to come before

jurors. *See Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017) (finding that "to demonstrate deficient performance" an inmate "must at a minimum show that the evidence would have been suppressed if objected to") (quotation omitted); *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008) ("[B]ecause the objection was of questionable merit, Ries has not shown a reasonable probability that the objection would have been sustained."). Joubert provided the unredacted records to his experts who used them to formulate their opinions. Joubert makes no argument that trial counsel should have withheld that information from his experts. Joubert opened the door to a discussion of his violent and aggressive behavior in jail by adducing testimony that he would not pose a threat when incarcerated.

Joubert has not shown that the trial court should have excluded the full records. The law in Texas at the time of trial allowed the admission of prison disciplinary records in the penalty phase of a capital trial. *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (deciding for the first time after Joubert's trial that similar records are testimonial in nature and barred by the Confrontation Clause). According to the trial court, Joubert's experts made the contents of the reports relevant to the penalty phase. Joubert has not shown that the trial court would have granted any objection to the prison disciplinary records under the law in place at the time of trial.

Joubert has also not shown that the state habeas court was unreasonable in finding that he had not shown *Strickland* prejudice. Even if counsel could have kept the full records for jurors, they knew that incarceration did not reform Joubert's character. And the question jurors faced did not just look at whether Joubert could behave while in custody. Texas' future-dangerous inquiry required jurors to decide whether he was a threat to society both in and out of the prison setting. *See Soliz v. State*, 432 S.W.3d 895, 901 (Tex. Crim. App. 2014) ("'Society' in this context includes both the free world and prison society."). As previously discussed, the State presented extensive evidence of Joubert's numerous violent acts and crimes. Considering all the evidence, both aggravating and mitigating, in the penalty phase, the state habeas court was not unreasonable in finding that trial counsel's failure to object did not prejudice the defense.

Joubert has not shown that the state habeas court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court will deny this claim.

### D.    Appeal (claim eight)

In claim eight, Joubert asserts that his appellate counsel was ineffective for not raising an Eighth Amendment claim concerning the exclusion of certain portions of Dr. Cunningham's intended presentation. Joubert raised this claim in his subsequent application. The Court of Criminal Appeals found that the claim

abused the habeas writ, a procedural decision which bars federal review unless Joubert makes a sufficient showing. Joubert's petition does not raise any argument to overcome the procedural bar. In his reply, Joubert does not respond to the procedural bar of his claim, but rather says that he "stands on [that] claim[] as he has pled [it]." (Docket Entry No. 102 at 205). Because Joubert defaulted the claim in state court and makes no effort to show that federal review is available to him, the Court will deny claim eight.

## VIII. Limitations on Presenting Mitigating Evidence (claim nine)

In his ninth ground for relief, Joubert contends that the trial court unconstitutionally prevented him from presenting mitigating evidence. During the penalty phase, the State elicited testimony from Joubert's co-defendant Glaspie about a plea offer he received in exchange for his truthful testimony. The State offered to let Glaspie plead to aggravated robbery for a sentence of thirty years. Joubert wanted to argue tell jurors that Glaspie's lighter sentence could be considered as a mitigating factor. The trial court granted the State's objection because "the state of the law in Texas at this point is that it is not a mitigating circumstance." (Docket Entry No. 89-14 at 132).

On direct appeal, Joubert complained about the alleged limitation on presenting mitigating evidence. The Court of Criminal Appeals held: "A co-defendant's conviction and punishment have no bearing on a defendant's own

personal moral culpability." *Joubert*, 235 S.W.3d at 734. The Court of Criminal Appeals cited its precedent in which it had held: "We do not see how the conviction and punishment of a co-defendant could mitigate [a defendant's] culpability in the crime. Each defendant should be judged by his own conduct and participation and by his own circumstances." *Morris v. State*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996).

Joubert raises this claim again on federal review. In the Answer, Respondent observes two defects with this claim. First, "no evidence was excluded from Joubert's trial. Rather, the trial court did not allow defense counsel to *argue* that the jury could consider Glaspie's potential sentence as mitigating evidence." (Docket Entry No. 83 at 197) (emphasis in original). Second, Respondent observes that the Fifth Circuit has repeatedly held that "[a] co-defendant's lesser sentence does not constitute a mitigating factor as defined by the Supreme Court." *Miniel v. Cockrell*, 339 F.3d 331, 337 n.1 (5th Cir. 2003); *see Morris v. Cockrell*, 35 F. App'x 390, at *5 (5th Cir. 2002); *Cordova v. Johnson*, 157 F.3d 380, 383–84 (5th Cir. 1998); *Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir. 1986). Joubert's Reply does not address Respondent's arguments but "stands on those claims as he has pled them." (Docket Entry No. 102 at 181). The Court finds Respondent's arguments persuasive. Joubert has not shown under the prevailing law that the Court of Criminal Appeal's rejection of this claim was

contrary to, or an unreasonable application of, federal law   *See* 28 U.S.C. § 2254(d)(1).  This claim is denied.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, an inmate cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Joubert has not yet requested that this court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit anticipates that a federal habeas court will resolve any questions about a certificate in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a certificate on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing

required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. A district court that has denied habeas relief on procedural grounds should issue a certificate of appealability only "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.* If an inmate does not meet this standard, "no appeal would be warranted." *Id.*

The Court has given Joubert's issues a careful review. The results of that review, particularly including the context of the AEDPA standards and controlling precedent, determine that a COA should not issue on any of Joubert's claims.

## CONCLUSION

The Court has considered Joubert's petition and his arguments in light of the briefing, the record, and the law.  The Court summarily denies any of Joubert's arguments not specifically addressed above.  The Court **DENIES** Joubert's federal petition for a writ of habeas corpus.  The Court will not certify any issue for appellate consideration.

Signed at Houston, Texas, on this the 24 day of September, 2024.

_____
DAVID HITTNER
United States District Judge